UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

---

In re:

ROCHESTER DRUG CO-OPERATIVE, INC.,[1]

                    Debtor.

Case No. 20-<u>20230</u>
Chapter 11 Case

---

## DECLARATION OF JOHN T. KINNEY IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, John T. Kinney, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am the Interim Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") of Rochester Drug Co-Operative, Inc., the debtor and debtor in possession in the captioned chapter 11 case (the "**Debtor**" or the "**Company**"). I was first employed by the Company as the CFO on September 12, 2016 and assumed the duties of interim CEO in February 2019. In my capacity as CFO and CEO, I am familiar with all aspects of the Debtor's business and operations.

2.      To enable the Debtor to minimize the adverse effects of the commencement of this chapter 11 case on its business, the Debtor has requested various types of relief in its "first day" pleadings and applications (each a "**First Day Pleading**"). The First Day Pleadings seek relief intended to allow the Debtor to effectively transition into chapter 11 and minimize disruption of the Debtor's business operations, thereby preserving and maximizing the value of the Debtor's estate.

3.      I submit this Declaration in support of the chapter 11 petition and First Day Pleadings filed by the Debtor on March 12, 2020[2]. I am familiar with the contents of each First

---

[1] The last four digits of the Debtor's federal tax identification number are 9574.

3474274.6

Day Pleading (including the exhibits and schedules thereto) and I believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving successful sales of the Debtor's assets; and (c) best serves the Debtor's estate and the creditors' interests.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion, my experience and knowledge of the Debtor's operations and financial conditions, or are based upon knowledge of employees of the Debtor reporting to me that are derived in the course of their duties. If I were called upon to testify, I could and would testify to the facts set forth herein. I am authorized on behalf of the Debtor to submit this Declaration.

5.      Part I of this Declaration describes the Debtor's business and the circumstances surrounding the filing of its chapter 11 petition. Part II of this Declaration sets forth the relevant facts in support of the various First Day Pleadings filed by the Debtor contemporaneously herewith.

## PART I - BACKGROUND

6.      On March 12, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, U.S.C. §§ 101, *et seq.*, as amended (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Western District of New York (the "**Court**") which commenced the captioned case (the "**Chapter 11 Case**").

---

2 All capitalized terms used but not defined herein shall have the same meanings ascribed to them in the relevant First Day Pleadings.

3474274.6

7.     The Debtor's corporate headquarters and principal assets are located in Rochester, New York and venue of this Chapter 11 Case in the Western District of New York is appropriate under 28 U.S.C. § 1408(1).

8.     The Debtor remains in possession of its assets and continues to manage and operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this case and, as of the date hereof, no official committees have been appointed or designated.

### A. Operations

#### 1. General Operations and Liquidity Issues

9.     The Debtor is an independently owned New York cooperative corporation formed in 1905 and incorporated in 1948 with a principal office and place of business located at 50 Jet View Drive, Rochester, New York 14624. The Debtor's principal business is to warehouse, merchandise, and then distribute, on a cooperative basis, drugs, pharmaceutical supplies, medical equipment and other merchandise commonly sold in drug stores, pharmacies, health and beauty stores, and durable medical equipment businesses. It is a wholesale regional drug cooperative that operates as both a buying cooperative and a traditional drug distribution company created for the purpose of helping independent pharmacies compete in the current healthcare environment. The Debtor recently ranked as the sixth largest pharmaceutical distributor in the United States and is owned and directed by approximately 307 stockholding independent pharmacists and pharmacies.

10.     As a cooperative, the Debtor's pharmacy customers can purchase shares in the co-op which, in turn, distributes its profits in the form of a dividend. The dividend is calculated based on sales volume and functionally works as a "rebate" to the shareholders. Because of poor

3474274.6

financial performance, no dividend was paid to shareholders for fiscal years 2018 and 2019 and the Debtor does not anticipate making further dividend payments.

11.     The Debtor distributes branded and generic drugs, health and beauty products, and home health care products to a ten-state northeast regional market composed of New York, Pennsylvania, New Jersey, Ohio, Connecticut, Massachusetts, Vermont, New Hampshire, Rhode Island and Maine. Approximately 70% of the Debtor's total revenues come from New York State, with approximately 38% of that revenue coming from Downstate New York's metropolitan market. The Debtor owns two distribution facilities, one located at 50 Jet View Drive, Rochester, New York (the "Rochester Facility") and the other located at 116 Lehigh Drive #3013, Fairfield, New Jersey (the "Fairfield Facility"), from which it serviced approximately 1,400 active customers, including community retail pharmacies, long-term care pharmacies, and home health care stores. The Debtor is in the process of consolidating its operations at the Rochester Facility. The Debtor currently employs approximately 75 employees at the Rochester Facility and approximately 75 employees at the Fairfield Facility. All the Debtor's employees are non-union employees.

12.     The 61,000 square foot Rochester Facility was the Debtor's original and sole distribution center prior to 2014. In July 2014, as a result of the increase in sales in the New York City metro market and the expansion of its service territory to the east, the Debtor purchased the 106,000 square foot Fairfield Facility to serve as a second distribution facility. The Fairfield Facility is highly automated and includes radio-frequency identification (RFID) technology, which requires fewer employees per volume of shipments.

13.     The Debtor has been the subject of numerous pending prepetition civil and criminal actions brought by various government authorities and private parties in state, local and

4

3474274.6

federal courts around the country seeking damages against the Debtor as a former distributor of opioid-related medications. These actions are discussed in more detail in Section I(B) below. The Debtor has responded to these types of action since 2015, when it first addressed the DEA Civil Action. Certain actions brought by government authorities have resulted in the Debtor paying significant fines and implementing robust and costly compliance programs. Several other actions remain pending and are being actively defended by the Debtor.

14.     The Debtor's capital structure includes a senior secured credit facility provided by Manufacturers & Traders Trust Company ("**M&T Bank**") that consists of a revolving credit facility governed by a borrowing base formula typical of such agreements in the original principal amount of $170,000,000 and a $5,000,000 term loan. The credit facility is secured by liens on substantially all of the Debtor's assets.

15.     The Debtor's annual revenue grew from approximately $700 million during the 2013 fiscal year to over $2 billion during the 2016 fiscal year through the addition of several specialty pharmacy customers that purchased large quantities of branded products, including controlled substances. Sales thereafter declined rapidly in fiscal year 2018 as certain significant customers ceased operating or were acquired. The Debtor's annual revenue for the 2019 fiscal year was $1.49 billion, and its annual revenue is projected to decline to approximately $790,000,000 for the current fiscal year ending on March 31, 2020.

16.     A significant portion of the Debtor's revenue is derived from the sale of branded pharmaceuticals; however, most of its profits are derived from the sale of generic pharmaceuticals. Generic sales represent approximately 9% of total sales, but typically carry a gross margin of over 30%. Branded sales carry a slightly negative gross margin but often

3474274.6

include significant rebates and discounts from suppliers which, when netted out against the cost of the branded pharmaceuticals, results in a nearly break-even gross margin.

17.     The Debtor purchases pharmaceuticals from vendors at an invoice price (known as a wholesale acquisition cost or "**WAC**") and the Debtor is subsequently provided a variety of post-sale payments including rebates, inventory management payments, purchase discounts and other payments from vendors. The Debtor typically sells its products to customers at WAC less an agreed upon discount and then collects post-sale rebates, resulting in an aggregate gross margin of approximately 3%. As such, the rebates and other post-sale payments contribute a large share of the Debtor's gross profit. One of the most significant post-sale payments the Debtor receives form vendors is a 2% discount on invoice payments; however, the discount is available only if the Debtor makes timely payments to the vendor under the terms of the vendor agreements. During the past several months, the Debtor's deteriorating liquidity situation has prevented it from making timely payments to vendors and it has had to forgo rebates and other discounts which have typically generated at least two-thirds of the Debtor's gross profit.

