Ilan D. Scharf, Esq. (NY Bar No. 4042107)
Gail S. Greenwood, Esq. (Admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone: (212) 561-7700
Facsimile: (212) 561-7777

*Counsel to Advisory Trust Group, LLC,*
*solely in its capacity as Liquidating Trustee of the RDC Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: | Chapter 11 |
| ROCHESTER DRUG CO-OPERATIVE, INC., | Case No. 20-20230 (PRW) |
| Debtor. | |

**MOTION OF THE LIQUIDATING TRUSTEE FOR ENTRY OF AN**
**ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING**
**THE PRODUCTION OF DOCUMENTS BY M&T BANK;**
**DECLARATION OF DAVID GREENBLATT IN SUPPORT THEREOF**

Advisory Trust Group, LLC, the Liquidating Trustee ("**Liquidating Trustee**") under the

Debtor's *Second Amended Chapter 11 Plan of Liquidation* and that certain Liquidating Trust

Agreement and Declaration of Trust, hereby moves (the "**Motion**") this Court for entry of an

order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure authorizing and

directing the production of documents by M&T Bank ("**M&T**") relating to the Debtor's

subordination of certain obligations owed to the Debtor by Stephen Giroux ("**Giroux**") and

entities owned or controlled by Giroux.  In support of the Motion, the Liquidating Trustee

respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Giroux and his pharmacies currently owe over $1.9 million to Rochester Drug Co-operative, Inc. (the "**Debtor**" or "**RDC**"), which is subordinated to a loan and guaranty in favor of M&T.  The subordination agreement was effectuated less than six weeks prior to the Debtor's bankruptcy when Giroux, as a member of the Board of Directors, was well aware of the impending bankruptcy.  Under the subordination agreement, Giroux and his pharmacies appear to have obtained a "sweetheart deal" because they may be insulated from any collection action or litigation until M&T has been paid in full.  No other RDC stockholder has received similar beneficial treatment.

2.      The Liquidating Trustee lacks information regarding the terms or the current balance of obligations owed by Giroux to M&T, much less information regarding the circumstances of the subordination agreement.  By this Motion, the Liquidating Trustee seeks the production of records from M&T to more fully investigate the Debtor's affairs.

## RELEVANT FACTS

### The Bankruptcy Case

3.      On March 12, 2020 (the "**Petition Date**"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code.  Prior to the Petition Date, RDC was a wholesale distributor of pharmaceutical drugs that was owned and directed by approximately 307 stockholding pharmacists and pharmacies. [First Day Declaration, Docket No. 8 at ¶9].

4.      RDC's stockholders were customers who purchased shares in the cooperative, which distributed its yearly profits as a dividend to the stockholders.  The dividend, if any, was allocated to stockholders based on sales volume such that higher dividends were paid to the largest purchasers of RDC pharmaceuticals.  *Id.* at 10.

2

5.      RDC made loans to its stockholders to allow them to purchase goods on credit and to encourage them to purchase stock.  RDC typically took a security interest in personal property of the stockholder as collateral for its loans and/or requested a personal guaranty from the principal of the stockholder.

6.      On February 26, 2021, the Bankruptcy Court entered an order (the "**Confirmation Order**") confirming RDC's *Second Amended Chapter 11 Plan of Liquidation dated January 15, 2021* (the "**Plan**") which (along with that certain Liquidating Trust Agreement and Declaration of Trust) established a liquidating trust (the "**RDC Liquidating Trust**") to collect and administer certain assets belonging to RDC (including Causes of Action as defined in the Plan) and to file, settle, compromise, withdraw or litigate to judgment any Cause of Action. The Effective Date of the Plan occurred on March 19, 2021.  As of the Effective Date, pursuant to the Confirmation Order, the Plan, and the Liquidating Trust Agreement, the Liquidating Trustee was appointed as trustee of the RDC Liquidating Trust; and the Liquidating Trustee has the exclusive right, power and interest to pursue, commence, prosecute, compromise, settle, dismiss, release, waive, withdraw, and abandon or resolve all Causes of Action.

**Stephen Giroux**

7.      Giroux was a member of the Debtor's Board of Directors as of the Petition Date. [Docket No. 105] ("**Schedules**") at p. 15 of 102. Giroux received $19,000 from the Debtor during the year prior to the Petition Date for Board of Director fees.  *Id.* at p. 16 of 102.

8.      Members of the Board of Directors were historically compensated $250 each for telephonic appearances and $1500 each for in-person meetings.  In August 2020, after the Petition Date and during the Covid-related lockdown, Giroux complained that board members were only receiving the lower telephonic compensation and, in response, the Debtor's Board of

Directors unanimously agreed to set their fees at the higher rate for in-person meetings *retroactive to March 2020* notwithstanding objections by counsel.  *See* Declaration of David Greenblatt attached hereto, ¶4.  Assuming the increased compensation was paid, Giroux received approximately $15,000 (12 x $1250) as additional fees, above the $3,000 to which he would otherwise be entitled, for attending telephonic meetings after the Petition Date.

**The Giroux Pharmacies**

9.     On information and belief, the following independent pharmacies are owned or controlled by Giroux (collectively, the "**Giroux Pharmacies**"):

- Moden-Giroux, Inc.
- d/b/a Middleport Family Health Center
- d/b/a Transit Hill Pharmacy
- d/b/a Summit Park Pharmacy
- d/b/a Wurlitzer Family Pharmacy
- d/b/a Lockport Home Medical
- d/b/a Thee Barker Store
- Rosenkrans Pharmacy Inc.
- d/b/a Oakfield Family Pharmacy
- d/b/a Hilton Family Pharmacy

The Giroux Pharmacies own sixteen preferred shares of the Debtor.  Docket No. 105-2, pp. 17, 22 of 29.  The Giroux Pharmacies (or some portion of them) received approximately $238,923 in total dividends from the Debtor for FYE 2017, not including preferred dividends, before the dividends were discontinued. During the period of fiscal years 2014 through 2017, the Giroux Pharmacies received total dividends of $1,195,846.  Greenblatt Declaration, ¶2.

10.     The Debtor's Schedules show transfers made within one year of the Petition Date for the benefit of insiders, including "notes receivable discounts" and payments related to the "RDC Retail Alliance Program" in the aggregate of approximately $211,369 for the benefit of certain Giroux Pharmacies.  *See* Schedules at Exhibit 4 [Docket No. 105-1], pp. 99-102 of 102.

4

11.     The Giroux Pharmacies currently owe RDC approximately $1,967,495 based on outstanding invoices for pharmaceutical goods, including approximately $212,000 for fees and interest accruing since approximately September 2019.  Greenblatt Declaration, ¶3.

