## EXHIBIT C

**Declaration of David Greenblatt**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                          :
In re                                     :          **Chapter 11**
                                          :
**ROCHESTER DRUG**                        :          **Case No. 20-20230 (PRW)**
**CO-OPERATIVE, INC.**                    :
                                          :
                 **Debtor.**              :
-------------------------------------------------------------x

## DECLARATION OF DAVID GREENBLATT IN SUPPORT OF LIQUIDATING TRUSTEE'S OBJECTION TO CLAIM 282 ASSERTED BY SHAREHOLDER KLEIN PHARMACY, INC.

I, David Greenblatt, declare under penalty of perjury as follows, pursuant to the provisions of 28 U.S.C. § 1746:

1.      I am a director of B.Riley Advisory Services ("B.Riley"), financial advisor to the Advisory Trust Group, LLC (the "Liquidating Trustee"), trustee of the RDC Liquidating Trust. I submit this declaration in support of the Liquidating Trustee's *Objection to Claim 282 Asserted by Shareholder Klein Pharmacy, Inc.* (the "Objection").

2.      On February 26, 2021, the Bankruptcy Court entered an order (the "Confirmation Order") confirming the *Second Amended Chapter 11 Plan of Liquidation* (the "Plan of Liquidation") of Rochester Drug Co-operative, Inc. (the "Debtor" or "RDC"). Pursuant to the Confirmation Order, the Plan of Liquidation and that certain Liquidating Trust Agreement and Declaration of Trust (the "Trust Agreement"), RDC's Assets were transferred to the RDC Liquidating Trust which was empowered, among other things, to: (i) collect and administer the Debtor's Assets (including Causes of Action) and (ii) resolve Claims against the Debtor and its estate.  The Effective Date of the Plan of Liquidation occurred on March 19, 2021. As of the

Effective Date, Advisory Trust Group, LLC was appointed to act as trustee of the RDC Liquidating Trust. Shortly thereafter, the Liquidating Trustee retained B.Riley to act as its financial advisor.

3. As part of my current position in assisting with the Liquidating Trustee's responsibilities under the Plan of Liquidation, I am responsible for certain claims management and reconciliation matters. I have read the *Objection* and am directly, or by and through the Liquidating Trustee's advisors and, in some cases, the Debtor's former personnel who are available to support the Liquidating Trustee (the "Transition Personnel"), familiar with the information contained therein and the exhibits attached thereto.

4. I am authorized to submit this declaration (the "Declaration") in support of the Objection. All matters set forth in this Declaration are based on: (a) my personal knowledge; (b) my review of relevant documents; (c) information supplied to me by the Debtor and its professionals, the Liquidating Trustee and its professionals, and/or the Transition Personal; or (d) as to matters involving United States bankruptcy law or rules or other applicable laws, my reliance upon the advice of counsel or other advisors to the Liquidating Trustee. If called upon to testify, I could and would testify competently to the facts set forth herein.

5. Prior to its liquidation under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), RDC was a New York cooperative corporation owned by approximately 307 stockholding pharmacists and pharmacies (the "Shareholder Pharmacies").

6. RDC sold pharmaceutical products to many (if not all) of its Shareholder Pharmacies and, as of the Petition Date, many Shareholder Pharmacies had accounts receivable owing to RDC (collectively, the "Shareholder Receivables") which were in default.

7.      For many years, RDC distributed profits to the Shareholder Pharmacies, if available and at the discretion of the Board of Directors, in the form of a patronage dividend ("Patronage Dividends").

8.      Each Shareholder Pharmacy was required to make minimum yearly purchases from RDC to remain in good standing, and Patronage Dividends were distributed based on each shareholder's total sales volume.

9.      RDC's board of directors last declared a Patronage Dividend (approximately $22.1 million) for the fiscal year ending March 31, 2017, which was paid in June of 2017 (the "2017 Patronage Dividend").

10.     Shareholder Pharmacies filed thirty-two proofs of claim against RDC (the "Shareholder Claimants") pursuant to which they assert claims for (a) undeclared patronage dividends (the "Dividend Claims"), (b) the value of their stock (the "Stock Claims"), and/or (c) breach of fiduciary duty or other corporate malfeasance (the "Bad Faith Claims").    (The Dividend Claims, the Stock Claims and the Bad Faith Claims are collectively, the "Shareholder Claims").[1]

11.     On or about July 30, 2020, Klein Pharmacy, Inc. ("Claimant") filed a proof of claim (docketed as claim 282) in the amount of $95,106.13 (the "Claim").  A copy of the Claim is attached as **Exhibit A** to the Objection.

12.     Claimant is a shareholder in the Debtor. According to the Debtor's books and records, Claimant owns two shares of common stock in RDC (the "RDC Stock"),[2] one of which it acquired on or about November 19, 2010 for $26,500 pursuant to that certain

---

[1] Approximately 18 of the Shareholder Claims include a combination of Stock Claims, Dividend Claims and/or Bad Faith Claims; 9 assert only Stock Claims; 2 assert only Dividend Claims; 3 are amended or duplicate claims.
[2] Ownership is according to the Debtor's List of Equity Security Holders [Doc. No. 105-1].

*Subscription Agreement Under Confidential Summary Offering Statement* Dated September 21, 2010 (the "<u>Subscription Agreement</u>").[3]

13.     A true and correct copy of the Subscription Agreement is attached hereto as **Exhibit 1**.

14.     A true and correct copy of the A copy of the *Confidential Summary Offering Statement Dated September 21, 2010* (the "<u>Offering Statement</u>") is attached hereto as **Exhibit 2.**

15.     Claimant has represented that it has (or had) an interest in two retail pharmacies that did business with the Debtor: (i) one located at 123 Fifth Avenue, Pelham, NY (operated under the name of Klein Pharmacy) and (ii) one located at 7035 Parsons Blvd, Flushing NY operated under the name of Jewel Pharmacy RX) that purchased inventory (the "<u>Goods</u>") from the Debtor pre-petition (the "<u>Pharmacies</u>").[4]  The Debtor extended credit to Claimant to finance the sale of the Goods (the "<u>RDC Obligations</u>"), which were personally guaranteed by Nadeem Kausar ("<u>Kausar</u>").

16.     Prior to the Petition Date, Claimant defaulted on the RDC Obligations by failing to pay for the Goods when and as due. Accordingly, on or about June 2, 2020, the Liquidating Trustee filed a Verified Complaint against Claimant and Guarantor and, in the Supreme Court of the State of New York County of Westchester (the "<u>State Court</u>") (Index No. 55664/2020) (the "<u>Collection Action</u>").[5] The Collection Action was ultimately settled and on July 15, 2022, case was dismissed as to all defendants with prejudice. The settlement did not, however, address or otherwise resolve the Claim.

---

[3] It is not clear from the Debtor's books & records when Claimant acquired its second share of common stock.
[4] The Liquidating Trustee is informed and believes that Jewel Pharmacy RX is or was owned and operated by Jewel of Flushing Rx Inc. ("Jewel, Inc.") in which Kausar also has an interest.
[5] The Collection Action was also filed against Jewel Inc. and Syed J. Rizvi.

17.     The Liquidating Trustee is informed and believes that the Claimant has been paid in full for any Patronage Dividends that were declared by the BOD through and including the FYE March 31, 2017.

18.     According to the Debtor's books and records, the Debtor paid Claimant a total of $233,697 in Patronage Dividends in 2017 ($22,973 related to Klein Pharmacy and $210,724 related Jewel RX Pharmacy).

19.      The Liquidating Trustee is informed and believes that BOD decided, in its discretion, not to issue Patronage Dividends following Fiscal Year ending March 31, 2017.

20.     Accordingly, no Patronage Dividends are owing to the Claimant.

21.     On or about March 8, 2022, the Liquidating Trustee, on behalf of the estate, filed a suit against the Debtor's Board of Directors (the "Board Action")[6] in connection with the 2017 Patronage Dividend.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
            September 21, 2022

                                            */s/ David Greenblatt*
                                            David Greenblatt

---

[6] *See Complaint for Breach of Fiduciary Duties and Recovery of Wrongful Declaration of Dividends* (the "BOD Complaint") filed by the Liquidating Trustee against Donald Arthur, Christopher Casey, Laurence F. Doud III, Stephen Giroux, Sherwood Klein, Richard Klenk, Joe Lech, Boris Mantell, Joseph Scott Miskovsky, Garry Mrozek, Paul Pagnotta, which is pending in the United States Bankrutpcy Court for the Western District of New York as 22-AP-02073. A trial in the action against the Director Defendants is set for April 2024.

**<u>EXHIBIT 1</u>**

**Subscription Agreement**

_KLEIN PHARMACY INC._

SUBSCRIBER

_061785232_

FEDERAL EMPLOYER IDENTIFICATION NUMBER

## ROCHESTER DRUG CO-OPERATIVE, INC.

### SUBSCRIPTION AGREEMENT

Under Confidential Summary Offering Statement
Dated September 21, 2010

Rochester Drug Co-operative, Inc.
50 Jet View Drive
Rochester, New York 14624

Attention: Board of Directors

Ladies and Gentlemen:

1.    The undersigned has received and read the Confidential Summary Offering Statement dated September 21, 2010 and all of the Exhibits thereto (collectively, the "Offering Documents"), concerning the offering made by Rochester Drug Co-operative, Inc. (the "Company"), of thirty seven (37) shares of its Voting Common Stock, par value $5.00 per share, (the "Shares"). The undersigned, intending to be legally bound, hereby subscribes for the Shares described on page 6 hereof, and as payment therefor hereby tenders herewith either (i) cash or a check backed by good, negotiable funds, in the amount set forth on page 6 hereof representing the full payment of the subscription price, or (ii) (a) cash or a check backed by good, negotiable funds, in the amount of $10,000, representing partial payment of the subscription price, and (b) a fully executed and delivered Promissory Note (in the original principal amount of $16,500, representing the balance of the subscription price) and Pledge Agreement (with Stock Power attached) in the forms attached hereto as Annexes 1 and 2.

2.    This subscription is irrevocable by the Subscriber, except as otherwise set forth herein. The Company shall have the right to reject this subscription in its sole discretion for any reason. Upon such rejection, all funds tendered shall be returned to the undersigned, without interest or deductions of any kind.

3. The undersigned acknowledges that: (a) he has read the Offering Documents and has evaluated the risks of investing in the Shares; (b) he is able to bear the economic risk of such investment; and (c) the Shares have not been and will not be registered under the Securities Act of 1933, as amended (the "1933 Act"). The undersigned represents that he has had the opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this transaction and the information presented in the Offering Documents. Any questions raised have been answered to the satisfaction of the undersigned. The undersigned's decision to purchase Shares is based solely on the information in the Offering Documents and on the written answers to such questions as the undersigned has raised concerning the transaction.

4. By executing this Agreement, the undersigned agrees to be bound by and comply with the By-laws, the Certificate of Incorporation and the rules and regulations of the Company, as each may be amended from time to time. Without limiting the generality of the foregoing, the undersigned specifically agrees and acknowledges that:

(a) In accordance with the Company's By-laws and Certificate of Incorporation, shares of Voting Common Stock owned by a shareholder which does not own a licensed pharmacy or which fails to make purchases from the Company of at least $500,000 (as such amount may be amended from time to time) during the preceding fiscal year (or a pro-rated portion of $500,000, as such amount may be amended from time to time, for any partial fiscal year in which the undersigned is a shareholder of the Company) are subject to redemption at the option of the Company, at net book value per share (as defined in the Company's Certificate of Incorporation and By-laws), plus previously declared and unpaid dividends, less amounts owed by the shareholder to the Company.

(b) In accordance with the Company's By-laws and Certificate of Incorporation, the Company is granted a first right to purchase any shares of Voting Common Stock presented to the Company for transfer. Any such purchase shall be at net book value per share (as defined in the Company's Certificate of Incorporation and By-laws) of Voting Common Stock plus previously declared and unpaid dividends, less amounts owed to the Company by the shareholder.

(c) In accordance with the Company's By-laws and Certificate of Incorporation, the Company may refuse to consent to the transfer of Shares if a transferring shareholder is indebted to the Company, for purchases of inventory or otherwise, until such indebtedness is paid.

5. The undersigned acknowledges and understands that the purchase price pursuant to the Offering of the Company's Shares is $26,500 per share, which is less than the net book value per share of the Company's Shares as of March 31, 2010, the conclusion of the Company's most recently completed fiscal year. The undersigned agrees and acknowledges that the Company's net book value per share as of the date of this Subscription Agreement, or as of March 31, 2011, the last day of the Company's current fiscal year, may be higher or lower than the net book value per share as of March 31, 2010, and may be higher or lower than the purchase price for the Shares.

2

6.     The undersigned represents to the Company that it is purchasing Shares for its own account, for investment, and not with a view to, or for resale in connection with, any distribution thereof.  The undersigned does not have any present intention of selling or otherwise transferring the Shares subscribed for or any interest therein.  The undersigned acknowledges and agrees that such Shares may not be sold, transferred, pledged or otherwise disposed of without registration under the 1933 Act and applicable state securities laws or in accordance with applicable exemptions therefrom.  If the undersigned is a resident of the Commonwealth of Pennsylvania, the undersigned agrees that it may not sell the Shares for a period of 12 months from the date of this Subscription Agreement except in accordance with Regulation 204.011 of the Pennsylvania Securities Act of 1972.

7.     The undersigned acknowledges that no representations or promises have been made concerning the marketability or value of the Shares.   Except as otherwise set forth in this Agreement, the Company has not agreed with or represented to the undersigned that the Shares will be purchased or redeemed from the undersigned at any time in the future.   Further, there have been no representations, promises or agreements that the Shares will be registered under the 1933 Act at any time in the future or otherwise qualified for sale under applicable securities laws.  The Company does not now file reports with the Securities and Exchange Commission (the "Commission") or otherwise make available to the public such information concerning itself as would permit its shareholders to use Rule 144 of the Rules and Regulations promulgated under the 1933 Act ("Rule 144") for transfer of the Shares, and there is no requirement that the Company do so in the future or take any other action to make available any other exemption from the registration requirements of the 1933 Act.

8.     The undersigned understands and agrees that the Shares may not be sold, transferred, pledged or otherwise disposed of in the absence of either an effective registration statement covering the Shares under the 1933 Act and relevant state securities laws, or an exemption from such registration requirements.  The undersigned acknowledges that: (a) a notation will be made on the appropriate records of the Company so that transfers of the Shares will not be effected on those records without compliance with those restrictions; and (b) the Commission has taken the position in various releases that persons who offer to sell restricted securities such as the Shares without reliance on Rule 144 are to be on notice that, in view of the broad remedial purposes of the 1933 Act and of public policy which supports registration, they will have a substantial burden of proof establishing that an exemption from registration is available for such offers or sales.  In view of the foregoing restrictions, the undersigned understands and acknowledges that it must continue to bear the economic risk of its investment in the Shares for an indefinite period of time.

9.     The rights and duties of the undersigned under this Subscription Agreement are not assignable without the written consent of the Company.   The provisions of this Subscription Agreement shall be binding upon the successors, permitted assigns and legal representatives of the undersigned.

10.     The representations and warranties made by the undersigned herein are made with the intent that they be relied upon by the Company in determining the suitability of the undersigned as a purchaser of the Shares.  In addition, the undersigned undertakes to notify the

3

Company immediately of any change in any representation, warranty or other information relating to the undersigned set forth herein. The undersigned hereby agrees that such representations and warranties and any agreements, undertakings and acknowledgments herein shall survive the purchase of the Shares, and hereby indemnifies the Company and its officers and directors and holds them harmless from and against any and all loss, damage, liability or expense, including costs and reasonable attorneys' fees, which they may incur by reason of or in connection with the undersigned's misrepresentation or breach of representation, warranty or covenant set forth herein.

11. The undersigned represents that: (a) if it is a corporation or other entity, it is duly organized, validly existing and in good standing under the laws of the state in which it was formed and has all the requisite power and authority to invest in the Shares as provided herein; (b) such investment does not result in any violation of, or conflict with, any term of any instrument to which the undersigned is bound or any laws or regulations applicable to it; (c) such investment has been duly authorized by all necessary action on behalf of the undersigned; (d) this Subscription Agreement has been duly executed and delivered on behalf of the undersigned and constitutes a legal, valid and binding agreement of the undersigned; and (e) the undersigned has not been formed for the specific purpose of acquiring the Shares.

12. Whenever used herein, the masculine pronoun shall include the feminine and neuter, as appropriate in the context.

13. If the undersigned has elected to deliver partial payment for the Shares subscribed for hereby by delivery to the Company of a Promissory Note in the form attached hereto as Annex 1 (the "Promissory Note"), the undersigned acknowledges and understands that he will be deemed to be a shareholder of the Company upon delivery to the Company of the Promissory Note and the related Pledge Agreement and Irrevocable Proxy (with Stock Power attached) in the form attached hereto as Annex 2 (the "Pledge Agreement") and this Subscription Agreement, and as such will be entitled to receive patronage dividends to the extent declared and paid by the Company prior to the repayment in full of the Promissory Note, in an amount determined pro-rata, based upon the undersigned's purchases from the Company after becoming a shareholder of the Company. However, in the event the Promissory Note is not repaid in full by the subscriber on or prior to March 18, 2011, or in the event of certain other events of default as set forth in the Promissory Note, the undersigned will forfeit any patronage dividend previously paid or payable with respect to periods on or prior to March 31, 2011, and the Company will have certain rights as a secured creditor pursuant to the Pledge Agreement. Without limiting the generality of the foregoing, if the Promissory Note is not paid in full by March 18, 2011, the undersigned hereby grants to the Company the right to repurchase the Shares subscribed for hereby by re-paying to the undersigned the principal amount paid by the undersigned to the Company prior to the delivery by the Company of notice of its intent to exercise its re-purchase rights hereunder. Upon such repurchase by the Company, all of the undersigned's rights in and to the Shares shall be cancelled, and the undersigned hereby forfeits and agrees to repay to the Company any patronage dividend previously paid or payable to the undersigned by the Company with respect to periods on or prior to March 31, 2011.

4

## FOR PENNSYLVANIA RESIDENTS ONLY

IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A WRITTEN NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M)(1) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, YOU MAY ELECT, WITHIN TWO BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS (WHICH IS NOT MATERIALLY DIFFERENT FROM THE FINAL PROSPECTUS) TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONIES PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A WRITTEN NOTICE (INCLUDING A NOTICE BY FACSIMILE OR ELECTRONIC MAIL) TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE PROSPECTUS) INDICATING YOUR INTENTION TO WITHDRAW.

IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES AND HAVE RECEIVED A WRITTEN NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M)(2) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, YOU MAY ELECT, WITHIN TWO BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF YOUR BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO BUSINESS DAYS AFTER YOU MAKE THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED, TO WITHDRAW YOUR ACCEPTANCE AND RECEIVE A FULL REFUND OF ALL MONIES PAID BY YOU. YOUR WITHDRAWAL OF ACCEPTANCE WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A WRITTEN NOTICE (INCLUDING A NOTICE BY FACSIMILE OR ELECTRONIC MAIL) TO THE ISSUER (OR PLACEMENT AGENT IF ONE IS LISTED ON THE FRONT PAGE OF THE OFFERING MEMORANDUM) INDICATING YOUR INTENTION TO WITHDRAW.

## Number of Shares and Purchase Price
### (to be completed by Subscriber):

One share of Voting Common Stock at $26,500 per share.

Total Purchase Price = $26,500

Dated: _11/19_, 20_10_

SUBSCRIBER:

KLEIN PHARMACY INC.

By: _Nadeem Kausar_
Title: _President_

ADDRESS OF SUBSCRIBER:

_123, Fifth Ave_

_Pelham, NY 10803_

DEA IDENTIFICATION NUMBER:

_FK0012942_

TAX IDENTIFICATION NUMBER:

_061785232_

Accepted this _____ day of

_____, 20____

Rochester Drug Co-operative, Inc.

By: _____
    Laurence F. Doud, III, Chief Executive Officer

6

# ANNEX 1

## FORM OF PROMISSORY NOTE

ANNEX 2

FORM OF PLEDGE AGREEMENT AND IRREVOCABLE PROXY WITH STOCK POWER
ATTACHED

8

**EXHIBIT 2**

**Offering Statement**

Offeree: _____  Number: _43___

**Confidential Summary Offering Statement**

**September 21, 2010**

# ROCHESTER DRUG CO-OPERATIVE, INC.

**37 Shares of Voting Common Stock**
**$26,500 Per Share**

<u>FOR PENNSYLVANIA RESIDENTS ONLY</u>

IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A WRITTEN NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M)(1) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, YOU MAY ELECT, WITHIN TWO BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS (WHICH IS NOT MATERIALLY DIFFERENT FROM THE FINAL PROSPECTUS) TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONIES PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A WRITTEN NOTICE (INCLUDING A NOTICE BY FACSIMILE OR ELECTRONIC MAIL) TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE PROSPECTUS) INDICATING YOUR INTENTION TO WITHDRAW.

IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES AND HAVE RECEIVED A WRITTEN NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M)(2) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, YOU MAY ELECT, WITHIN TWO BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF YOUR BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO BUSINESS DAYS AFTER YOU MAKE THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED, TO WITHDRAW YOUR ACCEPTANCE AND RECEIVE A FULL REFUND OF ALL MONIES PAID BY YOU. YOUR WITHDRAWAL OF ACCEPTANCE WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A WRITTEN NOTICE (INCLUDING A NOTICE BY FACSIMILE OR ELECTRONIC MAIL) TO THE ISSUER (OR PLACEMENT AGENT IF ONE IS LISTED ON THE FRONT PAGE OF THE OFFERING MEMORANDUM) INDICATING YOUR INTENTION TO WITHDRAW.

CONFIDENTIAL

THE SECURITIES OFFERED HEREBY ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933. THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT HAS NOT BEEN SUBMITTED TO, REVIEWED OR APPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, THE ATTORNEY GENERAL OF THE STATE OF NEW YORK OR ANY OTHER STATE SECURITIES COMMISSION NOR HAVE ANY OF THE FOREGOING PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING NOR IS IT INTENDED THAT ANY SUCH AGENCY WILL DO SO. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION MAY NOT LAWFULLY BE MADE.

UNDER CERTAIN EXEMPTIONS PROVIDED FOR BY FEDERAL AND STATE SECURITIES LAWS APPLICABLE TO THIS OFFERING, THE COMPANY IS NOT REQUIRED TO PROVIDE AND HAS NOT UNDERTAKEN TO PROVIDE IN THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT THE TYPE AND KIND OF INFORMATION THAT WOULD BE AVAILABLE TO AN INVESTOR IF THIS INVESTMENT WERE SUBJECT TO THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933.

THE SECURITIES ARE OFFERED SUBJECT TO PRIOR SALE, TO WITHDRAWAL, CANCELLATION OR MODIFICATION OF THE OFFER WITHOUT NOTICE, TO THE COMPANY'S RIGHT TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART AND TO APPROVAL OF CERTAIN LEGAL MATTERS BY COUNSEL TO THE COMPANY.

THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK.

THIS INVESTMENT IS SUITABLE ONLY FOR PERSONS WHO HAVE ADEQUATE FINANCIAL RESOURCES, WHO DO NOT ANTICIPATE THAT THEY WILL BE REQUIRED TO LIQUIDATE AN INVESTMENT ACQUIRED HEREUNDER IN THE FORESEEABLE FUTURE, AND WHO CAN AFFORD A TOTAL LOSS OF THEIR INVESTMENT.

THE COMPANY HEREBY EXTENDS TO EACH OFFEREE THE OPPORTUNITY, PRIOR TO THE CONSUMMATION OF A SALE OF ANY SECURITIES TO SUCH OFFEREE, TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE COMPANY TO THE EXTENT THE COMPANY POSSESSES THE SAME OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN. HOWEVER, ALL SUCH REQUESTS FOR ADDITIONAL INFORMATION MUST BE IN WRITING AND THE RESPONSES THERETO IDENTIFIED AS SUCH BY THE COMPANY. SEE "ADDITIONAL INFORMATION". NO PERSON IS AUTHORIZED BY THE COMPANY TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION IN CONNECTION WITH THIS OFFERING OTHER THAN AS CONTAINED IN THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT. NO PERSON HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THE SECURITIES OFFERED HEREBY, EXCEPT THE INFORMATION CONTAINED HEREIN. PROSPECTIVE INVESTORS SHOULD NOT RELY ON INFORMATION NOT CONTAINED HEREIN. NEITHER THE DELIVERY OF THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT AT ANY TIME NOR ANY SALE MADE HEREUNDER SHALL IMPLY THAT INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE.

---

THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT AND THE INFORMATION CONTAINED HEREIN MAY NOT BE REPRODUCED OR USED IN ANY OTHER MANNER WITHOUT THE EXPRESS WRITTEN CONSENT OF THE COMPANY. BY ACCEPTING DELIVERY HEREOF, EACH OFFEREE AGREES TO RETURN THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT IF HE DOES NOT PURCHASE THE SECURITIES OFFERED HEREBY.

---

THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT HAS BEEN PREPARED SOLELY FOR THE BENEFIT OF INVESTORS INTERESTED IN THE PRIVATE PLACEMENT OF THE SECURITIES OF THE COMPANY AND CONSTITUTES AN OFFER ONLY TO THE PERSON TO WHOM THE COMPANY HAS DELIVERED THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT.

SUMMARY

Rochester Drug Co-operative, Inc. ("RDC" or the "Company") is offering 37 shares of its Voting Common Stock (the "Voting Common Stock") at a purchase price of $26,500 per share. This Offering shall expire on March 18, 2011, unless the Company at its option elects to extend the offering period. This Offering has no minimum aggregate subscription amount. If all of the shares of Voting Common Stock offered hereby are not sold prior to March 18, 2011, the Company will not refund amounts subscribed for and tendered. If all 37 shares offered hereby are sold, the gross proceeds to the Company, prior to the payment of offering expenses, will be $980,500.

The following summary highlights certain information contained in this Confidential Summary Offering Statement. It does not purport to be complete. Please refer to the remainder of the Confidential Summary Offering Statement and the Exhibits hereto for more detailed information regarding the matters referred to in this summary. Summaries of documents or agreements do not purport to be complete. Exhibit B sets forth a list of certain material documents or agreements to which the Company is a party, copies of which will be provided to prospective investors on written request.

## RDC

Rochester Drug Co-operative, Inc. is a New York Cooperative Corporation formed in 1905 and incorporated in 1948. Its principal business is to warehouse, merchandise and then distribute, on a co-operative basis, drugs, pharmaceutical supplies and other merchandise commonly sold in drug stores, pharmacies and health and beauty stores, together with equipment and supplies commonly used in the maintenance and operation of drug stores, pharmacies, health and beauty stores and durable medical equipment businesses.

RDC distributes pharmaceutical and other products, principally to pharmacies in New York, Pennsylvania, New Jersey, Connecticut and Ohio. The Company operates a distribution center, located at 50 Jet View Drive, Rochester, New York 14624. RDC's administrative operations are also conducted from this location. The Rochester distribution center was constructed in 2001 to RDC's specifications. See, "PROPERTIES". RDC's telephone number is (585) 271-7220.

RDC's sales for the fiscal year ended March 31, 2010 were $634,528,666. RDC's sales for the preceding fiscal year ended March 31, 2009 were $563,047,439. The increase in sales for RDC's last fiscal year was due to various factors, including expanding geographic markets, increased purchases by new shareholders of the Company, and increases in sales in generic pharmaceuticals (with corresponding reductions in sales of higher priced, branded pharmaceuticals). See, "BUSINESS; THE COMPANY" for a more complete discussion of these factors and their effect on the Company's sales.

RDC has three classes of capital stock authorized: Voting Common Stock, Non-Voting Common Stock and Preferred Stock. The Company has outstanding 174 shares of Voting Common Stock, 204 shares of Non-Voting Common Stock and 208,670 shares of Preferred

1

357172_5

Stock. See, "DESCRIPTION OF SECURITIES" for a more complete description of the three classes of stock and their rights and preferences.

Shareholders are eligible to receive distributions when, as, and if declared by the Board of Directors of RDC, in amounts related to the shareholder's purchases of pharmaceutical and other products from RDC and payments to RDC for other services. The amounts received by shareholders pursuant to these distributions, known as "patronage dividends", totaled $5,200,000 for the fiscal year ended March 31, 2010, with no single shareholder receiving more than $435,088 for such fiscal year.

## Recent Events

RDC's sales for the four months ended July 31, 2010 were $231,229,412 compared to $203,832,326 for the four months ended July 31, 2009. For the four-month period ended July 31, 2010, 65% of RDC's sales were to holders of its Voting Common Stock. For the fiscal year ended March 31, 2010, 62.6% of RDC's sales were to holders of its Voting Common Stock.

## The Offering

**Voting Common Stock**. The Company is offering to sell 37 shares of its Voting Common Stock at a purchase price of $26,500 per share, for aggregate gross proceeds of $980,500. The offering price per share is less than the net book value per share of the Company's Voting Common Stock. The book value per share of the Company's Voting Common Stock as of March 31, 2010 was $27,459. Prospective investors are cautioned that the Company's net book value per share as of the date of this Confidential Summary Offering Statement or as of March 31, 2011 (the conclusion of the Company's current fiscal year) may be higher or lower than the net book value per share as of March 31, 2010, and may be higher or lower than the purchase price for the shares of Voting Common Stock. The shares of Voting Common Stock will have the terms described below, all of which should be read in conjunction with, and are qualified in their entirety by, the Company's Certificate of Incorporation, By-laws, and by the Subscription Agreement, a form of which is attached hereto as Exhibit C. Investors are also encouraged to review the information regarding the Company's other classes of capital stock, set forth herein under the heading "DESCRIPTION OF SECURITIES."

**Payment for Subscription**. Any subscription tendered by a prospective subscriber must be accompanied by payment of the purchase price therefor, which may be paid either (i) in full by cash or check, or (ii) $10,000 by cash or check, with the balance of $16,500 by delivery to the Company of a promissory note and related pledge agreement and stock power, in the forms attached hereto as Exhibits D and E. The Company shall have the right to reject any subscription in its sole discretion for any reason. Upon such rejection, all funds tendered by a subscriber shall be returned, without interest or deductions of any kind.

**Rights as Subscriber; Right to Receive Patronage Dividend.** If a subscriber elects to pay for a portion of the purchase price of the Voting Common Stock by delivering to the Company a promissory note in the form attached hereto as Exhibit D, the subscriber will be deemed to be a shareholder of the Company upon delivery to the Company of payment in the

amount of $10,000 together with the Promissory Note, the related pledge agreement and stock power (in the forms attached hereto as Exhibit E), and the Subscription Agreement (in the form attached as Exhibit C), and as such will be entitled to receive a pro-rata portion of patronage dividends to the extent declared and paid by the Company, with the amount thereof determined based upon the subscriber's purchases from the Company after becoming a shareholder. In the event the promissory note is not repaid in full by the subscriber on or prior to Friday, March 18, 2011, the subscriber shall not be deemed to have earned any patronage dividend previously paid or payable with respect to periods on or prior to March 31, 2011, and will waive any rights with respect thereto. The Company will have certain rights as a secured creditor pursuant to the pledge agreement.

