# Exhibit C-2

Case 2-20-20230-PRW,    Doc 1666-5,    Filed 10/06/22,    Entered 10/06/22 17:24:17,
Description: Exhibit C-2, Page 1 of 12

| United States Bankruptcy Court for the Western District of New York | |
|---|---|
| **Name of Debtor:** Rochester Drug Co-Operative, Inc.<br><br>**Case Number:** 20-20230 | **For Court Use Only**<br><br>Claim Number: 0000020093<br><br>File Date: 07/14/2020 13:04:47 |

# Proof of Claim (Official Form 410)

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case.  With the exception of 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.  18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.  That date is on the notice of bankruptcy** (Form 309) **that you received.**

**04/19**

| Part 1: | **Identify the Claim** |
|---|---|

**1.    Who is the current creditor?**

Name of the current creditor (the person or entity to be paid for this claim): Charles Aaron

Other names the creditor used with the debtor: N/A

**2.    Has this claim been acquired from someone else?**    ☑ No   ☐ Yes.   From whom? _____

**3.    Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name      Charles Aaron | Name      _____ |
| Address   ATTN: Lowell W. Finson, Esq | Address   _____ |
|           12777 W. Jefferson Blvd. |           _____ |
|           Bldg. D. 3rd Fl |           _____ |
| City      Playa Vista | City      _____ |
| State     CA          ZIP Code   90066 | State     _____  ZIP Code _____ |
| Country (if International): _____ | Country (if International): _____ |
| Phone:    (424) 289-2627 | Phone:    _____ |
| Email:    lowell@finsonlawfirm.com | Email:    _____ |

| **4. Does this claim amend one already filed?** | **5. Do you know if anyone else has filed a proof of claim for this claim?** |
|---|---|
| ☑ No | ☑ No |
| ☐ Yes. | ☐ Yes. |
| Claim number on court claims register (if known) _____ | Who made the earlier filing? |
| Filed on _____<br>MM / DD / YYYY | _____ |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes.

Last 4 digits of the debtor's account or any number you use to identify the debtor:

____  ____  ____  ____

**7. How much is the claim?**

undetermined

$_____

**Does this amount include interest or other charges?**

☐ No

☐ Yes.  Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples:  Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.  Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).  Limit disclosing information that is entitled to privacy, such as health care information.

Litigation-Pers. Injury/Workers Comp.
_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.    The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate.  If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other.  Describe:

_____

**Basis for perfection:**

_____

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                            $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:** $_____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any
default as of the date of the petition:**  $_____

**Annual Interest Rate** (when case was filed)    _____%

☐ Fixed  ☐ Variable

**10.  Is this claim based on a lease?**

☑ No

☐ Yes.  **Amount necessary to cure any default as of the date of petition**.

$_____

**11.  Is this claim subject to a right of setoff?**

☑ No

☐ Yes.  Identify the property:

_____

**12.  Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other.  Specify subsection of 11 U.S.C. § 507 (a) (_____) that applies.

* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

A claim may be partly priority and partly nonpriority.  For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

$_____

$_____

$_____

$_____

$_____

$_____

**13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes.  **Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9)**: $_____

| **Part 3:** | **Sign Below** |
|---|---|

| | |
|---|---|
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐  I am the creditor.<br><br>☑  I am the creditor's attorney or authorized agent.<br><br>☐  I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br><br>☐  I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Kelly Hensley*                       07/14/2020 13:04:47<br>Signature                             Date<br><br>**Provide the name and contact information of the person completing and signing this claim:**<br><br>Name    Kelly Henson<br><br>Address    12777 W. Jefferson Blvd.<br><br>Bldg. D. 3rd Fl<br><br>City    Play Vista<br><br>State    CA                        Zip    90066<br><br>Country (in international) _____<br><br>Phone    (424)289-2627<br><br>Email    lowell@finsonlawfirm.com |

# EXHIBIT A

Case 2-20-20230-PRW,   Doc 1666-5,   Filed 10/06/22,   Entered 10/06/22 17:24:17,
Description: Exhibit C-2, Page 5 of 12

## I.   OVERVIEW OF FACTS SUPPORTING INDIVIDUAL CLAIMS

### A.  Available Records

If necessary, Creditor/Claimant (hereinafter referred to as "Creditor" or "Creditor/Claimant") will produce medical records indicating proof of use of an opioid, addiction, and permanent physical and emotional damages. Further records can be produced showing economic losses associated with the addiction sequelae.