18.     Further impacting the Debtor's liquidity was the decision by the Debtor's insurer, Hiscox Insurance Company, Inc. ("**Hiscox**"), to disclaim coverage under the Debtor's liability policy such that the Debtor has been required to self-fund its attorneys' fees and defense costs in the Pending Actions (defined below). To date, the Debtor has incurred attorneys' fees and costs aggregating over $1,620,000 in defense of these actions. The Debtor has filed a lawsuit against Hiscox regarding the coverage as discussed in more detail in Section I(B) below.

19.     In addition to the foregoing, the Debtor's maximum revolving commitment under its Credit Agreement with the Secured Parties (defined below) was reduced on May 31, 2019 and September 9, 2019 as the Debtor's declining financial performance triggered numerous defaults

3474274.6

under the Credit Agreement. The liquidity available to the Debtor on a weekly basis under the Credit Agreement was determined by a borrowing base calculation based upon certain percentages of eligible accounts receivable and inventory. The amount of availability expanded or contracted depending upon the receivables and inventory reported in the Debtor's weekly borrowing base certificate.

20.     Since December 16, 2019, the Debtor has been unable to purchase sufficient levels of inventory using its existing liquidity, further exacerbating the declining sales and a loss of customers. The reduced sales have resulted in a lower amount of accounts receivable, which further reduced the eligible borrowing base. The declining availability caused by the reduced borrowing base further impacted the Debtor's ability to operate its business.

### 2. Prepetition Restructuring Efforts

21.     As a result of the decline in financial performance, the Debtor has taken steps since early 2019 to reduce its expenses and explore options for restructuring its finances. On or about April 18, 2019, the Debtor engaged Huron Consulting Services LLC ("**Huron**") to assess the Debtor's business plan, underlying financial projections, liquidity management and outlook. During July 2019, Huron delivered a comprehensive written Business Assessment of the Debtor's operations and has worked with the Debtor since then to assist the Debtor with its restructuring process.

22.     In addition, the Debtor has explored the sale of some or all of its assets since late 2019. On or around October 31, 2019, the Debtor engaged the services of Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**") to act as the Debtor's investment banker to market the assets for sale. Houlihan Lokey did not identify qualified prospective purchasers. On November 27, 2019, the Debtor suspended Houlihan Lokey's marketing efforts based on, among other things,

3474274.6

the lack of response from qualified prospective purchasers. Since then, the Debtor has continued to receive indications of interest regarding some or all of its assets and has engaged in discussion with, and provided information to, those parties.

23. In order to stabilize its business and improve its cash flow, over the past several months, the Debtor engaged in various measures to reduce expenses, improved its generic go-to-market pricing strategy, evaluated profitability of certain customer accounts, and renegotiated customer contracts. In addition, on January 13, 2020, the Debtor suspended its purchase of Schedule II-V controlled substances and narcotics. By this action, the Debtor reduced its cash requirement for inventory purchases and eliminated the positions of several employees in its purchasing and compliance departments. The Debtor, however, will continue to sell its remaining inventory of controlled substances and narcotics to customers until the effective date of its surrenders of its Controlled Substances Act registrations ("**CSA Registrations**"),[3] March 31, 2020. After March 31, 2020, the Debtor will no longer be authorized or permitted to sell controlled substances or narcotics and will dispose of them in a manner consistent with DEA regulations.

24. As part of its plan to exit the controlled substances and narcotics market, on or around January 10, 2020, the Debtor sold a block of controlled substance inventory to Value Drug Company for approximately $2.3 million. The Debtor has also engaged the services of a real estate broker to market the Fairfield Facility and is in the process of engaging a broker to market the Rochester Facility.

25. Finally, on February 13, 2020, the Debtor issued notices to its employees under the respective New York and New Jersey Worker Adjustment and Retraining Notification Acts

---

[3] The CSA Registrations permit the Debtor to lawfully purchase, possess, sell, and distribute controlled substances.

3474274.6

(WARN Acts) advising them of the possible closures of the Rochester Facility and Fairfield Facility.

## B. Pre-Petition Litigation

26.     Like many other drug manufacturers and distributors, during the past five years, the Debtor has been named as a defendant in numerous state and federal litigation matters involving the sale of controlled substances, including opioid products.  These actions include those summarized below.

27.     **2015 SDNY Civil Enforcement Action.**  In July 2015, the United States of America, through the Office of the United States Attorney for the Southern District of New York (the "**U.S. Attorney**") filed and simultaneously settled an affirmative civil enforcement action against the Debtor, based upon the Debtor's failure to electronically report certain drug sale activity to the Drug Enforcement Administration ("**DEA**") through the DEA's Automation of Reports and Consolidated Orders System ("**ARCOS**").  Through a consent decree entered on July 8, 2016, the Debtor settled the action by paying a civil penalty of $360,000.

28.     **2019 SDNY Criminal and Civil Enforcement Actions.**  In advance of April 2019, the U.S. Attorney notified the Debtor that the United States was prepared to pursue criminal charges against the Debtor, the first opioid distributor against whom such charges would be filed, along with another civil enforcement action under the Controlled Substances Act.

29.     On April 22, 2019, the Debtor and the U.S. Attorney entered into a Deferred Prosecution Agreement ("**DPA**") pursuant to which, among other terms, the Debtor: (i) consented to the filing of a three-count criminal Information against it, to which the Debtor would and did plead not guilty[4]; (ii) stipulated to a Statement of Facts containing admissions

---

[4] *United States v. Rochester Drug Co-Operative, Inc.*, Case No. 19-CR-290 filed on April 23, 2019 in the United States District Court for the Southern District of New York.

3474274.6

regarding its past conduct; (iii) agreed to forfeit the sum of $20,000,000 to the United States (the "**Stipulated Forfeiture Amount**"); (iv) agreed to enhance and adhere to its Controlled Substances Act compliance program, including by adopting a stipulated Controlled Substances Compliance Addendum, hiring an independent monitor, amending the Debtor's by-laws to create two independent director positions, and creating a board-level Controlled Substances Compliance Committee; and (v) agreed to cooperate with the U.S. Attorney regarding any matter related to conduct described in the criminal Information or any investigation or prosecution of the Debtor's current or former officers, agents, affiliates, employees or customers[5]. The DPA also includes a term, waivable at the sole discretion of the U.S. Attorney, that the Debtor must include in any sale or transfer of all or substantially all of its business operations a provision binding any purchaser or transferee to all the obligations described in the DPA (the "**Successor Liability Clause**"). In exchange for the foregoing, the U.S. Attorney agreed to defer prosecution of the criminal Information for a five-year period and, thereafter, to seek dismissal of the prosecution with prejudice.

30.    Separately from the criminal Information, the United States commenced a civil enforcement action against the Debtor based on allegations similar to those raised in the criminal Information (the "**U.S. Civil Action**")[6]. The U.S. Civil Action was settled in accordance with a Stipulation and Order of Settlement and Dismissal signed by the Debtor and the U.S. Attorney on April 23, 2019 and approved by the Hon. Lewis A. Kaplan (S.D.N.Y.) on April 25, 2019 (the

---

[5] In addition, the Debtor's former chief compliance officer pled guilty to two felony counts and the Debtor's former chief executive officer, Laurence F. Doud, III, was personally charged by the U.S. Attorney with two criminal counts in connection with the Debtor's distribution of opioid products. On March 13, 2018, the Debtor exercised its right to terminate Mr. Doud's employment agreement, effective April 12, 2018. On April 6, 2018, Mr. Doud sued the Debtor in the U.S. District Court for the Western District of New York for wrongful termination and defamation. *See*, para. 37, below.
[6] *United States v. Rochester Drug Co-Operative, Inc.*, Case No. 19-cv-3568 filed on April 23, 2019 in the United States District Court for the Southern District of New York.