### The Subordination Agreement Between M&T and RDC

12.     On or about January 28, 2020, the Debtor (defined as Creditor) entered a General Subordination Agreement ("**Subordination Agreement**") in favor of M&T (defined as Lender) with respect to Giroux Holdings, Inc., Rosenkrans Pharmacy, Inc. dba Oakfield Family Pharmacy and dba Rosenkrans Pharmacy, Moden-Giroux, Inc. dba Transit Hill Pharmacy and dba Middleport Family Health Center, and Stephen Giroux, individually (defined as Borrower). A copy of the Subordination Agreement is attached as Exhibit 1 to the Greenblatt Declaration.

13.     The last page of the Subordination Agreement, at Schedule A, sets forth the debt owed by the Giroux Pharmacies to RDC as of the date of the agreement in the amount of approximately $2.3 million.

14.     Pursuant to the Subordination Agreement, the debt owed to RDC was subordinated to the "primary obligations" owed to the bank.  The "subordinated obligations" are broadly defined to include obligations of every kind and character, whether then existing or later incurred, including fees and costs to collect or pursue any guaranty or other security.  Any lien securing the subordinated obligations was subordinated to the interests of M&T.

15.     The Subordination Agreement precludes all demands and actions by the Debtor against Giroux or the Giroux Pharmacies with respect to the subordinated obligations unless and until M&T's obligations are paid in full.  Paragraph 7 of the Subordination Agreement provides, in part:

> **Standstill Covenants**.  Creditor hereby covenants, as long as this
> Agreement is in effect, that Creditor will not, unless and until the Primary

5

Obligations are fully and irrevocably paid and satisfied and all financial and other arrangements between Lender and Borrower have been terminated, and prior thereto, without Lender's prior written consent: (i) ***accelerate, request, demand, take, accept, or receive*** from or on behalf of Borrower, by setoff or in any other manner, any monies representing all or any part of the Subordinated Obligations except as may be expressly permitted by this Agreement; (ii) ***initiate or participate with others in any suit, action, or proceeding, including, without limitation, any bankruptcy, reorganization, or insolvency proceeding against Borrower, or exercise any other rights or remedies*** to collect or enforce the Subordinated Obligations; (iii) repossess, foreclose upon, or otherwise take any action against, or exercise any rights or remedies with respect to, any collateral securing all or any part of the Subordinated Obligations; (iv) request, demand, take, accept, or receive any security for the Subordinated Obligations, other than as provided in any collateral documents in effect on the date hereof; (v) enter into any other subordination agreement with respect to any of the Subordinated Obligations or assign, transfer, pledge or otherwise dispose of, or change any term or condition of, any of the Subordinated Obligations....

(Emphasis added).

16.     The Liquidating Trustee is not aware of any other subordination agreement for the benefit of a stockholder or its bank that contains similar standstill provisions or such broadly defined (and onerous) terms with respect to the borrower and the subordinated obligations.

17.     The Liquidating Trustee has no information regarding the primary obligations owed to M&T as of the date of the Subordination Agreement or today.  The Liquidating Trustee believes that an order authorizing the production of documents by M&T pursuant to Bankruptcy Rule 2004 is necessary and appropriate to fully investigate the Debtor's prepetition affairs, including the status and circumstances of the Subordination Agreement, and negotiations that led to its terms.  The Liquidating Trustee reserves all rights to amend or supplement facts and legal remedies as they become known to the Liquidating Trustee.

## **<u>JURISDICTION</u>**

18.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the

relief sought herein are sections 1103 and 1109(b) of the Bankruptcy Code and Bankruptcy Rule

2004.

## RELIEF REQUESTED

19.     The Liquidating Trustee respectfully requests entry of an order pursuant to

Bankruptcy Rule 2004 in the form attached hereto as Exhibit A, authorizing the production of

documents by M&T described in Exhibit A-1 in accordance with a duly issued subpoena.

## BASIS FOR RELIEF

**A. The Liquidating Trustee Is Entitled to Information Relating to the Subordination Agreement with M&T Pursuant to Bankruptcy Rule 2004(a).**

20.     Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the

court may order the examination of any entity."  Bankruptcy Rule 2004(a).  The general purpose

of Rule 2004 is to "assist a party in interest in determining the nature and extent of the

bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing

has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) (citation

omitted); *see also In re Lufkin*, 255 B.R. 204, 208 (Bankr. E.D. Tenn. 2000) (Rule 2004's

purpose is to "determine the condition, extent, and location of the debtor's estate in order to

maximize distribution to unsecured creditors").  Rule 2004 "necessarily permits a broad

investigation into the financial affairs of debtors to assure the proper administration of

bankruptcy estates." *In re Symington*, 209 B.R. 678, 683-84 (Bankr. D. Md. 1997).

21.     Unlike discovery under the Federal Rules of Civil Procedure, discovery under

Bankruptcy Rule 2004 can be used as a "pre-litigation discovery device."  *In re Wilson*, 2009

WL 304672, at *5 (Bankr. E.D. La. 2009); *see also In re Hughes,* 281 B.R. 224, 226 (Bankr.

S.D.N.Y. 2002).  As such, a Bankruptcy Rule 2004 motion need not be tied to specific factual

allegations at issue between parties. *In re Symington*, 209 B.R. 678, 683 (Bankr. D. Md. 1997) (Bankruptcy Rule 2004 permits "examination of any party without the requirement of a pending adversary proceeding or contested matter").

22.     Moreover, the scope of a Bankruptcy Rule 2004 examination is broader than that of discovery under the Federal Rules of Civil Procedure or related Bankruptcy Rules governing adversary proceedings. *In re Ecam Publications, Inc.*, 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991); *see also In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) ("[T]he scope of a Rule 2004 examination is very broad. Rule 2004 discovery is broader than discovery under the Federal Rules of Civil Procedure."). In fact, courts have recognized that Bankruptcy Rule 2004 examinations may be "broad" and "unfettered," and can legitimately be in the nature of a "fishing expedition." *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008); *see also In re Lev*, 2008 WL 207523, at *3 (Bankr. D.N.J. 2008); *In re Bakalis*, 199 B.R. 443, 447 (Bankr. E.D.N.Y. 1996); *In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) (Rule 2004's purpose is to assist in "revealing the nature and extent of the estate, and to discover assets of the debtor which may have been intentionally or unintentionally concealed"); *In re Valley Forge Plaza Assocs.*, 109 B.R. 669, 674 (E.D. Pa. 1990).

23.     The decision whether to authorize discovery pursuant to Rule 2004 rests within the bankruptcy court's sound discretion. *See, e.g., In re Hammond*, 140 B.R. 197, 200 (Bankr. S.D. Ohio 1992). Courts authorize discovery under Bankruptcy Rule 2004 to assist in recovering assets for the benefit of a debtor's creditors. *See In re Vantage Petroleum Corp.*, 34 B.R. 650, 651 (Bankr. E.D.N.Y. 1983) (allowing discovery under Rule 2004 to help the debtor "discover and recover assets for benefit of creditors of the debtor").