## Use of Proceeds

The proceeds of this offering, net of legal fees, accounting fees and other expenses estimated to be approximately $35,000 in the aggregate, are estimated to be $945,500 (assuming all of the shares of Voting Common Stock offered hereby are sold) and will be used for general working capital purposes in the discretion of the Company's Board of Directors.

RISK FACTORS

**THERE ARE SIGNIFICANT RISKS ASSOCIATED WITH AN INVESTMENT IN THE VOTING COMMON STOCK. AN INVESTMENT IN THE SECURITIES OFFERED HEREBY IS SUITABLE ONLY BY PERSONS WHO CAN AFFORD THE LOSS OF THEIR ENTIRE INVESTMENT. PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER, AMONG OTHER THINGS, THE FOLLOWING RISK FACTORS:**

**Competition**. The Company engages in a very competitive business. Its principal customers are independent pharmacies. Larger and better-capitalized competitors may offer the Company's customers prices or ancillary service, which the Company cannot afford to meet. The trend in the industry is toward increasing consolidation of pharmacies in large drug or food store chains. The Company believes that independent pharmacies have recently been gaining increased popularity. However, if the trend toward consolidation continues, it could result in a decline in the number of independent pharmacies, which comprises the Company's primary market. See, "BUSINESS"; "THE COMPANY"; "COMPETITION".

**No Registration; Restrictions on Transferability**. The shares of Voting Common Stock being offered hereby are not registered under the Securities Act of 1933, as amended, or under any state securities laws. None of such shares may be sold, transferred or assigned except pursuant to valid registration statements filed under these statutes, or exemptions therefrom.

Other restrictions on the transferability of the Company's stock exist in the Company's Certificate of Incorporation and By-laws, including a provision permitting the Company's Board of Directors to refuse to consent to a transfer of any shares of Common Stock if the holder is indebted to the Company. The Company has a right to purchase certain shares of its capital stock which a holder desires to transfer upon certain terms more fully set forth herein under the heading "DESCRIPTION OF SECURITIES". There can be no assurance, however, that the price

3

required to be paid by the Company will equal or exceed the price at which a willing buyer would purchase such shares. There also can be no assurance that the Board of Directors will determine that it is in the best interests of the Company to repurchase shares at any particular time. In addition, New York law prohibits a repurchase of shares except from surplus or if a corporation is or would thereby be rendered insolvent. See, "DESCRIPTION OF SECURITIES".

**Voting Common Stock Subject to Redemption**. Shares of Voting Common Stock which are held by persons or entities who do not own a licensed pharmacy or who have not made purchases of at least $500,000 during the preceding fiscal year may have their shares redeemed, at the option of the Company at a price determined in accordance with the Company's By-laws and Certificate of Incorporation, and generally equal to the net book value per share, less amounts owed to the Company, plus declared and unpaid dividends. A subscriber in this offering will be subject to this requirement for the Company's current fiscal year, pro-rated to reflect the portion of the Company's fiscal year during which a subscriber is a shareholder of the Company. Although the net book value per share of the Company's capital stock has increased over the past ten years, there can be no assurance that net book value will continue to increase. The Company's Board of Directors is not required to cause the Company to repurchase the shares of Common Stock at any time. Investors should not expect to have their shares of Common Stock repurchased at any time. See, "DESCRIPTION OF SECURITIES".

**Patronage Dividends Uncertain**. As a cooperative corporation, the Company may, at the discretion of the Board of Directors, pay pro-rata patronage dividends to its shareholders based on their purchases from the Company during a given period. A prospective investor is unlikely to receive significant return on his investment unless such investor conducts substantial business with the Company. In addition, if the Company's retained earnings in any year are not sufficient to establish adequate reserves, the Board of Directors may determine not to pay any patronage dividends. Patronage dividends have been paid annually since 1986, but were not paid for a number of years before that time. There can be no assurance that patronage dividends will be paid at any time in the future or, if paid, will be at levels similar to those previously paid. In addition, if a subscriber elects to pay for a portion of his subscription by the delivery of a promissory note in the form attached hereto as Exhibit D, and the promissory note is not repaid in full by the subscriber on or prior to Friday, March 18, 2011, the subscriber will not be deemed to have earned any patronage dividend payable with respect to periods on or prior to March 31, 2011, and will waive any rights with respect thereto. See, "BUSINESS"; "THE COMPANY"; "DIVIDEND POLICY".

**Dependence on Certain Suppliers and Increase in Generic Pharmaceutics**. The Company purchases its pharmaceutical and other products from a number of manufacturers. Manufacturers generally offer drugs to all wholesale distributors on substantially similar terms with discounts for larger volume orders. A number of patented pharmaceutical products are only available from one manufacturer, the loss of any one of which might adversely affect the Company's business. The Company does not, however, anticipate that it will be unable to purchase any pharmaceutical product, since the Company may purchase such products from other wholesalers. See, "BUSINESS"; "THE COMPANY". In addition, the increased availability of generic pharmaceuticals has reduced the Company's revenues on branded pharmaceuticals, as patent protection expires and lower-priced generic versions of those products are introduced to the market. The expiration of patent protection increases the competition by vendors of generic

4

pharmaceuticals, which can result in retailers purchasing from multiple sources, thus reducing the loyalty of the Company's customer base. The Company believes it has implemented effective strategies to deal with the increasing availability of generic pharmaceuticals, there can be no assurance that those strategies will be fully effective to counter the reduced revenue and increased competition that results from increasing availability of generic pharmaceuticals. See, "BUSINESS"; WHOLESALE DRUG INDUSTRY"; "THE COMPANY".

**Dependence on Certain Customers**. For the four month period ended July 31, 2010, approximately 15% of the Company's sales were to its 15 largest customers. Further, approximately 35% of the Company's total sales were to customers who were not also shareholders of the Company. During its fiscal year ended March 31, 2010, approximately 16% of the Company's sales were to its 15 largest customers, including approximately 5.2% of the Company's sales to its single largest customer. In addition, during such fiscal year approximately 37% of the Company's total sales were to customers who were not also shareholders of the Company. The loss of any significant customer could have a material adverse effect on the Company's business and results of operations.

**Regulatory Compliance**. Wholesale drug distributors are subject to licensing and regulatory requirements by federal and state government agencies. Failure to obtain proper licenses or to comply with applicable regulations could result in fines to the Company or loss of licenses. Although the Company has a compliance program with strict record keeping to monitor ongoing compliance, any failure of compliance would have a material adverse effect on the Company and its operations. See, "BUSINESS"; "THE COMPANY"; "REGULATORY MATTERS".

**No Minimum Aggregate Subscription Amount**. This Offering has no minimum aggregate subscription amount. Accordingly, if subscriptions for less than the full amounts offered hereby are received, the Company will not refund amounts subscribed for or tendered. In that event, the Company may need to seek alternative methods of financing and there can be no assurance that such financing would be available or, if available, would be on terms acceptable to the Company. In addition, if subscriptions for less than the aggregate amount offered are received, expenses of the Offering will not decrease. As such, the percentage of gross proceeds of the Offering used to pay the expenses of the Offering will increase. See, "DESCRIPTION OF SECURITIES".

**Broad Discretion in Application of Proceeds**. All of the net proceeds of this Offering will be used for general working capital purposes. Accordingly, the Company's management will have broad discretion as to the application of such proceeds. See, "USE OF PROCEEDS".

## BUSINESS

### Wholesale Drug Industry Generally

Total wholesale drug industry revenues in the United States have increased steadily, from an estimated $11.9 billion in 1981 to approximately $263 billion in 2009, according to the *director of the Healthcare Distribution Management Association*. This growth has occurred principally due to the aging of the nation's population, escalation of hospital costs with resultant

357172_5

emphasis on outpatient treatment and the proliferation of both pharmaceutical products and retail outlets for such products. The Company believes that the wholesale drug business is not significantly affected by general economic cycles.

Wholesale drug distributors have increased their share of the total sales of pharmaceutical products. Industry sources estimate that the wholesale distributors' share of the pharmaceutical market increased from approximately 45% in 1974 to 85.5% in 2009. The Company has benefited from this trend as manufacturers and customers increasingly have relied upon the distribution capabilities of drug wholesalers to make a consistent supply of products available to retail outlets. By doing so, manufacturers reduce costs by relying on distributors rather than shipping small quantities to many customers.

Drug stores, hospitals and other pharmaceutical retailers have a continuing need for the immediate availability of a wide variety of health care products without the high cost of carrying large inventories. Many of these retailers have been turning to wholesale distributors to take advantage of rapid delivery, more support services and competitive prices. Customers can generally place smaller orders and receive more rapid delivery from wholesale distributors than from manufacturers, thereby reducing the customer's inventory carrying costs. The industry trend toward increased automation and computerization have led drug wholesalers to develop a variety of information processing services. Furthermore, full service distributors such as the Company offer a broad range of products from many manufacturers and a variety of marketing and management services generally not available from manufacturers.

In recent years, there has been a trend toward consolidation in the wholesale drug industry, as evidenced by the purchase of smaller distributors by major wholesalers. In addition, the growth of hospital buying groups, proprietary hospital chains, mass merchandisers and drugstore chains has created a demand for wholesalers with wide geographic distribution capabilities to serve various locations. Smaller wholesalers, like the Company, must compete with larger wholesalers to offer competitive prices and services, operating efficiencies and marketing programs. At present, the Company's primary competition includes three national wholesale drug companies, each of which has sales in excess of $70 billion annually. The Company competes against each of these competitors in all of the markets it serves.

The wholesale drug industry generally, and the Company in particular, have been significantly impacted by the increasing availability of generic pharmaceuticals. Upon expiration of patent protection on branded pharmaceuticals, generic versions of those products are introduced to the market, at substantially reduced prices. This results in an immediate decrease in the dollar volume of sales by pharmaceutical wholesalers. In addition, while there is little price differential among suppliers of branded pharmaceuticals, there is substantial variability in the price at which generic pharmaceuticals can be purchased from competing vendors. This variability in price can cause retailers to purchase generic pharmaceuticals from multiple sources.

**The Company**

The Company is a wholesale distributor of pharmaceutical and other products, principally to independent pharmacies and drug stores. Over 21,000 different products, including

6

prescription and over-the-counter drugs, health and beauty aids, sundries and home health care equipment are distributed from the Company's distribution center located in Rochester, New York. The Company serves over 800 independent pharmacies in New York, Pennsylvania, New Jersey, Connecticut and Ohio.

The Company purchases from and distributes the merchandise of about 650 suppliers including every major manufacturer in the industry. The Company's largest suppliers are Pfizer, Glaxo-SmithKline, Eli Lilly, Merck, and Bristol-Myers. For the four months ended July 31, 2010, non-shareholder customers accounted for 35% of the Company's net sales. During the fiscal year ended March 31, 2010 non-shareholder customers accounted for an aggregate of approximately 37% of the Company's net sales. See, "RISK FACTORS - DEPENDENCE ON CERTAIN CUSTOMERS". No single customer (including affiliates of customers) accounted for more than 5.2% of the Company's net sales during the fiscal year ended March 31, 2010.

In 2005, the Company acquired for its Rochester distribution center a new IBM AS-400 eServer computer system to handle inventory, order entry, billing, accounts receivable, accounts payable and other financial and administrative information processing requirements. This system processes all data for the Company's distribution center. The Company has continuously upgraded its computer hardware and software to maintain state of the art operating systems. In July 2010, the Company replaced its IBM AS-400 system with an IBM Power 6 Plus system, which increased the Company's capacity, to accommodate the Company's increased sales volume.

Approximately 98% of the Company's orders are placed by means of electronic order entry, with most of the balance placed by telephone or facsimile. All orders are received at the Rochester distribution center, which has the centralized information technology and customer service personnel. The Company believes that the electronic order entry system contributes to its ability to compete by providing better service through reduced order time and increased accuracy. As of March 31, 2010, the Company had completed the installation of a state-of-the-art voice directed warehousing and picking system to maximize the productivity, speed, quality control and accuracy of its warehouse operations including stocking inventory and filling customer orders. The Company continues to explore hardware and software technologies that provide for greater speed, accuracy and efficiency in picking, packing and shipping orders to its customers. The Company has also developed a proprietary in store, on-line computer system, which allows customers to access sales information and purchasing history on-line.

In May 2010, the Company began offering to its customers a hand held ordering device, to increase their speed, mobility and convenience in placing orders. These devices are provided to customers for a nominal monthly charge. As of July 31, 2010, approximately 5% of the Company's customers were using this new technology. The Company estimates that approximately 25-30% of its customers will ultimately elect to use this technology. The Company has also developed a web-based ordering system that provides customers with more complete best pricing and ordering information than previously available, which has proved to be succesful. The Company provides customers with hardware and software for electronic order entry and assists in converting a new customer's inventory scheme to that used by RDC. The Company also has the ability to communicate with its customers with point of sale ("POS")

7

systems. Although industry groups are encouraging the establishment of standard inventory identification information, currently each wholesaler has a proprietary inventory coding system.

At July 31, 2010, the Company employed approximately 113 persons in a variety of skilled and unskilled positions. RDC considers its relations with employees to be good.

The Company sponsors a defined contribution 401(k) Retirement Plan for the benefit of its full-time employees. Employees are eligible to participate in the Plan after one year of service with the Company. This Plan allows the participating employee to defer a portion of their compensation, subject to Internal Revenue Code limitations. The Company's policy is to match employee contributions at 100 percent, up to a maximum of 5% of eligible compensation.

In addition, the Company has in prior years voluntarily distributed bonuses to its employees based upon Company profits. The Company is not obligated to continue such payments by any formal agreement, and can modify or discontinue such payments at any time.

The Company's force of 12 regular sales persons maintains frequent personal customer contacts. The Company owns one delivery van and owns approximately 20 cars, used for deliveries, by its sales force and members of management. The majority of the Company's deliveries are accomplished through contract carriers. The Company's distribution center is located to enable RDC to fill substantially all orders at night, and deliver the next business morning, allowing customers to replenish pharmacy inventory on a daily basis.

Additional time is spent by Company personnel converting inventory records to allow the use of the Company's web-based ordering system, labeling of pharmacy customers to parallel the coding system employed by the Company, remerchandising stores and other value-added services, such as assistance with market surveys and store layout/design and remodeling.

In addition to supplying pharmaceutical and over-the-counter products to its customers, the Company also provides both shareholder and non-shareholder customers with merchandising assistance, store management computer programs, advice and assistance as to store layouts, promotions, store opening programs, durable medical equipment programs and cooperative advertising programs, pricing and marketing strategies.

The Board of Directors has authorized the Company to make loans to independent pharmacies for a variety of needs, to encourage the success of independent pharmacies. Over the past ten years, the Company has loaned funds to approximately 156 pharmacies to provide assistance ranging from computerization of inventory and records, covering cash flow shortfalls, promoting store openings and renovation and stocking of new pharmacies. As of July 31, 2010 the Company had outstanding loans in an aggregate amount of $5,996,843 to 51 pharmacies, which loans are due to be repaid in one to three years with interest at interest rates per year equal in most cases to the prime rate plus up to 2%. As collateral for these loans, the Company generally takes a security interest in personal property of the borrowing pharmacies and receives personal guarantees from its principals.

357172_5

The Company is a member of OptiSource, LLC, an industry buying group that focuses on generic pharmaceuticals. There are currently 13 members of OptiSource. RDC and other members of OptiSource make purchases from suppliers, based upon pricing and other terms (including supply levels, payment terms, and return policies) negotiated by OptiSource for the benefit of its members. The suppliers pay to OptiSource a fee based on the sales made to OptiSource members by the generic pharmaceutical supplier, and OptiSource has historically made distributions to its members from time to time. The business and affairs of OptiSource are managed by a Manager in consultation with a five (5) member Operating Committee. Laurence Doud, the Company's Chief Executive Officer, serves on OptiSource's Operating Committee. Under its membership agreement, the Company is entitled to distributions, if any are declared, based on its purchases. The amount and timing of distributions, if any, are subject to approval by the Manager and the Operating Committee, and a 2/3 vote of its members. The distribution that the Company received from Optisource for its fiscal year ending March 31, 2010 is reflected in the Company's financial statements attached hereto as Exhibit A. The Company believes that its participation as a member of OptiSource can help in its efforts to address the financial effects of increasing volumes of generic pharmaceuticals.

The Company also owns all of the outstanding capital stock of SourceOne Services, Inc. ("SourceOne"), a company which historically had contracted with suppliers of generic pharmaceuticals and acted as a purchasing organization on behalf of RDC's customers. With the Company having become a member of OptiSource, SourceOne is no longer an operating entity and is inactive.

The Company owns an approximately 0.4% interest in Pharmacy Productions, Inc., a voluntary organization which does business as Quality Care Pharmacies ("Quality Care"). Quality Care is owned by the Company and by approximately 255 member pharmacies. Additionally, there are approximately 150 affiliated member pharmacies, which do not hold an ownership interest. Quality Care was organized to provide independent pharmacies with a common marketing identity, group advertising, promotional activities, and group purchasing, including a rebate program under which Quality Care members earn up to an additional 4% on generic purchases. Laurence Doud, the Company's Chief Executive Officer, has been, since its inception, President of Pharmacy Productions, Inc. and is a permanent member of its Board of Directors. All Quality Care pharmacies are customers of the Company. Approximately 89% and 87 % of the Company's net sales for the four months ended July 31, 2010, and for the fiscal year ended March 31, 2010, respectively, were to Quality Care pharmacies. Quality Care receives payments from the Company in amounts equal to 0.25% of the purchases of the Quality Care pharmacies from the Company. Those payments totaled $2,837,824 and $2,457,075 for the fiscal years ended March 31, 2010 and March 31, 2009, respectively. Those payments totaled $957,527 and $1,221,266 for each of the four month periods ended July 31, 2009 and July 31, 2010, respectively.

RDC is also a founding member and owns approximately 11.4% of the Wholesale Alliance, LLC, which conducts business as Pharmacy First, and is a national group of independent regional pharmaceutical wholesalers. Pharmacy First provides services to its participating independent pharmacies through the development of market share incentive programs that provide members the ability to earn performance-based rebates directly from Pharmacy First. Laurence Doud serves on the Board of Managers of Wholesale Alliance.

9

**Legal Proceedings**

The Company is a party to various other legal actions arising out of the normal course of its business, including a number of collection matters. The Company believes that the ultimate resolution of those actions will not have a material adverse effect on its financial position, results of operations or its liquidity. During its fiscal year ended March 31, 2010, the Company settled prior to trial one material litigation matter with a current shareholder and customer. While the Company believes it had strong defenses to all claims in that matter, the Company concluded that the anticipated attorney's fees associated with conducting a trial and any appeals, as well as the risk of an adverse ruling, warranted the settlement.

**Financial Statements**

The financial statements attached as Exhibit A to this Memorandum include the unaudited financial statements as of and for the four months ended July 31, 2010. The audited financial statements of RDC as of and for the years ended March 31, 2010 and 2009 have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein. Potential investors are urged to review the unaudited interim financial statements and the audited financial statements (together with the notes thereto) in their entirety.

**Financing**

On November 10, 2006, The Company entered into a Revolving Line of Credit (the "Credit Facility Agreement") with Manufacturers and Traders Trust Company ("M&T Bank" or the "Bank") pursuant to which the Company may borrow, subject to certain limitations, up to $70,000,000. The Credit Facility Agreement provided for interest equal to the prime rate announced from time to time by M&T Bank (3.25% at March 31, 2010) or, at the Company's option, at various LIBOR interest rates plus 1.40% (effective rate of 1.65% at March 31, 2010). The Credit Facility Agreement terminates October 31, 2011 unless an event of default occurs prior to that date. All of the Company's borrowings as of July 31, 2010 were at LIBOR interest rates with an effective rate of 1.775%. The Company's Credit Facility Agreement also requires the payment by RDC of certain administrative fees and unused line fees to the Bank. As of July 31, 2010, taking into account the limitations contained in the Credit Facility Agreement, the Company was authorized to borrow approximately $66,000,000, of which approximately $29,000,000 was outstanding under the Revolving Line of Credit. The Company's borrowings from M&T Bank are secured by the Company's accounts receivable, inventory and equipment, and by an insurance policy on the life of the Company's Chief Executive Officer.

On June 6, 2008, the Credit Facility Agreement was amended to reflect a range of interest rates that became effective on October 1, 2008, based on the level of cash flow coverage maintained by the Company. Under that amendment, interest rates ranged from the prime rate, to the prime rate plus 0.25% or, at the Company's options, various LIBOR based rates (plus 1.4% to 1.8%), depending upon the Company's then existing cash flow coverage ratio.

On August 17, 2010 the Credit Facility Agreement was further amended to revise the interest rates established in the June 6, 2008 amendment, and allow the Company to elect to pay

357172_5

interest at various LIBOR based rates plus 1.40% through and including September 30, 2010, and at various LIBOR based rates plus 1.95% thereafter, for the remaining term of the Credit Facility Agreement, which was extended through October 31, 2014. In addition, and among other matters, certain of the financial covenants set forth in the Credit Facility Agreement were amended, to increase the amounts the Company may use annually to effect redemptions of shares, and to increase amounts the Company may loan to independent pharmacies.

Effective May 1, 2003, the Company purchased its administrative and distribution center, located in Rochester, New York, which the Company had previously leased, at an acquisition price of $4,150,000, plus closing costs and expenses. In connection with its acquisition, the Company assumed the obligations under an existing mortgage of $3,042,626, at an interest rate of 7.69%. The mortgage balance at March 31, 2010 was $1,840,350. The mortgage requires monthly payments of principal and interest in the amount of $30,949, through April 1, 2011, with a final "balloon" principal payment of $1,584,731 due on that date.

In addition, the Company borrows money from shareholders, former shareholders and other persons affiliated with the Company. The Company uses the proceeds of such loans for general working capital and the lenders are general, unsecured creditors of the Company. As of March 31, 2009 and March 31, 2010, the Company had borrowed from its shareholders and others affiliated with the Company a total of approximately $5,750,510 and $6,199,199, respectively. The Company pays interest quarterly based upon a variable rate of .5% below the Company's borrowing rate on its bank debt. At March 31, 2010, the interest rate was 1.49% .

## Competition

The wholesale drug business is very competitive and almost all drug stores, including pharmacies served by the Company, buy regularly from at least two wholesale drug distribution companies. The Company faces strong competition in both price and service from national, regional and local full-line, short-line and specialty wholesalers, service merchandisers, and from manufacturers engaged in direct distribution.

The Company's principal market is independent pharmacies. Throughout the Company's market areas and much of the United States, drug store ownership is increasingly concentrated in large chains, which negotiate volume discounts with manufacturers and large wholesalers. Hospital pharmacies and nursing homes frequently form cooperatives, which negotiate terms for purchases from wholesalers and drug manufacturers. In the Rochester, New York area, for example, three hospital and nursing home buying organizations dominate the sales to hospitals and institutions. The Company's competitive strategy includes focusing on independent pharmacies, frequency of personal contacts with customers, speed and accuracy of service, meeting price competition and providing ancillary services to members and other customers.

## Regulatory Matters

The Company's distribution center is licensed by the U.S. Food and Drug Administration ("FDA"), and the U.S. Department of Justice, Drug Enforcement Administration ("DEA"). Additionally, the Company is licensed by state regulatory authorities and pharmacy boards for the states in which it operates, and each state into which it ships pharmaceutical products. Its

11

operations are subject to the regulatory jurisdiction of various federal and state agencies, including the FDA, DEA, the U.S. Department of Agriculture, the Environmental Protection Agency, the Occupational Safety and Health Administration and state pharmacy boards. Like other wholesale drug distributors, the Company is subject to a variety of requirements, including guidelines on storage, handling and records maintenance and, with respect to controlled substances, specific labeling, packaging and record keeping requirements. The Company is in compliance with each of these regulations.

## Dividend Policy

The Company's Preferred Stock bears a non-cumulative preferred dividend of 5% per year. No dividend may be declared or paid for any fiscal year on the Company's Voting or Non-Voting Common Stock until provision is made for payment of the preferred dividend.

The patronage dividend is calculated annually based upon the Company's earnings during the most recently concluded fiscal year. Once the aggregate amount of the patronage dividend pool has been established, it is allocated to the Company's shareholders based upon their purchases. The Company had insufficient earnings from which to pay dividends in a number of years prior to 1986, but has paid a patronage dividend in each year since 1986.

Approximately 62.6% of the Company's sales during the fiscal year ended March 31, 2010 were to holders of its Voting Common Stock, which own or operate a licensed pharmacy. Shareholders are eligible to receive distributions when, as and if declared by the Board of Directors of the Company, in amounts related to the shareholder's purchases of pharmaceutical and other products from the Company and payments to the Company for other services. These distributions, known as "patronage dividends", totaled $5,200,000 for the fiscal year ended March 31, 2010, with no single shareholder receiving more than $435,088 for such fiscal year.

The following table sets forth the aggregate patronage dividends paid during the past five years:

| Fiscal Year Ended March 31, | Patronage Dividend | Patronage Dividend As Percentage of Each Shareholder's Purchases From RDC |
|---|---|---|
| 2006 | $3,412,086 | 1.00 % |
| 2007 | $1,100,000 | 0.34 % |
| 2008 | $1,500,000 | 0.50 % |
| 2009 | $2,003,973 | 0.64% |
| 2010 | $5,200,000 | 1.31% |

There can be no assurance that funds will be available to pay patronage dividends in any year. To the extent that such funds are available, a shareholder can increase its patronage dividend by increasing its purchases from the Company. During the fiscal years ended March 31, 2007, 2008 and 2009, the patronage dividend paid to shareholders, as a percentage of the each shareholder's purchases from RDC, declined when compared to earlier years. This decline resulted due to a number of factors that reduced the Company's overall profitability, including rising interest rates and overall operating expenses, expenses associated with the termination of the Company's defined benefit pension plan, losses incurred in connection with its operations in New Castle, Pennsylvania, a tighter credit policy implemented by the Company, the closure of independent pharmacies, or the sale of independent pharmacies to national retailers. For the fiscal year ending March 31, 2010, the Company's overall profitability increased due to expanding geographic markets, increased purchases by new shareholders, stricter control of selling, general and administrative expenses, decreased interest expenses, and increased generic sales based, in part, on new programs implemented by Quality Care which focused on growing generic sales volume. Certain of these positive factors were offset by increased delivery expenses and the continued closure of independent pharmacies or the sale of independent pharmacies to national retailers. There can be no assurance that these factors will not continue to exist, or that other factors will not exist that will negatively impact the Company's profitability and its ability to pay patronage dividends.

If a subscriber in this Offering elects to pay for a portion of his Voting Common Stock by delivering to the Company a promissory note in the form attached hereto as Exhibit D, the subscriber will be deemed to be a shareholder of the Company upon making partial payment and delivery to the Company of the promissory note, the related pledge agreement and stock power (in the form attached hereto as Exhibit E), and the Subscription Agreement, and as such will be entitled to receive patronage dividends based upon its purchases from the time it becomes a shareholder. However, in the event the promissory note is not repaid in full by the subscriber on or prior to Friday, March 18, 2011, the subscriber will not be deemed eligible to receive any patronage dividend previously paid or payable with respect to periods on or prior to March 31, 2011 and will waive any rights with respect thereto. The Company will have certain rights as a secured creditor pursuant to the pledge agreement.

## Properties

### *Rochester Distribution Center:*

RDC owns an approximately 67,000 square foot office and warehouse/distribution facility located at 50 Jet View Drive, Rochester, New York. The building contains a separate narcotics vault and cage constructed and maintained in accordance with DEA standards.

The Company moved to its Rochester distribution center location in early 2001. Prior to that, the Company operated for 54 years from a warehouse/distribution facility located at 320 North Goodman Street, Rochester, New York, which has been sold by the Company.

The Rochester facility is located on approximately 11 acres in the Jet View Business Park in Chili, New York. The facility includes a 55,000 square foot warehouse with 24-foot ceilings,

13

together with approximately 12,000 square feet of office space. The building also includes a 28,000 square foot mezzanine level over a portion of the space, constituting additional warehouse space. There is sufficient additional real property to allow for future expansion of the facility. The warehouse in this facility is state of the art and has an automated conveyor system. The first floor of the warehouse of this facility stores items that represent 83% of the Company's sales, and the mezzanine is arranged for "open stock picking". In addition, all invoices and labels are printed at the staging area. Moreover, the Company makes use of radio frequency technology throughout its warehouse operations. The Company has installed a state-of-the-art voice directed warehousing and picking system to maximize the productivity, speed, quality control and accuracy of its warehouse operations including stocking inventory and filling customer orders. The Company believes that the improvements in this facility greatly modernize the Company's processes and efficiencies, allow the Company to significantly increase its sales volume and capacity, and will assist the Company in its efforts to achieve continued growth in its existing markets.

### *New Castle Distribution Center:*

In December, 2005, RDC entered into an Asset Purchase Agreement to acquire certain of the assets of Valley Drug Company, a wholly owned subsidiary of FamilyMeds, Inc. (the "Valley Drug Acquisition"). In connection with the Valley Drug Acquisition, Valley Drug and its landlord, Becan Development, LLC ("Becan"), entered into an amendment to the existing lease between Valley Drug and Becan with respect to Valley Drug's distribution center, located in New Castle, Pennsylvania. A portion of the purchase price payable as part of the Valley Drug Acquisition was not paid at the closing, and was instead payable post-closing, upon the receipt of a third party consent required in connection with the assignment to the Company of the lease to the New Castle distribution center. This consent was not received, and a dispute ensued regarding the Company's rights with respect to the payment of the unpaid portion of the purchase price, and the continued occupancy of the New Castle distribution center by the Company. In October, 2006, the Company ceased its distribution operations from the New Castle distribution center.

The Company has settled its dispute regarding the New Castle distribution center and the unpaid portion of the purchase price payable in the Valley Drug Acquisition. As part of that settlement, the Company made partial payment of the unpaid portion of the purchase price, and remained responsible under the lease of the New Castle distribution center through the conclusion of 2010, at a lease cost of approximately $20,000 per month. The Company is currently subletting the New Castle distribution center to an unaffiliated third party on a month to month sub-tenancy. The current sub-tenant is negotiating for a possible purchase of the New Castle distribution center from Becan. The Company is negotiating for its release of any future obligations under the lease upon such a sale. These negotiations may include the payment of a lump sum amount by RDC. There can be no assurance that the New Castle distribution center will be sold to the sub-tenant, or that the Company will be able to obtain a release from its obligations under its lease of the New Castle distribution center on acceptable terms or at all.

The Company is a party to agreements with taxing authorities in New York which provide for certain tax incentives in connection with the Rochester distribution center, and which require the maintenance by the Company of certain employment levels.

14

357172_5

## USE OF PROCEEDS

The Company estimates net proceeds of the offering to be approximately $945,500, after deduction of legal fees, accounting fees, and other expenses in the aggregate amount of approximately $35,000, and assuming that all of the shares of Voting Common Stock offered hereby are sold. The Company intends to use the net proceeds of the offering for general working capital needs, as determined in the discretion of the Board of Directors.

## DIRECTORS AND OFFICERS

The Company is managed by a nine-person Board of Directors elected by the shareholders of the Company. Directors serve for three-year terms and three members of the Board are elected annually. Each Director must be a shareholder, and must own or operate a licensed pharmacy.