### B.  Factual Issues

Creditor/Claimant maintains Rochester Drug Coop, Inc. Debtor, (hereinafter referred to as "Debtor" or "RDC") owes Creditor/Claimant for serious physical, emotional personal injury, lost income and other property damages arising out of the sale, promotion and/or delivery of Opioid drugs, including, but not limited to, OxyContin, OxyContin ADF, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, Targiniq ER, Fentora, Actiq, Duragesic, Nucynta, Nucynta ER, Lazanda, Ultracet, Ultram, Opana, Opana ER, Percocet, Endocet, Percodan, Zydone, Kadian, Norco, Subsys, Roxicodone, Exalgo, Xartemis XR, and generic versions of oxycodone, oxymorphone, hydromorphone, hydrocodone, and fentanyl.

RDC is a New York Cooperative Corporation with its principal place of business in Rochester, New York.  It is a registered wholesaler with the New York State Board of Pharmacy. On October 6, 2017, Creditor/Claimant filed a complaint alleging that certain pharmaceutical distributors—including RDC—had been on notice that of an alarming and suspicious rise in the distribution of opioids to retailers.  Specifically, at all times pertinent, Debtor was on notice that it was engaged in abnormally and/or inherently dangerous activity and had a duty of care to Creditor/Claimant. Debtor had or should have had knowledge that they were supplying vast amounts of dangerous drugs to Creditor/Claimant.

In the past, in related litigation, RDC moved to dismiss these and other claims made against them.  On July 17, 2018, it was held that Creditor/Claimant's allegations, if proved, would establish liability.  In finding as much, this Court found sufficient allegations that the RDC was integral to the scheme to expand the market for prescription opioids by shipping suspicious orders

1

and by not investigating or taking other actions to prevent the Creditor/Claimant from becoming addicted to opioids.

With specific regard to the negligence claim, that Court found satisfactorily alleged that the RDC was in the best position to protect the Creditor/Claimant from addiction related damages, and that societal expectations required Debtor to engage in different behaviors including, but not limited to, refusing to fill suspicious orders for opioids. Further, that Court accepted allegations that RDC was in a position to anticipate or prevent the claimed injuries, and that Creditor/Claimant had been damaged not only by the illegal use of opioids but also by their legal use, consistent with the concerted efforts of RDC to market and promote its products for sale and distribution.

On April 23, 2019, RDC entered into a Stipulation and Order of Settlement and Dismissal with the United States of America, accepting responsibility for improper distribution of opioid pharmaceuticals. This Stipulation was the result of allegations that, between May 2012 and November 2016, RDC repeatedly violated the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.* ("CSA"), and the regulations promulgated thereunder, including 21 C.F.R. § 1301.74(b)), by knowingly failing to permeate an adequate system to detect, investigate, and report to the DEA suspicious orders of controlled substances, including thousands of suspicious orders of oxycodone, fentanyl, hydrocodone, amphetamine, and buprenorphine products.

In the Stipulation, RDC admitted and accepted responsibility for the following conduct during the Covered Period," including, *inter alia*, having:

- Knowingly failed to implement an adequate system to detect, investigate, and report suspicious orders of opioids

- Failing to report to the DEA at least two thousand orders of controlled substances . . . that should have been reported as suspicious

- Failing to conduct such further investigation into ordering patterns that should have resulted in further investigation

- Failing to maintain effective controls to prevent … diversion and failed to report frequent unexplained sharp spikes in opioid orders

- Failing to implement an adequate due diligence program to prevent the diversion of controlled substances by its pharmacy customers

2

- Failing to devote sufficient resources to its compliance program and employed compliances personnel who lacked necessary qualifications

- Failing to consistently obtain and review updated and complete dispensing reports that would have allowed it to better detect troubling dispensing patterns

The Stipulation specifically refers to an example of the illegal conduct occurring within Nassau County as follows:

> "RDC's top customer during the Covered Period was a specialty pharmacy located in Woodbury, New York, This pharmacy was one of the largest providers of Subsys, a highly-addictive fentanyl spray that is approved by the FDA only for use by cancer patients with breakthrough pain. This pharmacy was also a large provider of oxycodone; between October 2012 and October 2013, the pharmacy went from purchasing approximately 70,000 units of oxycodone per month to purchasing over 200,000 units per month. This pharmacy filled a high volume of prescriptions written by prescribers included on RDC's Suspicious Prescriber List, including numerous physicians who were subsequently arrested for diversion."