3474274.6

"**U.S. Civil Settlement**"). The terms of the U.S. Civil Settlement are nearly identical to terms within the DPA and run concurrently.

31. The Debtor paid the first $10,000,000 installment of the Stipulated Forfeiture Amount on or around May 3, 2019. The Debtor agreed to pay the balance of the Stipulated Forfeiture Amount in installments of $2,000,000 each on February 1st of the next five years (2020-2024). The Debtor also implemented the required compliance program under the Controlled Substances Act, retained an independent monitor, amended its by-laws to create two independent board positions, and created a Controlled Substances Compliance Committee.

32. On February 27, 2020, the U.S. Attorney served the Debtor with a default notice under the U.S. Civil Settlement based on the Debtor's failure to make the February 1, 2020 installment of the Stipulated Forfeiture Amount.

33. **New York Action.** On October 6, 2017, over fifty New York counties, towns and municipalities commenced an action in Suffolk County Supreme Court against seventeen pharmaceutical manufacturers, eleven pharmaceutical distributors (including the Debtor) and four individuals (collectively, the "**State Court Defendants**") to recover damages related to the State Court Defendants' manufacture and sale of opioid medications to residents of New York State (the "**New York Action**"). On August 14, 2018, the State of New York commenced a separate action against the State Court Defendants in Suffolk County Supreme Court seeking regulatory/injunctive relief and claims for monetary damages incurred on behalf of the State of New York. The two actions were consolidated in an action titled *In re Opioid Litigation*[7]. The Debtor previously entered into a standstill agreement with all the government authority plaintiffs which expired on September 30, 2019. On February 3, 2020, the Supreme Court issued an order granting, in part, the State Court Defendants' motion to dismiss, dismissing five causes of action

---

[7] Index No. 400000/2017, Supreme Court, Suffolk County.

3474274.6

brought against the Debtor, including the New York Controlled Substances Act claim, New York False Claims Act claims, and a cause of action for a declaratory judgment finding that the Debtor's license is void *ab initio*. The New York Action will now involve only two causes of action against the Debtor: a public nuisance cause of action seeking monetary damages and an action seeking injunctive relief under Executive Law § 63(12). On February 26, 2020, the Debtor's defense counsel, Allegaert Berger & Vogel LLP, moved to withdraw as the Debtor's counsel in the Suffolk County Litigation. The Debtor has opposed the withdrawal motion, which is now fully submitted and remains pending with the court. On March 10, 2020, the court issued a notice adjourning the March 20, 2020 trial date in the New York Action to an undetermined future date.

34. **Federal Multi-District Litigation.** The Debtor has also been named a defendant in numerous cases consolidated within the federal multi-district National Prescription Opiate Litigation pending in the United States District Court for the Northern District of Ohio (the "**Ohio MDL**")[8]. The actions consolidated into the Ohio MDL were commenced by counties, municipalities and Native American nations against numerous pharmaceutical manufacturers, distributors and store chains involved in the sale and distribution of opioid products. The cases filed against the Debtor are stayed at present as earlier-tracked cases proceed.

35. **Doud Litigation.** On April 6, 2018, the Debtor's former CEO, Laurence F. Doud, III ("**Doud**") commenced an action in the United States District Court for the Western District of New York against the Debtor alleging wrongful termination and against the Debtor's former CEO alleging defamation[9]. The Debtor filed counterclaims against Mr. Doud, and Mr. Doud filed third-party claims against the Debtor's individual board members and the board as an

---

[8] *In re: National Prescription Opiate Litigation*, MDL 2804, Case No. 17-md-2804 (N.D. Ohio).
[9] *Doud III v. Rochester Drug Co-Operative, Inc. et al.*, Index No. 6:18-cv-06557-FPG-MJP (W.D.N.Y.).

3474274.6

entity. Following the board's motion to dismiss the third-party claims against it as an entity, Mr. Doud voluntarily dismissed those third-party claims. On July 12, 2019, upon the motion of the U.S. Attorney's Office for the Southern District of New York, the Court entered an Order staying this case until the resolution of the criminal case against Mr. Doud.

36.    **Hiscox Litigation.** Based on the admissions made by the Debtor in the DPA, the Debtor's liability insurer, Hiscox, declined to provide the Debtor with coverage or to fund the defense costs related to the New York Action, the Ohio MDL, and the various individual wrongful death and personal injury actions. As a result, the Debtor has self-funded all its attorneys' fees and defense costs from operations. On January 10, 2020, the Debtor filed a complaint and on January 22, 2020 the Debtor filed a motion for preliminary injunction against Hiscox in the United States District Court for the Western District of New York[10] challenging Hiscox's decision not to provide insurance coverage for aspects of the New York Action discussed above. The action against Hiscox seeks (1) reimbursement for the defense counsel fees paid by the Debtor to defend itself in the New York Action and (2) a declaration that Hiscox has an obligation to advance defense fees in the litigation up to the policy's $6 million limit. On February 25, 2020, the District Court issued an Order granting the Debtor's request for a preliminary injunction and requiring Hiscox to pay the Debtor's defense costs in the New York Action through the end of trial, upon the posting of a bond by the Debtor in the amount of $500,000.

37.    **Fuller Litigation.** On April 27, 2019, the plaintiffs in the case *Deborah Fuller as Administrator of the Estate of Sarah Fuller v. Insys Therapeutics, Inc. et al.*, pending in U.S.

---

[10] *Rochester Drug Co-Operative, Inc. v. Hiscox Insurance Company, Inc.*, Index No. 6:20-cv-6025 (W.D.N.Y.).

3474274.6

District Court for the District of New Jersey[11], filed a motion seeking leave to file an amended complaint adding the Debtor as a defendant in this wrongful death action. On July 16, 2019, the Court granted the plaintiffs' motion to add the Debtor as a defendant, without prejudice to the Debtor filing a motion to dismiss. The Debtor filed a motion to dismiss on August 7, 2019, which remains pending.

38.     **Individual Personal Injury Actions.** The Debtor is named as a defendant, along with several other defendants, in six separate actions alleging wrongful death or personal injury involving individuals' opioid use that are currently pending in New Hampshire and Rhode Island. Finally, the Debtor is also named as a defendant in an action commenced in the New York Supreme Court, Bronx County by a plaintiff alleging a theory of liability for the Debtor based on respondeat superior. The Complaint alleges personal injuries stemming from an automobile accident caused by a former employee of the Debtor.

### C. Pre-Petition Indebtedness

39.     As of the Petition Date, the Debtor is the borrower under a certain Amended and Restated Credit Facility Agreement, dated December 10, 2014 (as amended, restated, supplemented or otherwise modified, the "**Credit Agreement**"), with the lenders from time to time party thereto (collectively, the "**Lenders**"), and M&T Bank, in its capacities as administrative agent for the Lenders (in such capacity, the "**Agent**"), Arranger (in such capacity, the "**Arranger**"), Swingline Lender (in such capacity, the "**Swingline Lender**") and Letter of Credit Issuer (in such capacity, the "**Letter of Credit Issuer**" and collectively with the Lenders, the Agent, the Arranger and the Swingline Lender, the "**Secured Parties**")[12]. The Credit Agreement is the subject of ten subsequent amendments and waivers, the most recent of which is

---

[11] *Fuller v. Insys Therapeutics, Inc. et al.*, Case No. 17-cv-07877 (D. N.J.).

[12] M&T Bank is the sole Lender under the Credit Agreement.

3474274.6

dated September 9, 2019 (collectively, the "**Amendments**"), and currently matures on October 1, 2020. The Credit Agreement, the Amendments, and all documents executed and delivered in connection therewith or relating thereto are collectively referred to herein as the "**Loan Documents**".