DOCS_SF:105506.1 75015/003

24.     In this case, Giroux and the Giroux Pharmacies owe more than $1.9 million to RDC but the debt appears to be subordinated and legal remedies barred until M&T's loan(s) has been paid in full.  The Liquidating Trustee has a right to obtain information "relating to the debtor's property or financial affairs," including facts and circumstances relating to the Subordination Agreement and the primary obligations thereunder.

**B.  M&T Holds Information That Is Necessary to the Liquidating Trustee's Investigation of the Debtor's Affairs.**

25.     The Liquidating Trustee seeks the production of documents by M&T as described in <u>Exhibit A-1</u>.  The documents in M&T's possession include information relating to its loan to the Giroux Pharmacies and/or Giroux – i.e., the "primary obligations" owed to M&T.  The Liquidating Trustee needs the information to assess the status and recoverability of RDC's accounts receivable and any other claims in favor of RDC.

26.     In addition, M&T's records include, among other items, communications regarding the Subordination Agreement and its terms.  The Liquidating Trustee needs the information to assess the circumstances of the transaction and consideration received by RDC.

<u>**NO PRIOR REQUEST**</u>

27.     No prior request for the relief sought in this Motion has been made to this or any other Court.

<u>**NOTICE**</u>

34.     Notice of this Motion has been given to (a) the U.S. Trustee; (b) the Debtor, (c) counsel for M&T, (d) Stephen Giroux, and (e) all parties requesting notice of proceedings after the effective date of the Plan.  In light of the nature of the relief requested herein, the Liquidating Trustee submits that no other or further notice is required.

WHEREFORE, the Liquidating Trustee respectfully requests that this Court: (i) enter an order substantially in the form attached hereto as **Exhibit A**, granting the relief sought herein, including the production of documents described in **Exhibit A-1**; and (ii) granting such other and further relief to the Liquidating Trustee as the Court may deem proper.

Date: June 29, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Ilan D. Scharf*
Ilan D. Scharf
Gail S. Greenwood (admitted *pro hac vice*)
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone: (212) 561-7700
Email: ischarf@pszjlaw.com
ggreenwood@pszjlaw.com

*Counsel to Advisory Trust Group, LLC, solely in its capacity as Liquidating Trustee of the RDC Liquidating Trust*

10

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

|   |   |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| ROCHESTER DRUG CO-OPERATIVE, INC., | ) Case No. 20-20230 (PRW) |
| | ) |
| Debtor. | ) |
| | ) |

### DECLARATION OF DAVID GREENBLATT IN SUPPORT OF MOTION OF THE LIQUIDATING TRUSTEE FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING THE PRODUCTION OF DOCUMENTS BY M&T BANK

I, David Greenblatt, declare under penalty of perjury as follows:

1.        I am a director of B. Riley Advisory Services, in its capacity as financial advisor to the Liquidating Trustee.  I submit this declaration in support of the Liquidating Trustee's *Motion for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Production of Documents by M&T Bank* ("**Motion**").[1]  I have personal knowledge of the facts set forth herein unless otherwise stated.

---

[1]  Capitalized terms not otherwise defined have the meanings ascribed to such terms in the Motion.

2.     Attached hereto as **Exhibit 1** is a copy of the Subordination Agreement dated January 28, 2020 by RDC in favor of M&T with respect to Giroux and certain of the Giroux Pharmacies.

3.     I have reviewed RDC's prepetition accounting relating to the company's payment of patronage dividends to shareholders and current A/R and A/P records. RDC paid the Giroux Pharmacies $238,923 in patronage dividends for the fiscal year ending 2017, not including preferred dividends. During the period of fiscal years 2014 through 2017, RDC paid the Giroux Pharmacies the aggregate sum of $1,195,846 as patronage dividends.

4.     As of today, the Giroux Pharmacies currently owe RDC approximately $1,967,495 based on outstanding invoices for pharmaceutical goods, including approximately $212,000 for fees and interest accruing since approximately September 2019.

5.     Based on my review of certain meeting minutes of RDC's Board of Directors, I am informed and believe that during the pendency of RDC's bankruptcy case, Mr. Giroux moved for an increase of director compensation relating to telephonic board appearances. Members of the Board of Directors were historically compensated $250 each for telephonic appearances and $1500 each for in-person meetings. In August 2020, RDC's Board of Directors unanimously agreed to set their fees at the higher rate of $1500 per meeting retroactive to March 2020 notwithstanding objections by the Official Committee of Unsecured Creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
          June 28 2020

David Greenblatt

# EXHIBIT 1



# GENERAL SUBORDINATION AGREEMENT
## New York

DATE: January 28, 2020

**CREDITOR**: Rochester Drug Co-operative, Inc., a New York domestic cooperative corporation whose principal place of business is 50 Jet View Drive, Rochester, New York 10462.

**LENDER**: M&T Bank, a New York banking corporation with banking offices at One M&T Plaza, Buffalo, New York 14203. Attention: Office of General Counsel

**BORROWER**: Giroux Holdings, Inc., a New York corporation, whose principal place of business is 81 Rochester Road, Middleport, New York 14105, Rosenkrans Pharmacy, Inc., d/b/a Oakfield Family Pharmacy and d/b/a Rosenkrans Pharmacy, a New York corporation, whose principal place of business is 32 Main Street, Hilton, New York 14668, Stephen Giroux, an individual whose residence is 9034 Ridge Road, Gasport, New York 14067 and Moden-Giroux, Inc., d/b/a Transit Hill Pharmacy and d/b/a Middleport Family Health Center, a New York corporation, whose principal place of business is 81 Rochester Road, Middleport, New York 14105

1. **Subordination.** Creditor, for value received, and intending to be legally bound, hereby subordinates, for the benefit of Lender, the Subordinated Obligations (defined below) to the Primary Obligations (defined below) and agrees to the other provisions of this Agreement. The provisions of this Agreement shall remain effective and enforceable against Creditor regardless of the enforceability of the Primary Obligations.

    a. "Primary Obligations" means collectively, any and all obligations owed by Borrower to Lender, whether now existing or hereafter incurred, of every kind and character, whether such obligations are from time to time reduced and thereafter increased, or entirely extinguished and thereafter reincurred, whether direct, indirect, primary, absolute, secondary, contractual, tortious, liquidated, unliquidated, contingent, secured, unsecured, matured or unmatured, by guarantee or otherwise including, without limitation: (i) obligations not yet outstanding, but contracted for, or with respect to which any other commitment by Lender exists; (ii) all interest provided for in any instrument, agreement or applicable law which accrues on any obligations; (iii) any obligations incurred prior to, during or after any filing by or against Borrower or any petition or request for liquidation, reorganization, arrangement, adjudication as a bankrupt, relief as a debtor, or other relief under bankruptcy, insolvency, or similar laws now or hereafter in effect in the United States of America or any state or territory thereof or any foreign jurisdiction, notwithstanding Borrower's legal status as a debtor or a debtor-in-possession or Borrower's discharge in any such proceeding, including, without limitation, any post-petition interest which may accrue on such obligations and whether or not all, or any part of, such obligations (including, without limitation, post-petition interest) is an allowable claim; (iv) all fees and costs (including, without limitation, actual attorneys' fees and disbursements whether for internal or outside counsel) Lender incurs in order to collect any amount due by Borrower, to negotiate or document a workout or restructuring, or to preserve its rights or realize upon any guaranty or other security for the payment of any amount due by Borrower to Lender; and (v) any sums owed by Borrower to others which Lender has obtained, or may obtain, by assignment or otherwise.