The Directors elect the President, Vice President, Secretary, Treasurer and any other officers the Directors consider necessary. The President and Vice President must be members of the Board of Directors. Directors are compensated at the rate of $750 for each Board meeting attended, and $100 per committee meeting attended. The composition of the Company's committees as of the date of this memorandum is as described below. Committee composition is determined by the Board of Directors annually at its July meeting.

Directors and Executive Officers of the Company are as follows:

| Name | Age | Title | Term Expires |
|------|-----|-------|--------------|
| Christopher K. Casey | 54 | Chairman | June 2011 |
| Richard Klenk | 65 | Director | June 2013 |
| J. Scott Miskovsky | 59 | Director | June 2012 |
| Laurence F. Doud, III | 66 | Chief Executive Officer, Secretary and Treasurer | N/A |
| Donald Arthur, Jr. | 50 | President | June 2012 |
| Michael Cave | 59 | Director | June 2012 |
| Joseph Lech | 51 | Director | June 2013 |
| Stephen Giroux | 52 | Director | June 2013 |
| Tom Quinlan | 65 | Director | June 2011 |
| Sally Brooks | 62 | Director | June 2011 |
| Sherwood Klein | 54 | Vice President and Director | June 2011 |

15

Christopher K. Casey serves as Chairman of the Company and has previously served twice as the Company's President and as its Chairman of the Board of Directors. Mr. Casey has served on the Company's Board of Directors for all but three years since 1989. Mr. Casey is owner, President and pharmacist of Mead Square Pharmacy in Victor, New York. Mr. Casey serves on the Company's Executive and Audit Committees.

Richard Klenk has served on the Company's Board of Directors since June, 1994. He has previously served as the Company's President and Chairman of the Board. He is a partner in Summit Park Pharmacy in Niagara Falls, New York and serves on the Company's Accounts Receivables and Audit Committees, and chairs the Company's Executive Committee.

J. Scott Miskovsky was appointed to the Board in 2002. He is the Company's first Director from outside New York State. He is the owner of Red Cross Pharmacy in Forest City, Pennsylvania. He has previously served as the Company's President and Chairman of the Board. Mr. Miskovsky serves on the Company's Nominations Committee and its Banking and Investments Committee.

Laurence F. Doud, III was elected Chief Executive Officer, Secretary and Treasurer of the Company in May 1991. From July 1987 to that time, Mr. Doud served as General Manager of the Company. Prior to that time, Mr. Doud was Vice President for Sales of Cardinal Health, Inc. and a predecessor company for eleven years. Mr. Doud serves on the Company's Executive, Insurance, Audit, Nominations, and Accounts Receivables Committees, and on its Banking and Investments Committee.

Donald Arthur, Jr. serves as President of the Company. Mr. Arthur was elected to the Company's Board of Directors in 1998. Mr. Arthur has previously served as the Company's Chairman of the Board of Directors and as its President. He is an owner of Black Rock Pharmacy and the Brighton Eggert Pharmacy in Buffalo, New York. Mr. Arthur serves on the Company's Executive and Audit Committees, and serves as Chairman of the Accounts Receivable Committee and its Banking and Investments Committee.

Michael Cave was appointed to the Board in 2002. Mr. Cave is a non-pharmacist pharmacy owner. Mr. Cave owns Gowanda Pharmacy, The Care Center Pharmacy, a long-term care pharmacy, and The Care Center, a durable medical equipment business all in Western New York State. Mr. Cave currently serves on the Company's Insurance Committee and its Banking and Investments Committee.

Joseph Lech has been a Board member since 2007 and, therefore is the most recently elected Board member. He is the principal owner of the Lech's Pharmacy Group, a five pharmacy small chain located in Wyoming, Sullivan and Bradford counties in Pennsylvania. He serves on the Company's Insurance Committee.

Stephen Giroux has served on the Company's Board of Directors since June 1995. Mr. Giroux has twice previously served as the Company's Chairman of the Board of Directors and as its President. Mr. Giroux is a partner in Middleport Family Health Center, Transit Hill Pharmacy, Summit Park Pharmacy, Lockport Home Medical, Rosenkrans Pharmacy, and Thee

Barker Store, all in western New York State. Mr. Giroux is a past President of the National Community Pharmacists Association. He serves on the Company's Insurance Committee.

Tom Quinlan has served on the Company's Board of Directors since 1996 and is currently a Director on the Board. Mr. Quinlan is President and pharmacist for Quinlan's Pharmacy in Wayland, New York since 1986. Mr. Quinlan currently serves on the Company's Nominating and Accounts Receivables Committees.

Sally Brooks was elected to the Company's Board of Directors in 1998 and has served as the Company's Chairman of the Board and as its President. Ms. Brooks is the first non-pharmacist store-owner to serve on the Company's Board of Directors. Ms. Brooks owns Livonia Pharmacy in Lakeville, New York. Ms. Brooks serves on the Company's Insurance Committee and as Chairperson of the Nominating Committee.

Sherwood Klein serves as a Vice President of the Board of Directors and has previously served as the Company's President and as its Chairman of the Board of Directors. Mr. Klein has served on the Company's Board of Directors since 1993. He is a pharmacist and owns, in partnership, Park Pharmacy in Salamanca, New York and Ellicottville Pharmacy in Ellicottville, New York. He is Chairman of the Company's Insurance Committee.

Mr. Doud, the Company's Chief Executive Officer, has an employment agreement, dated effective as of April 1, 2005, which extends for a term of nine years through March 31, 2014, and which sets Mr. Doud's annual compensation and the method for calculating an annual bonus, primarily based on the Company's profits. In addition, the agreement provides that in the event of a change of control of the Company, Mr. Doud will receive a payment in an amount equal to the aggregate price per share paid by the acquirer for one share of Voting Common Stock, one share of Non-Voting Common Stock, and 5,962 shares of Preferred Stock of the Company.

**DESCRIPTION OF SECURITIES**

The Company has authorized 570,000 shares of capital stock, of which (i) 60,000 shares are Voting Common Stock with a par value of $5 per share, (ii) 10,000 shares are Non-Voting Common Stock with a par value of $.01 per share, (iii) 500,000 shares are Preferred Stock, with a par value of $5 per share. Only shares of the Company's Voting Common Stock are offered hereby. As of the date of this Confidential Summary Offering Statement, the Company has issued and outstanding 174 shares of Voting Common Stock, 204 shares of Non-Voting Common Stock, and 208,670 shares of Preferred Stock. The net book value per share of the Company's Common Voting Stock as of March 31, 2010 was $27,459, which is higher than the offering price per share in this offering.

**Voting Common Stock; Non-Voting Common Stock**. The Company's Voting Common Stock and Non-Voting Common Stock have the following rights and privileges:

> *Voting.* Each holder of the Company's Voting Common Stock is entitled to one vote in the election of directors and one vote in all other matters submitted to the

17

shareholders. Holders of Non-Voting Common Stock do not have any voting rights, except as otherwise provided by law.

*Preemptive Rights.* The holders of the Company's Common Stock do not have any preemptive right to acquire any additional shares issued by the Company.

*Ownership and Minimum Purchase Requirements.* Holders of the Company's Voting Common Stock are required to own a licensed pharmacy and are required to make minimum annual purchases from the Company of at least $500,000. A shareholder who fails to meet these ownership and/or minimum purchase requirements is subject to redemption, as described below.

*Dissolution.* Upon dissolution of the Company, after payment of the Company's debts and provision has been made for the retirement of the Company's Preferred Stock at its par value and accruals thereon and other fixed obligations, if any, held by holders of Common Stock, then the holders of Voting and Non-Voting Common Stock are entitled to receive the net assets remaining in accordance with applicable law.

*Redemption; Right of First Refusal.* The Company's Certificate of Incorporation and By-Laws provide that the Company may redeem any Voting Common Stock owned by (a) a shareholder who does not, as of the date his Voting Common Stock is called for redemption, own a licensed pharmacy or (b) a shareholder who has made for the Company during the previous fiscal year no purchases or purchases amounting to less than $500,000. Such shares may be redeemed at net book value, less amounts owed to the Company by such shareholder, plus previously declared and unpaid dividends. In addition, the Company has the right to purchase at net book value, less any amounts owed by a shareholder to the Company, plus declared and unpaid dividends, any Voting Common Stock presented for transfer. The Company may also refuse to consent to the transfer of any Voting Common Stock or Non-Voting Common Stock if the proposed transferor is indebted to the Company.

*Dividends; Patronage Dividends.* In accordance with the Company's Certificate of Incorporation, the Company may pay dividends of up to 8% on its Voting Common Stock. These dividends may only be declared and paid after payment of accrued dividends on Preferred Stock.

In addition, as a co-operative corporation, the Company is also authorized to return earnings to its shareholders based upon their patronage of the Company, in the form of "patronage dividends". After establishment of reserve funds, the Company may distribute its earnings and savings in the form of stock, cash or evidence of indebtedness, or in savings proportionately and equitably among shareholders on the basis of the amount of sales or other services rendered to or by such shareholders as determined from time to time by the Board of Directors. The Board's current policy on such "patronage dividends", and information regarding the right to receive or retain patronage dividends by subscribers who deliver promissory notes in payment

18

of the purchase price for Voting Common Stock, is described under the heading "DIVIDEND POLICY".

## Preferred Stock.

*Voting.* The holders of the Company's Preferred Stock do not have any voting rights, except as otherwise provided by law.

*Preemptive Rights.* The holders of the Company's Preferred Stock do not have any preemptive right to acquire any additional shares issued by the Company.

*Dividend Rights.* The Preferred Stock bears a non-cumulative preferred dividend of 5% per year. No dividend may be declared or paid for any fiscal year on the Company's Voting or Non-Voting Common Stock until provision is made for payment of the Preferred dividend.

*Dissolution.* Upon dissolution of the Company, the holders of Preferred Stock are entitled to receive the $5 par value per share and accrued non-cumulative dividends at the rate of 5% of the par value per annum until the date of retirement of their shares, before the payment of any amounts to the holders of Common Stock.

*Redemption; Right of First Refusal.* The Preferred Stock may be called for redemption by the Company's Board of Directors at any time, upon 30 days' prior notice, at its par value, plus unpaid dividends, less amounts owed to the Company by the shareholder. In addition, the Company has a right of first refusal to purchase at par value, plus declared and unpaid dividends, less amounts owed to the Company, any preferred stock presented for transfer. The Company may also refuse to consent to the transfer of any Preferred Stock if the proposed transferor is indebted to the Company.

## ADDITIONAL INFORMATION

The Company will give prospective investors access to such additional information as they reasonably request in writing, including without limitation those documents described on Exhibit B attached hereto. Notwithstanding the foregoing, the Company will not disclose any information concerning its operations, which it believes to be proprietary, or the public disclosure of which would harm its competitive position.

19

## Index To Exhibits

| | |
|---|---|
| Exhibit A | Unaudited Financial Statements for the Four Months Ended July 31, 2010 and Audited Financial Statements for the Fiscal Years ended March 31, 2010 and 2009. |
| Exhibit B | List of Available Documents |
| Exhibit C | Form of Subscription Agreement |
| Exhibit D | Form of Promissory Note |
| Exhibit E | Form of Pledge Agreement and Irrevocable Proxy (with Stock Power) |
| Exhibit F | Certificate of Incorporation and By-laws, each as amended to date |

# Exhibit A

## Financial Statements

# Deloitte

Deloitte & Touche LLP
2200 Chase Square
Rochester, NY 14604-1998
USA

Tel: +1 585 238 3300
Fax: +1 585 232 2890
www.deloitte.com

September 21, 2010

Rochester Drug Cooperative, Inc.
50 Jet View Drive
Rochester, NY 14624

We agree to the inclusion in the Confidential Summary Offering Statement dated September 21, 2010, of our report, dated June 14, 2010, on our audits of the consolidated financial statements of Rochester Drug Cooperative, Inc. as of March 31, 2010 and 2009, and for the years then ended.

*Deloitte & Touche LLP*

# Rochester Drug Cooperative, Inc.

Consolidated Financial Statements as of and
for the Years Ended March 31, 2010 and 2009,
and Independent Auditors' Report

# ROCHESTER DRUG COOPERATIVE, INC.

## TABLE OF CONTENTS

|  | Page |
|---|---|
| INDEPENDENT AUDITORS' REPORT | 1 |
| CONSOLIDATED FINANCIAL STATEMENTS AS OF AND FOR THE YEARS ENDED MARCH 31, 2010 AND 2009: | |
| Balance Sheets | 2–3 |
| Statements of Earnings | 4 |
| Statements of Shareholders' Equity | 5 |
| Statements of Cash Flows | 6 |
| Notes to Consolidated Financial Statements | 7–15 |

# Deloitte

Deloitte & Touche LLP
2200 Chase Square
Rochester, NY 14604-1998
USA

Tel: +1 585 238 3300
Fax: +1 585 232 2890
www.deloitte.com

**INDEPENDENT AUDITORS' REPORT**

To the Board of Directors of
Rochester Drug Cooperative, Inc.
Rochester, New York

We have audited the accompanying consolidated balance sheets of Rochester Drug Cooperative, Inc. and subsidiary (the "Cooperative") as of March 31, 2010 and 2009, and the related consolidated statements of earnings, shareholders' equity, and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Cooperative's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Cooperative's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Cooperative as of March 31, 2010 and 2009, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Deloitte & Touche LLP*

June 14, 2010

Member of
Deloitte Touche Tohmatsu

# ROCHESTER DRUG COOPERATIVE, INC.

**CONSOLIDATED BALANCE SHEETS**
**AS OF MARCH 31, 2010 AND 2009**

| ASSETS | 2010 | 2009 |
|---|---|---|
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 3,190,360 | $ 700 |
| Accounts receivable — net of allowance for doubtful accounts of $1,400,000 and $1,250,000 in 2010 and 2009, respectively | 74,069,124 | 65,213,596 |
| Merchandise inventories | 22,960,130 | 23,960,400 |
| Current portion of notes receivable | 2,810,857 | 2,231,591 |
| Prepaid expenses and other current assets | 444,550 | 374,326 |
| Deferred tax assets | 686,795 | 413,310 |
| Total current assets | 104,161,816 | 92,193,923 |
| NONCURRENT DEFERRED TAX ASSETS | 24,877 | |
| LONG-TERM PORTION OF NOTES RECEIVABLE — Net of allowance for doubtful notes receivable of $500,000 and $250,000 in 2010 and 2009, respectively | 3,197,396 | 3,204,030 |
| INTANGIBLE ASSET — Net of accumulated amortization of $105,000 and $88,000 in 2010 and 2009, respectively | 170,000 | 187,000 |
| PROPERTY AND EQUIPMENT — Net of accumulated depreciation | 4,822,690 | 4,805,635 |
| OTHER ASSETS | 970,102 | 789,993 |
| TOTAL | $113,346,881 | $101,180,581 |

(Continued)

# ROCHESTER DRUG COOPERATIVE, INC.

**CONSOLIDATED BALANCE SHEETS**
**AS OF MARCH 31, 2010 AND 2009**

| | 2010 | 2009 |
|---|---|---|
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Mortgage payable — current portion | $ 236,243 | $ 223,346 |
| Accounts payable | 55,805,423 | 46,919,200 |
| Customer deposits | 6,199,199 | 5,750,510 |
| Accrued payroll, related taxes, and withholdings | 453,768 | 182,600 |
| Dividends payable | 5,252,168 | 2,053,658 |
| Other accrued expenses | 1,667,875 | 969,622 |
| Income taxes payable | 560,300 | |
| Total current liabilities | 70,174,976 | 56,098,936 |
| NONCURRENT DEFERRED TAX LIABILITY | | 64,335 |
| OTHER NONCURRENT LIABILITIES | 145,013 | 96,108 |
| MORTGAGE PAYABLE — Noncurrent portion | 1,604,107 | 1,835,583 |
| LONG-TERM DEBT | 30,000,000 | 33,159,390 |
| Total liabilities | 101,924,096 | 91,254,352 |
| **SHAREHOLDERS' EQUITY:** | | |
| Preferred shares, $5 par value — authorized 500,000 shares; 208,670 and 214,632 shares issued and outstanding in 2010 and 2009, respectively | 1,043,350 | 1,073,160 |
| Voting common shares, $5 par value — authorized 60,000 shares; 174 and 139 shares issued and outstanding in 2010 and 2009, respectively | 870 | 695 |
| Nonvoting common shares, $0.01 par value — authorized 10,000 shares; 204 and 211 shares issued and outstanding in 2010 and 2009, respectively | 2 | 2 |
| Additional paid-in capital | 2,410,550 | 1,714,253 |
| Retained earnings | 7,968,013 | 7,138,119 |
| Total shareholders' equity | 11,422,785 | 9,926,229 |
| **TOTAL** | $113,346,881 | $101,180,581 |

See notes to consolidated financial statements. (Concluded)

- 3 -

# ROCHESTER DRUG COOPERATIVE, INC.

## CONSOLIDATED STATEMENTS OF EARNINGS
### FOR THE YEARS ENDED MARCH 31, 2010 AND 2009

| | 2010 | | 2009 | |
| --- | --- | --- | --- | --- |
| | Amount | Percent of Net Sales | Amount | Percent of Net Sales |
| NET SALES | $ 634,528,666 | 100.00 % | $ 563,047,439 | 100.00 % |
| COST OF GOODS SOLD — Net of purchase discounts of $13,942,971 and $12,289,927 in 2010 and 2009, respectively | 614,619,878 | 96.86 | 545,436,162 | 96.87 |
| GROSS PROFIT ON NET SALES | 19,908,788 | 3.14 | 17,611,277 | 3.13 |
| SELLING, GENERAL, AND ADMINISTRATIVE EXPENSES | 11,330,279 | 1.79 | 12,463,592 | 2.21 |
| DELIVERY EXPENSE | 2,727,976 | 0.43 | 2,976,969 | 0.53 |
| DEPRECIATION AND AMORTIZATION | 285,473 | 0.04 | 283,375 | 0.05 |
| INTEREST EXPENSE | 945,953 | 0.15 | 1,648,778 | 0.29 |
| LEGAL SETTLEMENTS | (107,952) | (0.02) | | |
| OTHER INCOME — Net | (1,899,869) | (0.30) | (1,963,906) | (0.35) |
| EARNINGS BEFORE PATRONAGE DIVIDEND AND INCOME TAXES | 6,626,928 | 1.04 | 2,202,469 | 0.40 |
| FEDERAL INCOME TAX | 449,221 | 0.07 | 87,118 | (0.02) |
| STATE INCOME TAX | 95,645 | 0.02 | 15,912 | |
| EARNINGS BEFORE PATRONAGE DIVIDEND | 6,082,062 | 0.96 | 2,099,439 | 0.38 |
| PATRONAGE DIVIDEND | 5,200,000 | 0.82 | 2,003,973 | 0.36 |
| NET EARNINGS | $ 882,062 | 0.14 % | $ 95,466 | 0.02 % |

See notes to consolidated financial statements.

# ROCHESTER DRUG COOPERATIVE, INC.

## CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
### FOR THE YEARS ENDED MARCH 31, 2010 AND 2009

| | Nonvoting Common Shares | | Voting Common Shares | | Preferred Stock | | Additional Paid-In Capital | Retained Earnings | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Par Value | Shares | Par Value | Shares | Par Value | | | |
| BALANCE — March 31, 2008 | 36 | $ - | 141 | $705 | $214,632 | $1,073,160 | $1,814,945 | $7,096,311 | $ 9,985,121 |
| Stock dividend | 36 | | | | | | | | - |
| Stock dividend | 140 | 2 | | | | | (2) | | - |
| Preferred stock dividend | | | | | | | | (53,658) | (53,658) |
| Redemption of shares | (1) | | (2) | (10) | | | (100,690) | | (100,700) |
| Net earnings for the year ended March 31, 2009 | | | | | | | | 95,466 | 95,466 |
| BALANCE — March 31, 2009 | 211 | 2 | 139 | 695 | 214,632 | 1,073,160 | 1,714,253 | 7,138,119 | 9,926,229 |
| Issuance of common stock | | | 40 | 200 | | | 999,800 | | 1,000,000 |
| Preferred stock dividend | | | | | | | | (52,168) | (52,168) |
| Redemption of shares | (7) | | (5) | (25) | (5,962) | (29,810) | (303,503) | | (333,338) |
| Net earnings for the year ended March 31, 2010 | | | | | | | | 882,062 | 882,062 |
| BALANCE — March 31, 2010 | 204 | $ 2 | 174 | $870 | $208,670 | $1,043,350 | $2,410,550 | $7,968,013 | $11,422,785 |

See notes to consolidated financial statements.

# ROCHESTER DRUG COOPERATIVE, INC.

## CONSOLIDATED STATEMENTS OF CASH FLOWS
## FOR THE YEARS ENDED MARCH 31, 2010 AND 2009

|  | 2010 | 2009 |
|---|---|---|
| OPERATING ACTIVITIES: |  |  |
| Earnings before patronage dividend | $ 6,082,062 | $ 2,099,439 |
| Adjustments to reconcile earnings before cash patronage dividend to net cash provided by operating activities: |  |  |
| Depreciation and amortization | 695,872 | 664,968 |
| (Gain) loss on sale of property and equipment | (18,624) | 62,423 |
| Deferred income taxes | (362,697) | 86,469 |
| Bad debt expense | 413,454 | 353,900 |
| Changes in assets and liabilities: |  |  |
| Increase in accounts receivable | (9,005,528) | (5,229,209) |
| Decrease in merchandise inventories | 1,000,270 | 46,596 |
| Increase in prepaid expenses and other assets | (250,333) | (124,694) |
| Increase in accounts payable | 8,785,047 | 3,689,349 |
| Increase in customer deposits | 448,689 | 751,698 |
| Increase (decrease) in accrued payroll, related taxes, and withholdings | 271,168 | (82,640) |
| Increase in other accrued expenses | 747,158 | 315,293 |
| Increase (decrease) in income taxes payable | 560,300 | (280,983) |
| Net cash provided by operating activities | 9,366,838 | 2,352,609 |
| INVESTING ACTIVITIES: |  |  |
| Notes receivable issued during the year | (4,263,014) | (1,994,900) |
| Payments received on notes receivable | 3,426,928 | 3,430,379 |
| Additions to property and equipment | (703,932) | (420,267) |
| Cash received on disposal of property and equipment | 26,629 | 72,400 |
| Net cash (used in) provided by investing activities | (1,513,389) | 1,087,612 |
| FINANCING ACTIVITIES: |  |  |
| Borrowings on note payable to bank | 94,117,889 | 100,951,707 |
| Payments on note payable to bank | (97,277,279) | (102,792,316) |
| Payments on mortgage payable to bank | (218,579) | (202,235) |
| Issuance of shares of stock | 1,000,000 |  |
| Retirement of shares of stock | (232,162) | (100,700) |
| Patronage dividend | (2,001,490) | (1,503,973) |
| Preferred stock dividend | (52,168) | (53,658) |
| Net cash used in financing activities | (4,663,789) | (3,701,175) |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 3,189,660 | (260,954) |
| CASH AND CASH EQUIVALENTS — Beginning of year | 700 | 261,654 |
| CASH AND CASH EQUIVALENTS — End of year | $ 3,190,360 | $ 700 |
| SUPPLEMENTAL DISCLOSURES OF NONCASH AND FINANCING ACTIVITIES: |  |  |
| Cash paid for interest | $ 959,103 | $ 1,706,938 |
| Cash paid for income taxes | $ 344,557 | $ 202,996 |
| Payable incurred for purchase and retirement of shares | $ 101,176 | $ - |

See notes to consolidated financial statements.

# ROCHESTER DRUG COOPERATIVE, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**AS OF AND FOR THE YEARS ENDED MARCH 31, 2010 AND 2009**

## 1. ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Organization** — The consolidated financial statements consist of Rochester Drug Cooperative, Inc. and its wholly owned inactive subsidiary SourceOne Services, Inc. ("SourceOne") collectively (the "Cooperative"). Intercompany transactions have been eliminated.

The Cooperative is a New York Cooperative Corporation, formed in 1905 and incorporated in 1948. Its principal business is to warehouse, merchandise, and then distribute, on a cooperative basis, drugs, pharmaceutical supplies, and other merchandise commonly sold in drug stores, pharmacies, and health and beauty stores, together with equipment and supplies commonly used in the maintenance and operation of drug stores, pharmacies, health and beauty stores, and durable medical equipment businesses. The Cooperative currently distributes pharmaceutical and other related products from its distribution center in Rochester, NY, principally to independent pharmacies in New York, Pennsylvania, New Jersey, Connecticut and Ohio.

**Use of Estimates** — The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America (GAAP) requires management to make estimates and assumptions that affect amounts reported in the consolidated financial statements and accompanying notes. Actual results could differ from those estimates. Estimates include, but are not limited to, the allowance for doubtful accounts, the allowance for doubtful notes receivable, merchandise inventories, long-lived assets, and taxes.

**Fair Value of Financial Instruments** — The Cooperative's financial instruments consist of cash, accounts receivable, notes receivable, accounts payable, and debt. The carrying amounts of these financial instruments approximate their fair value.

**Cash and Cash Equivalents** — Cash and cash equivalents include cash, trade deposits, money market funds and fixed income securities with original maturities less than ninety days.

**Accounts Receivable** — The Cooperative accounts for receivables at outstanding billed amounts, net of allowances for doubtful accounts. The Cooperative estimates its allowance for doubtful accounts based on a specific analysis of accounts that management believes are not collectible. The Cooperative periodically reviews the accounts included in the allowance to determine those to be written off.

**Inventories** — Inventories are stated at the lower of cost or market. Cost is determined under the last-in, first-out (LIFO) method.

**Notes Receivable** — The Cooperative periodically issues notes to pharmacies to help finance their start-up costs. The notes are at cost in the consolidated balance sheets and are reviewed periodically for collectability based on payment history and financial status. The associated provision for uncollectible amounts is included within selling, general, and administrative expenses on the consolidated statements of earnings.

**Intangible Asset** — Intangible asset consists of a customer list acquired by the Cooperative. This asset is being amortized over 15 years, which is representative of the expected remaining useful life. The Cooperative evaluates this intangible asset for impairment whenever events or changes in circumstances indicate that the carrying value may not be recoverable from its estimated future cash flows. No impairment was indicated as of March 31, 2010 and 2009.

Amortization expense was $17,000 for each of the years ended March 31, 2010 and 2009. Future amortization expense will be as follows: $17,000 in 2011, $17,000 in 2012, $17,000 in 2013, $17,000 in 2014, $17,000 in 2015, and $85,000 thereafter.

**Property and Equipment** — Property and equipment are stated at cost. Depreciation is computed using straight-line and accelerated methods over the estimated useful lives of the assets. Maintenance, repairs, and renewals of minor items are expensed as incurred. Replacements of significant items are capitalized. The cost and accumulated depreciation of property and equipment sold or retired are eliminated from the accounting records, with the related gain or loss included in other income. The estimated useful lives are as follows:

| | |
|---|---|
| Building | 40 years |
| Building improvements | 5–20 years |
| Data processing equipment | 3–5 years |
| Warehouse equipment | 5–10 years |
| Vehicles | 3 years |

The Cooperative assesses whether its property and equipment are impaired when there are events or changes in circumstances which indicate the carrying amount of the asset may not be recoverable. No impairment was indicated as of March 31, 2010 and 2009.

**Revenue Recognition** — The Cooperative recognizes revenue on shipments on the date the merchandise is received by the customer and title transfers. Provisions for discounts, returns, and other adjustments are provided for in the same period the related sales are recorded.

**Other Income** — Other income consists primarily of interest charges to past due customer accounts in addition to interest charged on notes receivable from trade customers as described in Note 3.

**Vendor Rebates, Allowances, and Chargebacks** — Rebates and allowances are accounted for as a reduction in the cost of inventory and are recognized when the inventory is sold. The Cooperative records chargeback credits due from its vendors in the period when the sale is made to the customer.

**Concentration of Credit Risk** — Financial instruments that potentially subject the Cooperative to concentrations of credit risk consist primarily of cash and trade receivables. The Cooperative places its cash with high credit quality institutions. At times such amounts may be in excess of the Federal Deposit Insurance Corporation insurance limits. The Cooperative has not experienced any losses in such account and believes that it is not exposed to any significant credit risk on the account.

**Income Taxes** — The Cooperative accounts for income taxes by applying the asset and liability approach. Under this method, deferred income tax assets and liabilities are established to reflect the future tax consequences of differences between the tax and financial reporting bases of assets and liabilities and income tax carryforwards.

In July 2006, the Financial Accounting Standards Board (FASB) clarified certain provisions of FASB Accounting Standards Codification (ASC) Topic 740, Income Taxes (FASB Interpretation No. 48). These provisions create a model to address uncertainty in tax positions and prescribe a minimum recognition threshold that all income tax positions must meet prior to financial statement recognition. Any differences between the amounts recognized in the consolidated balance sheets prior to the adoption of Topic 740 and the amounts reported after adoption are generally accounted for as a cumulative-effect adjustment recorded to the beginning balance of retained earrings. Topic 740 was effective for the Cooperative on April 1, 2009, but did not have an impact on the Cooperative's financial position or results of operations.

The Cooperative's policy is to recognize any interest and penalties related to unrecognized tax benefits within the accompanying statements of earnings. Accrued interest and penalties would be included within the related tax liability in the consolidated balance sheets. There are no interest and penalties recognized for fiscal year 2010, and the Cooperative does not anticipate significant increases or decreases in its uncertain tax positions within the next twelve months.

**Dividend Policy** — The Cooperative's preferred stock bears a noncumulative preferred dividend of 5% per year. No dividend may be declared or paid for any fiscal year on the Cooperative's voting or nonvoting common stock until provision is made for payment of the preferred dividend. Patronage dividends are calculated annually based upon the Cooperative's earnings during the most recently concluded fiscal year. Once the aggregate amount of the patronage dividend pool has been established, it is allocated to the Cooperative's shareholders based upon their purchases. For the years ended March 31, 2010 and 2009, the Cooperative has declared both a preferred stock dividend and a patronage dividend on its voting common stock.

**Recent Accounting Pronouncements** — In June 2009, the FASB approved ASU 2009-01, the FASB ASC as the single source of authoritative nongovernmental GAAP. All existing accounting standard documents, such as FASB, American Institute of Certified Public Accountants, Emerging Issues Task Force and other related literature, excluding guidance from the Securities and Exchange Commission ("SEC"), have been superseded by the ASC. All other non-grandfathered, non-SEC accounting literature not included in the ASC has become nonauthoritative. The ASC did not change GAAP, but instead introduced a new structure that combines all authoritative standards into a comprehensive, topically organized online database. The ASC became effective for the Cooperative in fiscal year 2010. There have been no changes to the content of the Cooperative's consolidated financial statements or disclosures as a result of implementing the ASC.

In May 2009, the FASB issued FASB ASC Topic 855, Subsequent Events (FASB Statement No. 165), to establish general standards of accounting and disclosures for events that occur after the balance sheet date, but before financial statements are issued or are available to be issued. Application of ASC Topic 855 was required for annual financial periods ending after June 15, 2009, as disclosed in Note 13.