Finally, the Stipulation, specified that after having truthfully admitted to these facts, RDC agreed to make no statement contradicting these facts and representations "in litigation or otherwise."

### C. Legal Issues

As RDC has "truthfully admitted" the facts in the Stipulation and that it is barred from contradicting in this proceeding, establish Creditor/Claimant is entitled to participate as an individual unsecured creditor because RDC engaged in conduct or omissions that endangered or injured the Creditor/Claimant. Further, that RDC admittedly failed to exercise reasonable care in the distribution of opioids to Creditor/Claimant.

"To prove a prima facie case of negligence, a Creditor/Claimant must demonstrate the existence of a duty of care owed to the Creditor/Claimant, a breach of that duty, and that the breach of such duty was a proximate cause of his or her injuries." *Miglino v Bally Total Fitness of Greater N.Y., Inc.*, 92 A.D.3d 148, 159 (2d Dep't 2011). "Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party." *Espinal v. Melville Snow Contrs.*, 98 N.Y.2d 136, 138 (2002). "A critical consideration in determining whether a duty exists is whether 'RDC's relationship with

3

either the tortfeasor (including other marketers, distributors, manufacturers or pharmacies) or the Creditor/Claimant places the RDC in the best position to protect against the risk of harm.'" *Davis v South Nassau Communities Hosp.*, 26 N.Y.3d 563, 572 (2015) (quoting *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 233 (2001)).

Here, RDC has admitted in The Stipulation that it breached its duty by failing to live up to the standards of a reasonable distributor. In particular, RDC admitted that it, in the context of highly abused drugs, such as oxycodone, fentanyl, and hydrocodone, it knowingly failed to implement an adequate system to detect, investigate, and report suspicious orders. More specifically, RDC acknowledges that it has failed to conduct such further investigation where it was warranted, and ultimately failed to report at least two thousand orders of controlled substances . . . that should have been reported as suspicious. Although RDC admitted to having been warned internally of red flags indicating that certain pharmacy customers were dispensing controlled substances that were not for legitimate medical purposes, RDC nonetheless failed to report such abnormalities to officials. Moreover, RDC acknowledged its lack of diligence in failing to establish appropriate internal controls, including insufficient resources devoted to compliance, unqualified compliance personnel, inadequate field visits, and a failure to obtain or even review "complete dispensing reports that would have allowed it to better detect troubling dispensing patterns. These inactions alone are indicative of RDC's negligence in its distribution patterns, and therefore and enabled and promoted third-party misconduct.

More specifically, these omissions are all the more glaring in light of the integral role RDC played in the chain of opioids being distributed throughout the USA. According to the Drug Enforcement Agency's ("DEA") Automation of Reports Consolidated Orders System ("ARCOS") publicly available data, from 2006 to 2012 RDC supplied a significant number of those pills. As entities involved in the manufacture and distribution of opioid medications, RDC had a duty to notice suspicious or alarming orders of opioid pharmaceuticals and to report suspicious orders to the proper authorities and governing bodies including the DEA and the New York State Department of Health.

In reference to New York Law, pursuant to Section 80.22 of the New York Codes, Rules and Regulations, entitled "Suspicious Orders," RDC is required to "establish and operate a system to disclose to the licensee suspicious orders for controlled substances and inform the department of such suspicious orders. Suspicious orders shall include, but not be limited to, orders of unusual