40. The Credit Agreement evidences a revolving credit facility in the original principal amount of $170,000,000 and a term loan in the original principal amount of $5,000,000. Following the commitment reductions and decline in borrowing base availability set forth above, the aggregate principal amount of the Debtor's outstanding obligations owed to the Secured Parties under the Credit Agreement as of the Petition Date was approximately $32,300,000. Additional amounts are owed to the Secured Parties for, among other things, accrued interest, attorneys' fees and expenses under the Loan Documents.

41. The Debtor's obligations to the Secured Parties under the Loan Documents are secured by duly perfected pre-petition security interests in, and first priority liens upon, substantially all of the Debtor's assets, including mortgages on both the Rochester Facility and the Fairfield Facility.

42. As a result of the Debtor's financial condition, multiple financial covenant defaults under the Credit Agreement were triggered in March 2019. Since April 2019, the Debtor's principal balance due under the Credit Agreement was reduced from $146,000,000 to $32,300,000 while it worked to stabilize the company and ensure continued service to its customers.

### D. **Purpose of Chapter 11 Filing**

43. The operating adjustments discussed above have not produced the required amount of relief. Absent chapter 11 relief, the Debtor projects that it will not have sufficient

15

3474274.6

Case 2-20-20230, Doc 8, Filed 03/12/20, Entered 03/12/20 10:21:27, Description: Main Document , Page 15 of 40

cash flow to continue its operations over the long term. The Debtor has concluded that the best option to protect the value of its assets for creditors is to effect an organized wind-down of the operations by entering into the Chapter 11 Case. During this process, the Debtor will also continue the orderly collection of its outstanding accounts receivable in a further effort to generate funds for the benefit of its creditors.

44. As of the Petition Date, the Debtor estimates that its assets are valued at approximately $70,000,000, including accounts receivable totaling approximately $50,000,000. As discussed above, the Debtor owes its Secured Lenders approximately $32,300,000, owes the United States $10,000,000 under the DPA, and has unsecured creditors asserting claims totaling approximately $71,800,000. The purposes of the Debtor's chapter 11 filing, therefore, are to conclude the consolidation of its operations at its Rochester Facility, to operate its business while marketing its assets for sale and to address the Debtor's financial difficulties for the benefit of its creditors.

## PART II - FIRST DAY MOTIONS

**A. Application for Order Pursuant to Sections 327(a) of the Bankruptcy Code Authorizing the Retention of Bond, Schoeneck & King, PLLC as Attorneys for the Debtor and Debtor in Possession (*the "Counsel Retention Application"*)**

45. The Debtor has selected the law firm of Bond, Schoeneck & King, PLLC ("**Bond**") to act as its attorneys in connection with the prosecution of its Chapter 11 Case and will file a retention application with the Court within twenty-one days of the Petition Date.

46. Due to Bond's recognized expertise in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, as well as its specialized and substantial expertise in corporate, litigation, labor and real estate law, I believe that Bond is

3474274.6

highly qualified to assist the Debtor with the intricate legal issues likely to arise in this Chapter 11 Case.

47.     Prior to the Petition Date, the Debtor consulted with Bond with respect to, among other things, the restructuring of its obligations to creditors, its relationship with the Secured Parties, the proposed sale of the Debtor's assets, and the preparation, commencement and prosecution of this case.  Through such consultations, Bond has become familiar with the Debtor's business and legal affairs.  Furthermore, the members and associates of Bond who will advise the Debtor in this case have considerable knowledge and experience in the field of bankruptcy law and debtors' and creditors' rights, including insolvencies, restructurings and business reorganizations and liquidations under chapter 11 of the Bankruptcy Code, as well as in other areas of law related to this Chapter 11 Case.

48.     If retained, Bond will render the following services, without limitation, on the Debtor's behalf:

(a)     advising the Debtor with respect to its powers and duties as a debtor and debtor in possession in the continued management and operation of its business and assets;

(b)     attending meetings and negotiating with representatives of creditors and other parties in interest and advising and consulting on the conduct of the case, including all legal and administrative requirements of operating in chapter 11;

(c)     taking all necessary action to protect and preserve the Debtor's estate, including the prosecution of actions commenced under the Bankruptcy Code on its behalf, and objections to claims filed against the estate;

(d)     preparing, on behalf of the Debtor, all motions, applications, answers, orders, reports and papers necessary to the administration of the estate;

(e)     negotiating and preparing, on the Debtor's behalf, a chapter 11 plan, disclosure statement and all related agreements and/or documents and taking any necessary action on behalf of the Debtor to obtain confirmation

17

3474274.6

of such plan;

    (f)    advising the Debtor with respect to sales of assets;

    (g)    appearing before this Court, any appellate courts, and the U.S. Trustee, and protecting the interests of the Debtor's estate before such courts and the U.S. Trustee;

    (h)    performing all other legal services in connection with this Chapter 11 Case.

49.    Bond has indicated its willingness to act in this case as the Debtor's attorneys and to render the foregoing services. The Debtor has agreed to pay Bond compensation on an hourly basis, plus reimbursement of actual and necessary expenses and other charges incurred by Bond. I believe the fees that Bond will charge the Debtor, as set forth in the Affidavit of Camille W. Hill, Esq. to be filed in support of Bond's retention application, are fair and reasonable in light of prevailing market rates, both in and out of chapter 11 proceedings, and Bond's extensive experience and the scope of the work to be performed pursuant to this retention.

50.    I believe that Bond is well qualified to represent the Debtor as a debtor in possession in the Chapter 11 Cases and that the retention of Bond is necessary and in the best interests of the Debtor, its estate and its creditors. Accordingly, the Debtor respectfully requests that the Court issue an Order granting the Counsel Retention Motion and approving the appointment of Bond to act as the attorneys to the Debtor herein.

**B.**    **Application of the Debtor for Authority to Retain and Employ Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of Petition Date (the "*Epiq Retention Application*")**

51.    The Debtor requests entry of an order appointing Epiq as the Claims and Noticing Agent for the Debtor in the Chapter 11 Case, in order to assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Chapter 11 Case. The Debtor selected Epiq to act as the Claims and Noticing Agent after

3474274.6

having obtained and reviewed engagement proposals from three nationally known claims and noticing agents to ensure selection through a competitive process. Moreover, I believe that, based upon all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of service and expertise.

52.     Although the Debtor has not yet filed its schedules of assets and liabilities, it anticipates that there will be in excess of 2,000 entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtor's business, I believe that the appointment of a Claims and Noticing Agent is both necessary and in the best interests of both the Debtor's estate and its creditors.

53.     By appointing Epiq as the Claims and Noticing Agent in this Chapter 11 Case, the distribution of notices and processing of claims will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

54.     Epiq is comprised of leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases. Epiq's professionals have experience in noticing, claims administration, solicitation, balloting and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity.

55.     The Debtor respectfully submits that focusing the attention of key personnel on critical, strategic operational and chapter 11 compliance issues during the early days of the Chapter 11 Case will help the Debtor make a smoother transition into chapter 11 and, therefore, ultimately will maximize the value of the Debtor's estate for the benefit of creditors and all parties in interest. Prior to the Petition Date, the Debtor provided to Epiq an advance in the

3474274.6

amount of $75,000. Epiq will apply $50,000 of the advance to satisfy all pre-petition invoices and hold $25,000 as a retainer to satisfy its final invoice in this case.

56.     In view of the number of anticipated claimants and parties in interest to receive notices in the Chapter 11 Case, I respectfully submit that Epiq's retention is in the best interest of the Debtor's estate and its creditors, and that the Epiq Retention Application should be granted.