    b. "Subordinated Obligations" means collectively, any and all obligations owed by Borrower to Creditor whether now existing or hereafter incurred of every kind and character, whether such obligations are from time to time reduced and thereafter increased, or entirely extinguished and thereafter reincurred, whether direct, indirect, primary, absolute, secondary, contractual, tortious, liquidated, unliquidated, contingent, secured, unsecured, matured or unmatured, by guarantee or otherwise including, without limitation: (i) the obligations described on Schedule A and all extensions, renewals or modifications thereof; (ii) obligations not yet outstanding, but contracted for, or with respect to which any other commitment by Creditor exists; (iii) all interest provided in any instrument, agreement or applicable law which accrues on any obligations; (iv) any obligations incurred prior to, during or after any filing by or against Borrower or any petition or request for liquidation, reorganization, arrangement, adjudication as a bankrupt, relief as a debtor, or other relief under bankruptcy, insolvency, or similar laws now or hereafter in effect in the United States of America or any state or territory thereof or any foreign jurisdiction, notwithstanding Borrower's legal status as a debtor or a debtor-in-possession or Borrower's discharge in any such proceeding, including, without limitation, any post-petition interest which may accrue on such obligations and whether or not all, or any part of, such obligations (including, without limitation, post-petition interest) is an allowable claim; (v) all fees and costs (including, without limitation, actual attorneys' fees and disbursements whether for internal or outside counsel) Creditor incurs in order to collect any amount due by Borrower, to negotiate or document a workout or restructuring, or to preserve its rights or realize upon any guaranty or other security for the payment of any amount due by Borrower to Creditor; and (vi) any sums owed by Borrower to others which Creditor has obtained, or may obtain, by assignment or otherwise.

2. **Payments on Subordinated Obligations.** Creditor shall have the right to receive the following payments (but not prepayment) on the Subordinated Obligations listed on Schedule A unless and until Lender notifies Creditor or Borrower that an Event of Default (defined below) has occurred (check applicable box(es)):

X    Any payment made in cash and consisting of regularly scheduled payments of **interest** accruing after the date of this Agreement with respect to the Subordinated Obligations listed on Schedule A or with respect to any portion thereof in accordance with the terms of any instrument in effect as of the date hereof and disclosed to Lender in accordance with the terms of this Agreement, which evidences the Subordinated Obligations listed on Schedule A. Payment of accrued interest must be made when due under the terms of any such instrument evidencing the applicable Subordinated Obligation listed on Schedule A. Interest payable on demand is not a "regularly scheduled payment" in this context.

X    Any payment made in cash and consisting of regularly scheduled installments of **principal** (other than "balloon" payments at maturity) coming due after the date of this Agreement with respect to the Subordinated Obligations listed on Schedule A or with respect to any portion thereof in accordance with the terms of any instrument in effect as of the date hereof and disclosed to Lender in accordance with the terms of this Agreement, which evidences the Subordinated Obligations listed on Schedule A. Payment of such principal installments must be made when due under the terms of any such instrument evidencing the applicable Subordinated Obligation listed on Schedule A. Amounts payable on demand are not "regularly scheduled installments" in this context.

☐ Any payment made in cash and consisting of regularly scheduled installments of principal of the Subordinated Obligations listed on Schedule A or any portion thereof, so long as, immediately after the acceptance of such payment by Creditor, the outstanding principal amount of the Subordinated Obligations listed on Schedule A total no less than $_____.

☐ See Schedule B, attached hereto and made a part hereof.

(If no box is checked, no payments of either principal, interest or any other amounts are permitted at any time either before or after such notice of an Event of Default.) If there are any Subordinated Obligations not listed on Schedule A, Creditor is not permitted to receive any payment thereunder (either before or after an Event of Default), notwithstanding that payments may be permitted under the Subordinated Obligations listed on Schedule A. Following Lender providing Creditor with notice of an Event of Default, Creditor shall not demand or receive any payments of principal, interest or any other amounts on the Subordinated Obligations listed on Schedule A or any part thereof while this Agreement is in effect without the prior written consent of Lender. If there are any Subordinated Obligations not listed on Schedule A, Creditor shall not demand or receive payments of principal or interest under such Subordinated Obligations even if payments are being allowed under the Subordinated Obligations listed on Schedule A. If Creditor receives any payments in violation of this paragraph or any other provision in this Agreement, Creditor will hold such payments in trust for Lender in the same medium in which received, will not commingle the same with any of the assets of Creditor, and will deliver the same to Lender in the form received, properly endorsed to permit collection, not later than the next business day following the day of their receipt. Nothing herein shall require the Lender to accelerate or demand (as the case may be) payment of the Primary Obligations or exercise any other right or remedy against Borrower or any other person upon or after an Event of Default in order to exercise its rights under this Agreement.