In October 2009, the FASB issued ASU 2009-17, Consolidations (ASC Topic 810), Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities. This update amends the codification for the issuance of FASB Statement No. 167, Amendments to FASB Interpretation No. 46(R). The amendments in this update replace the quantitative-based risks and rewards calculation for determining which reporting entity, if any, has a controlling financial interest in a variable interest entity with an approach focused on identifying which reporting entity has the power to direct the activities of a variable interest entity that most significantly impact the entity's economic performance and (1) the obligation to absorb losses of the entity or (2) the right to receive benefits from the entity. An approach that is expected to be primarily qualitative will be more effective for identifying which reporting entity has a controlling financial interest in a variable interest entity. The amendments in this

update also require additional disclosures about a reporting entity's involvement in variable interest entities, which will enhance the information provided to users of financial statements. This update is effective at the start of a reporting entity's first fiscal year beginning after November 15, 2009. Early application is not permitted. The Cooperative has not evaluated the effects that the adoption of this standard will have, if any, on its consolidated financial statements.

## 2. MERCHANDISE INVENTORIES

Merchandise inventories at March 31, 2010 and 2009, consisted of the following:

|  | 2010 | 2009 |
|---|---|---|
| Merchandise inventories | $ 34,949,651 | $33,505,935 |
| LIFO reserve | (11,989,521) | (9,545,535) |
| Total merchandise inventories | $ 22,960,130 | $23,960,400 |

The following summary information for the years ended March 31, 2010 and 2009, for the Cooperative assumes inventories are stated on a first-in, first-out basis:

|  | 2010 | | 2009 | |
|---|---|---|---|---|
|  | Amount | Percent of Net Sales | Amount | Percent of Net Sales |
| Net sales | $634,528,666 | 100.00 % | $563,047,439 | 100.00 % |
| Cost of goods sold | 612,175,892 | 0.96 | 543,356,765 | 96.50 |
| Gross profit on net sales | $ 22,352,774 | 3.52 % | $ 19,690,674 | 3.50 % |
| Earnings before patronage dividend and income taxes | $ 9,066,371 | 1.43 % | $ 4,178,836 | 0.74 % |

During the fiscal years ended March 31, 2010 and 2009, certain inventory quantity reductions caused a LIFO liquidation of LIFO inventory values. The liquidations increased earnings before patronage dividend and income taxes by approximately $454,041 and $16,000 in 2010 and 2009, respectively.

## 3. NOTES RECEIVABLE

The Cooperative has notes receivable from trade customers at March 31, 2010 and 2009. Principal and interest are payable monthly, and the principal repayment terms range from one to three years. Interest charged on the notes is generally based on the current prime lending rate plus 2% (5.25% at March 31, 2010 and 2009). $176,206 and $359,702 of interest income was recorded for the years ended March 31, 2010 and 2009, respectively. The Cooperative has obtained various collateral and unconditional guarantees in the event of default. The Cooperative issued notes receivable of $4,263,014 and $1,994,900 for the start-up and operation of customer pharmacies during the years ended March 31, 2010 and 2009, respectively.

## 4. PROPERTY AND EQUIPMENT

Property and equipment at March 31, 2010 and 2009, consisted of the following:

|  | 2010 | 2009 |
|---|---|---|
| Land | $    575,000 | $    575,000 |
| Building and improvements | 3,938,238 | 3,934,448 |
| Data processing equipment | 5,378,060 | 5,352,748 |
| Warehouse equipment | 2,025,152 | 1,665,625 |
| Vehicles | 408,288 | 418,549 |
| Construction in progress | 33,817 | 11,936 |
|  | 12,358,555 | 11,958,306 |
| Less accumulated depreciation | 7,535,865 | 7,152,671 |
| Property and equipment — net | $  4,822,690 | $  4,805,635 |

Depreciation expense was $678,872 and $647,968 for the years ended March 31, 2010 and 2009, respectively, of which, $410,399 and $381,593, respectively, is included within cost of goods sold in the consolidated statements of earnings for each of the years then ended.

## 5. MORTGAGE PAYABLE AND LONG-TERM DEBT

Long-term debt at March 31, 2010 and 2009, consisted of the following:

|  | 2010 | 2009 |
|---|---|---|
| Long-term debt | $30,000,000 | $33,159,390 |
| Mortgage payable | 1,840,350 | 2,058,929 |
|  | 31,840,350 | 35,218,319 |
| Less current portion of mortgage payable | (236,243) | (223,346) |
| Long-term mortgage payable and long-term debt | $31,604,107 | $34,994,973 |

The Cooperative has a Revolving Line of Credit Agreement (the "Credit Agreement") with a bank pursuant to which the Cooperative may borrow, subject to certain limitations, up to $70,000,000. The Credit Agreement was amended to reflect a range of interest rates effective October 1, 2008, based on the level of cash flow coverage. These rates range from prime to prime plus 0.25% or LIBOR plus 1.4% to LIBOR plus 1.8% depending on the coverage ratio. The Credit Agreement provides for interest equal to the prime rate announced from time to time by the bank (3.25% at March 31, 2010) or, at the Cooperative's option, various London InterBank Offered Rate (LIBOR) interest rates plus 1.40% (effective rate of 1.65% at March 31, 2010). At March 31, 2010, all of the debt was at LIBOR interest rates. The Credit Agreement terminates October 31, 2011, unless an event of default occurs prior to that date. The Cooperative's borrowings are secured by the Cooperative's accounts receivable, inventory, equipment, and by an insurance policy on the life of the chief executive officer. The Credit Agreement also provides for the maintenance of a financial covenant, which is a modified cash flow coverage ratio.

The Cooperative's mortgage payable on its administrative and warehouse facility in Rochester, NY, bears interest at 7.69%. The mortgage stipulates monthly payments consisting of principal and interest amounting to $30,949 through April 1, 2011, with a remaining balance due at that date. Scheduled future principal payments of the mortgage payable are $242,965 in 2011 and $1,584,731 in 2012.

The fair value of long-term debt approximated the carrying value based on current rates available to the Cooperative for debt with similar maturities.

## 6.  CUSTOMER DEPOSITS

Customers may deposit funds with the Cooperative. Customers receive interest on their deposits quarterly based on a variable rate (1.15% and 1.49% at March 31, 2010 and 2009, respectively). Deposits may be withdrawn by customers quarterly. Interest paid on customer deposits for the years ended March 31, 2010 and 2009, was $74,931 and $164,986, respectively.

## 7.  EMPLOYEE BENEFIT PLANS

**Defined Contribution Plan** — The Cooperative sponsors a defined contribution 401(k) plan for its employees. All employees are eligible to participate in this plan after one year of service. The plan allows employees to participate by contributing a portion of their compensation subject to the annual contribution limit imposed by the Internal Revenue Code. The plan provides for matching by the Cooperative. The Cooperative's matching contributions to this plan totaled $190,875 and $183,672 for the years ended March 31, 2010 and 2009, respectively.

**Deferred Compensation Plan** — The Cooperative sponsors a Supplemental Executive Retirement Plan to provide retirement and survivor benefits for select key employees. Benefits under this plan constitute nonqualified deferred compensation for purposes of Section 409A of the Internal Revenue Code of 1986 as amended together with the Treasury Regulations and other official guidance issued there under. The benefits for each employee are discounted from their expected payout dates and discounted at 6% to determine the current liability.

## 8.  LITIGATION SETTLEMENTS

The Cooperative recorded income from two litigation settlements totaling $107,952 during the year ended March 31, 2010. The settlements resulted from the cash recovery of a class action claim from the *In Re Ovcon Antitrust Litigation and In Re TriCor Indirect Purchasers Antitrust Litigation* related to restraint of trade and overpricing of certain pharmaceutical products.

## 9. INCOME TAXES

The provisions for income taxes for the years ended March 31, 2010 and 2009, consist of the following:

|  | 2010 | 2009 |
|---|---|---|
| Current tax provisions: |  |  |
| Federal | $ 742,976 | $ 14,316 |
| State | 164,587 | 2,245 |
| Current tax provision | 907,563 | 16,561 |
| Deferred tax provision (benefit): |  |  |
| Federal | (293,755) | 72,802 |
| State | (68,942) | 13,667 |
| Deferred tax provision (benefit) | (362,697) | 86,469 |
| Tax provision | $ 544,866 | $103,030 |

The Cooperative's deferred tax assets (liabilities) as of March 31, 2010 and 2009, consist of the following:

|  | 2010 | 2009 |
|---|---|---|
| Current: |  |  |
| Allowance for doubtful accounts and notes | $ 730,018 | $ 569,400 |
| Inventory | 341,891 | 19,892 |
| Net operating loss carryforwards |  | 99,564 |
| Partnership basis differences | (385,114) | (267,793) |
| Other |  | (7,753) |
| Net current tax asset | 686,795 | 413,310 |
| Accrued pension | 227,951 |  |
| Other — primarily basis difference in fixed assets | (203,074) | (64,335) |
| Noncurrent tax asset | 24,877 | (64,335) |
| Net deferred tax asset | $ 711,672 | $ 348,975 |

The Cooperative's effective tax rate and statutory tax rate differ due to state taxes. The Cooperative does not currently maintain a valuation allowance because realization of the deferred tax assets is considered more likely than not.

The Cooperative is subject to taxation in the US and multiple states. As of March 31, 2010, the Cooperative's tax years for 2007, 2008, 2009, and 2010 are subject to examination by the tax authorities.

## 10. RELATED-PARTIES

The Cooperative owns approximately 1% of the outstanding capital stock of Pharmacy Productions, Inc., a voluntary organization, which conducts business as Quality Care Pharmacies ("Quality Care"). Quality Care was organized to provide independent pharmacies with a common marketing identity, group advertising, promotional activities, and group purchasing. The chief executive officer of the Cooperative serves as the president of Pharmacy Productions, Inc. and as a permanent member of its board of directors. Approximately 87% of the Cooperative's net sales for each of the years ended March 31, 2010 and 2009 were to members of Quality Care. The Cooperative's investment in Quality Care is recorded under the cost method at a carrying value of $0 as of March 31, 2010 and 2009. Quality Care receives payments from the Cooperative in amounts equal to 0.25% of all purchases by the Quality Care members and 3% of the generic purchases by Quality Care members, and those payments were $2,837,824 and $2,457,075, included in cost of goods sold on the consolidated statements of earnings, for the years ended March 31, 2010 and 2009, respectively.

The Cooperative is a founding member and owns approximately 10% of Wholesale Alliance, LLC (the "Alliance"), which conducts business as Pharmacy First. Pharmacy First is a national network of retail community pharmacies that share one common goal; accessing incremental revenue and operational programs to enhance their financial foundation while using sound professional judgment and protocols. The chief executive officer of the Cooperative serves on the board of managers. The Cooperative's investment in the Alliance of $713,098 and $556,519 is recorded under the equity method and is included with other assets in the accompanying consolidated balance sheets as of March 31, 2010 and 2009, respectively.

The Cooperative is member of Optisource, LLC and industry buying group that focuses on generic pharmaceuticals. The Cooperative's CEO serves on the Board of Directors of Optisource, LLC. Optisource members make purchases from suppliers based upon terms negotiated by Optisource, LLC for the benefit of its members. The suppliers pay to Optisource, LLC a fee based upon sales to members by the generic pharmaceutical suppliers. The Cooperative is entitled to distributions, if declared, based upon its purchases. The amount and timing of distributions, if any, are determined by the Board of Directors of Optisource, LLC.

## 11. COMMITMENTS AND CONTINGENCIES

The Cooperative ceased operations for the former distribution center in New Castle, PA in October 2006, however, remains responsible for the operating lease for this distribution center. The annual rent under the operating lease is $204,000 annually through December 2010. From the time the Cooperative closed this distribution center, various subtenants have occupied the distribution center and have been paying the monthly rental on a month-to-month basis. The current subtenant is in negotiations with the landlord to purchase the facility, which would relieve the Cooperative's lease payment obligations for the remaining term of the lease. Rental expense was $233,139 and $231,403 for the years ended March 31, 2010 and 2009, respectively. Rental income was $231,562 and $211,747 for the years ended March 31, 2010 and 2009, respectively.

## 12. STOCK ACTIVITY

The Cooperative engaged in a series of transactions in September 2008 that had the effect of increasing the number of issued and outstanding shares of nonvoting common stock. This was accomplished by (i) declaration of a stock dividend of one additional share of nonvoting common stock for each issued and outstanding share of the Cooperative's nonvoting common stock as of the record date for such dividend, and, following completion of such stock dividend (ii) the declaration by the Cooperative of a

further stock dividend of one share of nonvoting common stock for each issued and outstanding share of voting common stock as of the record date for such dividend. As a result of these transactions, the number of issued and outstanding shares of the Cooperative's nonvoting common stock was increased from 36 to 212. The number of issued and outstanding shares of the Cooperative's voting common stock remains unchanged as a result of the stock dividends described above.

## 13. SUBSEQUENT EVENTS

The Cooperative has evaluated all events subsequent to March 31, 2010 through the date these consolidated financial statements were available to be issued, June 14, 2010, and has determined that there are no subsequent events that require disclosure.

\* \* \* \* \* \*

# Rochester Drug Cooperative, Inc.

Unaudited Consolidated Financial Statements as of
and for the Four Month Period Ended July 31, 2010

# ROCHESTER DRUG COOPERATIVE, INC.

**CONSOLIDATED BALANCE SHEET (UNAUDITED)**
**AS OF JULY 31, 2010**

## ASSETS

CURRENT ASSETS:

| | |
|---|---:|
| Cash | $ 584,159 |
| Accounts Receivable - net of allowance for doubtful accounts of $1,709,863 | 81,372,408 |
| Merchandise Inventories | 28,015,284 |
| Current portion of notes receivable | 2,346,785 |
| Prepaid expenses and other current assets | 509,062 |
| Deferred income tax assets | 711,672 |
| Total current assets | 113,539,370 |
| LONG-TERM PORTION OF NOTES RECEIVABLE - Net of allowance for doubtful notes receivable of $500,000 | 3,150,058 |
| INTANGIBLE ASSET - Net of accumulated amortization of $110,667 | 164,333 |
| PROPERTY AND EQUIPMENT - Net of accumulated depreciation | 4,964,856 |
| OTHER ASSETS | 802,334 |
| TOTAL | $ 122,620,951 |

(Continued)

# ROCHESTER DRUG COOPERATIVE, INC.

## CONSOLIDATED BALANCE SHEET (UNAUDITED)
## AS OF JULY 31, 2010

### LIABILITIES AND SHAREHOLDERS' EQUITY

CURRENT LIABILITIES:

| | |
|---|---:|
| Mortgage payable - current portion | $ 236,243 |
| Accounts payable | 67,021,570 |
| Customer deposits | 7,471,190 |
| Accrued payroll, related taxes and withholdings | 255,094 |
| Dividends payable | 16,892 |
| Other accrued expenses | 1,155,184 |
| Income taxes payable | 180,340 |
| Total current liabilities | 76,336,513 |
| OTHER NONCURRENT LIABILITIES | 810,631 |
| MORTGAGE PAYABLE - Noncurrent portion | 1,527,500 |
| LONG-TERM DEBT | 30,283,445 |
| Total Liabilities | 108,958,089 |

SHAREHOLDERS EQUITY:

| | |
|---|---:|
| Preferred shares, $5 par value - authorized 500,000 shares: | |
| 208,670 shares issued and outstanding | 1,043,350 |
| Voting common shares, $5 par value - authorized 60,000 shares: | |
| 174 shares issued and outstanding | 870 |
| Nonvoting common shares, $.01 par value - authorized | |
| 10,000; 204 shares outstanding | 2 |
| Additional paid-in capital | 2,410,550 |
| Retained Earnings | 10,208,090 |
| Total shareholders' equity | 13,662,862 |
| TOTAL | $ 122,620,951 |

See notes to unaudited consolidated financial statements                    (Concluded)

# ROCHESTER DRUG COOPERATIVE, INC.

## CONSOLIDATED STATEMENT OF EARNINGS (UNAUDITED)
## FOR THE FOUR MONTH PERIOD ENDED JULY 31, 2010

|  | Amount | Percent of Net Sales |
|---|---|---|
| NET SALES | $ 231,229,412 | 100.00% |
| COST OF GOODS SOLD - Net of purchase discounts of $5,082,457 | 224,502,187 | 97.09 |
| GROSS PROFIT ON NET SALES | 6,727,225 | 2.91 |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES | 3,740,440 | 1.62 |
| DELIVERY EXPENSE | 1,044,507 | 0.45 |
| DEPRECIATION AND AMORTIZATION | 85,270 | 0.04 |
| INTEREST EXPENSE | 282,960 | 0.12 |
| LEGAL SETTLEMENTS | (509,826) | (0.22) |
| OTHER INCOME - Net | (598,695) | (0.26) |
| EARNINGS BEFORE PATRONAGE DIVIDEND AND INCOME TAXES | 2,682,569 | 1.16 |
| FEDERAL AND STATE INCOME TAX | 425,600 | 0.18 |
| EARNINGS BEFORE PATRONAGE DIVIDEND | 2,256,969 | 0.98 |
| PATRONAGE DIVIDEND | - | - |
| NET EARNINGS | $ 2,256,989 | 0.98% |

See notes to unaudited consolidated financial statements

# ROCHESTER DRUG COOPERATIVE, INC.

## CONSOLIDATED STATEMENTS OF CASH FLOWS (UNAUDITED)
## FOR THE FOUR MONTH PERIOD ENDED JULY 31, 2010

| | |
|---|---:|
| **OPERATING ACTIVITIES:** | |
| Earnings before patronage dividend | $ 2,256,969 |
| Adjustments to reconcile earnings before cash patronage dividend to net cash provided by operating activities: | |
| Depreciation and amortization | 227,263 |
| Gain on sale of property and equipment | (3,544) |
| Bad debt expense | 309,863 |
| Changes in assets and liabilities: | |
| Increase in accounts receivable | (7,613,147) |
| Increase in merchandise inventories | (5,055,154) |
| Decrease in prepaid expenses and other assets | 103,256 |
| Increase in accounts payable | 11,216,147 |
| Increase in customer deposits | 1,271,991 |
| Decrease in accrued payroll, related taxes, and withholdings | (198,674) |
| Increase in other accrued expenses | 152,927 |
| Decrease in income taxes payable | (379,960) |
| Net cash provided by operating activities | 2,287,937 |
| | |
| **INVESTING ACTIVITIES:** | |
| Notes receivable issued during the year | (1,197,461) |
| Payments received on notes receivable | 1,708,871 |
| Additions to property and equipment | (365,718) |
| Cash received on disposal of property and equipment | 5,500 |
| Net cash (used in) provided by investing activities | 151,192 |
| | |
| **FINANCING ACTIVITIES:** | |
| Borrowings on note payable to bank | 20,095,139 |
| Payments on note payable to bank | (19,811,694) |
| Payments on mortgage payable to bank | (78,607) |
| Patronage dividend | (5,200,000) |
| Preferred stock dividend | (52,168) |
| Net cash used in financing activities | (5,045,330) |
| | |
| NET INCREASE (DECREASE) IN CASH | (2,606,201) |
| CASH — Beginning of year | 3,190,360 |
| CASH — End of year | $ 584,159 |
| | |
| SUPPLEMENTAL DISCLOSURES OF NONCASH AND FINANCING ACTIVITIES: | |
| Cash paid for interest | $ 259,341 |
| Cash paid for income taxes | $ 805,560 |
| Payable incurred for purchase and retirement of shares | $ |

See notes to unaudited consolidated financial statements.

# ROCHESTER DRUG COOPERATIVE, INC.

## 1. ORGANIZATION AND BASIS OF PRESENTATION

The unaudited consolidated financial statements consist of Rochester Drug Cooperative, Inc. and its wholly owned inactive subsidiary SourceOne Services, Inc. ("SourceOne") collectively (the "Cooperative"). Intercompany transactions have been eliminated.

The Cooperative is a New York Cooperative Corporation, formed in 1905 and incorporated in 1948. Its principal business is to warehouse, merchandise, and then distribute, on a cooperative basis, drugs, pharmaceutical supplies, and other merchandise commonly sold in drug stores, pharmacies, and health and beauty stores, together with equipment and supplies commonly used in the maintenance and operation of drug stores, pharmacies, health and beauty stores, and durable medical equipment businesses. The Cooperative currently distributes pharmaceutical and other related products from its distribution center in Rochester, NY, principally to independent pharmacies in New York, Pennsylvania, New Jersey, Connecticut and Ohio.

The unaudited consolidated financial statements are prepared on the accrual basis of accounting in conformity with accounting principles generally accepted in the United States of America (GAAP). The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. On an ongoing basis, management reviews its estimates based on currently available information. Changes in facts and circumstances may result in revised estimates.

The unaudited consolidated balance sheet as of July 31, 2010, and the unaudited consolidated statement of earnings and cash flows for the four month period ended July 31, 2010, have been prepared by the Cooperative and have not been audited. In the opinion of management, all adjustments, consisting of only normal recurring adjustments necessary for the fair presentation of the financial position, results of operation and cash flows, have been made.

The accompanying interim unaudited consolidated financial statements should be read in conjunction with the audited consolidated financial statements as of March 31, 2010 and 2009, and for each of the years then ended. Certain information and footnote disclosure normally included in financial statements prepared in accordance with GAAP have been omitted. The results of operations for the four month period ended July 31, 2010 are not necessarily indicative of the operating results for the full fiscal year.

## 2. LITIGATION SETTLEMENTS

The Cooperative recorded income from a litigation settlement totaling $509,826 during the four month period ended July 31, 2010. The settlement resulted from the cash recovery of a class action claim from the *In re Tricor Indirect Purchasers Antitrust Litigation* related to restraint of trade and overpricing of certain pharmaceutical products.

3. **RECENT ACCOUNTING PRONOUNCMENTS**

In October 2009, the FASB issued ASU 2009-17, Consolidations (ASC Topic 810), Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities. This update amends the codification for the issuance of FASB Statement No. 167, Amendments to FASB Interpretation No. 46(R). The amendments in this update replace the quantitative-based risks and rewards calculation for determining which reporting entity, if any, has a controlling financial interest in a variable interest entity with an approach focused on identifying which reporting entity has the power to direct the activities of a variable interest entity that most significantly impact the entity's economic performance and (1) the obligation to absorb losses of the entity or (2) the right to receive benefits from the entity. An approach that is expected to be primarily qualitative will be more effective for identifying which reporting entity has a controlling financial interest in a variable interest entity. The amendments in this update also require additional disclosures about a reporting entity's involvement in variable interest entities, which will enhance the information provided to users of financial statements. This update is effective at the start of a reporting entity's first fiscal year beginning after November 15, 2009. Early application is not permitted. The Cooperative has adopted this standard as of April 1, 2010, and the adoption did not have a material impact on its consolidated financial statements.

4. **SUBSEQUENT EVENTS**

The Cooperative has evaluated all subsequent events through September 21, 2010 to ensure that the unaudited consolidated financial statements as of and for the four month period ended July 31, 2010 include appropriate disclosure of events both recognized in the unaudited consolidated financial statements as of July 31, 2010, and events which occurred subsequent to July 31, 2010 but were not recognized in the unaudited consolidated financial statements. No subsequent events which required recognition or disclosure were identified.

## AVAILABLE DOCUMENTS*

Credit Facility Agreement dated November 10, 2006 between Manufacturers and Traders Trust Company and Rochester Drug Co-operative, Inc., and all amendments thereto and agreements executed in connection therewith.

Employment Agreement dated effective as of April 1, 2005 between Rochester Drug Co-operative, Inc. and Laurence F. Doud, III, and all amendments and agreements executed in connection therewith.

Rochester Drug Co-operative, Inc. Supplemental Executive Retirement Plan, and all amendments and agreements executed in connection therewith.

Lease dated 7/26/2000 between Le Frois Development, LLC as tenant and the County of Monroe Industrial Development Agency ("COMIDA"), for premises commonly know as 50 Jet View Drive (containing approximately 10.8 acres) in the Town of Chili, County of Monroe, State of New York (as assigned to RDC on May 23, 2003).

Payment in Lieu of Tax Agreement dated 7/26/2000 between County of Monroe (COMIDA) and Le Frois Development, LLC.(the "Pilot Agreement which Pilot Agreement was assumed by RDC (and consented to by COMIDA) on 5/23/03.

Restated Mortgage Note dated 5/23/03 in the amount of $3,042,625.84 by RDC as maker to M&T Real Estate, Inc, which mortgage note is secured by (i) a certain mortgage executed 7/16/00 by Le Frois Development, LLC on property located at 50 Jet View Drive in the Town of Chili, County of Monroe, State of New York, which mortgage was assumed by RDC, as mortgagor, on 5/23/03; (ii) a general assignment of rents between RDC and M&T Real Estate, Inc. dated 5/23/03 and (iii) an Environmental Compliance and Indemnification Agreement between RDC and M&T Real Estate, Inc. dated 5/23/03.

Sublease between Valley Drug Company and RDC, as subtenant, dated 12/28/05 for premises located at 209 Green Ridge Road, New Castle, PA, under a Primary Lease between Becan Development LLC and Valley Drug dated 1/1/04, as amended by Amendment No. 1 to Lease dated 12/21/05, and related documents, subleasing all of sublandlord's right, title and interest as Tenant in and to the Primary Lease.

Agreement of Sublease between Rochester Drug Co-operative, Inc. and Axion dated December 10, 2008.

Amended and Restated Operating Agreement of Wholesale Alliance, L.L.C. dated November, 2007.

Amended and Restated OptiSource, LLC Operating Agreement, and OptiSource, LLC New Member Participation Agreement dated June 1, 2007.

*Certain agreements are subject to confidentiality restrictions, and may require the execution of non-disclosure agreements or consents of third parties prior to review.*

## EXHIBIT C

## FORM OF SUBSCRIPTION AGREEMENT

<u>SUBSCRIBER</u>

<u>FEDERAL EMPLOYER IDENTIFICATION NUMBER</u>

## ROCHESTER DRUG CO-OPERATIVE, INC.

### SUBSCRIPTION AGREEMENT

Under Confidential Summary Offering Statement
Dated September 21, 2010

Rochester Drug Co-operative, Inc.
50 Jet View Drive
Rochester, New York 14624

Attention: Board of Directors

Ladies and Gentlemen:

1.     The undersigned has received and read the Confidential Summary Offering Statement dated September 21, 2010 and all of the Exhibits thereto (collectively, the "Offering Documents"), concerning the offering made by Rochester Drug Co-operative, Inc. (the "Company"), of thirty seven (37) shares of its Voting Common Stock, par value $5.00 per share, (the "Shares"). The undersigned, intending to be legally bound, hereby subscribes for the Shares described on page 6 hereof, and as payment therefor hereby tenders herewith either (i) cash or a check backed by good, negotiable funds, in the amount set forth on page 6 hereof representing the full payment of the subscription price, or (ii) (a) cash or a check backed by good, negotiable funds, in the amount of $10,000, representing partial payment of the subscription price, and (b) a fully executed and delivered Promissory Note (in the original principal amount of $16,500, representing the balance of the subscription price) and Pledge Agreement (with Stock Power attached) in the forms attached hereto as Annexes 1 and 2.

2.     This subscription is irrevocable by the Subscriber, except as otherwise set forth herein. The Company shall have the right to reject this subscription in its sole discretion for any reason. Upon such rejection, all funds tendered shall be returned to the undersigned, without interest or deductions of any kind.

3.     The undersigned acknowledges that: (a) he has read the Offering Documents and has evaluated the risks of investing in the Shares; (b) he is able to bear the economic risk of such investment; and (c) the Shares have not been and will not be registered under the Securities Act of 1933, as amended (the "1933 Act"). The undersigned represents that he has had the opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this transaction and the information presented in the Offering Documents. Any questions raised have been answered to the satisfaction of the undersigned. The undersigned's decision to purchase Shares is based solely on the information in the Offering Documents and on the written answers to such questions as the undersigned has raised concerning the transaction.

4.     By executing this Agreement, the undersigned agrees to be bound by and comply with the By-laws, the Certificate of Incorporation and the rules and regulations of the Company, as each may be amended from time to time. Without limiting the generality of the foregoing, the undersigned specifically agrees and acknowledges that:

(a)     In accordance with the Company's By-laws and Certificate of Incorporation, shares of Voting Common Stock owned by a shareholder which does not own a licensed pharmacy or which fails to make purchases from the Company of at least $500,000 (as such amount may be amended from time to time) during the preceding fiscal year (or a pro-rated portion of $500,000, as such amount may be amended from time to time, for any partial fiscal year in which the undersigned is a shareholder of the Company) are subject to redemption at the option of the Company, at net book value per share (as defined in the Company's Certificate of Incorporation and By-laws), plus previously declared and unpaid dividends, less amounts owed by the shareholder to the Company.

(b)     In accordance with the Company's By-laws and Certificate of Incorporation, the Company is granted a first right to purchase any shares of Voting Common Stock presented to the Company for transfer. Any such purchase shall be at net book value per share (as defined in the Company's Certificate of Incorporation and By-laws) of Voting Common Stock plus previously declared and unpaid dividends, less amounts owed to the Company by the shareholder.

(c)     In accordance with the Company's By-laws and Certificate of Incorporation, the Company may refuse to consent to the transfer of Shares if a transferring shareholder is indebted to the Company, for purchases of inventory or otherwise, until such indebtedness is paid.

5.     The undersigned acknowledges and understands that the purchase price pursuant to the Offering of the Company's Shares is $26,500 per share, which is less than the net book value per share of the Company's Shares as of March 31, 2010, the conclusion of the Company's most recently completed fiscal year. The undersigned agrees and acknowledges that the Company's net book value per share as of the date of this Subscription Agreement, or as of March 31, 2011, the last day of the Company's current fiscal year, may be higher or lower than the net book value per share as of March 31, 2010, and may be higher or lower than the purchase price for the Shares.

471471_1

6.    The undersigned represents to the Company that it is purchasing Shares for its own account, for investment, and not with a view to, or for resale in connection with, any distribution thereof. The undersigned does not have any present intention of selling or otherwise transferring the Shares subscribed for or any interest therein. The undersigned acknowledges and agrees that such Shares may not be sold, transferred, pledged or otherwise disposed of without registration under the 1933 Act and applicable state securities laws or in accordance with applicable exemptions therefrom. If the undersigned is a resident of the Commonwealth of Pennsylvania, the undersigned agrees that it may not sell the Shares for a period of 12 months from the date of this Subscription Agreement except in accordance with Regulation 204.011 of the Pennsylvania Securities Act of 1972.

7.    The undersigned acknowledges that no representations or promises have been made concerning the marketability or value of the Shares.  Except as otherwise set forth in this Agreement, the Company has not agreed with or represented to the undersigned that the Shares will be purchased or redeemed from the undersigned at any time in the future. Further, there have been no representations, promises or agreements that the Shares will be registered under the 1933 Act at any time in the future or otherwise qualified for sale under applicable securities laws. The Company does not now file reports with the Securities and Exchange Commission (the "Commission") or otherwise make available to the public such information concerning itself as would permit its shareholders to use Rule 144 of the Rules and Regulations promulgated under the 1933 Act ("Rule 144") for transfer of the Shares, and there is no requirement that the Company do so in the future or take any other action to make available any other exemption from the registration requirements of the 1933 Act.