4

size, orders deviating substantially from a normal pattern, and orders of unusual frequency." This requirement parallels the requirements of federal law. The Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 *et seq.*, establishes a "closed system" for the manufacture, sale, and distribution of certain drugs, including prescription opioids. This means that "all legitimate handlers of controlled substances must obtain a DEA registration and, as a condition of maintaining such registration, must take reasonable steps to ensure that their registration is not being utilized as a source of diversion. As the DEA has pointed out, "[i]f the closed system is to function properly as Congress envisioned, distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes." *Id.* This responsibility is critical, because "Congress has expressly declared that the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people." One of the mechanisms through which the DEA administers the "closed system" is its power to grant, deny, or revoke registration under the CSA. The CSA sets forth as a primary factor in the grant of a registration to manufacture or distribute controlled substances the "maintenance of effective controls against diversion . . . into other than legitimate . . . channels ..." 21 U.S.C. § 823(a)(1), (b)(1); *see also* 21 C.F.R. § 1301.71(a) ("[a]ll applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances."). Registrants who fail to maintain such effective controls may have their registration revoked, *see Masters Pharmaceutical, Inc. v. Drug Enforcement Administration,* 861 F.3d 206, 212-213 (D.C. Cir. 2017); *Southwood Pharmaceuticals, Inc.; Revocation of Registration*, 72 FR 36487-01, 36500, 2007 WL 1886484 (DEA July 3, 2007). In this way, DEA seeks to ensure that only those who can be trusted to maintain effective controls against diversion are permitted to participate in the supply-chain for controlled substances. The mandate to maintain effective controls against diversion requires that, in exchange for the privilege of dealing in these drugs, registrants must play a substantial role in maintaining the closed-system and ensuring that dangerous drugs are not diverted. The system does not rely on the DEA to police shipments of controlled substances, but rather enlists registrants and requires them, in the first instance, to assume that task. *See Southwood Pharmaceuticals*, 72 FR 36487-01, 36504, 2007 WL 1886484 (the DEA cannot all by itself "protect the American people from [the] extraordinary threat to public health and safety" posed by prescription narcotics; it "must rely on registrants to fulfill their obligation under the Act to ensure that they do not supply controlled substances to entities which act as pushers."). The

Case 2-20-20230-PRW, Doc 1666-5, Filed 10/06/22, Entered 10/06/22 17:24:17, Description: Exhibit C-2, Page 10 of 12

DEA requires that, in order to maintain effective controls against diversion, a registrant must design and operate a system to identify suspicious orders of controlled substances (the "identification duty"); report to the DEA suspicious orders "when discovered" (the "reporting duty"); and decline to ship an order identified as suspicious unless, through due diligence, the registrant is able to determine that the order is not likely to be diverted into illegal channels (the "no-shipping duty"). *Masters Pharmaceutical*, 861 F.3d at 212-213; *see also Southwood Pharmaceuticals*, 72 FR 36487-01, 36500; 21 C.F.R. § 1301.74. "Suspicious orders" include "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.* Manufacturers, distributors, and pharmacies participate in the supply-chain for prescription opioid drugs, which are categorized under either Schedule II or Schedule III of the CSA. Manufacturers sell and ship these drugs to distributors, subject to the CSA requirements to guard against diversion. This means that, in shipping their products to distributors, opioid manufacturers are required to identify orders from distributors that are "suspicious" within the meaning of the CSA (including whether the orders are of unusual size, frequency, or pattern), report suspicious orders to the DEA, and to refrain from shipping suspicious orders unless the manufacturer determines that the order is not likely to be diverted. *See* § 1301.74; *see also* 21 U.S.C. § 823(a), (d) (requirements for registrants who are manufacturers of Schedule II or Schedule III drugs). The distributors, in turn, sell and ship opioids to pharmacies. They must identify orders from their customers – that is from pharmacies to whom they ship -- that are "suspicious" within the meaning of the CSA (including whether the orders are of unusual size, frequency, or pattern), report suspicious orders to the DEA, and refrain from shipping suspicious orders unless they have determined that the order is not likely to be diverted. *See* § 1301.74; *see also* 21 U.S.C. § 823(b), (e) (requirements for registrants who are distributors of Schedule II or Schedule III drugs). In order to maintain the closed system and guard against diversion, registrants at each step in the supply chain must take steps to ensure that orders they ship are not likely to be diverted.

Unfortunately, RDC now admits that it wholly failed in this duty to take any action to prevent or reduce the distribution of these drugs.

As a proximate result of this dereliction of duty, RDC and its agents have caused Creditor/Claimant to incur excessive costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids.

Case 2-20-20230-PRW, Doc 1666-5, Filed 10/06/22, Entered 10/06/22 17:24:17, Description: Exhibit C-2, Page 11 of 12

Accordingly, RDC admissions foreclose its ability to present evidentiary proof sufficient to require a trial on the question of its negligence in distribution, and summary judgment is properly entered on this claim as a matter of law.

### D. Conclusion

For the reasons above, and based upon RDC's own admitted conduct, Creditor/Claimant should be entitled to participate in the distribution of Debtor's assets.

7