**C.**     **Motion of the Debtor for Entry of Interim and Final Orders: (i) Authorizing the Debtor to (a) Use Cash Collateral and (b) Grant Adequate Protection to the Secured Parties; (ii) Scheduling a Final Hearing; (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief (the "Cash Collateral Motion")**

57.     The Secured Parties have consented to the Debtor's use of cash collateral pursuant to the terms and conditions of an Interim Order (I) Authorizing Post-Petition Use of Cash Collateral, (II) Granting Adequate Protection to Secured Parties, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), (IV) Modifying the Automatic Stay and (V) Granting Related Relief (the "**Interim Cash Collateral Order**") pursuant to sections 105, 361, 362 and 363 of the Bankruptcy Code, Rules 4001, 6003 and 9014 of the Federal Rules of Bankruptcy Procedure and Rule 4001-2 of the Local Bankruptcy Rules for the Western District of New York. Under the Interim Cash Collateral Order, the Debtor seeks authority to use cash collateral and grant the Secured Parties adequate protection with respect to their pre-petition liens in the form of replacement lien and super-priority claims, subject to the Carve-Out defined in the Interim Cash Collateral Order.

58.     It is my belief that the Debtor requires the use of cash collateral to fund its day-to-day operations. Indeed, absent such relief, the Debtor's business will be brought to an immediate halt, with disastrous consequences for the Debtor, its estate and creditors. Accordingly, the Debtor seeks authority, pursuant to section 363(c)(2) of the Bankruptcy Code, to use its prepetition cash collateral in the operation of its business and the administration of the Chapter

11 Case on the terms and conditions set forth in the Interim Cash Collateral Order. The Debtor has not been able to obtain, in the ordinary course of its business, unsecured credit under section 503(b)(1) of the Bankruptcy Code as an administrative expense sufficient to meet its operating needs.

59.     In order to adequately protect the Secured Parties' interest in the cash collateral, the Debtor is proposing to grant the Secured Parties adequate protection in the form of additional and replacement rollover security interests and liens in the Collateral (as defined in the Interim Cash Collateral Order), which shall be junior only to the Carve-Out provided for in the Interim Cash Collateral Order. In addition, the Secured Parties shall be granted an allowed superpriority administrative expense claim to compensation for the post-petition diminution in value of the Collateral, which shall have priority, except with respect to the Carve-Out, over all other claims in the Chapter 11 Case under sections 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code. A complete discussion of the terms affecting the Debtor's post-petition use of cash collateral is set forth in the Cash Collateral Motion and proposed Interim Cash Collateral Order filed contemporaneously herewith.

60.     In sum, without immediate access to the prepetition cash collateral, the Debtor faces a liquidity crisis that would threaten the viability of its business. If cash is not available to maintain business-as-usual operations during the critical period immediately following commencement of this case, the Debtor will likely face a substantial, if not devastating, loss of customer support and other irreparable harm from a severe tightening or elimination of trade credit, delayed deliveries, loss of almost 151 employees and employee morale, and deteriorating relationships with suppliers and customers – all of which would adversely affect the value of the Debtor's business. Thus, the Debtor's ability to remain a viable operating entity and preserve

21

3474274.6

value pending the orderly liquidation of its estate, depends upon obtaining the interim and final relief requested in the Interim Cash Collateral Order.

**D.**     **Motion for Interim and Final Orders Authorizing Debtor to (i) Maintain Existing Bank Accounts, (ii) Continue Using its Existing Cash Management Systems, (iii) Continue Using its Existing Business Forms, and (iv) Granting Limited Waiver of the Deposit Guidelines Set Forth in 11 U.S.C. § 345 (*the "Cash Management Motion"*)**

61.     A list of the Debtor's respective bank accounts (collectively, the "**Bank Accounts**") is attached to the Motion for Interim and Final Orders Authorizing the Debtor to (i) Maintain Existing Bank Accounts, (ii) Continue Using its Existing Cash Management System, (iii) Continue Using its Existing Business Forms, and (iv) Granting a Limited Waiver of the Deposit Guidelines Set Forth in 11 U.S.C. § 345 dated March 12, 2020 (the "**Cash Management Motion**"). The Bank Accounts include an operating account, a depository account, a disbursement account and a payroll account at M&T Bank.

62.     The Cash Management System is organized around two principal functions: (i) cash collections, including the collection of funds from the Debtor's customers, and (ii) disbursements to fund the Debtor's operations, including payments to vendors to ensure a steady supply drugs, pharmaceutical supplies and medical equipment, as well as funding of the Debtor's payroll obligations.

63.     The Debtor generates and receives funds primarily from its customers, primarily by check or by ACH credits and transfers. All funds are collected and deposited into the Depository Account. All disbursements are paid out of either the Operating Account, Disbursement Account, or Payroll Account. When accounts payable become due and owing, funds are drawn under the Credit Agreement to fund the Debtor's Operating Account. The Debtor's operating obligations are then satisfied either by direct payment from the Operating

3474274.6

Account or by payment from Disbursement Account or Payroll Account, which are funded by the Operating Account.

64.     As described above, the Bank Accounts and the Debtor's practices and procedures with respect to the collection of deposits, making disbursements and making payroll constitute the Debtor's cash management system (the "**Cash Management System**"). The Cash Management System enables the Debtor to monitor collection and disbursement of funds and maintain control over the administration of its Bank Accounts, all of which facilitate the effective collection, disbursement, and movement of cash.

65.     As of the Petition Date, the Debtor will instruct M&T Bank to stop payment on all outstanding checks issued to vendors or other trade creditors on account of prepetition debts or liabilities, with the exception of those checks to employees for wages and employee benefits, as described more fully in the Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Pay Prepetition Wages, Salaries, Commissions and Benefits; (II) Authorizing the Continuation of Employee Benefit Programs in the Ordinary Course of Business; and (III) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Wage, Salary, Commission and Benefit Obligations dated March 12, 2020 (the "**Employee Wage Motion**").

66.     Pursuant to the standard chapter 11 operating practice in this jurisdiction, the Debtor is required, among other things, to open new bank accounts upon the filing of the bankruptcy petition and is further required to designate such accounts as "Debtor in Possession" on the respective account signature cards.

67.     The Debtor's existing Cash Management System is essential to the ordinary coordination of the Debtor's business. The Debtor submits that the cost and expense of changing the Bank Accounts and creating a new cash management system would not only force the Debtor

23

3474274.6

to incur significant and unnecessary costs and expenses but would impair the operation of the Debtor's business.

68. Indeed, forcing the Debtor to employ a new cash management system could cause confusion, diminish the prospects for a successful Chapter 11 Case, disrupt payroll and introduce inefficiency at a time when efficiency is most critical, and place a strain on the Debtor's relationships with customers and vendors. Naturally, these relationships must be maintained if the Debtor is to be given the opportunity to operate successfully. Asking the Debtor's various customers to remit payments to new and different accounts will result in a slowdown in the Debtor's collection of receipts just at the time when prompt collection of much-needed cash is most critical.

69. Further, the preservation of the Bank Accounts will not adversely impact any of the Debtor's creditors, as M&T Bank has been designated as an authorized depository bank by the Office of the United States Trustee for the Western District of New York (the "**U.S. Trustee**").

70. The Debtor also requests that M&T Bank dishonor prepetition checks, drafts, funds transfer requests and ACHs, except as expressly provided for by Orders of this Court. As noted above, and in the Employee Wage Motion filed contemporaneously herewith, the Debtor requests that the Court direct M&T Bank to continue honoring payroll checks (to the extent sufficient funds are on deposit to honor such checks) without regard to when such payroll checks were issued. Such relief is necessary to implement, to the extent granted, and shall be subject to, the relief requested by the Debtor in the Employee Wage Motion. The Debtor intends to provide notice of entry of the order granting the Cash Management Motion to M&T Bank within one (1) business day of the entry of such an order.