3. **Event of Default.** Any of the following events or conditions shall constitute an "Event of Default": (i) failure by Borrower to pay when due (whether at the stated maturity, by acceleration, upon demand or otherwise) the Primary Obligations, or any part thereof, or there occurs any event or condition which after notice, lapse of time or both will permit acceleration of the Primary Obligations; (ii) Borrower defaults in the performance of any obligation, condition, covenant or other provision in any agreement between Borrower and the Lender or any of its affiliates or subsidiaries (collectively, "Affiliates"); (iii) Borrower fails to pay when due (whether at the stated maturity, by acceleration or otherwise) any indebtedness owing to a third party or Affiliate or the occurrence of any event which could result in acceleration of payment of any such indebtedness or the failure to perform any agreement with any third party or Affiliate; (iv) the sale, assignment transfer or delivery, by operation of law or otherwise, of all or substantially all of the assets of the Borrower to a third party; (v) a non-individual Borrower, without the Lender's prior written consent, engages in, agrees to or approves a plan for (a) reorganization, (b) merger or consolidation, (c) division into (or of) one or more entities or series of entities or allocation or transfer of any of Borrower's assets or liabilities as a result of such a division, (d) conversion to another form of business entity, or (e) dissolution of Borrower or cessation by Borrower as a going business concern; (vi) the death or judicial declaration of incompetency of Borrower, if an individual; (vii) failure by Borrower to pay, withhold or collect any tax as required by law; the service or filing against Borrower or any of its assets of any lien (other than a lien permitted in writing by the Lender), judgment, garnishment, order or award; (viii) if Borrower becomes insolvent or is generally not paying its debts as such debts become due; (ix) the making of any general assignment by Borrower for the benefit of creditors; the appointment of a receiver or similar trustee for Borrower or its assets; or the making of any, or sending notice of any intended, bulk sale; (x) Borrower commences (or has commenced against it and not dismissed or stayed within forty-five (45) days) any proceeding or request for relief under any bankruptcy, insolvency or similar laws now or hereafter in effect in the United States of America or any state or territory thereof or any foreign jurisdiction or any formal or informal proceeding for the dissolution or liquidation of, settlement of claims against or winding up of affairs of Borrower; (xi) any representation or warranty made in this Agreement, any related document or elsewhere was misleading in any material respect when made; Creditor omits to state a material fact necessary to make the statements made in this Agreement, any related document or elsewhere not misleading in light of the circumstances in which they were made; or, if upon the date of execution of this Agreement, there shall have been any material adverse change in any of the facts disclosed by Creditor in any representation, warranty or elsewhere that was not disclosed in writing to the Lender at or prior to the time of execution hereof; (xii) any pension plan of Borrower fails to comply with applicable law or has vested unfunded liabilities that, in the opinion of the Lender, might have a material adverse effect on Borrower's ability to repay its debts; (xiii) an adverse change in the Borrower, its business, assets, operations, management, ownership, affairs or condition (financial or otherwise) or the Lender's collateral from the status shown on any financial statement or other document submitted to the Lender or any Affiliate, and which change the Lender determines will have a material adverse effect on (a) the Lender's collateral or the Borrower, its business, assets, operations or condition (financial or otherwise), or (b) the ability of the Borrower to pay or perform any obligation to the Lender; (xiv) any indication or evidence received by the Lender that the Borrower may have directly or indirectly engaged in any type of activity which, in the Lender's discretion, might result in the forfeiture of any property of the Borrower to any governmental authority; (xv) the occurrence of any event described in sub-paragraph (i) through and including (xiv) hereof with respect to Creditor or any endorser, guarantor or other party liable for, or whose assets or any interest therein secures, payment of the Primary Obligations; (xvi) Borrower fails to supply new or additional collateral within ten (10) days of request by the Lender; or (xvii) the Lender in good faith deems itself insecure with respect to payment or performance of the Primary Obligations.

4. Intentionally omitted.

5. **Lien Subordination.** To the extent that any or all of the Subordinated Obligations are secured by any assets of Borrower (the "Subordinated Collateral"), then such lien, security interest or encumbrance and all collateral documents in connection therewith, and all modifications, amendments, consolidations thereto, and all rights of Creditor to receive insurance proceeds and condemnation awards in connection therewith, are subordinated and made junior to all liens, security interests or encumbrances of the Lender in any and all assets and property of Borrower, whether real or personal, tangible or intangible, wherever located, and whether now owned or hereafter acquired. This subordination is effective notwithstanding (i) the priorities that would ordinarily result from the order of granting or attaching or the order of filing or recording any financing statement, deed or other instrument (or any failure to do so); (ii) and (ii) the bankruptcy, reorganization or other insolvency proceeding of Borrower. Creditor waives any right it may have to assert that Lender should marshal assets subject to a lien securing the Primary Obligations.

6. **Subordinated Instrument.** Creditor agrees not to demand or receive any new note, certificate of stock, or other instrument evidencing the Subordinated Obligations or any part thereof while this Agreement is in effect without the prior written consent of Lender. Creditor agrees to hold in trust for, and to endorse and immediately deliver to, Lender, any and all such notes, certificates of stock or other instruments which may be received by Creditor with or without demand by Creditor, or without the prior written consent of Lender, or to the acceptance of which Lender may hereafter so consent. Creditor agrees that any and all such notes, certificates of stock or other instruments which may be delivered to Lender as set forth herein or otherwise may be held by Lender, subject to the terms and conditions of this Agreement. If the Subordinated Obligations are not evidenced by an instrument in writing, Creditor and Borrower agree, at Lender's request, to reduce the Subordinated Obligations to writing and Creditor further agrees to endorse such instruments as aforesaid. Creditor shall legend any documents evidencing the Subordinated Obligations, any security documents and/or financing statements to indicate that the Subordinated Obligations and, as applicable, any liens, security interests or encumbrances securing the Subordinated Obligations, are subject to the terms of this Agreement.

7. **Standstill Covenants.** Creditor hereby covenants, as long as this Agreement is in effect, that Creditor will not, unless and until the Primary Obligations are fully and irrevocably paid and satisfied and all financial and other arrangements between Lender and Borrower have been terminated, and prior thereto, without Lender's prior written consent: (i) accelerate, request, demand, take, accept, or receive from or on behalf of Borrower, by setoff or in any other manner, any monies representing all or any part of the Subordinated Obligations except as may be expressly permitted by this

Agreement; (ii) initiate or participate with others in any suit, action, or proceeding, including, without limitation, any bankruptcy, reorganization, or insolvency proceeding against Borrower, or exercise any other rights or remedies to collect or enforce the Subordinated Obligations; (iii) repossess, foreclose upon, or otherwise take any action against, or exercise any rights or remedies with respect to, any collateral securing all or any part of the Subordinated Obligations; (iv) request, demand, take, accept, or receive any security for the Subordinated Obligations, other than as provided in any collateral documents in effect on the date hereof; (v) enter into any other subordination agreement with respect to any of the Subordinated Obligations or assign, transfer, pledge or otherwise dispose of the Subordinated Obligations or any portion thereof, other than with Lender; or (vi) release, surrender, exchange, or permit a discharge of, or change any term or condition of, any of the Subordinated Obligations. Without in any way limiting the general application of the covenants above, Creditor hereby specifically agrees, without limitation, as follows: Creditor shall not, at any time (i) assert, claim or raise any challenge or objection to Lender's priority over Creditor with respect to debts owed by, and liens on assets of, Borrower, as provided for in this agreement; (ii) assert, claim or raise any challenge or objection to, or take any action to delay, any sale, liquidation or other disposition, supported by Lender, of any assets that constitute, or purportedly constitute, collateral securing the Primary Obligations; (iii) in the context of any bankruptcy, reorganization or insolvency proceeding involving Borrower and/or Borrower's assets, assert, claim or raise any challenge or objection to (a) any cash collateral or adequate protection arrangement supported by Lender, (b) any debtor-in-possession financing arrangement supported by Lender, or (c) any reorganization plan supported by Lender, nor shall Creditor support or vote in favor of any such arrangement or plan that Lender opposes.