8.    The undersigned understands and agrees that the Shares may not be sold, transferred, pledged or otherwise disposed of in the absence of either an effective registration statement covering the Shares under the 1933 Act and relevant state securities laws, or an exemption from such registration requirements. The undersigned acknowledges that: (a) a notation will be made on the appropriate records of the Company so that transfers of the Shares will not be effected on those records without compliance with those restrictions; and (b) the Commission has taken the position in various releases that persons who offer to sell restricted securities such as the Shares without reliance on Rule 144 are to be on notice that, in view of the broad remedial purposes of the 1933 Act and of public policy which supports registration, they will have a substantial burden of proof establishing that an exemption from registration is available for such offers or sales. In view of the foregoing restrictions, the undersigned understands and acknowledges that it must continue to bear the economic risk of its investment in the Shares for an indefinite period of time.

9.    The rights and duties of the undersigned under this Subscription Agreement are not assignable without the written consent of the Company.  The provisions of this Subscription Agreement shall be binding upon the successors, permitted assigns and legal representatives of the undersigned.

10.    The representations and warranties made by the undersigned herein are made with the intent that they be relied upon by the Company in determining the suitability of the undersigned as a purchaser of the Shares. In addition, the undersigned undertakes to notify the

3

Company immediately of any change in any representation, warranty or other information relating to the undersigned set forth herein. The undersigned hereby agrees that such representations and warranties and any agreements, undertakings and acknowledgments herein shall survive the purchase of the Shares, and hereby indemnifies the Company and its officers and directors and holds them harmless from and against any and all loss, damage, liability or expense, including costs and reasonable attorneys' fees, which they may incur by reason of or in connection with the undersigned's misrepresentation or breach of representation, warranty or covenant set forth herein.

11. The undersigned represents that: (a) if it is a corporation or other entity, it is duly organized, validly existing and in good standing under the laws of the state in which it was formed and has all the requisite power and authority to invest in the Shares as provided herein; (b) such investment does not result in any violation of, or conflict with, any term of any instrument to which the undersigned is bound or any laws or regulations applicable to it; (c) such investment has been duly authorized by all necessary action on behalf of the undersigned; (d) this Subscription Agreement has been duly executed and delivered on behalf of the undersigned and constitutes a legal, valid and binding agreement of the undersigned; and (e) the undersigned has not been formed for the specific purpose of acquiring the Shares.

12. Whenever used herein, the masculine pronoun shall include the feminine and neuter, as appropriate in the context.

13. If the undersigned has elected to deliver partial payment for the Shares subscribed for hereby by delivery to the Company of a Promissory Note in the form attached hereto as Annex 1 (the "Promissory Note"), the undersigned acknowledges and understands that he will be deemed to be a shareholder of the Company upon delivery to the Company of the Promissory Note and the related Pledge Agreement and Irrevocable Proxy (with Stock Power attached) in the form attached hereto as Annex 2 (the "Pledge Agreement") and this Subscription Agreement, and as such will be entitled to receive patronage dividends to the extent declared and paid by the Company prior to the repayment in full of the Promissory Note, in an amount determined pro-rata, based upon the undersigned's purchases from the Company after becoming a shareholder of the Company. However, in the event the Promissory Note is not repaid in full by the subscriber on or prior to March 18, 2011, or in the event of certain other events of default as set forth in the Promissory Note, the undersigned will forfeit any patronage dividend previously paid or payable with respect to periods on or prior to March 31, 2011, and the Company will have certain rights as a secured creditor pursuant to the Pledge Agreement. Without limiting the generality of the foregoing, if the Promissory Note is not paid in full by March 18, 2011, the undersigned hereby grants to the Company the right to repurchase the Shares subscribed for hereby by re-paying to the undersigned the principal amount paid by the undersigned to the Company prior to the delivery by the Company of notice of its intent to exercise its re-purchase rights hereunder. Upon such repurchase by the Company, all of the undersigned's rights in and to the Shares shall be cancelled, and the undersigned hereby forfeits and agrees to repay to the Company any patronage dividend previously paid or payable to the undersigned by the Company with respect to periods on or prior to March 31, 2011.

4

<u>FOR PENNSYLVANIA RESIDENTS ONLY</u>

IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A WRITTEN NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M)(1) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, YOU MAY ELECT, WITHIN TWO BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS (WHICH IS NOT MATERIALLY DIFFERENT FROM THE FINAL PROSPECTUS) TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONIES PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A WRITTEN NOTICE (INCLUDING A NOTICE BY FACSIMILE OR ELECTRONIC MAIL) TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE PROSPECTUS) INDICATING YOUR INTENTION TO WITHDRAW.

IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES AND HAVE RECEIVED A WRITTEN NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M)(2) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, YOU MAY ELECT, WITHIN TWO BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF YOUR BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO BUSINESS DAYS AFTER YOU MAKE THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED, TO WITHDRAW YOUR ACCEPTANCE AND RECEIVE A FULL REFUND OF ALL MONIES PAID BY YOU. YOUR WITHDRAWAL OF ACCEPTANCE WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A WRITTEN NOTICE (INCLUDING A NOTICE BY FACSIMILE OR ELECTRONIC MAIL) TO THE ISSUER (OR PLACEMENT AGENT IF ONE IS LISTED ON THE FRONT PAGE OF THE OFFERING MEMORANDUM) INDICATING YOUR INTENTION TO WITHDRAW.

**Number of Shares and Purchase Price
(to be completed by Subscriber):**

One share of Voting Common Stock at $26,500 per share.

Total Purchase Price = $26,500

Dated: _____ , 20____

SUBSCRIBER:

_____

By: _____
Title: _____

ADDRESS OF SUBSCRIBER:

_____

_____

DEA IDENTIFICATION NUMBER:

_____

TAX IDENTIFICATION NUMBER:

_____

Accepted this _____ day of

_____, 20____

Rochester Drug Co-operative, Inc.

By: _____
      Laurence F. Doud, III, Chief Executive Officer

6

ANNEX 1

FORM OF PROMISSORY NOTE

# FORM OF PLEDGE AGREEMENT AND IRREVOCABLE PROXY WITH STOCK POWER ATTACHED

**EXHIBIT D**

**FORM OF PROMISSORY NOTE**

# PROMISSORY NOTE

$16,500

Dated: _____, 20__

_____
City and State

**FOR VALUE RECEIVED**, pursuant to that certain Subscription Agreement dated as of _____, 20__ (the "Subscription Agreement") by and between _____, with an address at _____ ("Maker"), and **ROCHESTER DRUG CO-OPERATIVE, INC.**, a New York Cooperative Corporation with offices at 50 Jet View Drive, Rochester, New York ("Payee"), Maker promises to pay to Payee the principal sum of Sixteen Thousand Five Hundred and 00/100 Dollars ($16,500.00), together with interest on the unpaid balance of this Note beginning as of the date hereof, at the per annum rate set forth below, on the following terms:

1. **Interest**. Interest on the unpaid balance of this Promissory Note (the "Note") shall accrue at a fixed rate of two and one-half percent (2.5%) per annum.

2. **Payments**. The indebtedness evidenced by this Note, including all accrued interest thereon, may be paid at any time, and from time to time, without advance notice to Payee, in whole or in part, between the date hereof and March 18, 2011 (the "Maturity Date"), provided that the entire unpaid principal balance of this Note, together with all accrued interest thereon, shall be paid in full on or before the Maturity Date. All payments shall be in lawful money of the United States. Payments shall be made to Payee at Payee's address set forth above, or at such other place as Payee may designate to Maker in writing.

3. **Events of Default**. Upon the occurrence of any of the following events of default (each, an "Event of Default"), (i) Payee shall refund to Maker (a) any and all principal and interest payments made by Maker pursuant to this Note prior to such Event of Default, and (b) all amounts paid by Maker to Payee upon execution and delivery of the Subscription Agreement, without interest; (ii) the Maker's rights in and to Shares subscribed for pursuant to the Subscription Agreement will be cancelled; and (iv) Maker will forfeit and waive any rights to, and be required to repay, any patronage dividend previously paid or payable with respect to periods on or prior to March 31, 2011:

    a.    Maker fails to pay the entire unpaid principal balance and accrued interest on this Note on or before the Maturity Date;

    b.    Maker fails to pay in accordance with Payee's credit policies, terms and conditions any amounts owed by Maker to Payee;

    c.    the insolvency of Maker or the appointment of a receiver or liquidator, whether voluntary or involuntary, for Maker or for any of its property; the filing by or against Maker of a petition under the provisions of any state insolvency law, or the Bankruptcy Code, as now in effect or hereafter amended; the making by Maker of an assignment for the benefit of its creditors; or the institution by or against Maker of any other type of insolvency proceeding (under bankruptcy laws or otherwise) or proceeding for the settlement of claims against Maker;

d.    the institution of any formal or informal proceeding for the dissolution or liquidation of, or settlement of claims against, or winding up of the affairs of Maker;

e.    the taking of any judgment against Maker, which judgment is not paid, discharged, stayed or bonded within sixty (60) days from the entry thereof;

f.    the sale of all or substantially all of the assets of Maker;

g.    the transfer of the Maker's business, whether by stock sale or otherwise;

h.    any merger involving the Maker where the Maker is not the surviving entity;

i.    failure by Maker to own a licensed pharmacy;

j.    failure by Maker to make purchases from Payee of at least $500,000 during any fiscal year of the Company ending March 31, during the term of this Promissory Note, or a pro-rated portion of $500,000 for any partial fiscal year in which Maker is a shareholder of Payee;

k.    any default by Maker under the Subscription Agreement;

l.    any default by Maker under that certain Pledge Agreement and Irrevocable Proxy between Maker and Payee delivered in connection with this Note (the "Pledge Agreement"); and

m.    any default by Maker under any other agreement between Maker and Payee, including without limitation written or verbal agreements related to purchases of inventory or merchandise.

4.    **Miscellaneous**.

a.    **No Waiver**.  No delay or omission on the part of Payee in exercising any right hereunder shall operate as a waiver of such right or of any other right of Payee, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. Maker waives presentment, demand, protest and notices of every kind with respect to this Note.

b.    **Governing Law**.  This Note shall be governed by and construed in accordance with the laws of the State of New York, without reference to conflicts of laws principles thereof. Any action brought by any party hereunder shall be venued in Monroe County (State of New York) or the Western District of New York (Federal Court), as the case may be and as designated by Payee, and Maker consents to the jurisdiction of said courts.  Maker hereby waives any defenses based upon forum non conveniens or any similar provision of law.

c.    **Notices**.  All notices and other communications provided for hereunder shall be in writing and mailed or delivered (including by facsimile) to the party to receive the notice or communication at its respective address set forth above; or, as to each such party or any holder hereof, at such other address as shall be designated by such party or holder in a written notice to the other. All notices and communications shall, when mailed or sent by facsimile, be effective when deposited in the mail, or delivered, respectively, addressed as aforesaid.

d.  **Binding Effect**.  The covenants and obligations of this Note shall be binding upon the Maker, its successors and assigns, and shall inure to the benefit of Payee, its successors and assigns.

e.  **Costs.**  Maker agrees to pay all costs, expenses and attorneys' fees at any time paid or incurred by Payee in endeavoring to collect the indebtedness evidenced hereby, whether the same shall become due by acceleration or otherwise.

f.  **Nature of Indebtedness.**  This Note evidences the indebtedness referred to in, and is subject to the provisions of the Subscription Agreement and the Pledge Agreement.

IN WITNESS WHEREOF, Maker has executed this Note as of the date first above written.

_____

By:_____

Name:_____
Its:_____

STATE OF _____ )
COUNTY OF _____ ) SS.

     On the _____ day of _____ in the year 20____ before me, the undersigned, a Notary Public in and for said State, personally appeared _____, to me known, who, being by me duly sworn did depose and say the above-named person resides in _____, _____, that said person is the _____ of _____, the _____ described in and which executed the foregoing instrument, and that the above-named person signed thereto by order of the _____ of such _____.

_____
Notary Public

## Exhibit E

## Form of Pledge Agreement and Irrevocable Proxy (with Stock Power Attached)

## PLEDGE AGREEMENT AND IRREVOCABLE PROXY

**THIS AGREEMENT** has been made effective as of _____, 20___ by and between **ROCHESTER DRUG CO-OPERATIVE, INC.**, a New York co-operative corporation with an address at 50 Jet View Drive, Rochester, New York 14624, and _____ _____with an office at _____, (the "Debtor").

For good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

### I.    SECURITY INTEREST

A.    Debtor hereby pledges and grants to the Secured Party a present security interest in the collateral described in Article II hereof (the "Security Interest"), to secure payment and performance of all payment obligations arising out of and evidenced by that certain Promissory Note of Debtor dated the date hereof in favor of the Secured Party, in the principal amount of $16,500 (the "Note").

### II.    COLLATERAL

A.    The collateral which is subject to the Security Interest and to this Agreement is all of the right and interest of Debtor in and to one share of the Voting Common Stock of Rochester Drug Co-operative, Inc. (the "Pledged Share").

B.    Debtor hereby consents to Secured Party serving as pledge holder in accordance with this Agreement and, with a present intention of creating a security interest in the Pledged Share in favor of Secured Party, and to perfect the Security Interest, hereby deposits with the Secured Party the Pledged Share, as represented by the certificate issued in the name of Debtor with a blank stock power, duly endorsed, attached.

### III.    DEBTOR'S REPRESENTATIONS AND WARRANTIES

Debtor represents and warrants that:

A.    Debtor has not granted to any other party any interest in or to the Pledged Share.

B.    Debtor is authorized to enter into this Agreement.

C.    This Agreement is effective to vest in Secured Party the Security Interest in the Pledged Share as set forth herein.

### IV.    COVENANTS OF DEBTOR

So long as any portion of the Note remains unpaid, Debtor covenants and agrees as follows:

A.      Debtor shall defend the Pledged Share against the claims and demands of all other parties.

B.      Debtor shall keep the Pledged Share free from all security interests, liens or other encumbrances other than the Security Interest.

C.      Debtor shall not sell, transfer, assign or otherwise dispose of its interest in and to the Pledged Share without the prior consent of Secured Party.

D.      Debtor shall advise Secured Party promptly in writing, in sufficient detail, of the occurrence of any event which would have a material effect on the value of its interest in and to the Pledged Share.

E.      Debtor shall, on Secured Party's reasonable request, execute and deliver to Secured Party such financing statements and other papers and do all such acts as in Secured Party's reasonable judgment may be necessary or appropriate to establish and maintain a valid and prior security interest in the Pledged Share. On Debtor's failure so to do, Secured Party may sign any financing statements or other papers on Debtor's behalf.

F.      Debtor shall promptly notify Secured Party in writing of any condition or event which constitutes, or would constitute with the passage of time or giving of notice or both, a default under this Agreement.

## V.      DEFAULT

Each and any of the following events or conditions shall constitute a default hereunder:

A.      default by Debtor under any term, obligation, covenant or provision contained or referred to in this Agreement;

B.      default by Debtor under any term, obligation, covenant or provision of that certain Subscription Agreement dated the date hereof between Debtor and Secured Party;

C.      default of Debtor under any term, obligation, covenant or provision of the Note;

D.      default by Debtor under any term, obligation, covenant or provision of any other agreement between Debtor and Secured Party, including without limitation written or verbal agreements related to purchases of inventory or merchandise.

E.      the insolvency of the Debtor; the appointment of a receiver or liquidator, whether voluntary or involuntary, for the Debtor or for any of its property; the filing by or against the Debtor of a petition under the provisions of any state insolvency law, or the Bankruptcy Code, as now in effect or hereafter amended; the making by the Debtor of an assignment for the benefit of its creditors; the institution by or against the Debtor of any other type of insolvency proceeding (under the bankruptcy laws or otherwise) or proceeding for the settlement of claims against the Debtor;

F.      the filing against the Debtor of a Petition for Adjudication as a bankrupt; or the institution against the Debtor of any other type of insolvency proceeding (under the Bankruptcy

Code or otherwise) or of any formal or informal proceeding for the settlement of claims against Debtor, if such Petition or proceeding has not been discharged or otherwise terminated by Debtor within sixty (60) days from the entry thereof;

G.     the taking of any judgment against Debtor, which judgment is not paid, discharged, stayed or bonded within sixty (60) days from the entry thereof;

H.     the institution of any formal or informal proceeding for the dissolution or liquidation of, or settlement of claims against, or winding up of the affairs of Debtor;

I.     the sale of all or substantially all of the assets of Debtor;

J.     the transfer of the Debtor's business, whether by stock sale or otherwise;

K.     any merger involving the Debtor where the Debtor is not the surviving entity;

L.     failure by Debtor to own a licensed pharmacy; and

M.     failure by Debtor to make purchases from Secured Party of at least $500,000 during any fiscal year of the Secured Party, ending March 31, during the term of this Promissory Note, or a pro-rated portion of $500,000 for any partial fiscal year in which Debtor is a shareholder of Secured Party.

## VI.     SECURED PARTY'S REMEDIES ON DEFAULT

A.     Debtor hereby authorizes Secured Party to keep and preserve the Pledged Share in its possession pending payment in full of the Note. Upon the occurrence of any default hereunder, Secured Party shall promptly give to Debtor written notice describing, in reasonably specific detail, the nature of the default. The Debtor shall have ten (10) days following its receipt of such notice to cure any such default. If at the conclusion of the ten (10) day period the described default has not been cured, Secured Party's rights and remedies with respect to the Pledged Share shall be those of a Secured Party under the Uniform Commercial Code as enacted in New York and under any other applicable law, as the same may from time to time be in effect, in addition to those rights granted herein.

B.     Except as otherwise expressly provided in this Agreement, Debtor agrees that any notice given by Secured Party of any intended action hereunder or in connection herewith, whether required by the Uniform Commercial Code or otherwise, shall constitute reasonable notice to Debtor if such notice is mailed by regular or certified mail, postage prepaid, at least ten days prior to such action, to Debtor's address specified herein and to any other address which Debtor has specified in writing to Secured Party as the address at which notices hereunder shall be given to Debtor.

C.     No act, delay, or omission shall constitute a waiver of any of Secured Party's rights or remedies under this Agreement, and no single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or the exercise of any other right or remedy. A waiver by Secured Party of any rights or remedies under the terms of this Agreement on

any occasion shall not be a bar to the exercise of any right or remedy on any subsequent occasion. Secured Party may remedy any default by Debtor hereunder in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Debtor.

## VII.     OTHER RIGHTS OF SECURED PARTY

A.     Debtor hereby authorizes Secured Party, at Debtor's expense, to file such financing statement or statements relating to the Pledged Share without Debtor's signature thereon as Secured Party at its option may reasonably deem necessary in order to perfect the Security Interest hereunder, and appoints Secured Party as Debtor's attorney-in-fact to execute any such financing statement or statements in Debtor's name and to perform all other acts which Secured Party reasonably deems necessary in order to perfect and continue the Security Interest.

## VIII.     BENEFICIAL OWNERSHIP

Prior to any default under the terms of this Agreement, Debtor shall be deemed to be the beneficial owner of the Pledged Share and shall have all rights and benefits incident thereto, except as such rights may be otherwise limited pursuant to the terms of this Agreement, the Subscription Agreement, or any other agreement between Debtor and Secured Party. Upon the occurrence of a default under this Agreement, the Debtor's rights with respect to the Pledged Share shall terminate and all rights of beneficial ownership in the Pledged Share shall vest in the Secured Party.

## IX.     RELEASE OF PLEDGED SHARE AND
## TERMINATION OF PLEDGE AGREEMENT

Upon payment in full of all amounts owed pursuant to the Note, Secured Party shall deliver the Pledged Share with stock power attached to the Debtor and this Agreement shall terminate.

## X.     IRREVOCABLE PROXY

The Debtor hereby irrevocably constitutes and appoints the Secured Party as its proxy, with full power of substitution, for and in the Debtor's name, place and stead to attend all meetings of the Secured Party's shareholders, and any adjournments thereof, and to vote at such meetings the Pledged Share, which the Debtor would be entitled to vote if personally present, with discretionary authority upon all matters which may properly come before each such meeting and with the authority to execute consents in lieu thereof and waivers of notice in connection therewith. This irrevocable proxy shall continue until amounts payable pursuant to the Note have been paid in full and shall be legally binding upon the Debtor and any transferee of the Pledged Share. Secured Party is a "pledgee" in accordance with Section 609(f) of the New York Business Corporation Law.

## XI.     GENERAL PROVISIONS

A.     All rights and remedies of Secured Party inure to the benefit of its successors or assigns, and Debtor may assert no claims or defenses against the assignee which it may have against the Secured Party except those granted by this Agreement.

B.     As used in this Agreement, "Debtor" includes Debtor's successors, assigns, receivers and trustees; and "Secured Party" includes Secured Party's heirs, executors, administrators, personal representatives, successors and assigns.

C.     If any provision of this Agreement is invalid or unenforceable under any law, such provision is and will be totally ineffective to that extent, but the remaining provisions shall be unaffected.

D.     Article headings used in this Agreement are for convenience only and are to be given no substantive meaning or significance whatever in construing the terms and provisions of this Agreement.

E.     Any notice required or permitted by this Agreement shall be given to the parties at the address set forth above, or to either party hereto at such other address or addresses as it may from time to time specify in a notice given to the other party.

F.     This Agreement and the transactions evidenced hereby shall be interpreted, construed, applied and enforced in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State, as such laws may from time to time be in effect and without reference to principles of conflicts of laws.

G.     This Agreement constitutes the entire understanding among the parties with respect to the transactions contemplated hereby; and no modification, rescission, release, amendment or waiver (except as provided by this Agreement) of any provision of this Agreement shall be made except by a written agreement subscribed by Debtor and by Secured Party.

H.     All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person or persons may require.

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement on the date first above written.

**ROCHESTER DRUG CO-OPERATIVE, INC.**

By:_____
Its:_____

_____

By:_____
Its:_____

## STOCK POWER

FOR VALUE RECEIVED, _____, with an office located at _____ _____, hereby sells, transfers and assigns unto **Rochester Drug Co-operative, Inc.**, a New York co-operative corporation with an office at 50 Jet View Drive, Rochester, New York 14624 ("RDC"), one (1) share of the Voting Common Stock of RDC standing in its name on the books of RDC represented by Certificate Number_____herewith, and do hereby irrevocably constitute and appoint _____attorney to transfer such shares on the books of RDC with full power of substitution in the premises.

Dated:_____

_____

By: _____

Its: _____

Witness:_____

# EXHIBIT F

## CERTIFICATE OF INCORPORATION AND BY-LAWS

CERTIFICATE OF INCORPORATION

-of-

ROCHESTER DRUG CO-OPERATIVE, INC.

Pursuant to Article 7 of the Co-Operative Corporation Law of the State of New York.

WE, the undersigned, desiring to form a co-operative stock corporation pursuant to the provisions of Article 7 of the Co-Operative Corporations Law of the State of New York, all of us being of full age and at least two-thirds of us being citizens of the United States, and at least one of us being a resident of the State of New York, do hereby certify:

FIRST: The name of the proposed corporation is Rochester Drug Co-Operative, Inc.

SECOND: The purposes for which said corporation is to be formed are to carry on a general producing, manufacturing, warehousing and merchandising business on the co-operative plan as related in Article 7 of the aforesaid law, in articles in common use including drugs, pharmacutical supplies, and all articles of merchandise customarily stocked by and sold in drug stores and pharmacies, together with equipment and supplies commonly used in the maintenance and operation of drug stores and pharmacies, all within the limitation of the provisions of Article 7 of the Co-Operative Corporations Law. This corporation shall have the following additional powers:

(a) To do each and everything herein setforth as objects, purposes and powers, or otherwise, to the same extent and as fully as any natural person, within or without the State of New York, as principal agent, contractor or otherwise.

(b) To conduct its business in one location or in branches, and have one or more offices, without limitation as to amount; to own, hold, purchase and convey real and personal property, both within and without the State of New York.

(c) To borrow money and contract debts whenever necessary for the transaction of its business or for the exercise of its corporation-rights, privileges and franchises, or for any other lawful purpose as related in Article 7 of the said law, and to issue and dispose of its obligations for any amount so borrowed, and mortgage its property and franchises to secure the payment of any such obligations.

(d) To act as agent or representative of any member or members in any of the above listed activities.

(e) To purchase, hold or otherwise acquire, and to hold, own or exercise all rights of ownership in and to sell, transfer or pledge shares of the capital stock or security of any corporation engaged in any wholesale druggist or pharmacutical activities, or in the producing, manufacturing, warehousing and merchandising of any of the products or merchandise handled by this corporation.

(f) To establish reserves and to invest the funds therefrom in bonds or in such other property as may be provided in the by-laws of the corporation.

(g) To do each and everything necessary and suitable or proper for the accomplishment of any one of the purposes or the attainment of one or more of the objects or purposes herein enumerated, and to contract accordingly; and to exercise and possess all the powers, rights and privileges necessary or incidental to the purposes for which the corporation is organized, or other activities in which it is engaged; and in addition thereto, to have all or any other rights, powers and privileges

13KK-97.2

granted by the corporation laws of the State of New York, except where the privileges are in conflict or inconsistent with the expressed provisions of said Article 7 of the Co-Operative Corporations Law.

3. The amount of the capital stock of said corporation shall be $150,000.00. Such capital shall consist of 30,000 shares of stock having a par value of $5.00 each, to be known as capital stock.

4. The principal office of the corporation is to be located in the City of Rochester, County of Monroe and State of New York.

5. The duration of the corporation is to be perpetual.

6. The number of directors of the corporation shall be nine.

7. The names and post office address of the directors of the corporation until the first annual meeting of stockholders are as follows:

| NAME | P.O. ADDRESS |
|---|---|
| Immanuel J. Arndt | 1135 Culver Road Rochester, New York |
| James F. Chilson | 1492 Monroe Avenue Rochester, New York |
| Norman E. Emblidge | 582 Chili Avenue Rochester, New York |
| Charles DeCarlo | 447 North Street Rochester, New York |
| George A. Klier | 692 Maple Street Rochester, New York |
| Alfred J. Krieter | 659 Titus Avenue Rochester, New York |
| John F. O'Brien | 379 Winton Rd. North Rochester, New York |

13 K K - 97 - 3

| NAME | P.O. ADDRESS |
|---|---|
| Charles C. Wing | 117 North Clinton Avenue Rochester, New York |
| Julian Zweig | 1470 Dewey Avenue Rochester, New York |

8. At least one of the persons names as a director is a citizen of the United States and a resident of the State of New York.

9. Name and post office address of each of the subscribers to this certificate, and a statement of the number of shares which each agrees to take are as follows:

| NAME | P.O. ADDRESS. | NO. OF SHARES |
|---|---|---|
| Alfred J. Krieter | 659 Titus Avenue Rochester, N.Y. | 1 |
| Charles C. Wing | 117 No. Clinton Ave. Rochester, N.Y. | 1 |
| Wyllis A. Bellinger | 54 Brown Street Rochester, N.Y. | 1 |

10. The directors of this corporation need not be stockholders.

11. The following provisions are included herein for the regulation and conduct of the affairs of the corporation.

(a) No transaction, right or liability entered into, enjoyed or incurred by or in respect to the corporation, shall be affected by the fact that any director or directors of the corporation are, or may have been personally interested in or concerned in the same; and each director of the corporation is hereby relieved of and from any and all liability which otherwise migh prevent him from contracting with the corporation for the benefit of himself or of any firm, association or corporation in which in anywise he might be interested.

(b) The Corporation may pay not to exceed 8% dividends upon its capital stock, and not to exceed 6% interest on its

13 K K - 97 - 4

indebtedness, and its earnings and savings, after deduction of reserve funds or amounts to be permitted by law established, shall be distributed either in the form of stock, cash or evidence of indebtedness; or in savings proportionally and equitably among the persons for which it does business on the basis of the amount of sales or other services rendered to or by such persons, and within the limitations of the law provided, and the Board of Directors shall determine and establish, and from time to time modify or readjust the amounts, terms, conditions and manner of such distribution, among the persons for which it does, or shall do, or conduct business, or for which it shall render its services by means of sales, provisions, or otherwise, and a designation of classes by dealing, trading or representation shall be proper; all such distribution shall be in such manner as its directors may determine to be for the advantage and best interest of the corporation, and the persons for which it does business pursuant to said Article 7 of the Co-Operative Corporations Law.

      12. All of the subscribers hereto are of full age, at least two-thirds are citizens of the United States and at least one is a resident of the State of New York; and of the persons names as directors, at least one is a citizen of the United States and a resident of the State of New York.

      IN WITNESS WHEREOF, we have made, signed, acknowledged and filed this certificate.

*Alfred White*

*Charles C. Wing*

*William A. Billings*

13KR-97-5

STATE OF NEW YORK
COUNTY OF MONROE   SS:
CITY OF ROCHESTER

On this 17th day of October, 1948, before me
personally appeared Alfred J. Krieter, Charles C. Wing, and
Wyllis A. Bellinger, to be known and known to me to be the same
persons who executed the foregoing Certificate of Incorporation,
and they severally acknowledged to me that they executed the
same.

_Fred B. Goodelle_

Notary Public

FRED B. GOODELLE
Notary Public, N.Y., Monroe Co. No. 1941
Commission Expires March 30, 1949

R 11/5

ROCHESTER DRUG
CO-OPERATIVE, INC.

13KK

Certificate

of

Incorporation

Dated: Sept. _____, 1948

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED NOV 5 - 1948
TAX $ ..................
FILING FEE $ ... 40 ..

SECRETARY OF STATE

BY ..................

LAW OFFICES OF

*State of New York* ⎱ *ss:*
*Department of State* ⎰

*I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.*

*Witness my hand and seal of the Department of State on*

MAR 0 5 1999

*Special Deputy Secretary of State*

S-1266 (3/96)

CERTIFICATE OF AMENDMENT

of

Incorporation Certificate of Rochester Drug Co-Operative, Inc., Pursuant to Section Twelve of the Cooperative Corporations Law:

We, the undersigned Jerome Markin, President of Rochester Drug Co-Operative, Inc., and Wyllis A. Bellinger, Secretary thereof, do hereby certify as follows:

1. The certificate of incorporation of said corporation was filed in the office of the Secretary of State on the 5th day of November, 1948.

2. Paragraph numbered 3 of said certificate is amended to read as follows:

3. The amount of capital stock of said corporation is $500,000.00, and is divided into 60,000 shares of capital stock (common) of the par value of $5.00 each, and 40,000 shares of capital stock (preferred) of the par value of $5.00 each. All shares of capital stock authorized, issued and outstanding at the date of filing this certificate shall be and are classified as capital stock (common). The designations, privileges, preferences, and voting powers or restrictions and qualifications of the shares of each class are as follows:

(a). The capital stock (common) and the owner thereof shall have all the voting power of the corporation, except as otherwise expressly provided by statute.

(b). The capital stock (preferred) shall bear and receive a preferred dividend of 5% of the par value of such stock, payable annually to stockholders of record at the end of the fiscal year of the corporation. Such preferred dividend shall be non-cumulative. No dividend shall be declared or paid for any fiscal year or part thereof, upon capital stock (common) until provision has been made for payment of such preferred dividend.

(c). Upon dissolution of the corporation the holders of capital stock (preferred) will be entitled to receive par and accrued non-cumulative dividends at the rate of 5% per annum to date of retirement of their shares before any liquidating dividends are paid to the holders of capital stock (common).