3474274.6

71.     The Debtor also requests permission to use its existing business forms and stationery without alteration or change. The Debtor does not print its own business forms and stationery. Thus, substantial time and expense would be required if the Debtor is required to print new business forms and stationery merely to indicate "debtor in possession". The Debtor, therefore, requests that it be relieved of the requirement to stamp its business forms and stationery with the "DIP" or "debtor in possession" designation. The Debtor, however, will obtain and affix a stamp or label stating "DIP" or "debtor in possession" to all post-petition checks that it issues.

72.     The Debtor also submits that "cause" exists to waive the investment and deposit restrictions under section 345(b) of the Bankruptcy Code to the extent that the Debtor's cash management deposits and investments do not comply. M&T Bank, the financial institution at which the Debtor maintains its Bank Accounts, is a financially stable commercial banking institution and is FDIC insured (up to the applicable unit per account). All such deposits and investment are prudent and designated to yield the maximum reasonable net return on the funds invested, taking into account the safety of such deposits and investments. In addition, M&T Bank is an authorized depository by the U.S. Trustee to maintain debtor in possession accounts.

73.     The Debtor believes that the deposit and investment of its cash in the Bank Accounts at M&T Bank provides the protection required by section 345(a) of the Bankruptcy Code, notwithstanding the absence of a "corporate surety" requirement. The requirement of obtaining a bond secured by the undertaking of a corporate surety from such a financial institution would be prohibitively expensive and administratively burdensome and could offset any of the financial gain derived from investing in private as well as federal or federally guaranteed securities.

3474274.6

74. The Debtor submits that sufficient cause exists under section 345(b)(2) of the Bankruptcy Code to allow the Debtor to deviate from the approved investment practices otherwise required. Accordingly, the Debtor respectfully requests authority to deposit and invest funds in a safe and prudent manner in accordance with its existing Cash Management System and past practice.

75. Based upon all of the foregoing, the Debtor submits that sufficient cause exists to allow the Debtor to maintain its existing Bank Accounts, Cash Management System and business forms, and respectfully requests that it be authorized to continue using its current Cash Management System and business forms during the post-petition period.

E. **Motion for Entry of Interim and Final Orders (i) Authorizing Debtor to Pay Prepetition Wages, Salaries, Commissions and Benefits, (ii) Authorizing the Continuation of Employee Benefit Programs in the Ordinary Course of Business and (iii) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Wage, Salary, Commission and Benefit Obligations (_the "Employee Wage Motion"_)**

76. To avoid the significant risks of resignations and of discontent or loss of morale among essential employees, and in view of the priority awarded to wage claims, it is necessary and appropriate that the Debtor be granted authorization requested in the Employee Wage Motion. The Debtor requires the continued services of its employees in order to ensure that the continuity and quality of its business operations will not be threatened and so that the Debtor may continue, without unnecessary interruption, its efforts to achieve a successful outcome for the Chapter 11 Case.

77. The Debtor currently employs approximately 151 individuals, with 147 employed full-time and four employed part-time. Approximately 71% of the employees are hourly wage earners and 29% are salaried. All of the Debtor's employees are non-union employees.

3474274.6

78.    The Debtor employs certain employees that the Fair Labor Standards Act ("**FLSA**") mandates must receive compensation over certain fixed thresholds for both standard and overtime pay (the "**Non-Exempt Employees**"). Non-Exempt Employees are paid weekly in arrears on Thursday. Based upon historical data, the average weekly payroll for Non-Exempt Employees is approximately $92,000.00.

79.    The Debtor also employs certain employees who qualify for an exemption from such FLSA requirements (the "**Exempt Employees**", together with the Non-Exempt Employees, collectively, the "**Employees**"). Exempt Employees are paid biweekly on Thursday, for services performed the prior week and for Sunday through Thursday of the current week, as well as an advancement for Friday of the current week. Based upon historical data, the average biweekly payroll for Exempt Employees is approximately $335,000.00.

80.    Further, in addition to their fixed compensation, eleven former and current Exempt Employees are eligible to receive commissions, which are earned on a monthly basis and paid in the second pay period of the subsequent month. However, there currently aren't any accrued commissions due those former and current Exempt Employees.

81.    As of the Petition Date, the accrued, unpaid payroll for all Employees is approximately $118,350.00, including the Debtor's portion of payroll taxes. The next regularly scheduled pay date for Non-Exempt Employees is March 12, 2020[13]. The next pay date for Exempt Employees is March 19, 2020.[14] All wages, salaries and commissions earned by the Employees prior to the Petition Date and paid on March 12 and 19, 2020 constitute prepetition wages, salaries and commissions. Therefore, it is imperative that the Debtor obtains

---

[13] This pay date for Non-Exempt Employees covers the period of March 2-6, 2020.
[14] This pay date for Exempt Employees will cover the period of March 9-20, 2020.

3474274.6

authorization to pay priority prepetition wages, salaries and commissions to all its Employees on or before March 12, 2020.

82.    Except for my biweekly salary, no Employee is currently owed wages, a salary or commissions that exceeds the $13,650.00 cap on priority claims set forth in section 507(a)(4) of the Bankruptcy Code.

83.    Accordingly, the Employee Wage Motion seeks authority to pay accrued but unpaid prepetition wages, salaries and commissions due all Employees through the Petition Date. The Debtor seeks to pay the wages, salaries and commissions for all Employees in the ordinary course when the first obligations come due on March 12, 2020, including obligations that are not yet due.

84.    In addition, in the ordinary course of its business, the Debtor provides benefits to its Employees (collectively, the "**Employee Benefits**").  The Employee Benefits include, without limitation, reimbursement of business expenses, vacation leave, paid time off, 401(k) plan, pension, health insurance, dental insurance, vision insurance, life insurance, workers' compensation, disability insurance, and related programs.   The Debtor requests that it be permitted to continue providing all the Employee Benefits during the post-petition period in the ordinary course of business.

85.    Except for the vacation/paid time off accrued by me and chief operating officer Chris Masseth, the accrued Employee Benefits owed is less than $13,650.00 for each Employee under section 507(a)(5) of the Bankruptcy Code.

86.    The Debtor further requests that this Court authorize M&T Bank to process, honor and pay all prepetition checks issued by, and fund transfer requests made from, the Debtor

with respect to Employee wages, salaries and commissions and Employee Benefits that were not processed, honored or paid as of the Petition Date.

87.     Finally, the Debtor routinely withholds from Employee paychecks amounts that the Debtor is required to transmit to third parties.  Examples of such withholdings include Social Security, FICA, federal, state, and local income taxes, 401(k) contributions, garnishments, health care payments and charitable donations.  Such withheld funds, to the extent that they remain in the Debtor's possession, constitute monies held in trust and, therefore, are not property of the Debtor's bankruptcy estate.  I respectfully submit that the Debtor's practice of directing such funds to the appropriate parties is in the ordinary course of business, and the Debtor is seeking authority to continue such practice.

88.     The obligations for which the Debtor seeks authorization to honor to its Employees were earned by individuals employed by the Debtor and are for services rendered within 180 days before the commencement of the Chapter 11 Case.  The obligations are for wages and payroll taxes based on such wages, and for the other Employee Benefits mentioned above.

89.     The relief requested under the Employee Wage Motion will not prejudice creditors, but rather will protect the Debtor's and the Employees' respective interests.