8.  **Authorizations & Waivers.**

    a.  This Agreement is a continuing agreement and Creditor authorizes Lender, without notice or demand and without affecting Creditor's obligations hereunder, from time to time: (i) to renew, extend, increase, accelerate or otherwise change the time for payment of the terms of or the interest on the Primary Obligations, or any part thereof, and to modify or amend any other term or condition in the document(s) or instrument(s) which may evidence the Primary Obligations from time to time; (ii) to take from any party (including Borrower) and hold collateral (other than the Subordinated Obligations) for the payment of the Primary Obligations, or any part thereof, and to exchange, enforce or release such collateral or any part thereof; (iii) to accept and hold any endorsement or guaranty of payment of the Primary Obligations, or any part thereof and to release or substitute any such endorser or guarantor, or any party (including Borrower) who has given any security interest in any collateral as security for the payment of the Primary Obligations, or any part thereof, or any other party in any way obligated to pay the Primary Obligations, or any part thereof; (iv) to direct the order or manner of the disposition of any and all other collateral and the enforcement of any and all endorsements and guaranties relating to the Primary Obligations, or any part thereof, as Lender, in its sole, but reasonable, discretion, may determine; (v) to exercise or refrain from exercising any rights or remedies against Borrower or any other person or waive any Event of Default; and (vi) to exercise, or refrain from exercising, any rights or remedies under this Agreement which is directly or indirectly conditioned upon the occurrence of an Event of Default even if the Lender waives such Event of Default or refrains from taking action against Borrower or any other person based upon such Event of Default.

    b.  To the fullest extent permitted by applicable law, Creditor waives (i) any defense based on or arising out of any defense of Borrower or the unenforceability of the Primary Obligations or any part thereof from any cause, or the cessation from any cause of the liability of Borrower (other than the final and indefeasible payment in full in cash of the Primary Obligations) and (ii) presentment to, demand of payment from and protest to Borrower of any of the Primary Obligations, and also waives notice of acceptance and notice of protest for non-payment. To the fullest extent permitted by applicable law, the obligations of Creditor hereunder shall not be affected by (a) the failure of Lender to assert any claim or demand or to enforce or exercise any right or remedy against Borrower; (b) any rescission, waiver, amendment or modification of any agreement with Borrower; or (c) the release of any security held by Lender with regard to the Primary Obligations. The obligations of Creditor and the rights of Lender hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Primary Obligations), including any claim of waiver, release, surrender, alteration or compromise of any of the Primary Obligations and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Primary Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of Creditor hereunder shall not be discharged, impaired or otherwise affected by the failure of Lender to assert any claim or demand or to enforce any remedy under its agreements with Borrower, by any waiver or modification of any provision thereof, by any default, failure or delay, willful or otherwise, in the performance of the Primary Obligations, or by any other act or omission that may or might in any manner or to any extent vary the rights of Creditor or that would otherwise operate as a discharge of Creditor's obligations or Lender's rights against Creditor as a matter of law or equity (other than the indefeasible payment in full in cash of all of the Primary Obligations).

9.  **Rights of Lender.**

    a.  If Creditor shall commence, prosecute, or participate in any suit, action, or proceeding against Borrower or Lender, in violation of this Agreement, or shall attempt to enforce, foreclose upon or realize upon any collateral securing all or any part of the Subordinated Obligations, Borrower or Lender may (but is not obligated to) interpose as a defense the terms and conditions of this Agreement, and Lender may intervene and interpose such defense in its name or in the name of Borrower.

10. **Representations and Warranties.** Creditor hereby represents and warrants as follows:

    a.  The outstanding principal amount of the Subordinated Obligations as of the date of this Agreement is set forth on Schedule A.

    b.  Creditor has all requisite power to enter into this Agreement and to carry out the provisions hereof and has duly authorized the execution and delivery of this Agreement. The execution and delivery of this Agreement and the performance of the obligations hereunder do not violate articles of incorporation, bylaws or other relevant organization documents or constitute a default under any agreement or other instrument to which it is a party or by which it is bound. Creditor has duly executed and delivered this Agreement and it constitutes a legal, valid and binding obligation enforceable against it in accordance with its terms and no consent, license, approval, or authorization of, or registration, declaration, or filing with, any court, governmental body, authority, or other person or entity is required in connection with the valid execution, delivery and performance of this Agreement, other than filings and recordings in connection with this Agreement.

    c.  Creditor has not previously assigned, transferred, or granted any interest in the Subordinated Obligations to any party, no party owns an interest in the Subordinated Obligations other than Creditor, whether as a joint holder of the Subordinated Obligations, a participant, or otherwise, the entire Subordinated Obligations are owing to Creditor, and the Subordinated Obligations shall continue to be owing only to Creditor.

11. **Further Assurances.** Creditor agrees to, and to cause it affiliates to execute and deliver to Lender such other and further powers of attorney or other documents, instruments, agreements or writings as Lender may request at any time or from time to time in order to effectuate the terms and conditions and purposes and intent of this Agreement, including, without limitation, causing any affiliate, entity or series of entities it may create hereafter through merger, division or otherwise, to execute agreements, in form and substance acceptable to Lender, (i) assuming or guarantying the

Creditor's obligations and agreements under this Agreement and all related agreements and (ii) subordinating the Subordinated Obligations to the Primary Obligations to the same extent as the Creditor has pursuant to this Agreement.

12.  Intentionally omitted.

13.  **Specific Performance.** Lender is hereby authorized to demand specific performance of this Agreement at any time when Creditor shall have failed to comply with any of the provisions of this Agreement. Creditor hereby irrevocably waives any defense based on the adequacy of a remedy at law, or any other defense which might be asserted as a bar to such remedy of specific performance. Further, the parties acknowledge that breach of this Agreement by Creditor could cause irreparable harm to Lender for which there may be no adequate remedy at law; and, therefore, Lender is entitled to injunctive relief in the event of an anticipated or actual breach by Creditor of the terms hereof.

14.  **Notices.** Any demand or notice hereunder or under any applicable law pertaining hereto shall be in writing and duly given if delivered to Creditor (at its address on the Lender's records) or to the Lender (at the address on page one and separately to the Lender officer responsible for Borrower's relationship with the Lender). Such notice or demand shall be deemed sufficiently given for all purposes when delivered (i) by personal delivery and shall be deemed effective when delivered, or (ii) by mail or courier and shall be deemed effective three (3) business days after deposit in an official depository maintained by the United States Post Office for the collection of mail or one (1) business day after delivery to a nationally recognized overnight courier service (*e.g.*, Federal Express). Notice by e-mail is not valid notice under this or any other agreement between Creditor and the Lender.

15.  **Information.** Creditor assumes all responsibility for being and keeping itself informed of Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of non-payment of the Primary Obligations and the Subordinated Obligations and the nature, scope and extent of the risks that Creditor assumes and incurs hereunder, and agrees that Lender will not have any duty to advise Creditor of information known to it regarding such circumstances or risks.