(d). All capital stock (preferred) or any part thereof, may be called for redemption by order of the board of directors, at any time, upon 30 days written notice to the respective stockholder in which event the corporation shall pay to the respective stockholder the par value of such called stock plus 5% preferred dividend payable at the end of the then current corporation fiscal year. No additional dividend shall accrue, be, declared, or paid, on such called stock, subsequent to the end of such fiscal year.

(e). Any capital stock (common) owned by a shareholder who has made purchases from the corporation during the preceding corporation fiscal year amounting to less than $100.00 may be called for redemption by order of the board of directors at its par value, plus previously declared and unpaid dividends, upon 30 days written notice mailed to the respective shareholder. No dividend shall accrue, be declared or paid, on such called stock subsequent to the expiration of said 30 day period.

(f). If a shareholder of either capital stock (common) or capital stock (preferred) shall be indebted to the corporation, the board of directors may refuse to consent to the transfer of his stock until such indebtedness is paid. The corporation shall have the first right to purchase at par, plus any accrued and unpaid preferred dividends, and any declared and unpaid common stock dividends, thereon, any capital stock of either class presented for transfer, providing written notice of the exercise of such right is given to the respective shareholder within 3 days after such presentation.

(g). The board of directors may, from time to time, sell any and all of the unissued capital stock of the corporation, whether the same be any of the original authorized capital or of any increase thereof, without first offering the same to stockholders then existing, and said board may restrict the purchase, sale, distribution, transfer, owning and holding of stock as fully and to the extent authorized by statute.

IN WITNESS WHEREOF, we have made and subscribed this certificate the 25th day of March, 1952.

_Jerome Markin_
President

_Wyllis A. Bellinger_
Secretary

STATE OF NEW YORK )
COUNTY OF MONROE ) ss
CITY OF ROCHESTER )

Jerome Markin and Wyllis A. Bellinger being severally duly sworn, do depose and say, and each for himself deposes and says, that he the said Jerome Markin is the President of Rochester Drug Co-Operative, Inc., and he, the said Wyllis A. Bellinger is the Secretary thereof; that they have been authorized to execute and file the foregoing certificate with the approval and by the affirmative vote of at least two-thirds of the members, and the owners of at least two-thirds of the outstanding shares of the capital stock of said cooperative at a special meeting thereof duly called and held on the 18th day of March, 1952.

Sworn to before me this
_____ day of March, 1952

_Jerome Markin_

_Wyllis A. Bellinger_

SHIRLEY FIELD NOTARY PUBLIC
STATE OF NEW YORK, COUNTY OF MONROE
MY COMMISSION EXPIRES MARCH 30, 19__

STATE OF NEW YORK)
COUNTY OF MONROE ) (ss)
CITY OF ROCHESTER)

Jerome Markin and Wyllis A. Bellinger, being severally duly sworn, depose and say and each for himself deposes and says:

1. That he, Jerome Markin is President and that he, Wyllis A. Bellinger is the Secretary-Treasurer of Rochester Drug Co-Operative, Inc., referred to in the foregoing certificate.

2. That the number of additional shares not resulting from a change of shares which the corporation is thereby authorized to issue is 70,000; the number of such additional shares with par value is 70,000 and the par value thereof is $5.00.

3. That the number of shares changed as provided in subparagraph five of paragraph (C) on subdivision two of section thirty-five is 10,000 and the par value thereof, if any, is $5.00.

4. That the number of shares not resulting from a change of shares of which the par value has been increased is none, the amount of the increase in par value is none.

Sworn to before me this
_____ day of April _____ 1952.

_____
NOTARY PUBLIC
SHERIDAN S. HELD, Notary Public
State of New York, County of Monroe
My Commission Expires March 30, 19__

STATE OF NEW YORK )
COUNTY OF MONROE )    SS
CITY OF ROCHESTER )

On this 14th day of April, 1952, before me personally

appeared Jerome Harkin and Wyllis A. Bellinger to me known to be

the persons described in and who executed the foregoing instrument

and duly acknowledged to me that they executed the same.

_Sheridan S. Held_
NOTARY PUBLIC
SHERIDAN S. HELD, Notary Public
State of New York - County of Monroe
My Commission Expires March 30, 19__

11/5/48 Rochester Monroe Co

13KK-97

(1

March 25, 1952 74'
CKK - #No,000

CERTIFICATE OF AMENDMENT

of . No Tax

Incorporation Certificate of
Rochester Drug Co-Operative,
Inc.

a.J.

Original

GOODELLE AND JAFFEY
515 Union Trust Bldg.
Rochester, New York

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED APR 15 1952
TAX $ ..... none
FILING FEE $ ..... 25

Thomas J Curran
Secretary of State
By

13KK-97-6

*State of New York* }ss:
*Department of State*

*I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.*

*Witness my hand and seal of the Department of State on*

MAR 0 5 1999

*Special Deputy Secretary of State*

NS-1266 (5/96)

CERTIFICATE OF AMENDMENT

Incorporation Certificate of Rochester Drug Co-Operative,
Inc., Pursuant to Section Twelve of the Cooperative Corporations
Law of N.Y.

We, the undersigned WILLIAM C. BURKE, President of
Rochester Drug Co-Operative, Inc., and Wyllis A. Bellinger,
Secretary thereof, do hereby certify as follows:

1. The Certificate of Incorporation of said corporation
was filed in the office of the Secretary of State on the 5th day
of November, 1948.

2. A Certificate of Amendment of said Certificate of
Incorporation was filed in the office of the Secretary of State
on the 15th day of April, 1952.

3. The first sentence of Paragraph numbered 3 of said
Certificate of Incorporation filed the 5th day of November, 1948,
as amended by said Certificate of Amendment filed the 15th day
of April, 1952, is hereby amended to read as follows:

3. The amount of capital stock of said corporation
is $750,000.00 and is divided into 60,000 shares of capital stock
(common) of the par value of $5.00 each, and 90,000 shares of
capital stock (preferred) of the par value of $5.00 each.

IN WITNESS WHEREOF, we have made and subscribed this
Certificate the 12th day of March, 1955.

_William C. Burke_
President

_Wyllis A. Bellinger_
Secretary

# 20 44-73-1

STATE OF NEW YORK }
COUNTY OF MONROE }  ss:
CITY OF ROCHESTER }

On this 22nd day of March, 1955, before me personally

appeared William C. Burke and Wyllis A. Bellinger to me known to

be the persons described in and who executed the foregoing

instrument and duly acknowledged to me that they executed the

same.

*Fred B. Goodelle*

FRED B. GOODELLE
NOTARY PUBLIC, State of N. Y., Monroe Co. No. 1001
Commission Expires March 30, 19__

26KK-73-2

-2-

STATE OF NEW YORK)
COUNTY OF MONROE)  SS:
CITY OF ROCHESTER)

WILLIAM C. BURKE and Wyllis A. Bellinger being severally duly sworn, do depose and say, and each for himself deposes and says that he the said WILLIAM C. BURKE is the President of Rochester Drug Co-Operative, Inc., and he, the said Wyllis A. Bellinger is the Secretary thereof; that they have been authorized to execute and file the foregoing certificate with the approval and by the affirmative vote of at least two-thirds of the members, and the owners of at least two-thirds of the outstanding shares of the capital stock of said corporation at a special meeting thereof duly called and held on the 15ᵗʰ day of March, 1955.

William C. Burke

Wyllis A. Bellinger

Sworn to before me this
22ⁿᵈ day of March, 1955

Fred B. Goodell

FRED B. GOODELL

STATE OF NEW YORK)
COUNTY OF MONROE )  SS:
CITY OF ROCHESTER)

WILLIAM C. BURKE and Wyllis A. Bellinger, being severally duly sworn, depose and say and each for himself depose and says:

1. That he, WILLIAM C. BURKE is President and that he, Wyllis A. Bellinger is Secretary of Rochester Drug Co-Operative, Inc. referred to in the foregoing certificate.

20 K K - 73 - 3

-3-

2. That the number of additional shares not resulting from a change of shares which the corporation is thereby authorized to issue is 50,000; the number of such additional shares with par value is 50,000 and the par value thereof is $5.00.

3. That the number of shares changed as provided in subparagraph five of paragraph (c) of subdivision two of section thirty-five is none and the par value thereof, if any, is none.

4. That the number of shares not resulting from a change of shares of which the par value has been increased is none, the amount of the increase in par value is none.

William C. Burke

Phyllis A. Billings

Sworn to before me this
___ day of March, 1955.

Fred A. Smith

FRED A. GOODRICH

2055-73-4

11-5-48
Rochester
Monroe Co.

30473

CERTIFICATE OF AMENDMENT

of

INCORPORATION CERTIFICATE

of

ROCHESTER DRUG CO-OPERATIVE, INC.

Dated: March 22, 1955

Original

STATE OF NEW YORK
DEPARTMENT OF STATE

*State of New York* ⎫ *ss:*
*Department of State* ⎭

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.

Witness my hand and seal of the Department of State on

**MAR 0 5 1999**

*Special Deputy Secretary of State*

S-1266 (5/96)

CERTIFICATE OF AMENDMENT OF THE CERTIFICATE OF INCORPORATION

of

ROCHESTER DRUG CO-OPERATIVE, INC.,

Under Section 805 of the Business Corporation Law

We, the undersigned, hereby certify:

1. The name of the corporation is Rochester Drug Co-operative, Inc.

2. The Certificate of Incorporation of the corporation was filed by the Department of State on November 5, 194_, and was amended by a Certificate of Amendment filed by the Department of State on April __, 19__, and was further amended by a Certificate of Amendment filed by the Department of State on April 4, 19__.

3. The Certificate of Incorporation is amended to allow the corporation to trade with non-members, while preserving the current borrowing, dividend and dissolution rights of present shareholders and to remove the limitation of 6% interest on indebtedness incurred by the corporation.

In accordance therewith:

A. Paragraph SECOND of the Certificate of Incorporation is amended by changing paragraph (g) of paragraph (h) and inserting a new paragraph (g) to read as follows:

(g). To deal with any drug store, pharmacy or any other business establishment.

B. Paragraph 9(e) of the Certificate of Incorporation is amended to read as follows:

9(e). Upon dissolution of the corporation the holders of capital stock (preferred) will be entitled to receive par and accrued non-cumulative dividends at the rate of five percent (5%) per annum to date of retirement of their shares before any liquidating. Upon dissolution of the corporation, after the payment of the corporation's debts and after provision has been made for the retirement of the corporation's capital stock outstanding, if any, at par, and before distribution, the holders of obligations, if any, held by members, only "shareholders" "stock" as defined in Section 11(b)(2) of this certificate shall be entitled to receive the net assets remaining, in accordance with Section 17 of the New York Cooperative Corporations Law.

C. Paragraph 11(b) of the Certificate of Incorporation is amended to read as follows:

11(b)(1). The corporation may pay not to exceed eight percent (8%) dividends upon its capital stock. The net earnings of the corporation, after deduction of reserve funds as required to be maintained by law and bylaws, shall be distributed either in the form of stock, cash or __ to the in-

debtedness, or in savings proportionally and equitably among "stockholder-affiliates", on the basis of the amount of sales or other services rendered to or by such "stockholder-affiliates", and within the limitations of the law provided, and the Board of Directors shall determine and establish, and from time to time modify or readjust the amounts, terms, conditions and manner of such distribution, among the "stockholder-affiliates" for which it does, or shall do or conduct business, or for which it shall render its services by means of sales, provisions or otherwise and a designation of classes by dealing, trading, or representation shall be proper; all such distribution shall be in such manner as its directors may determine to be for the advantage and best interest of the corporation; and the "stockholder-affiliates" for which it does business pursuant to said Article VII of the New York Cooperative Corporations Law.

11(b)(2). A "stockholder-affiliate" is any person, firm or corporation who or which

(i) owns or operates a drug store or pharmacy and
(ii) owns or holds 300 shares of capital stock (common) and who has purchased interest bearing obligations of the corporation to such an amount as shall be required by action of the Board of Directors pursuant to Section 1 of this Article, and in case of operating more than one store, as a customer of this corporation, who has purchased such additional capital stock or made such cash deposit as may be required by the Board of Directors for such additional store or stores. A "stockholder-affiliate" shall also include any person, firm or corporation who or which has subscribed to the required capital stock and obligations of the corporation and has assigned future purchase discounts or savings to the corporation in payment therefor.

4. The above amendments to the Certificate of Incorporation were authorized by the affirmative vote of two-thirds of the members of the corporation voting thereon at a special meeting of the corporation duly called pursuant to and in accordance with section 17 of the Cooperative Corporations Law.

| | | |
|---|---|---|
| *Buik Psaila* | BART PSAILA | President |
| Signature | Name | President |
| *Donald L. Bilgore* | DONALD L. BILGORE | SECRETARY |
| Signature | Name | Secretary |

STATE OF NEW YORK )
COUNTY OF MONROE ) ss:

On the 14th day of September, in the year 1973, before me personally
came Bart Psaila to me known, who, being by me duly sworn, did depose and
say that he resides in Rochester, New York; that he is the president of
Rochester Drug Co-operative, Inc., the corporation described in and which
executed the above instrument; that he knows the seal of said corporation;
that the seal affixed to said instrument is such corporate seal; that it
was so affixed by order of the board of directors of said corporation, and
that he signed his name thereto by like order.

*[signature]*

WARREN J. WELTMAN
NOTARY PUBLIC, State of N.Y. Monroe County
My Commission Expires March 30, 19__

STATE OF NEW YORK )
COUNTY OF MONROE ) ss:

On the 14th day of September, in the year 1973, before me personally
came Donald L. Silgore to me known, who, being by me duly sworn, did depose
and say that he resides in Rochester, New York; that he is the secretary
of Rochester Drug Co-operative, Inc., the corporation described in and
which executed the above instrument; that he knows the seal of said cor-
poration; that the seal affixed to said instrument is such corporate seal;
that it was so affixed by order of the board of directors of said corpor-
ation, and that he signed his name thereto by like order.

*[signature]*

WARREN J. WELTMAN
NOTARY PUBLIC, State of N.Y. Monroe County
My Commission Expires March 30, 19__

CERTIFICATE OF AMENDMENT OF THE CERTIFICATE OF INCORPORATION

of

ROCHESTER DRUG CO-OPERATIVE, INC.,                    AFFIDAVIT

Bart Psaila and Donald L. Bilgore, being duly sworn, depose as
follows:

1. I, Bart Psaila, am the President of Rochester Drug Co-operative,
Inc.

2. I, Donald L. Bilgore, am the Secretary of Rochester Drug Co-
operative, Inc.

3. We have been authorized to execute and file the Certificate of
Amendment of the Certificate of Incorporation of Rochester Drug Co-operative,
Inc. by the votes required by section 12 of the Cooperative Corporations
Law and in the manner prescribed in section 12 of the Cooperative Corpor-
ations Law.

4. In accordance with section 12 of the Cooperative Corporations
Law, the amendments to the Certificate of Incorporation of Rochester Drug
Co-operative, Inc. were approved by the affirmative vote of two-thirds of
the members voting thereon at a special meeting of Rochester Drug Co-
operative, Inc.

5. Also in accordance with section 12 of the Cooperative Corporations
Law, a printed notice of the proposed amendments and of the time and place
of the meeting to vote thereon was mailed to each member at his last known
address, as shown by the books of the corporation, more than twenty (20)
days prior to the special meeting.

Sworn to before me this

14th day of _____, 1973.                    _[signature]_
                                              Bart Psaila

_[signature]_
WARREN J. WELTMAN
NOTARY PUBLIC, State of N.Y., Monroe County
My Commission Expires March 30, 19__

Sworn to before me this

14th day of _____, 1973.                    _[signature]_
                                              Donald L. Bilgore

_[signature]_
WARREN J. WELTMAN
NOTARY PUBLIC, State of N.Y., Monroe County
My Commission Expires March 30, 19__



CERTIFICATE OF INCORPORATION
OF
ROCHESTER TOWER CO-OPERATIVE, INC.

STATE OF NEW YORK
DEPARTMENT OF STATE
SEP 28 1971

*State of New York* }*ss:*
*Department of State* }*ss:*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.

Witness my hand and seal of the Department of State on

**MAR 0 5 1999**

*Special Deputy Secretary of State*

DS-1266 (5/96)

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

ROCHESTER BROS. CO-OPERATIVE, INC.

Pursuant to Section 12 of the Cooperative
Corporations Law:

We, the undersigned, Randall Hunter, President
of Rochester Bros. Co-operative, Inc., and Lou Carlascio,
Secretary thereof, do hereby certify as follows:

1.  The Certificate of Incorporation of said
corporation was filed in the office of the Secretary of
State on the 5th day of November, 1948.

2.  Certificates of Amendment of said Certificate
of Incorporation were filed in the office of the Secretary
of State on the 15th day of April, 1952 and the 4th day of
April, 1955 and the 26th day of September, 1973.

3.  Paragraph numbered 12 of said certificate is
hereby renumbered paragraph 11 and a new paragraph 12 is
added to read in its entirety as follows:

"12.  No director of the Corporation shall be
held personally liable to the Corporation or its
shareholders for damages for any breach of duty in his
capacity as a director occurring after authorization of
this Paragraph by the shareholders unless a judgment or
other final adjudication adverse to him establishes that
(1) his acts or omissions were in bad faith or involved
intentional misconduct or a knowing violation of law, or
(2) he personally gained in fact a financial profit or
other advantage to which he was not legally entitled, or
(3) his acts violated section 719 of the Business
Corporation Law.  Any repeal of this Paragraph, or any
amendment of this Paragraph insofar as it would in any way
enlarge the liability of any director of the Corporation,
shall be ineffective with respect to any acts or omissions
occurring prior to the date of such repeal or amendment."

4.  This amendment to the Certificate of
Incorporation was authorized by vote of the Board of
Directors followed by the affirmative vote of at least
two-thirds the shareholders present at the Corporation's
annual meeting duly called and held on May 10, 1989.

IN WITNESS WHEREOF, we have made and subscribed this certificate and hereby affirm under the penalties of perjury that its contents are true this ___ day of _____ 1989.

_Randall Hunter, President_

_Lou Carlaccio, Secretary_

STATE OF NEW YORK )
                  ) ss:
COUNTY OF Monroe  )

On this ___ day of _____, 1989, before me personally appeared Randall Hunter to me known to be the person described in and who executed the foregoing instrument and each duly acknowledged to me that he executed the same.

x _____
        Notary Public

STATE OF NEW YORK )
                  ) ss:
COUNTY OF MONROE  )

On this ___ day of June, 1989, before me personally appeared Lou Carlaccio to me known to be the person described in and who executed the foregoing instrument and each duly acknowledged to me that he executed the same.

_____
        Notary Public

JOHN C PARTIGAN
NOTARY PUBLIC, State of New York
Qualified in Monroe County
Commission Expires August 3, 19__

STATE OF NEW YORK )
                  ) ss.
COUNTY OF MONROE  )

Randall Hunter being duly sworn, does depose and
say that he is the President of Rochester Drug
Co-operative, Inc.; that he has been authorized to execute
and file the foregoing certificate with the approval and
by the affirmative vote of at least two-thirds of the
members voting thereon at a regular meeting of the
corporation duly called and held on the 10th day of May,
1989.

                          _Randall J. Hunter_
                          Randall Hunter, President

STATE OF NEW YORK )
                  ) ss.
COUNTY OF MONROE  )

Lou Carlascio being duly sworn, does depose and
say that he is the Secretary of Rochester Drug
Co-operative, Inc.; that he has been authorized to execute
and file the foregoing certificate with the approval and
by the affirmative vote of at least two-thirds of the
members voting thereon at a regular meeting of the
corporation duly called and held on the 10th day of May,
1989.

                          _Lou Carlascio_
                          Lou Carlascio, Secretary

Sworn to before me
this 1st day of June, 1989.

s/John C. Partigan
Notary Public

0000 1201

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED JUN 1 6 1989

AMT. OF CHECK $
FILING FEE $
TAX $
COUNTY FEE $
COPY $
CERT $
REFUND $
SPEC HANDLE $

BY: monroe

3 —

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

ROCHESTER DRUG CO-OPERATIVE, INC.

Pursuant to Section 17 of the Cooperative Corporations Law

Nixon, Hargrave, Devans & Doyle
Lincoln First Tower
Post Office Box 1051
Rochester, N.Y. 14603
ATTN— Lieberman

*State of New York* } *ss:*
*Department of State* }

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.

Witness my hand and seal of the Department of State on     **MAR 0 5 1999**



*Special Deputy Secretary of State*

OS-1265 (5/96)

C.107956

# CERTIFICATE OF AMENDMENT
## OF
## CERTIFICATE OF INCORPORATION
### OF
## ROCHESTER DRUG CO-OPERATIVE, INC.

Pursuant to Section 12 of the Cooperative Corporations Law.

We, the undersigned, Randall Hunter, President of Rochester Drug Co-operative, Inc., and Lou Carlascio, Secretary thereof, do hereby certify as follows:

1. The Certificate of Incorporation of said corporation was filed in the office of the Secretary of State on the 5th day of November, 1948.

2. Certificates of Amendment of said Certificate of Incorporation were filed in the office of the Secretary of State on the 15th day of April, 1952 and the 4th day of April, 1955 and the 26th day of September, 1973 and the 5th day of June, 1989.

3. Paragraph numbered 3(a) of said certificate is hereby amended to read in its entirety as follows:

3(a) Any capital stock (common) owned by (a) a stockholder who is not a "stockholder-affiliate", or (b) a "stockholder-affiliate" who has made from the Corporation during the preceding fiscal year no purchases or purchases amounting to less than $60,000 may be called for redemption by order of the Board of Directors, at net book value, plus previously declared and unpaid dividends, upon 30 days written notice mailed to the respective stockholder. No dividend shall accrue, be declared or paid on such called stock subsequent to the expiration of said 30-day period. As used in this Article V, Section 4, net book value shall be computed in accordance with generally accepted accounting principles and accounting policies (including accounting for inventory) followed by the corporation during the preceding fiscal year, and shall be calculated on the basis of the corporation's balance sheet for the preceding fiscal year. For purposes of determining net book value per share, the number of shares of capital stock (common) outstanding as of the end of such fiscal year shall be used.

4. Paragraph numbered 3(f) of said certificate is hereby amended to read in its entirety as follows:

0002 4920

"3(f). If a stockholder of either capital stock (common) or capital stock (preferred) shall be indebted to the corporation, the Board of Directors may refuse to consent to the transfer of his stock until such indebtedness is paid. The corporation shall have the first right to purchase at net book value (as defined in Section 4 above), plus any declared and unpaid common stock dividends thereon, any capital stock (common) presented for transfer, providing written notice of the exercise of such right is given to the respective stockholder within 45 days after such presentation. The corporation shall have the first right to purchase at par value, plus any declared and unpaid preferred stock dividends thereon, any capital stock (preferred) presented for transfer, providing written notice of the exercise of such right is given to the respective stockholder within 45 days after such presentation. Each certificate of stock shall have a copy of the substance of this section written or printed thereon.

Paragraph numbered 11(b)(2)(i) is amended to read in its entirety as follows:

"11(b)(2)(i) owns or operates a licensed pharmacy and"

6. This amendment to the Certificate of Incorporation was authorized by vote of the Board of Directors followed by the affirmative vote of at least two-thirds the shareholders present at the Corporation's special meeting duly called and held on January 11, 1990.

IN WITNESS WHEREOF, we have made and subscribed this certificate and hereby affirm under the penalties of perjury that its contents are true this 11th day of January, 1990.

_____
President

_____
Secretary

0002 4921

STATE OF NEW YORK )
                  ) ss.
COUNTY OF MONROE )

Randall Hunter, being duly sworn, does depose and
say that he is the President of Rochester Drug
Co-operative, Inc., that he has been authorized to execute
and file the foregoing certificate with the approval and
by the affirmative vote of at least two-thirds of the
members voting thereon at a special meeting of the
corporation duly called and held on the 11th day of
January, 1990.

                                    _____
                                              President

STATE OF NEW YORK )
                  ) ss.
COUNTY OF MONROE )

Lou Carlascio being duly sworn, does depose and
say that he is the Secretary of Rochester Drug
Co-operative, Inc., that he has been authorized to execute
and file the foregoing certificate with the approval and
by the affirmative vote of at least two-thirds of the
members voting thereon at a special meeting of the
corporation duly called and held on the 11th day of
January, 1990.

                                    _____
                                              Secretary

Sworn to before me,
this 11th day of January, 1990.

_____
Notary Public

GAIL M. NORRIS
Notary Public, State of New York
No. C2NO4808186
Qualified in Monroe County
Commission Expires March 30, 19__

3

0002 4922

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED FEB 1 1990
AM'T OF CHECK $ 100
FILING FEE $ 60
TAX $
COUNTY FEE $
3 COPY $ 50
CERT $
REFUND $
SPEC HANDLE $
BY

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

ROCHESTER DRUG CO-OPERATIVE, INC.

Pursuant to Section 12 of the Cooperative Corporations Law

Nixon, Hargrave, Devans & Doyle
Lincoln First Tower
Post Office Box 1051
Rochester, N.Y. 14603
ATTENTION: Lieberman

*State of New York* } *ss:*
*Department of State* }

*I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.*

*Witness my hand and seal of the Department of State on*

MAR 05 1999



*Special Deputy Secretary of State*

NIS

CERTIFICATE OF AMENDMENT
OF
CERTIFICATE OF INCORPORATION
OF

ROCHESTER DRUG CO-OPERATIVE, INC.
Under Section 12 of the Cooperative Corporations
Law and Section 805 of the Business Corporation
Law.

We, the undersigned, Christopher K. Casey,
President of Rochester Drug Co-operative, Inc., and
Laurence F. Doud, III, Secretary thereof, do hereby
certify as follows:

1.    The name of the Corporation is ROCHESTER
DRUG CO-OPERATIVE, INC.

2.    The Certificate of Incorporation of the
Corporation was filed in the office of the Secretary of
State on the 5th day of November, 1948.

3.    Certificates of Amendment of said Certificate
of Incorporation were filed in the office of the Secretary
of State on the 15th day of April, 1952, the 4th day of
April, 1955, the 26th day of September, 1973, the 5th day
of June, 1989; the 13th day of February, 1990.

4.    The Certificate of Incorporation is hereby
amended to effect the following:

        (a)    To change each of the Seventeen
Thousand Four Hundred (17,400) presently
authorized, issued and outstanding shares of
capital stock (common) of the Corporation, par
value of $5.00 per share, into Fifty-Eight (58)
shares of capital stock (common), par value $5.00
per share for a total of Fifty-Eight (58) shares
of capital stock par value $5.00 per share issued
and outstanding; each of the Forty-Two Thousand
Six Hundred (42,600) presently authorized but
unissued shares of capital stock (common) of the
Corporation, par value of $5.00 per share shall
remain unchanged; and

        (b)    To return Seventeen Thousand Three
Hundred Forty-Two (17,342) shares of previously
issued and outstanding shares of capital stock
(common) to the status of authorized but
unissued; and

(c)  To make such other changes as are set forth below.

5.  The number of shares of capital stock issued is Thirty-Nine Thousand Fifty-Seven (39,057) shares of which Seventeen Thousand Four Hundred (17,400) are shares of capital stock (common) and Twenty-One Thousand Six Hundred Fifty-Seven (21,657) are shares of capital stock (preferred), par value $5.00 per share. The terms of the change are that each three hundred (300) issued shares of capital stock (common), par value $5.00 per share is changed into one (1) share of capital stock (common) par value $5.00 per share and the remaining shares previously issued and outstanding shares of capital stock (common) shall be returned to the status of authorized and unissued. After the change, a total of Twenty-One Thousand Seven Hundred Fifteen (21,715) shares will be issued, as follows: Fifty Eight (58) shares of capital stock (common) par value $5.00 per share and Twenty-One Thousand Six Hundred Fifty-Seven (21,657) shares of capital stock (preferred) par value $5.00.

6.  Paragraph numbered 1(c) of said certificate with respect to distributions on dissolution is hereby amended to read in its entirety as follows:

(c)  Upon dissolution of the corporation, the holders of capital stock (preferred) will be entitled to receive par and accrued non-cumulative dividends at the rate of 5% per annum to date of retirement of their shares before any liquidating dividends are paid to the holders of capital stock (common). Upon dissolution of the Corporation, payment of the corporation's debts and after provision has been made for the retirement of the corporation's capital stock outstanding, if any, at par, and accruals thereon, and other fixed obligations, if any, held by members, holders of capital stock (common) shall be entitled to receive the net assets remaining in accordance with Section 17 of the New York Cooperative Corporations Law.

7.  Paragraph numbered 3(e) of said certificate with respect to certain redemptions of capital stock (common) by the Corporation is hereby amended to read in its entirety as follows:

(e)  Any capital stock (common) owned by (e) a stockholder who does not, as of the date his capital stock (common) is called for

- 3 -

redemption, own licensed pharmacy or (b) a
stockholder who has made from the Corporation
during the preceding fiscal year no purchases or
purchases amounting to less than $165,000 may be
called for redemption, by order of the Board of
Directors, at net book value, plus previously
declared and unpaid dividends, upon 30 days
written notice mailed to the respective
stockholder. No dividend shall accrue, be
declared or be paid on such called stock
subsequent to the expiration of said 30 day
period. As used in this Paragraph 3(e), net book
value shall be computed in accordance with
generally accepted accounting principles and
accounting policies (including accounting for
inventory) followed by the Corporation during the
preceding fiscal year, and shall be calculated on
the basis of the Corporation's balance sheet for
the preceding fiscal year. For purposes of
determining net book value per share, the number
of shares of capital stock (common) outstanding
as of the end of such fiscal year shall be used.

8.   Paragraph numbered 10 of said certificate
with respect to directors not being stockholders is hereby
amended to read in its entirety as follows:

10.   Any (1) plan of merger or
consolidation or exchange offer, or (2) sale,
lease, exchange or other disposition of all or
substantially all of the assets of the
Corporation, or (3) voluntary dissolution of the
Corporation be adopted or approved, as the case
may be, at a meeting of the stockholders by vote
of three-quarters of all holders of outstanding
shares entitled to vote thereon.

9.   Paragraph numbered 11 of said certificate is
hereby amended so that subparagraph (b)(2) with respect to
the definition of "stockholder-affiliates" is deleted in
its entirety and subparagraph (b) with respect to
dividends of the Corporation is hereby amended to read in
its entirety as follows:

(b)   The Corporation may pay dividends, not
to exceed eight percent (8%) per annum, upon its
capital stock. The Corporation's earnings and
savings, after deduction of reserve funds
required or permitted by law to be established,
shall be distributed either in the form of stock,
cash or evidence of indebtedness; or in savings

- 4 -

proportionally and equitably among stockholders on the basis of the amount of sales or other services rendered to or by such stockholders and within the limitations of the law provided, and the Board of Directors shall determine and establish, and from time to time modify or readjust the amounts, terms, conditions and manner of such distribution, among the stockholders for which it does, or shall do, or conduct business, or for which it shall render its services by means of sales, provisions, or otherwise, and a designation of classes by dealing, trading or representation shall be proper; any such distribution shall be in such manner as the Board of Directors may determine to be for the advantage and best interest of the Corporation, and the stockholders for which it does business.