**F.     Motion for Entry of Interim and Final Orders Authorizing the Debtor to Pay Prepetition Taxes and Regulatory Fees *(the "Tax Motion")***

90.     I have reviewed the Motion for Entry of Interim and Final Orders Authorizing the Debtor to Pay Prepetition Taxes and Regulatory Fees (the "**Tax Motion**").  Based upon my review of the Tax Motion, I understand that the Debtor seeks an Order from the Court authorizing, but not directing, it to pay prepetition sales, use, payroll, trust fund and other taxes and federal, state and local regulatory fees and licensing fees (collectively, "**Taxes and Fees**") to

3474274.6

the respective authorities in the ordinary course of the Debtor's business. Prior to the Petition Date, the Debtor generally paid the Taxes and Fees as they became due to Taxing Authorities. Nothing contained in the Tax Motion, however, would preclude the Debtor from contesting, in its sole discretion, the validity and amount of any prepetition Taxes or Fees under bankruptcy or non-bankruptcy law, and the Debtor expressly reserve all rights with respect thereto.

91.     The Debtor, in the ordinary course of its business, incurs various tax liabilities, including Taxes and Fees. The Taxes and Fees are paid to various taxing authorities (collectively, the "**Taxing Authorities**") on a periodic basis that is established for each tax.

92.     As of the Petition Date, the Debtor believes that it is generally current with respect to the payment of Taxes except that (i) accrued prepetition opioid excise taxes[15] in the approximate amount of $158,404.03 may be owed to New York State with regard to the transfer of opioid products; (ii) approximately $2,250.00 is owed for sales taxes; (iii) approximately $72,901.00 is owed for real property taxes; and (iv) certain Taxes, such as payroll withholding taxes, may have accrued prepetition but not yet come due for payment.

93.     I am informed that the Debtor generally does not have any legal or equitable interests in funds held to pay Taxes and Fees. Moreover, to the extent that these "trust fund" taxes and other amounts are collected from third parties and held for payment to the Taxing Authorities, I am informed that they are not property of the estate. The Debtor, therefore, generally has no equitable interest in funds collected and segregated to pay the Taxes and Fees.

---

[15] In early 2019, the State of New York passed a state budget, which included an annual excise tax on prescription opioid manufacturers and distributors. The excise tax is imposed on the first sale of any opioid in the State of New York at a rate of $0.0025 (a quarter of a cent) per morphine milligram equivalent ("**MME**") where the WAC is less than $0.50 (fifty cents) or $0.015 (one and one-half cents) per MME where the  wholesale acquisition cost ("**WAC**") is greater than or equal to $0.50 (fifty cents). The excise tax became effective July 1, 2019 and the Debtor is required to file a return and remit payment to the State of New York on a quarterly basis. The next filing due by the Debtor is on April 20, 2020 for the period of January 1, 2020 to March 31, 2020.

3474274.6

94. Further, I am informed that most, if not all, of the Taxes and Fees are entitled to priority status under the Bankruptcy Code. The Debtor's payment of Taxes and Fees in the ordinary course of business, will likely only affect the timing of the payments and not the amounts to be received by such entities. Therefore, I do not believe that other creditors and parties in interest will be prejudiced by such payments.

95. Without question, I believe that the payment of the Taxes and Fees is necessary to avoid interruption of the Debtor's business activities. The withholding of the payment of the Taxes and Fees likely would cause taxing and other authorities to conduct audits and other administrative proceedings, resulting in significant administrative burdens. Prompt and regular payment of the Taxes and Fees will avoid these unnecessary government actions.

96. Furthermore, authority to pay the Taxes and Fees is necessary to avoid subjecting the Debtor's officers and directors to lawsuits during the pendency of this proceeding that would distract from the effort to successfully conclude the Chapter 11 Case. Many federal and state statutes provide that various Taxes and Fees constitute "trust fund" taxes for which officers and directors of the collecting entity may in certain circumstances be held personally liable. To the extent any accrued Taxes and Fees are unpaid as of the Petition Date, the taxing and other authorities in such jurisdictions may attempt to enforce such personal liability provisions against certain of the Debtor's officers and directors. Such potential actions would prove extremely distracting for the Debtor, and for the named officers and directors whose immediate and full-time attention to the Debtor's operations is required. I believe it is in the best interests of the Debtor's estate to eliminate the possibility of such time-consuming and potentially damaging distractions.

3474274.6

97.     I believe that granting the relief requested will enhance the likelihood of the successful liquidation of the Debtor and the probability of maximizing the value of the estate's assets and, ultimately, the returns to creditors. Further, I believe that the timely payment of the Taxes and Fees is necessary, is in the best interests of the Debtor's estate and is highly beneficial to the current operation and eventual wind down of the Debtor's business. Accordingly, the Debtor requests that the Court grant the Tax Motion and authorize the Debtor to pay, in its sole discretion, the Taxes and Fees to the relevant Taxing Authorities in the ordinary course of business.

**G.      Motion for Entry of Interim and Final Orders (i) Authorizing Continuation of Various Insurance Policies and (ii) Authorizing Payment of Prepetition and Post-Petition Obligations in Respect Thereof** *(the "Insurance Motion")*

98.     I have reviewed the Motion for Entry of Interim and Final Orders (I) Authorizing Continuation of Various Insurance Policies and (II) Authorizing Payment of Pre-Petition and Post-Petition Obligations in Respect Thereof (the "**Insurance Motion**"). I believe that, if the requested relief is not granted and the Insurance Programs (discussed below) lapse or terminate, the Debtor will be unable to continue its business operations, thereby endangering the Debtor's on-going operations and substantially harming all creditors.

99.     In the ordinary course of the Debtor's business, it maintains numerous insurance policies providing coverage for, among other things, (a) workers' compensation, (b) general liability, (c) property, (d) products and completed operations, (e) commercial automobile liability, (f) crime, (g) cyber liability, (h) directors and officers liability, (i) cargo, (j) umbrella liability, and (k) excess liability (collectively, the "**Insurance Policies**") through several private insurance carriers (the "**Insurance Carriers**"). All the Insurance Policies referenced above are

3474274.6

discussed more fully in the Insurance Motion and are essential to the on-going operation of the Debtor's business.

100.    The aggregate annual premiums for all Insurance Policies total approximately $2,151,914.00.   Although the Debtor pays an annual lump-sum premium for several of its Insurance Policies, it is not always economically advantageous for the Debtor to pay a premium on a lump-sum basis.   Accordingly, in the ordinary course of the Debtor's business, the Debtor finances the premiums on some of its Insurance Policies by entering into premium finance agreements with the Insurance Companies that require a significant percentage down payment and two or three subsequent installment payments.

101.    All monthly, quarterly and annual premium payment due in connection with the Insurance Policies are current; however, certain installment payments may come due during the post-petition period in the ordinary course of business.

102.    In addition, because certain of the Insurance Policies may expire during the Chapter 11 Case, the Debtor seeks authority to renew the Insurance Policies or to enter into similar replacement policies in the ordinary course of its business, without further Court approval.  The Debtor will need to continue its insurance coverage throughout the entire duration of the Chapter 11 Case.  The Debtor respectfully submits that renewal of the Insurance Policies falls squarely within its ordinary course of business, and, but for the constraints of section 364 of the Bankruptcy Code, the Debtor would not need the Court's prior approval to renew the Insurance Policies.  To reduce the administrative burden, as well as the expense of operating as a debtor in possession, the Debtor seeks the Court's authority now to renew the Insurance Policies or enter into new similar policies if and when necessary.

103.     The nature of the Debtor's business and the extent of its operations make it essential for the Debtor to maintain the Insurance Policies on an ongoing and uninterrupted basis. The nonpayment of any premiums, deductibles or related fees under the Insurance Policies could result in one or more of the Insurance Carriers terminating or declining to renew an insurance policy or refusing to enter into new insurance policies with the Debtor in the future. If the Insurance Policies lapse without renewal, the Debtor could be exposed to substantial liability for personal and/or property damages, to the detriment of all parties in interest.