16.  **Miscellaneous.**

a.  This Agreement contains the entire agreement between Lender and Creditor with respect to this subordination, and supersedes every course of dealing, other conduct, oral agreement and representation previously made by Lender. All rights and remedies of Lender under applicable law and this Agreement or amendment of any provision hereof are cumulative and not exclusive. No course of dealing between Creditor and the Lender and no delay or omission by the Lender in exercising any right or remedy hereunder or with respect to any Primary Obligations shall operate as a waiver thereof or of any other right or remedy, and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy Lender, Borrower and Creditor as used herein shall include the heirs, executors or administrators, or successors or assigns, of those parties. No modification, rescission, waiver, release or amendment of any provision of this Agreement shall be made except by a written agreement subscribed by Creditor and by a duly authorized officer of Lender. If a court deems any provision of this Agreement to be void, the remainder of the Agreement shall remain in effect. Section headings are for convenience only. Borrower agrees that in any legal proceeding, a copy of this Agreement kept in the Lender's course of business may be admitted into evidence as an original. Singular number includes plural and neuter gender includes masculine and feminine as appropriate.

b.  Lender shall have no obligation to collect the Subordinated Obligations. Further, Lender shall have no obligation whatsoever for maintenance, protection, preservation or liquidation of any security for the Subordinated Obligations.

c.  Creditor has, to the extent deemed necessary by Creditor, reviewed the existing Agreements between Lender and Borrower, as such have been presented to Creditor by Borrower, and understands that there is no commitment or obligation on Lender's part to make any loans or advances or to extend credit to Borrower except as may be contained in current and presently effective written agreements between Lender and Borrower; provided, however, that Creditor further understands that such agreements may be modified, altered, or amended, without notice to or consent of Creditor.

d.  Creditor agrees to pay all costs and expenses (including attorneys' fees) which Lender may incur in protecting or enforcing any of its rights hereunder and/or against Creditor.

e.  All terms, unless otherwise defined in this Agreement, shall have the definitions set forth in the Uniform Commercial Code, as the same may be in effect in the State of New York, as amended from time to time.

17.  **Joint and Several.** If more than one party executes this Agreement, the term "Creditor" shall include each as well as all of them and their obligations, warranties and representations hereunder shall be joint and several. If there is more than one Borrower, then the term "Borrower" shall include each as well as all of them.

18.  **Governing Law and Jurisdiction.** This Agreement has been delivered to and accepted by the Lender and will be deemed to be made in the State of New York. Unless provided otherwise under federal law, this Agreement will be interpreted in accordance with the laws of the State of New York excluding its conflict of laws rules. **CREDITOR HEREBY IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT IN NEW YORK IN ANY COUNTY OR JUDICIAL DISTRICT WHERE THE LENDER MAINTAINS A BRANCH AND CONSENTS THAT THE LENDER MAY EFFECT ANY SERVICE OF PROCESS IN THE MANNER AND AT CREDITOR'S ADDRESS SET FORTH ABOVE FOR PROVIDING NOTICE OR DEMAND; PROVIDED THAT NOTHING CONTAINED IN THIS AGREEMENT WILL PREVENT THE LENDER FROM BRINGING ANY ACTION, ENFORCING ANY AWARD OR JUDGMENT OR EXERCISING ANY RIGHTS AGAINST CREDITOR INDIVIDUALLY, AGAINST ANY SECURITY OR AGAINST ANY PROPERTY OF CREDITOR WITHIN ANY OTHER COUNTY, STATE OR OTHER FOREIGN OR DOMESTIC JURISDICTION.** Creditor acknowledges and agrees that the venue provided above is the most convenient forum for both the Lender and Creditor and waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Agreement.

19.  **Trial by Jury.** CREDITOR AND LENDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY CREDITOR OR LENDER MAY HAVE IN ANY ACTION OR PROCEEDING, IN LAW OR IN EQUITY, IN CONNECTION WITH THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS RELATED THERETO. CREDITOR REPRESENTS AND WARRANTS THAT NO REPRESENTATIVE OR AGENT OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WILL NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THIS RIGHT TO JURY TRIAL WAIVER.

The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a)  When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in

accordance with federal law.

b)      Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

Rochester Drug Co-operative, Inc.

By: _____

Name: Samuel Alaimo_____

Title: Credit Manager_____

## ACKNOWLEDGMENT

STATE OF NEW YORK)

                : SS.

COUNTY OF MONROE)

On the 28ᵗʰ day of January, in the year 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared *Samuel Alaimo*, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

JEANINE M. DAVIS
NOTARY PUBLIC-STATE OF NEW YORK
No. 01DA6257682
Qualified in Monroe County
My Commission Expires March 19, 20__

_Jeanine M Davis_
Notary Public

LENDER USE ONLY

Authorization Confirmed: _____

                                          Signature

## SCHEDULE A

### Description of Subordinated Obligations (§1(b))

Rochester Drug Co-operative, Inc. trade receivables owed by

MODEN-GIROUX, INC. - Middleport Pharmacy's trade account # 1354 with an approximate balance of $824,485.41

MODEN-GIROUX, INC. - Transit Hill Pharmacy's trade account # 1519 with an approximate balance of $315,002.47

ROSENKRANS PHARMACY INC. - Rosenkrans Pharmacy's trade account # 1433 with an approximate balance of $630,950.16

ROSENKRANS PHARMACY INC. - Hilton Family Pharmacy's trade account # 3099 with an approximate balance of $130,875.11

ROSENKRANS PHARMACY INC. - OAKFIELD FAMILY PHARMACY trade account #1368 with an approximate balance of $183,360.02

WURLITZER FAMILY PHARMACY-which corporation owns this? Wurlitzer Family Pharmacy Inc. owns it. And what is the approximate balance? Trade account = $ 107,224.73 while its Note = $ 89,244.96

Is there any other debt owed to RDC? List here. Two other trade accounts: # 1325 Lockport Home Medical $ 34,473.66
                                        # 2981 Summit Park Pharmacy $ 125,559.72

# BORROWER'S AGREEMENT

The undersigned Borrower, mentioned in the foregoing General Subordination Agreement, hereby acknowledges receipt of a copy thereof, acknowledges that the Subordinated Obligations mentioned therein are payable as stated therein, and agrees (i) to make no payment on the Subordinated Obligations so long as there are any outstanding Primary Obligations, except such payments specifically permitted in Section 2 of the Subordination Agreement without Lender's consent; (ii) not to issue any note or other instrument evidencing the Subordinated Obligations, to give any security therefor, or accept any extension, renewal, refinancing, release or modification thereof; and/or (iii) that the Subordinated Obligations are not subject to any counterclaim, setoff or defense. If there are more than one undersigned, the term "Borrower" herein and in the Subordination Agreement shall include each as well as all of them, and their obligations hereunder and under the Subordination Agreement shall be joint and several.