10. This amendment to the Certificate of Incorporation was authorized by vote of the Board of Directors followed by the affirmative vote of at least two-thirds the shareholders present at the Corporation's annual meeting duly called and held on May 15, 1991.

IN WITNESS WHEREOF, we have made and subscribed this certificate and hereby affirm under the penalties of perjury that its contents are true this 5th day of _____, 1991.

_____
Christopher E. Casey, President

_____
Lawrence F. Doud, III, Secretary

STATE OF NEW YORK )
                  ) ss.
COUNTY OF MONROE  )

Christopher K. Casey being duly sworn, does depose and say that he is the President of Rochester Drug Co-operative, Inc.; that he has been authorized to execute and file the foregoing certificate with the approval and by the affirmative vote of at least two-thirds of the members voting thereon at a special meeting of the corporation duly called and held on the 15th day of May, 1991.

_____
President

STATE OF NEW YORK )
                  ) ss.
COUNTY OF MONROE  )

Lawrence F. Doud, III being duly sworn, does depose and say that he is the Secretary of Rochester Drug Co-operative, Inc.; that he has been authorized to execute and file the foregoing certificate with the approval and by the affirmative vote of at least two-thirds of the members voting thereon at a special meeting of the corporation duly called and held on the 15th day of May, 1991.

_____
Secretary

Sworn to before me
this 5 day of Nov 1991.

_____
Notary Public

4827A:2:145

0000 0762

911204000 213

2CC

**STATE OF NEW YORK**
**DEPARTMENT OF STATE**
FILED    DEC 04 1991.

TAX S

BY

Monroe

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

ROCHESTER DRUG CO-OPERATIVE, INC.

N.P.S

911204000 241

Nixon, Hargrave, Devans & Doyle
Clinton Square
Post Office Box 1051
Rochester, N.Y. 14603

RECEIVED

RECEIVED

0000 0763

*State of New York* } *ss:*
*Department of State* }

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.

Witness my hand and seal of the Department of State on        MAR 0 5 1999

*Special Deputy Secretary of State*

:-1268 (5/96)

AIDF-24

CERTIFICATE OF AMENDMENT

AIDF-24

TO    F 960311000668

CERTIFICATE OF INCORPORATION

OF

ROCHESTER DRUG CO-OPERATIVE, INC.

Pursuant to Section 12 of the Cooperative Corporations Law and,
Section 805 of the Business Corporation Law

The undersigned, Michael C. Federici and Laurence P. Doud, III, being the President and
Secretary, respectively, of Rochester Drug Co-operative, Inc. hereby certify that:

I.    The name of the Corporation is Rochester Drug Co-operative, Inc.

II.    The Certificate of Incorporation of the Corporation was filed by the Department of
State on November 5, 1948. Certificates of Amendment of said Certificate of Incorporation
were filed by the Department of State on April 15, 1952, April 4, 1955, September 26, 1973,
June 16, 1989, February 14, 1990 and December 4, 1991.

III.    The Certificate of Incorporation of the Corporation is hereby amended to effect the
amendments specified below, each of which is authorized by the Cooperative Corporations Law
and the Business Corporation Law:

A.    Paragraph 2 of the Certificate of Incorporation is hereby amended to delete the
references to Article 7 of the Cooperative Corporations Law.

B.    Paragraph 3 of the Certificate of Incorporation is hereby amended to delete the
statement that all of the shares of capital stock authorized, issued and outstanding are
capital stock (common).

C.    Paragraph 3(e) of the Certificate of Incorporation is hereby amended (i) to
increase the level of annual purchases which a stockholder shall be required to make from
the Corporation from $165,000 to $175,000, and (ii) to clarify that any redemption of
shares by the Corporation in accordance with Paragraph 3(e) of the Certificate of
Incorporation shall be at the net book value of such shares, less any amounts owed to the
Corporation by the stockholder being redeemed, plus previously declared and unpaid
dividends.

D.    Paragraph 3(f) of the Certificate of Incorporation is hereby amended (i) to change the reference to Section 4 contained therein to a reference to Section 3(e), and (ii) to clarify that any purchase by the corporation of shares of capital stock (common) pursuant to the right of first refusal contained in Paragraph 3(f) of the Certificate of Incorporation shall be at the net book value of such shares, less any amounts owed to the Corporation by the selling stockholder, plus previously declared and unpaid dividends.

E.    In accordance with Section 807(c) of the Business Corporation Law, Paragraph 7 of the Certificate of Incorporation, which identifies the original directors of the Corporation, is hereby stricken from the Certificate of Incorporation and shall be of no further force or effect.

F.    In accordance with Section 807(c) of the Business Corporation Law, Paragraph 8 of the Certificate of Incorporation, which contains information regarding the citizenship and residence of the original directors of the Corporation, is hereby stricken from the Certificate of Incorporation and shall be of no further force or effect.

G.    In accordance with Section 807(c) of the Business Corporation Law, Paragraph 9 of the Certificate of Incorporation, which identifies the incorporators and original subscribers for shares of the Corporation, is hereby stricken from the Certificate of Incorporation and shall be of no further force or effect.

H.    In accordance with Section 807(c) of the Business Corporation Law, Paragraph 13 of the Certificate of Incorporation, which contains certain information regarding the incorporators of the Corporation, is hereby stricken from the Certificate of Incorporation and shall be of no further force or effect.

I.    As a result of the striking of Paragraphs 7, 8, and 9 of the Certificate of Incorporation in accordance with Sections E, F and G above, Paragraphs 10, 11 and 12 of the Certificate of Incorporation are hereby renumbered as Paragraphs 7, 8 and 9, respectively, of the Certificate of Incorporation so that the text of the Certificate of Incorporation of the Corporation is hereby restated, as amended hereby, to provide in its entirety as follows:

2

# CERTIFICATE OF INCORPORATION

## OF

## ROCHESTER DRUG CO-OPERATIVE, INC.

1. The name of the corporation is Rochester Drug Co-Operative, Inc.

2. The purposes for which said corporation is to be formed are to carry on a general producing, manufacturing, warehousing and merchandising business on the co-operative plan as related in the Cooperative Corporations Law, in articles in common use including drugs, pharmaceutical supplies, and all articles of merchandise customarily stocked by and sold in drug stores and pharmacies, together with equipment and supplies commonly used in the maintenance and operation of drug stores and pharmacies, all within the limitation of the provisions of the Cooperative Corporations Law. This corporation shall have the following additional powers:

(a)  To do each and everything herein set forth as objects, purposes and powers, or otherwise, to the same extent and as fully as any natural person, within or without the State of New York, as principal, agent, contractor or otherwise.

(b)  To conduct its business in one location or in branches, and have one or more offices, without limitation as to amount; to own, hold, purchase and convey real and personal property, both within and without the State of New York.

(c)  To borrow money and contract debts whenever necessary for the transaction of its business or for the exercise of its corporation rights, privileges and franchises, or for any other lawful purpose as related in the Cooperative Corporations Law, and to issue and dispose of its obligations for any amount so borrowed, and mortgage its property and franchises to secure the payment of any such obligations.

(d)  To act as agent or representative of any member or members in any of the above listed activities.

(e)  To purchase, hold or otherwise acquire, and to hold, own or exercise all rights of ownership in and to sell, transfer or pledge shares of the capital stock or security of any corporation engaged in any wholesale druggist or pharmaceutical activities, or in the producing, manufacturing, warehousing and merchandising of any of the products or merchandise handled by this corporation.

(f)  To establish reserves and to invest the funds therefrom in bonds or in such other property as may be provided in the by-laws of the corporation.

(g)  To deal with any drug store, pharmacy or any other business establishment.

③

(b) To do each and everything necessary and suitable or proper for the accomplishment of any one of the purposes or the attainment of one or more of the objects or purposes herein enumerated; and to contract accordingly; and to exercise and possess all the powers, right and privileges necessary or incidental to the purposes for which the corporation is organized, or other activities in which it is engaged; and in addition thereto, to have all or any other rights, powers and privileges granted by the corporation laws of the State of New York, except where the privileges are in conflict or inconsistent with the expressed provisions of the Cooperative Corporations Law.

3.   The amount of the capital stock of said corporation is $750,000 and is divided into 60,000 shares of capital stock (common) of the par value of $5.00 each, and 90,000 shares of capital stock (preferred) of the par value of $5.00 each.   The designations, privileges, preferences and voting power or restrictions and qualifications of the shares of each class are as follows:

(a)   The capital stock (common) and the owner thereof shall have all the voting power of the corporation, except as otherwise expressly provided by statute.

(b)   The capital stock (preferred) shall bear and receive a preferred dividend of 5% of the par value of such stock, payable annually to stockholders of record at the end of the fiscal year of the corporation.   Such preferred dividend shall be non-cumulative.   No dividend shall be declared or paid for any fiscal year or part thereof, upon capital stock (common) until provision has been made for payment of such preferred dividend.

(c)   Upon dissolution of the corporation, the holders of capital stock (preferred) will be entitled to receive par and accrued non-cumulative dividends at the rate of retirement of their shares before any liquidating dividends are paid to the holders of capital stock (common).   Upon dissolution of the corporation, payment of the corporation's debts and after provision has been made for the retirement of the corporation's capital stock outstanding, if any, at par, and accruals thereon, and other fixed obligations, if any, held by members, holders of capital stock (common) shall be entitled to receive the net assets remaining in accordance with Section 17 of the New York Cooperative Corporations Law.

(d)   All capital stock (preferred) or any part thereof, may be called for redemption by order of the board of directors, at any time, upon 30 days written notice to the respective stockholder in which event the corporation shall pay to the respective stockholder the par value of such called stock plus 5% preferred dividend payable at the end of the then current corporation fiscal year.   No additional dividend shall accrue, be declared, or paid, on such called stock, subsequent to the end of such fiscal year.

(e)   Any capital stock (common) owned by (a) a stockholder who does not, as of the date his capital stock (common) is called for redemption, own a licensed pharmacy, or (b) a stockholder who has made from the Corporation during the preceding fiscal year no purchases or purchases amounting to less than $175,000 may be called for redemption, by order of the Board of Directors, at net book value (less any amounts owed to the Corporation by such stockholder), plus previously declared and unpaid dividends, upon 30 days written notice mailed

④

to the respective stockholder. No dividend shall accrue, be declared or be paid on such called stock subsequent to the expiration of said 30 day period. As used in this Paragraph 3(e), net book value shall be computed in accordance with generally accepted accounting principles and accounting policies (including accounting for inventory) followed by the corporation during the preceding fiscal year, and shall be calculated on the basis of the corporation's balance sheet for the preceding fiscal year. For purposes of determining net book value per share, the number of shares of capital stock (common) outstanding as of the end of such fiscal year shall be used.

(f)   If a stockholder of either capital stock (common) or capital stock (preferred) shall be indebted to the corporation, the Board of Directors may refuse to consent to the transfer of his stock until such indebtedness is paid. The corporation shall have the first right to purchase at net book value (as defined in Section 3(e) above), less any amounts owed to the corporation by such stockholder, plus any declared and unpaid common-stock dividends thereon, any capital stock (common) presented for transfer, providing written notice of the exercise of such right is given to the respective stockholder within 45 days after such presentation. The corporation shall have the first right to purchase at par value, plus any declared and unpaid preferred stock dividends thereon, any capital stock (preferred) presented for transfer, providing written notice of the exercise of such right is given to the respective stockholder within 45 days after such presentation. Each certificate of stock shall have a copy of the substance of this section written or printed thereon.

(g)   The Board of Directors may, from time to time, sell any and all of the unissued capital stock of the corporation, whether the same be any of the original authorized capital or any increase thereof, without first offering the same to stockholders then existing, and said Board may restrict a purchase, sale, distribution, transfer, owning and holding of stock as fully and to the extent authorized by statute.

4.   The principal office of the corporation is to be located in the City of Rochester, County of Monroe and State of New York.

5.   The duration of the corporation is to be perpetual.

6.   The number of directors of the corporation shall be nine.

7.   Any (1) plan of merger or consolidation or exchange offer, or (2) sale, lease, exchange or other disposition of all or substantially all of the assets of the Corporation, or (3) voluntary dissolution of the Corporation must be adopted or approved, as the case may be, at a meeting of the stockholders by vote of three-quarters of all holders of outstanding shares entitled to vote thereon.

8.   The following provisions are included herein for the regulation and conduct of the affairs of the corporation:

(a)   No transaction, right or liability entered into, enjoyed or incurred by or in respect to the corporation, shall be affected by the fact that any director or directors of the corporation are, or may have been personally interested in or concerned in the same; and each

5

director of the corporation is hereby relieved of and from any and all liability which otherwise might prevent him from contracting with the corporation for the benefit of himself or of any firm, association or corporation in which in any way he might be interested.

(b)    The Corporation may pay dividends, not to exceed eight percent (8%) per annum, upon its capital stock. The Corporation's earnings and savings, after deduction of reserve funds required or permitted by law to be established, shall be distributed either in the form of stock, cash or evidence of indebtedness; or in savings proportionally and equitably among stockholders on the basis of the amount of sales or other services rendered to or by such stockholders and within the limitations of the law provided, and the Board of Directors shall determine and establish, and from time to time modify or readjust the amounts, terms, conditions and manner of such distribution, among the stockholders for which it does, or shall do, or conduct business, or for which it shall render its services by means of sales, provisions, or otherwise, and a designation of classes by dealing, trading or representation shall be proper; any such distribution shall be in such manner as the Board of Directors may determine to be for the advantage and best interest of the Corporation and the stockholders for which it does business.

9.    No director of the Corporation shall be held personally liable to the Corporation or its shareholders for damages for any breach of duty in his capacity as a director occurring after authorization of this Paragraph by the shareholders unless a judgment or other final adjudication adverse to him establishes that (1) his acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law, or (2) he personally gained in fact a financial profit or other advantage to which he was not legally entitled, or (3) his acts violated Section 719 of the Business Corporation Law.--Any repeal of this Paragraph, or any amendment of this Paragraph insofar as it would in any way enlarge the liability of any director of the Corporation, shall be ineffective with respect to any acts or omissions occurring prior to the date of such repeal or amendment.

IV.    This amendment of the Corporation's Certificate of Incorporation was authorized by the vote of the Board of Directors followed by the affirmative vote of at least two-thirds of the shareholders present at a special meeting of the Corporation's shareholders, duly called and held on March 10, 1996.

IN WITNESS WHEREOF, we have signed this Certificate this 10th day of March, 1996 and hereby affirm the truth  of the statements contained herein under penalties of perjury.

Michael C. Goderici,
President

Laurence P. Doud, III,
Secretary



# AFFADAVIT

State of New York )
County of Monroe )
City of Rochester ) SS:

The undersigned, Michael C. Pederici and Laurence F. Doud, III, being respectively the President and Secretary of Rochester Drug Co-operative, Inc. ("RDC"), each being duly sworn, deposes and says:

1. I have been authorized to execute and file the attached Certificate of Amendment to the Certificate of Incorporation of RDC, in the manner set forth in Section 12 of the Cooperative Corporations Law. Such Certificate of Amendment was authorized by the vote of the Board of Directors followed by the affirmative vote of at least two-thirds of the shareholders present at a special meeting of RDC's shareholders, duly called and held on March 10, 1996.

Michael C. Pederici,
President

Sworn to before me this 15 day of
March, 1996

Notary Public

Laurence F. Doud, III,
Secretary

Sworn to before me this 10 day of
March, 1996

Notary Public

AIDF-24

$F$ 960311000668

CERTIFICATE OF

AMENDMENT

OF

ROCHESTER DRUG CO-OPERATIVE, INC.

FILED

11.3 53 14 nck 9

RECEIVED

Mar 11  11 26 AM '96

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED   MAR 11 1996
TAX $
BY:

Monroe

(8)

AIDF-24

BILLED

Filed by:

Khristine E. Peacock
Accelerated Information & Document Filing, Inc.
107 Washington Avenue
Albany, New York 12210

960311000717

*State of New York*
*Department of State* }ss:

I hereby certify that the annexed copy has been compared with the original document in the custody of the
Secretary of State and that the same is a true copy of said original.

*Witness my hand and seal of the Department of State on* **MAR 0 5 1999**



*Special Deputy Secretary of State*

OS-1266 (5/96)

F 981109000273

CERTIFICATE OF AMENDMENT

of the

CERTIFICATE OF INCORPORATION

of

Rochester Drug Co-Operative, Inc.

Pursuant to Section 12 of the Co-operative Corporations Law and
Section 805 of the Business Corporation Law

The undersigned, Richard L. Klenk and Laurence P. Doud, III, being the President and
the Secretary, respectively, of Rochester Drug Co-operative, Inc., hereby certify that:

    I.    The name of the Corporation is Rochester Drug Co-Operative, Inc.

    II.    The Certificate of Incorporation of the Corporation was filed by the Department
of State on November 5, 1948. Certificates of Amendment to such Certificate of Incorporation
were filed by the Department of State on April 15, 1952, April 4, 1955, September 26, 1973,
June 16, 1989, February 14, 1990, December 4, 1991, and March 11, 1996.

    III.    The Certificate of Incorporation of the Corporation is hereby amended to effect
the amendments specified below, each of which are authorized by the Cooperative Corporations
Law and the Business Corporation Law:

    A.    Paragraph "3." of the Certificate of Incorporation is hereby amended to:
(a) redesignate the Corporation's existing class of capital stock (common) as "Voting.
Common Stock"; (b) create a new class of Non-Voting Common Stock, par value $.01
per share; and (c) change the aggregate number of shares which the Corporation shall
be authorized to issue from (i) 150,000 shares, of which 60,000 are shares of Voting
Common Stock, $5.00 par value per share, and 90,000 of which are shares of capital
stock (preferred), to (ii) 570,000 shares, of which 60,000 are shares of Voting Common
Stock, $5.00 par value per share, 500,000 of which are shares of capital stock
(preferred), par value $5.00 per share, and 10,000 of which are shares of Non-Voting
Common Stock, par value $.01 per share, so that said paragraph "3." shall read in its
entirety as follows:

    "3.    The aggregate number of shares which the corporation shall have
authority to issue is 570,000, of which (i) 60,000 shares shall be Voting Common

Stock with a par value of $5.00 per share, (ii) 10,000 shares shall be Non-Voting Common Stock with a par value of $.01 per share, and (iii) 500,000 shares shall be capital stock (preferred), with a par value of $5.00 per share. The designations, privileges, preferences and voting power or restrictions and qualifications of the shares of each class are as follows:

(a) The Voting Common Stock and the owners thereof shall have all the voting power of the corporation, except as otherwise expressly provided by statute.

(b) The capital stock (preferred) shall bear and receive a preferred dividend of 5% of the par value of such stock, payable annually to shareholders of record at the end of the fiscal year of the corporation. Such preferred dividend shall be non-cumulative. No dividend shall be declared or paid for any fiscal year or part thereof, upon Common Stock until provision has been made for payment of such preferred dividend.

(c) Upon dissolution of the corporation, the holders of capital stock (preferred) will be entitled to receive the par value and accrued non-cumulative dividends at the rate of 5% per annum to the date of retirement of their shares, before any liquidating dividends are paid to the holders of Voting Common Stock or Non-Voting Common Stock. Upon dissolution of the corporation, payment of the corporation's debts and after provision has been made for the retirement of the corporation's capital stock outstanding, if any, at par, and accruals thereon, and other fixed obligations, if any, held by members, holders of the corporation's Voting Common Stock and Non-Voting Common Stock shall be entitled to receive the net assets remaining in accordance with Section 17 of the New York Cooperative Corporations Law.

(d) All capital stock (preferred) or any part thereof, may be called for redemption by order of the board of directors, at any time, upon 30 days written notice to the respective shareholder in which event the corporation shall pay to the respective shareholder the par value of such called stock plus the 5% preferred dividend payable at the end of the then current corporation fiscal year, less any amounts owed by the Corporation to such shareholder. No additional dividend shall accrue, be declared, or paid, on such called stock, subsequent to the end of such fiscal year.

(e) Any Voting Common Stock owned by (a) a Shareholder who does not, as of the date his Voting Common Stock is called for redemption, own a licensed pharmacy or (b) a Shareholder who has made from the Corporation during the preceding fiscal year no purchases or

2

purchases amounting to less than $175,000 may be called for redemption, by order of the Board of Directors, at net-book value (less any amount owed to the Corporation by such shareholder) plus any previously declared and unpaid dividends, upon 30 days written notice mailed to the respective Shareholder. No dividend shall accrue, be declared or paid on such called stock subsequent to the expiration of said 30 day period. As used in this Paragraph 3(e), net book value shall be computed in accordance with generally accepted accounting principles and accounting policies (including accounting for inventory) followed by the Corporation during the preceding fiscal year, and shall be calculated on the basis of the Corporation's balance sheet for the preceding fiscal year. For purposes of determining net book value per share, the number of shares of Voting Common Stock and Non Voting Common Stock outstanding as of the end of the Corporation's preceding fiscal year shall be used.

(f)     If a shareholder of either Voting Common Stock, Non Voting Common Stock or capital stock (preferred) shall be indebted to the Corporation, the Board of Directors may refuse to consent to the transfer of his stock until such indebtedness is paid.

(g)     The Corporation shall have the first right to purchase at net book value (as defined in Section 3(e) above), less any amounts owed by such Shareholder to the Corporation, plus any declared and unpaid common stock dividends thereon, any Voting Common Stock presented for transfer, providing written notice of the exercise of such right is given to the respective Shareholder within 45 days after such presentation. The Corporation shall have the first right to purchase at par value, plus any declared and unpaid preferred stock dividends thereon, less any amounts owed by such Shareholder to the Corporation, any capital stock (preferred) presented for transfer, providing written notice of the exercise of such right is given to the respective Shareholder within 45 days after such presentation. Each certificate of stock shall have a copy or the substance of this section written or printed thereon:—  

(h) The Board of Directors may, from time to time, sell any and all of the unissued capital stock of the Corporation, whether the same be any of the original authorized capital or any increase thereof, without first offering the same to shareholders then existing, and said Board may restrict a purchase, sale, distribution, transfer, owning and holding of stock as fully and to the extent authorized by statute.

IV.     The Corporation is presently authorized to issue 60,000 shares of capital stock (common), par value $5.00 (which shares are redesignated as "Voting Common Stock"), of

3

which 56 shares are issued and outstanding, and 90,000 shares of capital stock (preferred), par value $5.00 per share, of which no shares are issued and outstanding. The 56 shares of Voting Common Stock which are presently issued and outstanding shall be changed into: (i) 56 shares of Voting Common Stock; (ii) 56 shares of Non-Voting Common Stock; and (iii) 333,872 shares of capital stock (preferred), at the rate of one share of Voting Common Stock, one share of Non-Voting Common Stock and 5,962 shares of capital stock (preferred) for each share of Voting Common Stock currently issued and outstanding. The 59,944 shares of Voting Common Stock which are presently authorized but unissued shall be unchanged and shall remain authorized but unissued. The Corporation is adding 9,944 shares of Non-Voting Common Stock which will be authorized but unissued and the Corporation is adding 166,128 shares of capital stock (preferred) which will be authorized but unissued.

V.     This amendment of the Corporation's Certificate of Incorporation was authorized by the vote of the Board of Directors followed by the affirmative vote of at least two-thirds of the shareholders voting thereon at a special meeting of the Corporation's shareholders, duly called and held on October 13, 1998.

IN WITNESS WHEREOF, we have signed this Certificate this 13th day of October, 1998 and hereby affirm the truth of the statements contained herein under penalties of perjury.

_____
Richard L. Klenk, President

_____
Laurence F. Doud, III, Secretary

4

## AFFIDAVIT

STATE OF NEW YORK        )

COUNTY OF MONROE        )  ss:

Laurence F. Doud, III, being duly sworn, deposes and says:

1.    I am the Secretary of Rochester Drug Co-Operative, Inc., a New York Cooperative Corporation (the "Corporation").

2.    I have been authorized to execute and file the foregoing Certificate of Amendment to the Certificate of Incorporation of the Corporation by the votes required by Article 2 of the Cooperative Corporations Law of the State of New York ("Article 2") and in the manner prescribed in Article 2.

3.    I make this affidavit pursuant to Article 2 to induce the New York Department of State to file the Certificate of Amendment to the Certificate of Incorporation of the Corporation.

_____
Laurence F. Doud, III, Secretary
Rochester Drug Co-Operative, Inc.

Sworn to before me this
23  day of October, 1998.

_____
Notary Public

5

# AFFIDAVIT

STATE OF NEW YORK )

COUNTY OF MONROE ) ss:

Richard L. Klenk, being duly sworn, deposes and says:

1. I am the President of Rochester Drug Co-Operative, Inc., a New York Cooperative Corporation (the "Corporation").

2. I have been authorized to execute and file the foregoing Certificate of Amendment to the Certificate of Incorporation of the Corporation by the votes required by Article 2 of the Cooperative Corporations Law of the State of New York ("Article 2") and in the manner prescribed in Article 2.

3. I make this affidavit pursuant to Article 2 to induce the New York Department of State to file the Certificate of Amendment to the Certificate of Incorporation of the Corporation.

_____
Richard L. Klenk, President
Rochester Drug Co-Operative, Inc.

Sworn to before me this
27th day of October, 1998.

_____
Notary Public

SUZANNE A. WILDRIDGE
Notary Public, State of New York
Qualified in Niagara County
My Commission Expires July 31, 99

6

F 981109000 273

AIDF-24

CERTIFICATE OF

AMENDMENT

OF

ROCHESTER DRUG CO-OPERATIVE, INC.

1cc

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED NOV 0 9 1998
TAX $ 415.37
BY:
Monroe

AIDF-24

BILLED

Filed By:

Khristos L. Pencek
Accelerated Information & Document Filing, Inc.
90 State Street, Suite 856
Albany, New York 1220

981109000 285

FILING RECEIPT

==================================================================================

ENTITY NAME: ROCHESTER DRUG CO-OPERATIVE, INC.


DOCUMENT TYPE: AMENDMENT (DOMESTIC COOPERATIVE)          COUNTY: MONR
               PROVISIONS

SERVICE COMPANY: CORPORATION SERVICE COMPANY          SERVICE CODE: 45

==================================================================================

FILED:08/01/2002 DURATION:********  CASH#:020801000651 FILM #:020801000643

ADDRESS FOR PROCESS
- - - - - - - - - - - - - - - - - - - - -


REGISTERED AGENT
- - - - - - - - - - - - - - - -



==================================================================================

| FILER | FEES | 95.00 | PAYMENTS | 95.00 |
|-------|------|-------|----------|-------|
| - - - - - | - - - - | | | - - - - - - - - |
| | FILING | 60.00 | CASH | 0.00 |
| BILGORE REICH LEVINE KROLL & KANTOR | TAX | 0.00 | CHECK | 0.00 |
| 950 REYNOLDS ARCADE BUILDING | CERT | 0.00 | CHARGE | 0.00 |
| | COPIES | 10.00 | DRAWDOWN | 95.00 |
| ROCHESTER, NY 14614 | HANDLING | 25.00 | BILLED | 0.00 |
| | | | REFUND | 0.00 |
| | | | | - - - - - - |

==================================================================================

667054DAV                                              DOS-1025 (11/89)

## CERTIFICATE OF AMENDMENT

### of the

## CERTIFICATE OF INCORPORATION

### of

### Rochester Drug Co-Operative, Inc.

Pursuant to Section 12 of the Co-operative Corporations Law and
Section 805 of the Business Corporation Law

The undersigned, Donald Arthur, Jr. and Laurence F. Doud, III, being the President and
Secretary, respectively, of Rochester Drug Co-operative, Inc., hereby certify that:

I.      The name of the Corporation is Rochester Drug Co-Operative, Inc.

II.     The Certificate of Incorporation of the Corporation was filed by the Department
of State on November 5, 1948. Certificates of Amendment to such Certificate of Incorporation
were filed by the Department of State on April 15, 1952, April 4, 1955, September 26, 1973,
June 16, 1989, February 14, 1990, December 4, 1991, March 11, 1996 and November 9, 1998.

III.    The Certificate of Incorporation of the Corporation is hereby amended to effect
amendments specified below, each of which are authorized by the Cooperative
Corporations and the Business Corporation Law:

A.      Paragraph "3(e)" of the Certificate of Incorporation is hereby amended to
increase the current level of annual purchases from $175,000.00 to $300,000.00, so that
said Paragraph "3(e)" shall read in its entirety as follows:

> 3(e).   Any Voting Common Stock owned by (a) a Shareholder who does
> not, as of the date his Voting Common Stock is called for redemption,
> own a licensed pharmacy or (b) a Shareholder who has made from the
> Corporation during the preceding fiscal year no purchases or purchases
> amounting to less than $300,000.00 may be called for redemption, by
> order of the Board of Directors, at net-book value (less any amount owed
> to the Corporation by such shareholder) plus any previously declared and
> unpaid dividends, upon 30 days written notice mailed to the respective
> Shareholder. No dividend shall accrue, be declared or paid on such called
> stock subsequent to the expiration of said 30 day period. As used in this
> Paragraph 3(e), net book value shall be computed in accordance with
> generally accepted accounting principles and accounting policies
> (including accounting for inventory) followed by the Corporation during
> the preceding fiscal year, and shall be calculated on the basis of the

Corporation's balance sheet for the preceding fiscal year. For purposes of determining net book value per share, the number of shares of Voting Common Stock and Non Voting Common Stock outstanding as of the end of the Corporation's preceding fiscal year shall be used.

IV.    This amendment of the Corporation's Certificate of Incorporation was authorized by the vote of the Board of Directors followed by the affirmative vote of at least two-thirds of the shareholders voting thereon at a special meeting of the Corporation's shareholders, duly called and held on June 9, 2002.

IN WITNESS WHEREOF, we have signed this Certificate this 9th day of June, 2002 and hereby affirm the truth of the statements contained herein under penalties of perjury.

Donald Arthur, Jr., President

Laurence F. Doud, III, Secretary

## AFFIDAVIT

STATE OF NEW YORK )

COUNTY OF MONROE ) ss:

    Laurence F. Doud, III, being duly sworn, deposes and says:

    1.    I am the Secretary of Rochester Drug Co-Operative, Inc., a New York Cooperative Corporation (the "Coporation").

    2.    I have been authorized to execute and file the foregoing Certificate of Amendment to the Certificate of Incorporation of the Corporation by the votes required by Article 2 of the Cooperative Corporations Law of the State of New York ("Article 2") and in the manner prescribed in Article 2.

    3.    I make this affidavit pursuant to Article 2 to induce the New York Department of State to file the Certificate of Amendment to the Certificate of Incorporation of the Corporation.

Laurence F. Doud, III, Secretary
Rochester Drug Co-Operative, Inc.

Sworn to before me this
__ day of June, 2002.

Notary Public

BERNARD D. LEVINE
Notary Public, State of New York
No. 02LE7510955
Commission Expires March 30, 20__

## AFFIDAVIT

STATE OF NEW YORK    )

COUNTY OF MONROE   ) ss:

    Donald Arthur, Jr., being duly sworn, deposes and says:

    1.    I am the President of Rochester Drug Co-Operative, Inc., a New York Cooperative Corporation (the "Coporation").

    2.    I have been authorized to execute and file the foregoing Certificate of Amendment to the Certificate of Incorporation of the Corporation by the votes required by Article 2 of the Cooperative Corporations Law of the State of New York ("Article 2") and in the manner prescribed in Article 2.