104.     For the Debtor to maintain its operations in compliance with various legal and contractual obligations, the Debtor must be able to continue the Insurance Policies without disruption. In addition, as directed by the U.S. Trustee, a debtor in a chapter 11 case has a fiduciary obligation and a legal duty to account for its business operations, which in part is met "substantially" by "obtaining and maintaining insurance" following the Petition Date. The continuation of the Insurance Policies and the payment of all prepetition and post-petition insurance obligations arising under the Insurance Policies are therefore essential to preserve the Debtor's business and to preserve the value of the Debtor's estate for all creditors. I therefore respectfully request that the Court grant the relief requested in the Insurance Motion in its entirety.

**H.      Debtor's Motion for Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service on Account of Prepetition Amounts Due, (II) Determining Adequate Assurance of Payment for Post-Petition Utility Services Under 11 U.S.C. § 366, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (_the "Utility Motion"_)**

105.     The Debtor seeks entry of the Interim Order and Final Order (the "**Utility Orders**"), (i) prohibiting the Debtor's utility providers (as the term is used in the Bankruptcy Code section 366 and as described herein, the "**Utility Providers**") from altering, refusing or

3474274.6

discontinuing service on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance, (ii) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of Bankruptcy Code section 366, (iii) approving the Debtor's adequate assurance procedures as proposed herein and as set forth in the proposed Orders ("**Adequate Assurance Procedures**") and (iv) determining that the Debtor is not required to provide any additional adequate assurance beyond what is proposed by the Utility Motion and the Adequate Assurance Procedures. In connection with the operation of its business and management of its Facilities, the Debtor obtains utility services, including electricity, natural gas, telephone, sewage, telecommunications, waste removal, water and other similar services from several utilities, as that term is used in section 366 of the Bankruptcy Code. The Debtor seeks approval of the procedures to avoid severe consequences to the Debtor of any interruption in services by the Utility Providers.

106.   In connection with the operation of its business and management of its Facilities, the Debtor purchases utility services, including electricity, telecommunications, cable and internet (collectively, the "**Utility Services**") from the Utility Providers. Annexed as Exhibit A to the Utility Motion is a list of Utility Providers (as may be supplemented from time to time, the "**Utility List**")[16] that provide Utility Services to the Debtor as of the Petition Date. The relief requested in the Utility Motion is for all Utility Providers providing Utility Services to the Debtor and is not limited to those listed on the Utility List. The Debtor has made a good faith effort to identify all the Utility Providers that provide Utility Services to it and to include such Utility Providers in the Utilities List. Nonetheless, I understand that the Debtor reserves the right to supplement the Utilities List by filing a notice with the Court at a later date, if necessary.

---

[16] I understand that the listing of an entity on the Utility List is not an admission that such entity is a Utility Provider within the meaning of Bankruptcy Code section 366, and that the Debtor reserves the right to contest any such characterization at any time in the future.

3474274.6

107.    During the past twelve months, the Debtor paid an average of approximately $87,378.45[17] per month on account of Utility Services.  To the best of the Debtor's knowledge, there are no material defaults or arrearages with respect to the Debtor's undisputed Utility Services invoices, other than payment interruption that may be caused by the commencement of this Chapter 11 Case.  The Debtor intends to pay all post-petition obligations owed to the Utility Providers in a timely manner.

108.    To provide adequate assurance to the Utility Providers, the debtor proposes to provide a deposit[18] equal to one month's worth of Utility Services, calculated as a historical average over the past twelve months (the "**Adequate Assurance Deposit**").  As of the Petition Date, the Debtor estimates the Adequate Assurance Deposit will total approximately $87,378.45. The portion of the Adequate Assurance Deposit applicable to each Utility Provider will be set aside and separately accounted for.  The Debtor will not use the Adequate Assurance Deposits for any purpose other than to provide adequate assurance to Utility Providers.  The Adequate Assurance Deposit will be held by the Debtor until the earlier of (a) the Debtor's termination of Utility Services from such Utility Provider or (b) the conclusion of the Chapter 11 Case, if not applied earlier.

109.    The Debtor will set aside the Adequate Assurance Deposit in the within ten calendar days of receipt of a request by Debtor, of a written request from a Utility Provider for adequate assurance under chapter 11 of the Bankruptcy Code.  The amount allocated for, and payable to, each Utility Provider shall be equal to the amount set forth on the Utilities List as to each Utility Provider or as otherwise agreed.

---

[17] Based on the twelve months ended February 29, 2020.
[18] Section 366(c)(1)(A) of the Bankruptcy Code defines "assurance of payment" to mean, among other things, a cash deposit.

3474274.6

110. The portion of the Adequate Assurance Deposit attributable to each Utility Provider shall be returned to the Debtor upon the effective date of a chapter 11 plan for the Debtor. Additionally, if the Debtor terminates any of the Utility Services provided by a Utility Provider, the Debtor requests that it immediately be permitted to reduce the Adequate Assurance Deposit to reflect the termination of such Utility Services.

111. I believe that uninterrupted Utility Services are essential to the Debtor's ongoing operations, and therefore, maximizing the value of the Debtor's estate. The relief requested in the Utilities Motion will ensure that the Debtor's operations will not be disrupted. Further, the relief requested provides the Utility Providers with a fair and orderly procedure for addressing requests for additional or different adequate assurance. Without the Adequate Assurance Procedures, the Debtor could be forced to address numerous requests by the Utility Providers in a disorganized manner at a critical period in the Chapter 11 Case and during a time when the Debtor's efforts could be more productively focused on the continuation of the Debtor's operations for the benefit of all parties in interest.

112. In my opinion, the relief requested in the Utilities Motion is reasonable and necessary to avoid immediate and irreparable harm to the Debtor, is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, I respectfully request that the Utilities Motion be granted.

I. **Debtor's Application for an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (*the "Schedules Motion"*)**

113. The Debtor seeks entry of an order extending the time for the Debtor to file its Schedules and Statements until April 17, 2020.

3474274.6

114.    The Debtor estimates that it has more than 2,000 creditors and other parties in interest in this Chapter 11 Case.  Given the size and complexity of the Debtor's business operations, preparing the Schedules and Statements accurately and with sufficient detail will require significant attention from the Debtor's personnel and advisors.  The complexity of the Debtor's business, the limited staff available to perform the required internal review of financial records and affairs, the numerous critical operational matters that the Debtor's accounting and legal personnel must address in the early days of the Chapter 11 Case, the pressure incident to the commencement of the Chapter 11 Case, and the fact that certain prepetition invoices may have not yet been received or entered into the Debtor's accounting system provide ample cause justifying, if not necessitating, the requested extension of the deadline to file the Schedules and Statements.

115.    In light of the amount of work entailed in completing the Schedules and Statements and the competing demands upon the Debtor's employees and professionals to assist in efforts to transition into the initial post-petition period under extraordinary circumstances, the Debtor will not be able to properly and accurately complete the Schedules and Statements within the required 14-day time period.

116.    Given the numerous critical operational matters that the Debtor's accounting and legal personnel must address in the early days of the Chapter 11 Case, I believe that with the 22-day extension requested, the Debtor will be able to focus its attention on business operations to maximize the value of the Debtor's estate during the first critical post-petition month.  I believe this will help the Debtor make a smooth transition into chapter 11 and, therefore maximize the value of the Debtor's estate to the benefit of creditors and all parties in interest.

3474274.6

117.    In my opinion, the relief requested in the Schedules Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtor, I respectfully request that the Court grant the Schedules Motion and extend the filing deadline set forth under Bankruptcy Rule 1007(c) to April 17, 2020, which would provide the Debtor with a total of 36 days from the Petition Date to file the Schedules and Statements.

*[Signature page follows]*

3474274.6

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: March 11, 2020
       Rochester, New York

*John T. Kinney*
John T. Kinney
Interim Chief Executive Officer
and Chief Financial Officer
Rochester Drug Co-operative, Inc.

40