Date: January _____, 2020

Giroux Holdings, Inc.,

Rosenkrans Pharmacy, Inc., d/b/a Oakfield Family Pharmacy and d/b/a Rosenkrans Pharmacy,

Moden-Giroux, Inc., d/b/a Transit Hill Pharmacy and d/b/a Middleport Family Health Center

_____

By: Stephen L. Giroux, President

_____

Stephen L. Giroux

# ACKNOWLEDGMENT

STATE OF NEW YORK)
                    : SS.
COUNTY OF ERIE    )

On the _____ day of January, in the year 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared Stephen L. Giroux, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____

Notary Public

---

LENDER USE ONLY

Authorization Confirmed: _____

Signature

# EXHIBIT A
(Proposed Order)

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| IN RE: | ) | Chapter 11 |
| | ) | |
| ROCHESTER DRUG CO-OPERATIVE, INC., | ) | Case No. 20-20230 (PRW) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## ORDER GRANTING MOTION OF THE LIQUIDATING TRUSTEE FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING THE PRODUCTION OF DOCUMENTS BY M&T BANK

This matter coming before the Court on the *Motion of the Liquidating Trustee for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Production of Documents by M&T Bank* (the "**Motion**");[1] the Court having reviewed and considered the Motion and accompanying papers; the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and (iii) notice of the Motion as described in the Motion was proper under the circumstances; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and good and sufficient cause appearing therefor, it is hereby ORDERED that

1.      The Motion is GRANTED.

2.      M&T Bank ("**M&T**") is directed to produce to the Liquidating Trustee the records described in Exhibit A-1 hereto within thirty days of entry of this Order, or on such other date as may be agreed by the parties.  A copy of this Order shall be served on M&T or its counsel pursuant to a form of Subpoena for Rule 2004 Examination.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

3.      Nothing contained herein shall prejudice the Liquidating Trustee's rights under Bankruptcy Rule 2004 and other applicable laws to seek further document productions and written or oral examinations in connection with the case.

4.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.


Dated: Rochester, New York  
     _____, 2021

_____  
THE HONORABLE PAUL R. WARREN  
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A-1
(Document Requests)

**EXHIBIT A-1**

**<u>INSTRUCTIONS</u>**

1.      Documents shall be produced in exactly the manner in which they were found, including file folders, tabulations or other forms or manner of organization.  Further, all attachments to the documents, whether stapled, paper-clipped, electronically attached, or otherwise affixed, shall be produced and shall be attached to the documents to which they relate in exactly the same manner in which they were found.  All copies of documents or items that are not identical to the originals by reason of handwritten comments, marginal notations, underlining or otherwise shall be produced in addition to the originals.

2.      All Documents should be produced that are in your possession, custody or control, including documents in the possession, custody, or control of your attorneys, investigators, agents, employees, officers, accountants, independent contractors, subcontractors, consultants, experts or other representatives.

3.      You are required to make a diligent search for all available Documents within your actual and constructive possession, custody or control, and not merely such Documents within the personal possession of the individual answering these Requests.

4.      If there are no Documents in existence that are responsive to a particular Request, your response must include a statement to that effect.  If Documents once existed in your possession, custody or control, but are no longer in your possession, custody or control for any reason, please identify the specific circumstances under which you lost possession, custody or control, and identify your understanding of the documents' current whereabouts, or the manner in which you disposed of the Documents.

5.      Electronically stored information ("ESI") responsive to these Requests shall be produced in the same manner in which it is stored, together with all associated metadata.  If software not in normal, typical commercial use is necessary to view the ESI produced in full,

1

native and usable form with full functionality, then a copy of or license to the necessary software shall be produced together with the ESI.

6.      Where the context permits, a term's singular form shall include its plural form, and a term's plural form shall include its singular.

7.      If any of the requested Documents within the scope of this Request have not been produced on grounds that such documents are privileged, immune or trade secrets, please provide the following information as to each document to which such claim is made: (a) the privilege that is grounds for withholding the Document; (b) the nature of the Document (i.e., letter, spreadsheet, memorandum); (c) the date that the Document was prepared; (d) the name/title of the author; (e) the name/title of each recipient or addressee of the Document; (f) the number of pages withheld; and (g) the name and location of the current custodian of the Document.

8.      Unless otherwise stated, each Request seeks Documents from **January 1, 2016 through present**.

**DEFINITIONS**

A.      "DEBTOR" means Rochester Drug Cooperative, Inc., its agents, affiliates, employees, representatives, and/or attorneys.

A.      "DOCUMENT" or "DOCUMENTS" is used in the broadest sense possible and means any printed, written, typed, recorded, transcribed, taped, or photographic matter, however produced or reproduced, including, but not limited to, the following: (i) any electronically stored information; (ii) any letter, correspondence, electronic mail or communication of any sort; (iii) film, negative or photograph; (iv) sound recording or video recording; (v) note, notebook, diary, calendar, minutes, memorandum, contract, agreement, or any amendment thereto; (vi) facsimile transmission; (vii) summary, report, or record of telephone conversation, personal conversation, discussion interview, meeting, conference, investigation, negotiation, act or activity; (viii) projection, work paper, or draft; (viii) financial statement, statement of account, bank statement, check book, stubs or register, cancelled check, deposit slip, charge slip, tax return (income or

other), or requisition; (ix) file, study, graph, tabulation, and any and all other writings and recordings of whatever nature, whether signed or unsigned or transcribed; (x) any other data compilation from which information can be obtained, translated, recalled, viewed, and/or edited by the respondent through detection devices into reasonably usable form.

B.    "GIROUX" means Stephen Giroux, his agents, representatives, and/or attorneys.

C.    "GIROUX PHARMACIES" means any entities owned or controlled by GIROUX, including without limitation, Giroux Holdings, Inc., Rosenkrans Pharmacy, Inc., Oakfield Family Pharmacy, Moden-Giroux, Inc., Transit Hill Pharmacy, and/or Middleport Family Health Center, their agents, representatives, and/or attorneys.

D.    "REFLECTING" or "RELATING TO" means that the requested document or information evidences, constitutes, embodies, comprises, reflects, identifies, states, deals with, comments on, responds to, describes, analyzes, contains information concerning, summarizes, or is in any way pertinent to the information requested.

E.    "SUBORDINATION AGREEMENT" means the General Subordination Agreement dated January 28, 2020 entered between and among the DEBTOR and YOU.

F.    "YOU" or "YOUR" means M&T Bank, its employees, representatives, and/or attorneys.

## DOCUMENTS REQUESTED

1.    All DOCUMENTS RELATING TO the SUBORDINATION AGREEMENT, including internal notes, loan analyses, and memoranda.

2.    All agreements entered contemporaneously with or RELATING TO the SUBORDINATION AGREEMENT, including related loans, personal guarantees, or security agreements.

3.    All closing statements RELATING TO any loan entered in connection with the SUBORDINATION AGREEMENT.

4.    All communications between YOU and GIROUX or the GIROUX PHARMACIES.

5.  All communications between YOU and the DEBTOR RELATING TO the SUBORDINATION AGREEMENT, including drafts or redlines of the agreement.

6.  All DOCUMENTS REFLECTING or RELATING TO obligations owed to YOU by the GIROUX PHARMACIES on or after January 1, 2016.

7.  All DOCUMENTS REFLECTING or RELATING TO the current balance of obligations owed to YOU by GIROUX or the GIROUX PHARMACIES, including payments received in the last twelve (12) months.