    3.    I make this affidavit pursuant to Article 2 to induce the New York Department of State to file the Certificate of Amendment to the Certificate of Incorporation of the Corporation.

                Donald Arthur, Jr., President
                Rochester Drug Co-Operative, Inc.

Sworn to before me this
9th day of June, 2002.

Notary Public

BERNARD D. LEVINE
Notary Public, State of New York
No. 02LE7510955
Commission Expires March 30, 20 0 6

080919000 ∂ᴺ

CERTIFICATE OF AMENDMENT

OF

ROCHESTER DRUG CO-OPERATIVE, INC.

_____

Section 12 of the Cooperative Corporation Law    and
Section 805 of the Business Corporation Law

RECEIVED
2008 SEP 18 PM 1:07

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED   SEP 19 2008
TAX:
BY:

monn

Filer:    Bilgore, Reich, Levine, Kroll & Kantor
          950 Reynolds Arcade Building
          16 East Main Street
          Rochester, NY  14614
Cust. Ref#723964Jba

   DRAWDOWN

2008 SEP 19 AM 10:03   FILED

┌─────────────────┐
│   CSC 45        │
│  DRAW DOWN      │
└─────────────────┘

080919000 ᵘᴼᶠᶠ

2008 SEP 17 AM 9:05
RECEIVED

*State of New York  }  ss:*
*Department of State }*

*I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.*

*Witness my hand and seal of the Department of State on*  **November 6, 2006**



*Special Deputy Secretary of State*

DOS-1266 (Rev. 11/05)

050913000453

## CERTIFICATE OF AMENDMENT

### of the

### CERTIFICATE OF INCORPORATION

of

Rochester Drug Co-Operative, Inc.

Pursuant to Section 12 of the Co-operative Corporations Law and
Section 805 of the Business Corporation Law

The undersigned, James McLaughlin and Laurence F. Doud, III, being the President and Secretary, respectively, of Rochester Drug Co-operative, Inc., hereby certify that:

I.        The name of the Corporation is Rochester Drug Co-Operative, Inc.

II.        The Certificate of Incorporation of the Corporation was filed by the Department of State on November 5, 1948. Certificates of Amendment to such Certificate of Incorporation were filed by the Department of State on April 15, 1952, April 4, 1955, September 26, 1973, June 16, 1989, February 14, 1990, December 4, 1991, March 11, 1996, November 9, 1998, and August 1, 2002.

III.        The Certificate of Incorporation of the Corporation is hereby amended to effect amendments specified below, each of which are authorized by the Cooperative Corporations and the Business Corporation Law:

A.        Paragraph "3(e)" of the Certificate of Incorporation is hereby amended to increase the current level of annual purchases from $300,000.00 to $500,000.00, so that said Paragraph "3(e)" shall read in its entirety as follows:

> 3(e).  Any Voting Common Stock owned by (a) a Shareholder who does not, as of the date his Voting Common Stock is called for redemption, own a licensed pharmacy or (b) a Shareholder who has made from the Corporation during the preceding fiscal year no purchases or purchases amounting to less than $500,000.00 may be called for redemption, by order of the Board of Directors, at net-book value (less any amount owed to the Corporation by such Shareholder) plus any previously declared and unpaid dividends, upon 30 days written notice mailed to the respective Shareholder. No dividend shall accrue, be declared or paid on such called stock subsequent to the expiration of said 30 day period. As used in this Paragraph 3(e), net book value shall be computed in accordance with generally accepted accounting principles and accounting policies

(including accounting for inventory) followed by the Corporation during the preceding fiscal year, and shall be calculated on the basis of the Corporation's balance sheet for the preceding fiscal year. For purposes of determining net book value per share, the number of shares of Voting Common Stock and Non Voting Common Stock outstanding as of the end of the Corporation's preceding fiscal year shall be used.

IV.    This amendment of the Corporation's Certificate of Incorporation was authorized by the vote of the Board of Directors followed by the affirmative vote of at least two-thirds of the shareholders voting thereon at a special meeting of the Corporation's shareholders, duly called and held on June 5, 2005.

IN WITNESS WHEREOF, we have signed this Certificate this 18 day of June, 2005 and hereby affirm the truth of the statements contained herein under penalties of perjury.

James McLaughlin, President

Laurence F. Doud, III, Secretary

DOROTHY L. GRAHAM
Notary Public in the State of New York
MONROE COUNTY,
Commission Expires

## AFFIDAVIT

STATE OF NEW YORK    )

COUNTY OF MONROE    ) ss:

Laurence F. Doud, III, being duly sworn, deposes and says:

1.    I am the Secretary of Rochester Drug Co-Operative, Inc., a New York Cooperative Corporation (the "Coporation").

2.    I have been authorized to execute and file the foregoing Certificate of Amendment to the Certificate of Incorporation of the Corporation by the votes required by Article 2 of the Cooperative Corporations Law of the State of New York ("Article 2") and in the manner prescribed in Article 2.

3.    I make this affidavit pursuant to Article 2 to induce the New York Department of State to file the Certificate of Amendment to the Certificate of Incorporation of the Corporation.

Laurence F. Doud, III, Secretary
Rochester Drug Co-Operative, Inc.

Sworn to before me this
18 day of June, 2005.

Notary Public
DOROTHY L. GRAHAM
Notary Public in the State of New York
MONROE COUNTY
Commission Expires _____

3

## AFFIDAVIT

STATE OF NEW YORK    )

COUNTY OF ~~ONONDAGA~~ Monroe } ss:

James McLaughlin, being duly sworn, deposes and says:

1.      I am the President of Rochester Drug Co-Operative, Inc., a New York Cooperative Corporation (the "Coporation").

2.      I have been authorized to execute and file the foregoing Certificate of Amendment to the Certificate of Incorporation of the Corporation by the votes required by Article 2 of the Cooperative Corporations Law of the State of New York ("Article 2") and in the manner prescribed in Article 2.

3.      I make this affidavit pursuant to Article 2 to induce the New York Department of State to file the Certificate of Amendment to the Certificate of Incorporation of the Corporation.

_____
James McLaughlin, President
Rochester Drug Co-Operative, Inc.

Sworn to before me this
1 8 day of June, 2005.

_____
Notary Public

**DOROTHY L. GRAHAM**
Notary Public in the State of New York
MONROE COUNTY
Commission Expires  4-30-06

( 050913000453

CSC 45
DOWN

CERTIFICATE OF AMENDMENT

OF

ROCHESTER DRUG CO-OPERATIVE, INC.

Under Section 12 of the Co-Operative Corporations Law and
Section 805 of the Business Corporation Law

ICC
STATE OF NEW YORK
DEPARTMENT OF STATE

SEP 1 3 2005

FILED
TAX $
BY: _____ Monroe

FILED BY:
        KILGORE, REICH, LEVINE, KROLL & KANTOR
        900 Reynolds Arcade Building
        16 East Main Street
        Rochester, NY 14614

5

483

FILING RECEIPT
============================================================================
ENTITY NAME: ROCHESTER DRUG CO-OPERATIVE, INC.

DOCUMENT TYPE: AMENDMENT (DOMESTIC COOPERATIVE)                COUNTY: MONR
              PROVISIONS

============================================================================
FILED:09/19/2008 DURATION:********  CASH#:080919000089 FILM #:080919000080

    FILER:
    ------
    BILGORE REICH LEVINE KROLL &
    KANTOR, 950 REYNOLDS ARCADE BLDG.
    16 EAST MAIN STREET
    RICHESTER, NY 14614

    ADDRESS FOR PROCESS:
    --------------------



    REGISTERED AGENT:
    -----------------






============================================================================
SERVICE COMPANY: CORPORATIÓN SERVICE COMPANY - 45          SERVICE CODE: 45


    FEES        120.00                      PAYMENTS      120.00
                --------                                  --------
    FILING       60.00                      CASH            0.00
    TAX           0.00                      CHECK           0.00
    CERT          0.00                      CHARGE          0.00
    COPIES       10.00                      DRAWDOWN      120.00
    HANDLING     50.00                      OPAL            0.00
                                            REFUND          0.00
============================================================================
723964JBA                                          DOS-1025 (04/2007)

# STATE OF NEW YORK

## DEPARTMENT OF STATE

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on September 19, 2008.

Paul LaPointe
Special Deputy Secretary of State

Rev. 06/07



08091900 ⌀℗⅃

CERTIFICATE OF AMENDMENT

of the

CERTIFICATE OF INCORPORATION

of

Rochester Drug Co-Operative, Inc.

Pursuant to Section 12 of the Cooperative Corporations Law and
Section 805 of the Business Corporation Law

The undersigned, Richard L. Klenk, being the President and Laurence F. Doud, III being
the Secretary, respectively, of Rochester Drug Co-Operative, Inc., hereby certify that:

I.  The name of the Corporation is Rochester Drug Co-Operative, Inc.

II.  The Certificate of Incorporation of the Corporation was filed by the Department
of State on November 5, 1948.

III.  The Certificate of Incorporation of the Corporation is hereby amended to effect
the amendment specified below, which is authorized by the Cooperative
Corporations and Business Corporation Law:

A.  Paragraph "8(c)" is added to the Certificate of Incorporation to permit the
Board of Directors to distribute shares of any class or series of its capital stock
to holders of the same or any other class or series of its capital stock, so that
said Paragraph "8(c)" shall read in its entirety as follows:

8(c).  The Board of Directors may, from time to time, distribute the shares of
any class or series of its capital stock to holders of the same or any other class
or series of its capital stock.

IV.  This amendment of the Corporation's Certificate of Incorporation was authorized
by the vote of the Board of Directors followed by the affirmative vote of at least
two-thirds of the members voting thereon at a special meeting of the
Corporation's members, duly called and held on September __, 2008.

[Signature Page Follows]

IN WITNESS WHEREOF, we have signed this Certificate this 16 day of September, 2008 and hereby affirm the truth of the statement contained herein under penalties of perjury

Richard L. Klenk, President

Laurence F. Doud, III, Secretary

## AFFIDAVIT

STATE OF NEW YORK    )

COUTNY OF MONROE    ) ss:

Richard L. Klenk, being duly sworn, deposes and says:

1.    I am the President of Rochester Drug Co-Operative, Inc., a New York Cooperative Corporation (the "Corporation").

2.    I have been authorized to execute and file the foregoing Certificate of Amendment to the Certificate of Incorporation of the Corporation by the votes required by Article 2 of the Cooperative Corporations Law of the State of New York ("Article 2") and in the manner prescribed in Article 2.

3.    I make this affidavit pursuant to Article 2 to induce the New York Department of State to file the Certificate of Amendment to the Certificate of Incorporation of the Corporation.

Richard L. Klenk, President
Rochester Drug Co-Operative, Inc.

Sworn to before me this
_16_ day of September, 2008.

Dorothy L. Graham Reeves
Notary Public in the State of New York
Monroe County 01RE4825263
Commission Expires _4-30-10_

Notary Public

## AFFIDAVIT

STATE OF NEW YORK     )

COUTNY OF MONROE     ) ss:

       Laurence F. Doud, III, being duly sworn, deposes and says:

       1.      I am the Secretary of Rochester Drug Co-Operative, Inc., a New York Cooperative Corporation (the "Corporation").

       2.      I have been authorized to execute and file the foregoing Certificate of Amendment to the Certificate of Incorporation of the Corporation by the votes required by Article 2 of the Cooperative Corporations Law of the State of New York ("Article 2") and in the manner prescribed in Article 2.

       3.      I make this affidavit pursuant to Article 2 to induce the New York Department of State to file the Certificate of Amendment to the Certificate of Incorporation of the Corporation.

                                Laurence F. Doud, III, Secretary
                                 Rochester Drug Co-Operative, Inc.

Sworn to before me this
_16_ day of September, 2008.

Dorothy L. Graham Reeves
Notary Public in the State of New York
Monroe County 01RE4825263
Commission Expires _4-30-10_

Dorothy L. Graham Reeves
Notary Public

## AMENDED AND RESTATED
## BY-LAWS OF ROCHESTER DRUG COOPERATIVE, INC.

### As last Amended June 5, 2005

### ARTICLE I

### Statement of Policy

Section 1. This corporation is organized under the Cooperative Corporations Law primarily for the mutual benefit of its members and patrons and not to make profits for itself as such. The object of this Corporation is to promote the interest of retail pharmacists, by operating a wholesale organization which shall purchase and maintain a reasonable inventory, and sell merchandise to retail pharmacies. Any earnings and savings shall be distributed, upon a uniform basis, among Stockholders according to the amount of purchases by each Stockholder, the compensation from each Stockholder received by this Corporation for other services rendered to each such Stockholder and such other basis determined in good faith by the Board of Directors. The rate of distribution may be graduated upon a uniform basis according to the amount of purchases and compensation from each Stockholder. It shall be the policy of this Corporation to give patronage dividends to Stockholders annually or at such time as the Board of Directors may determine in the form of cash, capital stock or evidence of indebtedness. The Corporation shall pay such dividends on capital stock and establish and maintain such reserves and earned surplus as may be authorized by law and ordered by the Board of Directors.

### ARTICLE II

### Meeting of Stockholders

Section 1. The annual meeting of Stockholders of this Corporation shall be held at the office of the Corporation on the first Tuesday in June of each year or at such other time and place as the Board of Directors may designate, for the election of Directors and such other business as may properly come before said meeting. Notice of the time, place and object of such meeting shall be given by mailing at least ten days previous to the date, postage paid, a copy of such notice addressed to each Stockholder at his residence or place of business as the same shall appear on the books of the Corporation.

Section 2. Special meetings of Stockholders, other than those regulated by statute, may be called at any time by a three quarters vote of the Directors. It shall also be the duty of the President to call such meetings whenever requested in writing to do so by the Stockholders owning a majority of the capital stock. A notice of every special meeting stating the time, place and object thereof, shall be given by mailing, postage prepaid, at least ten days before such meeting, a copy of such notice addressed to each Stockholder at his residence or place of business as the same shall appear on the books of the Corporation.

Section 3.    The Corporation's Voting Common Stock and/or the owners thereof shall have all the voting power of the Corporation, except as otherwise expressly provided by statute. Holders of the Corporation's Non-Voting Common Stock and capital stock (preferred) may be present and have the privilege of the floor at any Stockholder meeting, but, except as above provided, shall not have the privilege of voting. At all meetings of Stockholders, except as otherwise provided by statute, not less than eight percent (8%) of the holders of the Corporation's Voting Common Stock shall be present in person in order to constitute a quorum.

Section 4.    At the annual meeting of the Stockholders, the following shall be the order of business, so far as consistent with the purpose of the meeting, viz:

|  |  |
|---|---|
| FIRST: | Calling the Roll; |
| SECOND: | Appointment of two tellers of election; |
| THIRD: | Proof of proper notice of meeting; |
| FOURTH: | Reading of Secretary-Treasurer; |
| FIFTH: | Election of Directors; |
| SIXTH: | Miscellaneous business. |

Section 5. At all meetings of Stockholders only such persons shall be entitled to vote who appear as Stockholders qualified to vote upon the particular matter of election upon the transfer books of the Corporation for ten days immediately preceding such meeting, and each Stockholder shall be entitled to one vote on any questions or in any election unless the manner of voting is otherwise prescribed by statute. Voting shall be by written ballot on the election of directors and on any questions required to be voted by statute, and whenever ten percent of the qualified voters present at the meeting demand a written ballot. All other voting shall be viva voce, except that a stock vote shall be by ballot, each of which shall state the name of the Stockholder voting and the number of shares owned by him. When authorized by statute, representatives of Stockholders shall be permitted to vote.

Section 6. Stockholders may vote for Directors by absentee ballot at any annual meeting. Such ballot shall be upon a form, enclosed in a sealed plain envelope, which envelope shall be enclosed in a second envelope endorsed "Ballot for Directors" with the signature of the Stockholder thereon, and shall be filed with the Secretary prior to the annual meeting. The blank ballot form, plain envelope and covering envelope shall be furnished by the Secretary upon request at any time after the notice of meeting has been given to Stockholders. In case the Stockholder or representative is present at the meeting, such ballot may be returned prior to the voting, upon request. At the election of Directors, the secretary shall announce the names of the Stockholders casting absentee ballots, and after covering envelopes have been inspected by the tellers, shall open the same and deliver the plain inside envelopes containing the ballots to the tellers, who shall count the ballots therein with the other ballots from Stockholders and representatives present and voting. In case the balloting results in no election, or the elected Director refuses to serve, the Stockholders and representatives present shall cast further ballots, in which no absentee voting shall be permitted, until the vacancy is filled.

2

## ARTICLE III

### Directors

Section 1. The affairs of the Corporation shall be managed by a Board of nine Directors, of whom five shall constitute a quorum. At the first Annual Meeting of the Stockholders held in the year 1979, three Directors shall be elected for a term of one year; three Directors for a term of two years; and three Directors for a full term of three years; to succeed the nine Directors named in the Certificate of Incorporation. Each director shall be a Stockholder who owns or operates a licensed pharmacy, except that any Director serving on the Board of Directors as of March 1, 1991 who is not a Stockholder owning a licensed pharmacy may continue to serve on the Board until his current term expires. In all other cases, when a Director ceases to be a Stockholder who owns or operates a licensed pharmacy at any time during his term, he shall be removed as a Director by the Board of Directors and his vacancy filled as provided in Section 5 of this Article III.

Section 2. Three Directors thereafter shall be elected annually by a majority of the votes cast at such election, for a term of three years, at each annual meeting of the Stockholders, the Directors so elected to take the place of the three Directors whose terms are presently expiring. The terms of the newly elected Directors shall begin at the first meeting of the Directors following such election, and they shall hold office until the election and qualification of their successors. The Directors shall elect a President, a Vice President, a Secretary, a Treasurer, and any subordinate officers they consider necessary. The office of President and Vice President shall be filled by Directors. The offices of Secretary and Treasurer, and any subordinate offices, may be filled by persons outside the Directors and any one person may hold two such offices.

Section 3. The regular meeting of the Board of Directors shall be held on the first Tuesday on or after the twelfth of each month, or at such other time as the President may order. Meetings of the Board of Directors shall be called by the Secretary when ordered by the President, or upon the written demand of three Directors, by giving notice thereof to each Director, either verbally, by telephone, by telegram, by telefax, or in writing, sent to his usual place of business or residence, in sufficient time for him to attend the meeting from either of said addresses in a reasonable manner. Unless otherwise ordered by a Stockholders meeting, the Directors shall receive a fee for each Board meeting established by the Board of Directors each year equal to the sum of (a) five times the average wage paid per hour for a relief pharmacist in the Rochester area, plus (b) 15% of the amount determined in (a).

Section 4. The immediate past President of the Corporation shall be ex officio Chairman of the Board of Directors and shall share in all its deliberations until the expiration of the term of office of his successor, but shall have no vote on any questions coming before the Board. The compensation for serving as Chairman and attending meetings of the Board shall be the same as paid to elected Directors.

Section 5. Vacancies in the Board of Directors shall be filled for the unexpired term by a majority vote of the Directors at any Special or Regular Meeting.

3

Section 6.    Any Director who misses three consecutive Board Meetings may be removed by a majority vote of the Directors at any Special or Regular Meeting, provided adequate notice of such proposed removal be sent to all Directors. Any such vacancy shall be filled in accordance with the provisions of Article III, Section 5.

Section 7.    In case the entire Board of Directors shall die or resign, any Stockholder may call a meeting in the same manner that the President may call such meeting, and Directors for each unexpired term may be elected at such special meeting in the manner provided for their election at the annual meetings.

Section 8.    The Board of Directors may adopt such rules and regulations for the conduct of their meetings and management of the affairs of the Corporation, as they may deem proper, not inconsistent with the laws of the State of New York or these By-Laws.

Section 9.    The Board of Directors, by resolution, may authorize the Treasurer and/or other officers of the Corporation, to sign checks, drafts, notes and orders for the payment of money in the name of the Corporation.

## ARTICLE IV

### Officers

Section 1. The President shall preside at all Stockholders' meetings and in the absence or incapacity of the Chairman of the Board, at all meetings of the Board of Directors, and shall perform the usual duties assigned to the office of President, and such other duties as may be imposed by these By-Laws or direction of the Board of Directors.

Section 2. The Vice President shall, in the absence or incapacity of the President, perform the duties of that officer.

Section 3. The Secretary shall keep the minutes of the meetings of Stockholders and of the Board of Directors. He shall attend to the giving and serving of all notices of the Corporation. He shall have charge of such books and papers as the Board of Directors may direct. He shall also keep a stock-book containing the names of all persons who are Stockholders of the Corporation, showing the address, the number of shares held by them respectively, the time they respectively become the owners thereof, and the amount paid thereon. He shall also attend to such correspondence as may be assigned to him, and perform all the duties incidental to his office.

Section 4. The Treasurer shall have the care and custody of all the funds and securities of the Corporation and deposit the same in the name of the Corporation in such bank or banks as the Directors may elect. He shall keep the books of account which shall at all times by subject to inspection by the Board of Directors. He shall give a bond in an amount to be determined from time to time by the Board of Directors, the expense of procuring which shall be paid by the

4

Corporation. He shall make a report at each annual meeting of Stockholders, at meetings of the Board of Directors, and whenever requested by the Board of Directors to do so.Section 4. The Treasurer shall have the care and custody of all the funds and securities of the Corporation and deposit the same in the name of the Corporation in such bank or banks as the Directors may elect. He shall keep the books of account which shall at all times by subject to inspection by the Board of Directors. He shall give a bond in an amount to be determined from time to time by the Board of Directors, the expense of procuring which shall be paid by the

Corporation. He shall make a report at each annual meeting of Stockholders, at meetings of the Board of Directors, and whenever requested by the Board of Directors to do so.

Section 5. The Board of Directors shall create any subordinate or additional offices and shall prescribe the duties of each office, which duties shall not be inconsistent with the duties assigned to the President, Vice President, Secretary and Treasurer of these By-Laws.

## ARTICLE V

### Capital Stock

Section 1. The Corporation shall have authority to issue such shares of capital stock as shall from time to time be authorized by the Corporation's Certificate of Incorporation.

Section 2. Shares of Common Stock shall be offered by the Corporation for sale and purchase only to a person, firm or Corporation as the Board of Directors shall in its discretion deem prudent and in the best interests of the Corporation, all in accordance with law, but only to a person, firm or Corporation who or which owns or operates a licensed pharmacy. The purchase price and terms of purchase for any shares of the Corporation's Common Stock issued by the Corporation shall be determined in good faith by the Board of Directors. Subscriptions to the capital shall be paid to the Treasurer. Certificates of stock shall be numbered and registered in the order in which they are issued, and shall be signed by the President or Vice President and by the Treasurer, and the seal of the Corporation shall be affixed thereto.

Section 3. Transfers of shares of stock shall only be made upon the books of the Corporation by the holder in person, or by the holder of a power of attorney duly executed and acknowledged and filed with the Secretary of the Corporation, and on the surrender of the certificate of such shares.

Section 4. Any Voting Common Stock of the Corporation which is owned by (a) a Stockholder who does not, as of the date his Voting Common Stock is called for redemption, own a licensed pharmacy or (b) a Stockholder who has made from the Corporation during the preceding fiscal year no purchases or purchases amounting to less than $500,000 may be called for redemption, by order of the Board of Directors, at net book value, less any amounts owed by such Stockholder to the Corporation, plus previously declared and unpaid dividends, upon 30 days written notice mailed to the respective Stockholder. No dividend shall accrue, be declared or paid on such called stock subsequent to the expiration of said 30 day period. As used in this Article V, Section 4, net book value shall be computed in accordance with generally accepted accounting principles and accounting policies (including accounting for inventory) followed by the Corporation during the preceding fiscal year, and shall be calculated on the basis of the Corporation's balance sheet for the preceding fiscal year. For purposes of determining net book value per share, the number of shares of Voting Common Stock and Non-Voting Common Stock outstanding as of the end of such fiscal year shall be used.

Section 5. If a Stockholder of either Voting Common Stock, Non-Voting Common Stock or capital stock (preferred) shall be indebted to the Corporation, the Board of Directors may

6

refuse to consent to the transfer of his stock until such indebtedness is paid. The Corporation shall have the first right to purchase at net book value (as defined in Section 4 above), less any amounts owed by such Stockholder to the Corporation, plus any declared and unpaid common stock dividends thereon, any Voting Common Stock presented for transfer, providing written notice of the exercise of such right is given to the respective Stockholder within 45 days after such presentation. The Corporation shall have the first right to purchase at par value, plus any declared and unpaid preferred stock dividends thereon, any capital stock (preferred) presented for transfer, providing written notice of the exercise of such right is given to the respective Stockholder within 45 days after such presentation. Each certificate of stock shall have a copy or the substance of this section written or printed thereon.

## ARTICLE VI

### Trading Privileges

Section 1. The Board of Directors, for the purpose of providing adequate funds to conduct the business of the Corporation, may borrow money upon bonds, certificates of indebtedness, and notes of the Corporation, and may adopt regulations prescribing the amount of such obligations which a person must hold in order to purchase goods from the Corporation in a prescribed amount.

Section 2.

(a) This Corporation must sell goods to Stockholders, subject to such terms, conditions, rules and regulations as the Board of Directors may from time to time adopt.

(b) This Corporation may, in its discretion, sell its goods to any person, firm, or corporation who or which is not a Stockholder, subject to such terms, conditions, rules and regulations as the Board of Directors may from time to time adopt.

Section 3.     If any Stockholder or customer shall violate any of these By- Laws or any rules or regulations of this Corporation, or shall cease to be in good standing, or elect to discontinue business, his trading privileges shall immediately cease and terminate, and shall be restored only by a majority vote of the Board of Directors.

## ARTICLE VII

### Indemnification

Section 1. To the full extent authorized or permitted by law, the Corporation shall indemnify any person made, or threatened to be made, a party to any action or proceeding, whether civil, at law, in equity, criminal, administrative, investigative or otherwise, including any action by or in the right of the Corporation, by reason of the fact that he, his testator or intestate, whether before or after adoption of this Article, is or was a director or officer of the Corporation, or is serving or served any other corporation, or any partnership, joint venture, trust, employee benefit plan or other enterprise in any capacity, at the request of the Corporation, against all judgments fines penalties, amounts paid in settlement (provided the Corporation shall

have consented to such settlement, which consent shall not be unreasonably withheld by it) and reasonable expenses, including attorneys' fees and costs or investigation, incurred by any such person with respect to any such threatened or actual action or proceeding, and any appeal therein, provided only that (a) acts of such person which were material to the cause of action so adjudicated or otherwise disposed of were not (i) committed in bad faith or (ii) were not the result of active and deliberate dishonesty, and (b) he did not personally gain in fact a financial profit or other advantage to which he was not legally entitled.

Section 2. All expenses reasonably incurred by a person in connection with a threatened or actual action or proceeding with respect to which such person is or may be entitled to indemnification under this Article shall be advanced or promptly reimbursed by the Corporation to him in advance of the final disposition of such action or proceeding, upon receipt of an undertaking by him or on his behalf to repay the amount of such advances, if any, as to which he is ultimately found not to be entitled to indemnification or, where indemnification is granted, to the extent such advances exceed the indemnification to which he is entitled.

Section 3.

Not later than thirty (30) days following final disposition of an action or proceeding with respect to which the Corporation has received written request by a person for indemnification pursuant to this Article, if such indemnification has not been ordered by a court, the Board of Directors shall meet and find whether the director or officer met the standard of conduct set forth in Section 1 of this Article, and if it finds that he did, or to the extent it so finds, shall authorize such indemnification.

(a) Such standard shall be found to have been met unless (i) a judgment or other final adjudication adverse to such person establishes that (A) acts of the director or officer were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (B) he personally gained in fact a financial profit or other advantage to which he was not legally entitled; or (ii) if no judgment or other final adjudication is obtained, the Board finds in good faith that, if it had been disposed of by judgment or other final adjudication, such judgment or other final adjudication would have been adverse to him and would have established (A) or (B) above.

(b) If indemnification is denied because of such a finding by the Board in the absence of a judgment or other final adjudication, such action by the Board shall in no way affect the right of the person seeking such indemnification to make application therefor in any court having jurisdiction thereof, and in such action or proceeding the issue shall be whether the director or officer met the standard set forth in Section 1, the Board shall then grant such indemnification, and shall also grant to the person entitled to such indemnification, indemnification of the expenses incurred by him in connection with the action or proceeding resulting in the judgment or other final adjudication that such standard of conduct was met.

(c) A finding by the Board pursuant to this Section that the standard of conduct set forth in Section 1 has been met shall mean a finding (i) by a quorum consisting of directors who are not parties to such action or proceeding, or, (ii) if such a quorum is not obtainable, or, if obtainable, such a quorum is unable to make such a finding and so directs, (A) by the Board upon the written opinion of independent legal counsel that indemnification is proper in the circumstance because the applicable standard of conduct has been met, or (B) by the

shareholders upon a finding that such standard has been met, such action by the Board or shareholders to be taken as promptly as is practicable.

Section 4.    This Article shall be deemed to constitute a contract between the Corporation and each director and each officer of the Corporation who serves as such at any time while this Article is in effect. No repeal or amendment of this Article, insofar as it reduces the extent of any director's or officer's right of indemnification, shall without his written consent be effective as to such person with respect to any event, act or omission occurring or allegedly occurring prior to the end of the term of office (for whatever reason) he is serving as director or officer of the Corporation when such repeal or amendment is adopted. No amendment of the Business Corporation Law or the Cooperative Corporation Law shall, insofar as it reduces the permissible extent of any director's or officer's right of indemnification under this Article, be effective as to such person with respect to any event act or allegedly occurring prior to the effective date of such amendment. This Article shall be binding on any successor to the Corporation, including any corporation or other entity which acquires all or substantially all of the Corporation's assets.

Section 5.    The Corporation may, but need not, maintain insurance insuring the Corporation or persons entitled to indemnification under Section 1 of this article for liabilities against which they are entitled to indemnification under this Article or insuring such persons for liabilities against which they are not entitled to indemnification under this Article.

Section 6.    The indemnification provided by this Article shall not be deemed exclusive of any other rights to which a director or officer of the Corporation may be entitled other than pursuant to this Article. The Corporation is authorized to enter into agreements with any of its directors or officers providing them rights to the provisions therefor in this Article to the full extent permitted by law.

## ARTICLE VIII

### Seal

The seal of the Corporation shall be in the form of a circle and shall bear the following inscription "Rochester Drug Co-Operative, Inc., Incorporated 1948" and such other inscriptions as may be authorized by the Board of Directors.

## ARTICLE IX

### Amendments

These By-Laws may be repealed or amended by the affirmative vote of two-thirds of the members voting thereon at a meeting held after due written notice setting forth the proposed action and the purpose of the meeting. Such notice shall be given by the Secretary on order of the Board of Directors or pursuant to resolution adopted at any annual meeting of the Corporation. A certified copy of such amended By-Laws shall be filed by the Secretary in the Department of Agriculture and Markets and shall take effect upon the date of such filing and copies thereof shall be available for the member at the office of the Secretary upon request.