# EXHIBIT A-1

**Fill in this information to identify the case:**

Debtor 1    Rochester Drug Co-Operative, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Western District of New York

Case number   20-20230

Filed: USBC - Western District of New York
Rochester Drug Co-Operative, Inc. (B10)
20-20230 (PRW)

**RDR**

0000000281

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Echo Drugs Inc.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Lee E. Woodard, Esq.
Name

333 West Washington St., Suite 200
Number   Street

Syracuse    NY    13202
City    State    ZIP Code

Contact phone (315) 423-7100

Contact email bkemail@harrisbeach.com

Where should payments to the creditor be sent? (if different)

Echo Drugs Inc.
Name

260 Broadway
Number   Street

Brooklyn    NY    11211
City    State    ZIP Code

Contact phone (855) 794-8453

Contact email levrx@aol.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Case 2-20-20230-PRW,    Doc 1793-1,    Filed 02/15/23,    Entered 02/15/23 20:18:02,
Description: Exhibit A-1 - Claim 281, Page 2 of 41



**Part 2:  Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

7. **How much is the claim?**   $_____1,090,681.74_. **Does this amount include interest or other charges?**
   ☑ No
   ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

   Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

   Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

   Limit disclosing information that is entitled to privacy, such as health care information.

   <u>Unpaid patronage dividends as part of the product sales program.</u>

9. **Is all or part of the claim secured?**

   ☑ No
   ☐ Yes.   The claim is secured by a lien on property.

   **Nature of property:**
   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
   ☐ Motor vehicle
   ☐ Other. Describe: _____

   **Basis for perfection:** _____
   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:**   $_____
   **Amount of the claim that is secured:**   $_____
   **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:**   $_____

   **Annual Interest Rate** (when case was filed)_____%
   ☐ Fixed
   ☐ Variable

10. **Is this claim based on a lease?**
    ☑ No
    ☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

11. **Is this claim subject to a right of setoff?**
    ☑ No
    ☐ Yes. Identify the property: _____

Case 2-20-20230-PRW,    Doc 1793-1,    Filed 02/15/23,    Entered 02/15/23 20:18:02,
Description: Exhibit A-1 - Claim 281, Page 3 of 41

12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. Check one:

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 07/29/2020
 MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Lee E. Woodard, Esq. |
|---|---|
| | First name — Middle name — Last name |
| Title | Attorney |
| Company | Harris Beach PLLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer |
| Address | 333 West Washington St., Suite 200 |
| | Number — Street |
| | Syracuse — NY — 13202 |
| | City — State — ZIP Code |
| Contact phone | (315) 423-7100 — Email bkemail@harrisbeach.com |

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 4 of 41

STATEMENT OF CLAIM AND RESERVATION OF RIGHTS OF
Echo Drugs Inc.
In re Rochester Drug Co-Operative, Inc.
Case No.: 20-20230

Amount of Claim: Approximately $1,090,681.74

The Claim of Echo Drugs Inc. ("Claimant") is based on unpaid patronage dividends which became due as part of the product sales program of the debtor Rochester Drug Co-Operative, Inc. ("Debtor"). The amount of Claimant's claim against the Debtor is approximately $1,090,681.74. Additionally, the Debtor has filed suit against the Claimant which is currently pending in the Supreme Court of the State of New York, County of Kings, under Index No.: 508966/2020 (the "Action"). Claimant has not had an opportunity answer and assert counterclaims in the Action.

The amount of this claim is estimated only and is subject to further investigation. Accordingly, Claimant reserves its right to file an Amended Proof of Claim and/or attach or bring forth additional documents supporting its claim and additional documents setting forth the amount and classification of its claim, including but not limited to, pre-petition, attorneys' fees, potential indemnity obligations, amounts subject to rights of setoff and any other additional amounts due from the Debtor

Nothing contained herein shall constitute (i) an admission or acknowledgement of any liability on the part of Claimant; or (ii) a waiver of any rights or claims that Claimant may have against the Debtor.

1

Offeree: _____          Number: _**60**_

## Confidential Summary Offering Statement

### May 23, 2016

## ROCHESTER DRUG CO-OPERATIVE, INC.

**60 Shares of Voting Common Stock**
**$16,666 Per Share**

**THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE BANKING COMMISSIONER OF THE STATE OF CONNECTICUT NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THE OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

**THESE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE REGISTERED UNDER THE CONNECTICUT SECURITIES LAW AND BUSINESS OPPORTUNITY INVESTMENT ACT (THE "ACT") OR EXEMPT FROM REGISTRATION UNDER THE ACT.**

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 11 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 6 of 41

## FOR PENNSYLVANIA RESIDENTS ONLY

IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A WRITTEN NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M)(1) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, YOU MAY ELECT, WITHIN TWO BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS (WHICH IS NOT MATERIALLY DIFFERENT FROM THE FINAL PROSPECTUS) TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONIES PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A WRITTEN NOTICE (INCLUDING A NOTICE BY FACSIMILE OR ELECTRONIC MAIL) TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE PROSPECTUS) INDICATING YOUR INTENTION TO WITHDRAW.

IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES AND HAVE RECEIVED A WRITTEN NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M)(2) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, YOU MAY ELECT, WITHIN TWO BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF YOUR BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO BUSINESS DAYS AFTER YOU MAKE THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED, TO WITHDRAW YOUR ACCEPTANCE AND RECEIVE A FULL REFUND OF ALL MONIES PAID BY YOU. YOUR WITHDRAWAL OF ACCEPTANCE WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A WRITTEN NOTICE (INCLUDING A NOTICE BY FACSIMILE OR ELECTRONIC MAIL) TO THE ISSUER (OR PLACEMENT AGENT IF ONE IS LISTED ON THE FRONT PAGE OF THE OFFERING MEMORANDUM) INDICATING YOUR INTENTION TO WITHDRAW.

Case 2-20-20230-PRW,   Doc 480-1,   Filed 07/10/20,   Entered 07/10/20 11:16:30,
Description: Exhibit A - Kinney Declaration, Page 12 of 45

Case 2-20-20230-PRW,   Doc 1793-1,   Filed 02/15/23,   Entered 02/15/23 20:18:02,
Description: Exhibit A-1 - Claim 281, Page 7 of 41

CONFIDENTIAL

THE SECURITIES OFFERED HEREBY ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933. THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT HAS NOT BEEN SUBMITTED TO, REVIEWED OR APPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, THE ATTORNEY GENERAL OF THE STATE OF NEW YORK OR ANY OTHER STATE SECURITIES COMMISSION NOR HAVE ANY OF THE FOREGOING PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING NOR IS IT INTENDED THAT ANY SUCH AGENCY WILL DO SO. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION MAY NOT LAWFULLY BE MADE.

---

UNDER CERTAIN EXEMPTIONS PROVIDED FOR BY FEDERAL AND STATE SECURITIES LAWS APPLICABLE TO THIS OFFERING, THE COMPANY IS NOT REQUIRED TO PROVIDE AND HAS NOT UNDERTAKEN TO PROVIDE IN THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT THE TYPE AND KIND OF INFORMATION THAT WOULD BE AVAILABLE TO AN INVESTOR IF THIS INVESTMENT WERE SUBJECT TO THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933.

---

THE SECURITIES ARE OFFERED SUBJECT TO PRIOR SALE, TO WITHDRAWAL, CANCELLATION OR MODIFICATION OF THE OFFER WITHOUT NOTICE, TO THE COMPANY'S RIGHT TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART AND TO APPROVAL OF CERTAIN LEGAL MATTERS BY COUNSEL TO THE COMPANY.

---

THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK.

---

THIS INVESTMENT IS SUITABLE ONLY FOR PERSONS WHO HAVE ADEQUATE FINANCIAL RESOURCES, WHO DO NOT ANTICIPATE THAT THEY WILL BE REQUIRED TO LIQUIDATE AN INVESTMENT ACQUIRED HEREUNDER IN THE FORESEEABLE FUTURE, AND WHO CAN AFFORD A TOTAL LOSS OF THEIR INVESTMENT.

---

Case 2-20-20230-PRW,   Doc 480-1,   Filed 07/10/20,   Entered 07/10/20 11:16:30,   Description: Exhibit A - Kinney Declaration, Page 13 of 45

Case 2-20-20230-PRW,   Doc 1793-1,   Filed 02/15/23,   Entered 02/15/23 20:18:02,   Description: Exhibit A-1 - Claim 281, Page 8 of 41

THE COMPANY HEREBY EXTENDS TO EACH OFFEREE THE OPPORTUNITY, PRIOR TO THE CONSUMMATION OF A SALE OF ANY SECURITIES TO SUCH OFFEREE, TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE COMPANY TO THE EXTENT THE COMPANY POSSESSES THE SAME OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN. HOWEVER, ALL SUCH REQUESTS FOR ADDITIONAL INFORMATION MUST BE IN WRITING AND THE RESPONSES THERETO IDENTIFIED AS SUCH BY THE COMPANY. SEE "ADDITIONAL INFORMATION". NO PERSON IS AUTHORIZED BY THE COMPANY TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION IN CONNECTION WITH THIS OFFERING OTHER THAN AS CONTAINED IN THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT. NO PERSON HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THE SECURITIES OFFERED HEREBY, EXCEPT THE INFORMATION CONTAINED HEREIN. PROSPECTIVE INVESTORS SHOULD NOT RELY ON INFORMATION NOT CONTAINED HEREIN. NEITHER THE DELIVERY OF THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT AT ANY TIME NOR ANY SALE MADE HEREUNDER SHALL IMPLY THAT INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE.

---

THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT AND THE INFORMATION CONTAINED HEREIN MAY NOT BE REPRODUCED OR USED IN ANY OTHER MANNER WITHOUT THE EXPRESS WRITTEN CONSENT OF THE COMPANY. BY ACCEPTING DELIVERY HEREOF, EACH OFFEREE AGREES TO RETURN THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT IF HE DOES NOT PURCHASE THE SECURITIES OFFERED HEREBY.

---

THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT HAS BEEN PREPARED SOLELY FOR THE BENEFIT OF INVESTORS INTERESTED IN THE PRIVATE PLACEMENT OF THE SECURITIES OF THE COMPANY AND CONSTITUTES AN OFFER ONLY TO THE PERSON TO WHOM THE COMPANY HAS DELIVERED THIS CONFIDENTIAL SUMMARY OFFERING STATEMENT.

Case 2-20-20230-PRW,   Doc 480-1,   Filed 07/10/20,   Entered 07/10/20 11:16:30,
Description: Exhibit A - Kinney Declaration, Page 14 of 45

Case 2-20-20230-PRW,   Doc 1793-1,   Filed 02/15/23,   Entered 02/15/23 20:18:02,
Description: Exhibit A-1 - Claim 281, Page 9 of 41

## SUMMARY

Rochester Drug Co-operative, Inc. ("RDC" or the "Company") is offering 60 shares of its Voting Common Stock (the "Voting Common Stock") at a purchase price of $16,666 per share. This Offering shall expire on March 22, 2017, unless the Company at its option elects to extend the offering period. This Offering has no minimum aggregate subscription amount. If all of the shares of Voting Common Stock offered hereby are not sold prior to March 27, 2017, the Company will not refund amounts subscribed for and tendered. If all 60 shares offered hereby are sold, the gross proceeds to the Company, prior to the payment of offering expenses, will be $999,960.

The following summary highlights certain information contained in this Confidential Summary Offering Statement. It does not purport to be complete. Please refer to the remainder of the Confidential Summary Offering Statement and the Exhibits hereto for more detailed information regarding the matters referred to in this summary. Summaries of documents or agreements do not purport to be complete. Subject to applicable confidentiality provisions, copies of material agreements will be provided to prospective investors on written request.

## RDC

Rochester Drug Co-operative, Inc. is a New York Cooperative Corporation formed in 1905 and incorporated in 1948. Its principal business is to warehouse, merchandise and then distribute, on a co-operative basis, drugs, pharmaceutical supplies and other merchandise commonly sold in drug stores, pharmacies and health and beauty stores, together with equipment and supplies commonly used in the maintenance and operation of drug stores, pharmacies, health and beauty stores and durable medical equipment businesses.

RDC distributes pharmaceutical and other products, principally to pharmacies in New York, Pennsylvania, New Jersey, Connecticut and Ohio. The Company operates two distribution centers. One distribution center is located at 50 Jet View Drive, Rochester, New York 14624. RDC's administrative operations are also conducted from this location. The Rochester distribution center was constructed in 2001 to RDC's specifications. RDC operates a second distribution center in Fairfield, New Jersey to allow it to better serve its customers and expand its market presence in downstate New York, New Jersey and Connecticut. See, "BUSINESS; THE COMPANY; PROPERTIES". RDC's telephone number is (585) 271-7220 and its website is located at www.rdcdrug.com.

RDC's sales for the fiscal year ended March 31, 2015 were $2,034,663,627. RDC's sales for the preceding fiscal year ended March 31, 2014 were $1,178,061,635. The substantial increase in sales for RDC's last fiscal year was due to various factors, including expanding geographic markets, increased purchases by new shareholders of the Company, increases in sales in generic pharmaceuticals, increases in high-priced specialty products, and an expanding customer base, particularly in the downstate New York, Long Island, New Jersey, Connecticut and Philadelphia area, which we refer to as the "Metro Markets". See, "BUSINESS; THE COMPANY" for a more complete discussion of these factors and their effect on the Company's sales.

1

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 15 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 10 of 41

RDC has three classes of capital stock authorized: Voting Common Stock, Non-Voting Common Stock and Preferred Stock. See, "DESCRIPTION OF SECURITIES" for a more complete description of the three classes of stock, their rights and preferences, and the number of shares issued and outstanding.

On February 16, 2016, the Company declared a stock dividend (the "Stock Dividend"), payable in the form of RDC's non-voting common stock, equal to one share of new non-voting common stock for each issued and outstanding share of voting common stock as of March 15, 2016 (the "Record Date") and one share of new non-voting common stock for each share of non-voting common stock issued and outstanding as of the Record Date. On the Record Date, there were 262 shares of voting common stock and 138 shares of non-voting common stock issued and outstanding. Accordingly, on the Record Date, the Company issued a total of 400 new shares of non-voting common stock, consisting of (i) an additional 262 shares of non-voting common stock, representing the dividend on the then-outstanding shares of voting common stock, and (ii) an additional 132 shares of non-voting common stock, representing the dividend on the then-outstanding shares of non-voting common stock. On March 29, 2016, the additional shares of non-voting common stock were issued to shareholders of record as of the Record Date. Immediately following the issuance of the new shares of non-voting common stock, there were 262 shares of the Company's voting common stock and 538 shares of non-voting common stock issued and outstanding.

As a result of the Stock Dividend, the total number of shares of the Company's common stock (consisting of voting common stock and non-voting common stock) has been doubled and, accordingly, the Company's net book value per share of common stock has been reduced by half. The Company calculates its net book value per share only once per year, following the completion of its fiscal year. As of March 31, 2015, the completion of the Company's last fiscal year, the Company's net book value per common share was $34,546 per share. On a pro forma basis, had the Stock Dividend been completed as of March 31, 2015, the net book value per common share would have been reduced to $17,273 per share.

Shareholders are eligible to receive distributions when, as, and if declared by the Board of Directors of RDC, in amounts related to the shareholder's purchases of pharmaceutical and other products from RDC and payments to RDC for other services. The amounts received by shareholders pursuant to these distributions, known as "patronage dividends", totaled $31,068,406 for the fiscal year ended March 31, 2015. The largest patronage dividend paid to any single shareholder for such fiscal year was $10,567,921.

### Recent Events

RDC's sales for the nine months ended December 31, 2015 were $1,792,187,355, compared to $1,506,119,394 for the nine months ended December 31, 2014. For the nine months ended December 31, 2015 and December 31, 2014, 75% and 77%, respectively, of RDC's sales were to holders of its Voting Common Stock. For the fiscal year ended March 31, 2015, 77% of RDC's sales were to holders of its Voting Common Stock.

2

Case 2-20-20230-PRW,  Doc 480-1,  Filed 07/10/20,  Entered 07/10/20 11:16:30,
Description: Exhibit A - Kinney Declaration, Page 16 of 45

Case 2-20-20230-PRW,  Doc 1793-1,  Filed 02/15/23,  Entered 02/15/23 20:18:02,
Description: Exhibit A-1 - Claim 281, Page 11 of 41

## The Offering

### *Voting Common Stock*

The Company is offering to sell 60 shares of its Voting Common Stock at a purchase price of $16,666 per share, for aggregate gross proceeds of $999,960. The book value per share of the Company's Voting Common Stock as of March 31, 2015, the end of the Company's most recently completed fiscal year, was $34,546. As a result of the Stock Dividend described above, the book value per share of the Company's Voting Common Stock on a pro forma basis as of March 31, 2015 would have been reduced to $17,273. The Company only calculates book value per share upon the conclusion of each fiscal year. Prospective investors are cautioned that the Company's net book value per share as of the date of this Confidential Summary Offering Statement or as of March 31, 2016 (the conclusion of the Company's current fiscal year, which will occur soon after the commencement of this offering) could be substantially higher or lower than the pro forma net book value per share as of March 31, 2015 (after giving effect to the Stock Dividend), and therefore could be substantially higher or lower than the purchase price for the shares of Voting Common Stock. The shares of Voting Common Stock will have the terms described below, all of which should be read in conjunction with, and are qualified in their entirety by, the Subscription Agreement, a form of which is attached hereto as Exhibit B, and by the Company's Certificate of Incorporation and By-laws, which are attached hereto as Exhibit E. Investors are also encouraged to review the information regarding the Company's other classes of capital stock, set forth herein under the heading "DESCRIPTION OF SECURITIES."

### *Payment for Subscription*

Any subscription tendered by a prospective subscriber must be accompanied by payment of the purchase price therefor, which may be paid either (i) in full by cash or check, or (ii) $8,666 by cash or check, with the balance of $8,000 by delivery to the Company of a promissory note and related pledge agreement and stock power, in the forms attached hereto as Exhibits C and D. The Company shall have the right to reject any subscription in its sole discretion for any reason. Upon such rejection, all funds tendered by a subscriber shall be returned, without interest or deductions of any kind.

### *Rights as Subscriber; Right to Receive Patronage Dividend*

If a subscriber elects to pay for a portion of the purchase price of the Voting Common Stock by delivering to the Company a promissory note in the form attached hereto as Exhibit C, the subscriber will be deemed to be a shareholder of the Company upon delivery to the Company of payment in the amount of $8,666 together with the promissory note, the related pledge agreement and stock power (in the forms attached hereto as Exhibit D), and the Subscription Agreement (in the form attached as Exhibit B), and as such will be entitled to receive a pro-rata portion of patronage dividends to the extent declared and paid by the Company, with the amount thereof determined based upon the subscriber's purchases from the Company after becoming a shareholder. In the event the promissory note is not repaid in full by the subscriber on or prior to the earlier of (i) six months following its date of issuance, or (ii) March 22, 2017, the subscriber shall not be deemed to have earned any patronage dividend previously paid or payable with respect to periods on or prior to March 31, 2017, and will waive any rights with respect thereto. The Company will have certain rights as a secured creditor pursuant to the pledge agreement.

3

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 17 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 12 of 41

*Use of Proceeds*

The proceeds of this offering, net of legal fees, accounting fees and other expenses estimated to be approximately $41,500 in the aggregate, are estimated to be $958,460 (assuming all of the shares of Voting Common Stock offered hereby are sold) and will be used for general working capital purposes in the discretion of the Company's Board of Directors.

## RISK FACTORS

THERE ARE SIGNIFICANT RISKS ASSOCIATED WITH AN INVESTMENT IN THE VOTING COMMON STOCK. AN INVESTMENT IN THE SECURITIES OFFERED HEREBY IS SUITABLE ONLY BY PERSONS WHO CAN AFFORD THE LOSS OF THEIR ENTIRE INVESTMENT. PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER, AMONG OTHER THINGS, THE FOLLOWING RISK FACTORS:

### Competition

The Company engages in a very competitive business. Its principal customers are independent pharmacies. Larger and better-capitalized competitors may offer the Company's customers prices or ancillary service, which the Company cannot afford to meet. The trend in the industry is toward increasing consolidation of pharmacies in large drug or food store chains. The Company believes that independent pharmacies have recently been gaining increased popularity. However, if the trend toward consolidation continues, it could result in a decline in the number of independent pharmacies, which comprises the Company's primary market. See, "BUSINESS"; "THE COMPANY"; "COMPETITION".

### No Registration; Restrictions on Transferability

The shares of Voting Common Stock being offered hereby are not registered under the Securities Act of 1933, as amended, or under any state securities laws. None of such shares may be sold, transferred or assigned except pursuant to valid registration statements filed under these statutes, or exemptions therefrom.

Other restrictions on the transferability of the Company's stock exist in the Company's Certificate of Incorporation and By-laws, including a provision permitting the Company's Board of Directors to refuse to consent to a transfer of any shares of Common Stock if the holder is indebted to the Company. The Company has a right to purchase certain shares of its capital stock which a holder desires to transfer upon certain terms more fully set forth herein under the heading "DESCRIPTION OF SECURITIES". There can be no assurance, however, that the price required to be paid by the Company will equal or exceed the price at which a willing buyer would purchase such shares. There also can be no assurance that the Board of Directors will determine that it is in the best interests of the Company to repurchase shares at any particular time. In addition, New York law prohibits a repurchase of shares except from surplus or if a corporation is or would thereby be rendered insolvent. See, "DESCRIPTION OF SECURITIES".

4

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 18 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 13 of 41

**Stock Subject to Redemption**

Shares of Voting Common Stock, Non-Voting Common Stock and Capital Stock (Preferred) which are held by persons or entities who do not own a licensed pharmacy or who have not made purchases of at least $500,000 during the preceding fiscal year may have their shares redeemed, at the option of the Company at a price determined in accordance with the Company's By-laws and Certificate of Incorporation, and generally equal to (i) with respect to shares of Voting Common Stock and Non-Voting Common Stock, the net book value per share, less amounts owed by the Shareholder (directly or indirectly) to the Company, plus declared and unpaid dividends, and (ii) with respect to Capital Stock (Preferred), the par value of such shares, less amounts owed by the Shareholder (directly or indirectly) to the Company, plus any declared and unpaid preferred stock dividends thereon. A subscriber in this offering will be subject to the minimum annual purchase requirement for the Company's current fiscal year, pro-rated to reflect the portion of the Company's fiscal year during which a subscriber is a shareholder of the Company. Although the net book value per share of the Company's capital stock has increased over the past ten years, there can be no assurance that net book value will continue to increase. Shares of Voting Common Stock, Non-Voting Common Stock and Capital Stock (Preferred) held by a Stockholder who (directly or indirectly) is indebted to the Company with respect to any amounts which are more than 180 days past due may also be called for redemption, with the price determined in the manner set forth above (with any such amounts otherwise payable reduced by the amount of the Stockholder's indebtedness to the Company).

As a component of the minimum purchase obligations set forth in the Company's By-laws and Certificate of Incorporation and described above, an investor in this Offering is required, as a condition to its subscription for Voting Common Stock, to agree to make and pay for purchases from the Company, during each of the five (5) fiscal years of the Company beginning with the fiscal year commencing April 1, 2016 (the "Five Fiscal Year Period"), of generic pharmaceutical products having an aggregate purchase price of not less than $100,000 (the "Minimum Generic Purchase Requirement"). The $100,000 Minimum Generic Purchase Requirement is not intended to increase the aggregate dollar amount of the minimum purchase requirements set forth in the Company's By-laws and Certificate of Incorporation. Upon any default of the Minimum Generic Purchase Requirement, the Company may elect to redeem and repurchase the shares of Voting Common Stock held by the investor upon written notice given within one hundred eighty (180) days following the conclusion of any of year during the Five Fiscal Year Period. The purchase price for any repurchase of Voting Common Stock pursuant as a result of a failure to meet the Minimum Generic Purchase Requirement shall be equal to the lesser of (i) the amount originally paid by the investor to purchase the shares of Voting Common Stock from the Company, or (ii) the book value per share of Voting Common Stock as of the last day of the fiscal year for which the Minimum Generic Purchase Requirement was not met, as determined by the Company's independent auditors. The purchase price for any repurchase of Voting Common Stock upon a failure to meet the Minimum Generic Purchase Requirement shall be increased by the amount of any previously declared and unpaid dividends, and reduced by any amounts owed by the shareholder to the Company.

The Company's Board of Directors is not required to cause the Company to repurchase the shares of Common Stock at any time. Investors should not expect to have their shares of Common Stock repurchased at any time. See, "DESCRIPTION OF SECURITIES".

5

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30,
Description: Exhibit A - Kinney Declaration, Page 19 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02,
Description: Exhibit A-1 - Claim 281, Page 14 of 41

**Patronage Dividends Uncertain; Significant Investment in Fairfield, New Jersey Distribution Center May Reduce Patronage Dividends**

As a cooperative corporation, the Company may, at the discretion of the Board of Directors, pay pro-rata patronage dividends to its shareholders based on their purchases from the Company during a given period. A prospective investor is unlikely to receive significant return on his investment unless such investor conducts substantial business with the Company. In addition, if the Company's retained earnings in any year are not sufficient to establish adequate reserves, the Board of Directors may determine not to pay any patronage dividends. Patronage dividends have been paid annually since 1986, but were not paid for a number of years before that time. There can be no assurance that patronage dividends will be paid at any time in the future or, if paid, will be at levels similar to those previously paid. The significant investments the Company has made and is continuing to make in connection with the opening of its second distribution center in Fairfield, New Jersey are expected to reduce the amounts otherwise payable as patronage dividends for the Company's next few fiscal years. See "BUSINESS; THE COMPANY; PROPERTIES". In addition, if a subscriber elects to pay for a portion of his subscription by the delivery of a promissory note in the form attached hereto as Exhibit C, and the promissory note is not repaid in full by the subscriber on or prior to the earlier of (i) six months following its date of issuance, or (ii) March 22, 2017, the subscriber will not be deemed to have earned any patronage dividend payable with respect to periods on or prior to March 31, 2017, and will waive any rights with respect thereto. See, "BUSINESS"; "THE COMPANY"; "DIVIDEND POLICY".

**Dependence on Certain Suppliers**

The Company purchases its pharmaceutical and other products from a number of manufacturers. Manufacturers generally offer drugs to all wholesale distributors on substantially similar terms with discounts for larger volume orders. Nearly all patented pharmaceutical products are only available from one manufacturer, the loss of any one of which might adversely affect the Company's business. The Company does not currently anticipate that it will be unable to purchase any pharmaceutical product, since the Company may purchase such products from other wholesalers. See, "BUSINESS"; "THE COMPANY; OVERVIEW".

**Increase in Generic Pharmaceuticals**

The increased availability of generic pharmaceuticals has reduced the Company's revenues on branded pharmaceuticals, as patent protection expires and lower-priced generic versions of those products are introduced to the market. In recent years, patent protection has expired on a number of high volume, high priced pharmaceuticals, which has reduced the Company's revenue from the sale of those branded products. However, the Company has been successful in increasing the volume of its generic product sales, and its customer base, which has offset the reduction in revenue from branded products. The sale of generic products, with higher margins, produces increased profits for the Company. The expiration of patent protection also increases the competition by vendors of generic pharmaceuticals, which can result in retailers purchasing from multiple sources, thus reducing the loyalty of the Company's customer base. The Company believes it has implemented effective strategies to deal with the increasing availability of generic pharmaceuticals, but there can be no assurance that those strategies will be fully effective to counter the reduced revenue and increased competition that results from increasing availability of generic pharmaceuticals. See, "BUSINESS"; WHOLESALE DRUG

6

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 20 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 15 of 41

### Dependence on Certain Customers; Dependence on Metro Markets

For the nine month period ended December 31, 2015, approximately 51% of the Company's sales were to its 15 largest customers. Further, approximately 25% of the Company's total sales were to customers who were not also shareholders of the Company. During its fiscal year ended March 31, 2015, approximately 47% of the Company's sales were to its 15 largest customers, including approximately 25% of the Company's sales to a group of affiliated entities. In addition, during such fiscal year approximately 23% of the Company's total sales were to customers who were not also shareholders of the Company. In recent years the percentage of Company sales represented by the Company's largest customers has increased, and this trend may continue. The loss of any significant customer could have a material adverse effect on the Company's business and results of operations. In addition, the Company's sales in the Metro Markets has increased significantly in recent years, in total dollar volume and as a percentage of the Company's total sales. Between fiscal year 2011 and fiscal year 2015, the percentage of the Company's overall sales volume from customers in the Metro Markets has increased from approximately 51.5% to approximately 72%, and is expected to continue to increase. While the Company believes that its opening of the Metro Markets distribution center will allow it to continue to expand its market share within the Metro Markets and better serve the needs of its existing customers, there can be no assurance that the Company will be able to further expand its presence in the Metro Markets or otherwise capitalize on the significant investment associated with the Metro Markets distribution center.

### Regulatory Compliance

Wholesale drug distributors are subject to licensing and regulatory requirements by federal and state government agencies. Failure to obtain proper licenses or to comply with applicable regulations could result in fines or penalties to the Company, or loss of licenses. In recent years, compliance with DEA and other regulations, including "Know Your Customer" requirements, has become more costly and administratively burdensome. Although the Company has a compliance program with strict record keeping to monitor ongoing compliance, any failure of compliance would have a material adverse effect on the Company and its operations. See, "BUSINESS"; "THE COMPANY"; "REGULATORY MATTERS".

### No Minimum Aggregate Subscription Amount

This Offering has no minimum aggregate subscription amount. Accordingly, if subscriptions for less than the full amounts offered hereby are received, the Company will not refund amounts subscribed for or tendered. In that event, the Company may need to seek alternative methods of financing and there can be no assurance that such financing would be available or, if available, would be on terms acceptable to the Company. In addition, if subscriptions for less than the aggregate amount offered are received, expenses of the Offering will not decrease. As such, the percentage of gross proceeds of the Offering used to pay the expenses of the Offering will increase. See, "DESCRIPTION OF SECURITIES".

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 21 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 16 of 41

## Broad Discretion in Application of Proceeds

All of the net proceeds of this Offering will be used for general working capital purposes. Accordingly, the Company's management will have broad discretion as to the application of such proceeds. See, "USE OF PROCEEDS".

## BUSINESS

## Wholesale Drug Industry Generally

Total wholesale drug industry revenues in the United States have increased steadily, from an estimated $11.9 billion in 1981 to approximately $350 billion in 2014, according to the Director of the Healthcare Distribution Management Association. This growth has occurred principally due to the aging of the nation's population, escalation of hospital costs with resultant emphasis on outpatient treatment, and the proliferation of both pharmaceutical products and retail outlets for such products. The Company believes that the wholesale drug business is not significantly affected by general economic cycles.

Wholesale drug distributors have increased their share of the total sales of pharmaceutical products. Industry sources estimate that the wholesale distributors' share of the pharmaceutical market increased from approximately 45% in 1974 to 91.4% in 2014. The Company has benefited from this trend as manufacturers and customers increasingly have relied upon the distribution capabilities of drug wholesalers to make a consistent supply of products available to retail outlets. By doing so, manufacturers reduce costs by relying on distributors rather than shipping small quantities to many customers.

Drug stores, hospitals and other pharmaceutical retailers have a continuing need for the immediate availability of a wide variety of health care products without the high cost of carrying large inventories. Many of these retailers have been turning to wholesale distributors to take advantage of rapid delivery, more support services and competitive prices. Customers can generally place smaller orders and receive more rapid delivery from wholesale distributors than from manufacturers, thereby reducing the customer's inventory carrying costs. The industry trend toward increased automation and computerization have led drug wholesalers to develop a variety of information processing services. Furthermore, full service distributors such as the Company offer a broad range of products from many manufacturers and a variety of marketing and management services generally not available from manufacturers.

In recent years, there has been a trend toward consolidation in the wholesale drug industry, as evidenced by the purchase of smaller distributors by major wholesalers. In addition, the growth of hospital buying groups, proprietary hospital chains, mass merchandisers and drugstore chains has created a demand for wholesalers with wide geographic distribution capabilities to serve various locations. Smaller wholesalers, like the Company, must compete with larger wholesalers to offer competitive prices and services, operating efficiencies and marketing programs. At present, the Company's primary competition includes three national wholesale drug companies, each of which has sales in excess of $90 billion annually. The Company competes against each of these competitors in all of the markets it serves.

8

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 22 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 17 of 41

The wholesale drug industry generally, and the Company in particular, have been significantly impacted by the increasing availability of generic pharmaceuticals. Upon expiration of patent protection on branded pharmaceuticals, generic versions of those products are introduced to the market, at substantially reduced prices. This results in an immediate decrease in the dollar volume of sales by pharmaceutical wholesalers. In addition, while there is little price differential among suppliers of branded pharmaceuticals, there is substantial variability in the price at which generic pharmaceuticals can be purchased from competing vendors. This variability in price can cause retailers to purchase generic pharmaceuticals from multiple sources. In recent years, patent protection has expired on a number of high-volume, high-priced branded pharmaceuticals. The Company has been able to offset the reduction in revenue from branded products through strong growth in its customer base and in its overall quantity of pharmaceutical products sold.

## The Company

### Overview

The Company is a wholesale distributor of pharmaceutical and other products, principally to independent pharmacies and drug stores. Over 21,000 different products, including prescription and over-the-counter drugs, health and beauty aids, sundries and home health care equipment are distributed from the Company's current distribution center located in Rochester, New York. The Company serves over 1,200 independent pharmacies and home health care dealers in New York, Pennsylvania, New Jersey, Connecticut and Ohio. In addition, the Company is seeking to expand its distribution to include independent pharmacies and home health care dealers in Massachusetts, Delaware, Maryland, and Vermont.

The Company purchases from and distributes the merchandise of about 600 suppliers including every major manufacturer in the industry. The Company's largest suppliers are Pfizer, Glaxo SmithKline, Astrazeneca, Teva Pharmaceuticals, Eli Lilly, Gilead Sciences, Inc., Janssen Pharmaceuticals, Insys Therapeutics, Merck, and Bristol Myers. For the nine months ended December 31, 2015, non-shareholder customers accounted for 25% of the Company's net sales. During the fiscal year ended March 31, 2015 non-shareholder customers accounted for an aggregate of approximately 23% of the Company's net sales. See, "RISK FACTORS - DEPENDENCE ON CERTAIN CUSTOMERS; DEPENDENCE ON METRO MARKETS". The Company is highly dependent on its largest customers, with its single largest customer (consisting of a group of affiliated entities) accounting for approximately 25% of the Company's net sales during the fiscal year ended March 31, 2015.

### Customers

During the past several years, the Company has achieved significant growth in its customer base in downstate New York, Long Island, New Jersey, Connecticut and the Philadelphia area (the "Metro Markets"). During 2015, the Company opened a second distribution center in Fairfield, New Jersey to allow it to better serve and expand its customer base in the Metro Markets. See "BUSINESS; THE COMPANY; PROPERTIES".

The Company's force of 19 regular sales persons maintains frequent personal customer contacts. The Company owns one delivery van and owns approximately 29 cars, used for

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 23 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 18 of 41

deliveries, by its sales force and members of management. The majority of the Company's deliveries are accomplished through contract carriers. The Company's current and anticipated distribution centers are located to enable RDC to fill substantially all orders at night, and deliver the next business morning, allowing customers to replenish pharmacy inventory on a daily basis.

In addition to supplying pharmaceutical and over-the-counter products to its customers, the Company also provides both shareholder and non-shareholder customers with merchandising assistance, store management computer programs, advice and assistance as to store layouts, promotions, store opening programs, durable medical equipment programs and cooperative advertising programs, pricing and marketing strategies.

The Board of Directors has authorized the Company to make loans to independent pharmacies for a variety of needs, to encourage the success of independent pharmacies. Over the past ten years, the Company has loaned funds to pharmacies to provide assistance ranging from computerization of inventory and records, covering cash flow shortfalls, promoting store openings and renovation and stocking of new pharmacies. As of December 31, 2015, the Company had outstanding loans in an aggregate amount of $10,179,574 to 105 pharmacies, which loans are due to be repaid in one to three years with interest at interest rates per year equal in most cases to the prime rate plus up to 2%. As collateral for these loans, the Company generally takes a security interest in personal property of the borrowing pharmacies and receives personal guarantees from its principals.

### IT Systems

The Company's primary system platform is based on IBM's midrange computers formerly known AS/400, now called Power Systems. The Company maintains computer systems and back-ups at its distribution centers. The Company utilizes an Enterprise Resource Planning (ERP) system for both warehouses, order entry system for both warehouses, and the Warehouse Management System (WMS) for the Rochester warehouse.

The Company maintains a Disaster Recovery Plan which is implemented in the event of a system failure at one of its distribution centers.

SSI Schaefer has become a valuable partner to RDC. SSI Schaefer is the world's leading supplier of high-quality automated systems for warehouse production and picking. Their systems installed in both warehouses have allowed the Company's operations to grow with great efficiency and have facilitated marketplace expansion.

Approximately 98% of the Company's orders are placed by means of electronic order entry via a specialized web interface, direct electronic interchange with pharmacy systems, or mobile scanning equipment. The balance of orders are processed manually by phone, handheld modems, or facsimile. All orders are received at the Rochester facility, and then sent to the appropriate warehouse for fulfillment.

To comply with FDA's supply chain requirements as outlined in the Drug Supply Chain Security Act of 2013 (DSCSA), the Company partnered with TraceLink, a firm that manages a large cloud-based Track and Trace network of pharmaceutical manufacturers and distributors on Amazon's Web Services platform. To date, over 70% of the Company's pharmaceutical

10

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 24 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 19 of 41

manufacturers have integrated their electronic Advance Ship Notices (ASN's) to the TraceLink network. The remaining 30% are uploaded manually from paper documents captured at Receiving.

### Employees

At December 31, 2014, the Company employed approximately 165 persons in a variety of skilled and unskilled positions. RDC considers its relations with employees to be good. The Company sponsors a defined contribution 401(k) Retirement Plan for the benefit of its full-time employees. Employees are eligible to participate in the Plan after one year of service with the Company. This Plan allows the participating employee to defer a portion of their compensation, subject to Internal Revenue Code limitations. The Company's policy is to match employee contributions at 100 percent, up to a maximum of 5% of eligible compensation. In addition, the Company has in prior years voluntarily distributed bonuses to its employees based upon Company profits. The Company is not obligated to continue such payments by any formal agreement, and can modify or discontinue such payments at any time.

### Optisource

The Company is a member of OptiSource, LLC, an industry buying group that focuses on generic pharmaceuticals. There are currently 13 members of OptiSource. RDC and other members of OptiSource make purchases from suppliers, based upon pricing and other terms (including supply levels, payment terms, and return policies) negotiated by OptiSource for the benefit of its members. The suppliers pay to OptiSource fees based on the sales and other criteria made to OptiSource members by the generic pharmaceutical supplier, and OptiSource makes distributions to its members. The business and affairs of OptiSource are managed by the President of OptiSource in consultation with a five (5) member Operating Committee. Laurence Doud, the Company's Chief Executive Officer, serves on OptiSource's Operating Committee. Under its membership agreement, the Company is entitled to distributions, if any are declared, based on its purchases. The amount and timing of distributions, if any, by OptiSource to its members are subject to approval by the OptiSource President and the Operating Committee, and a 2/3 vote of its members. The distribution that the Company received from OptiSource for its fiscal year ended March 31, 2015 is reflected in the Company's financial statements attached hereto as Exhibit A. The Company believes that its participation as a member of OptiSource can help in its efforts to address the financial effects of increasing volumes of generic pharmaceuticals.

### Quality Care

The Company owns an approximately 0.3% interest in Pharmacy Productions, Inc., a voluntary organization which does business as Quality Care Pharmacies ("Quality Care"). Quality Care is owned by the Company and by approximately 310 member pharmacies. Additionally, there are approximately 300 affiliated member pharmacies, which do not hold an ownership interest. Quality Care was organized to provide independent pharmacies with a common marketing identity, group advertising, promotional activities, and group purchasing, including a rebate program under which Quality Care members earn up to an additional 5% on generic purchases. Laurence Doud, the Company's Chief Executive Officer, has been, since its inception, President of Pharmacy Productions, Inc. and is a permanent member of its Board of

11

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 25 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 20 of 41

Directors. All Quality Care pharmacies are customers of the Company who make minimum purchases from the Company of $50,000 per month, or $6,000 per month in generic pharmaceuticals. Approximately 87% and 88% of the Company's net sales for the nine months ended December 31, 2015, and for the fiscal year ended March 31, 2015, respectively, were to Quality Care pharmacies. Quality Care receives payments from the Company in amounts equal to 0.25% of purchases by the Quality Care pharmacies from the Company, plus the generic rebate described above. Those payments totaled $12,495,278 and $8,441,246 for the fiscal years ended March 31, 2015 and March 31, 2014, respectively. Those payments totaled $10,536,553 and $9,345,642 for each of the nine month periods ended December 31, 2015 and December 31, 2014, respectively.

### Wholesale Alliance

RDC is also a founding member and owns approximately 14.7% of the Wholesale Alliance, LLC, which conducts business as Pharmacy First, and is a national group of independent regional pharmaceutical wholesalers. Wholesale Alliance, LLC owns a subsidiary, Third Party Station, which services and handles third party billing for members of Wholesale Alliance, LLC. Pharmacy First also provides services to its participating independent pharmacies through the development of market share incentive programs that provide members the ability to earn performance-based rebates directly from Pharmacy First.

### Legal Proceedings

The Company is a party to various legal actions arising out of the normal course of its business, including collection matters. In addition, the Company is sometimes subject to investigations and information subpoenas conducted or issued by various governmental or regulatory agencies. The Company believes that the ultimate resolution of those actions and proceedings will not have a material adverse effect on its financial position, results of operations or its liquidity.

### Financial Statements

The financial statements attached as Exhibit A to this Memorandum include the unaudited financial statements as of and for the nine months ended December 31, 2015. The financial statements of RDC as of and for the years ended March 31, 2015 and 2014, included in this Confidential Summary Offering Statement, have been audited by Deloitte & Touche LLP, independent auditors, as stated in their report appearing herein. Potential investors are urged to review the unaudited interim financial statements and the audited financial statements (together with the notes thereto) in their entirety.

### Financing

On December 10, 2014, The Company entered into an Amended and Restated Credit Facility Agreement (the "Credit Facility Agreement") with Manufacturers and Traders Trust Company, as agent for itself and certain other lenders ("M&T Bank" or the "Bank"). The Credit Facility Agreement was amended on January 21, 2016. Pursuant to the Credit Facility Agreement, as amended, the Company may borrow, subject to certain limitations, up to $215,000,000. The Credit Facility Agreement provided for interest equal to the prime rate

12

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 26 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 21 of 41

announced from time to time by M&T Bank or, at the Company's option, at various LIBOR interest rates plus 1.50%. The Credit Facility Agreement terminates October 31, 2018 unless an event of default occurs prior to that date. As of December 31, 2015, the Company had borrowings of $140,000,000 at LIBOR interest rates with an effective rate of 1.94%. The Credit Facility Agreement also requires the payment by RDC of certain administrative fees and unused line fees to the Bank. As of December 31, 2015, taking into account the limitations contained in the Credit Facility Agreement, the Company was authorized to borrow $185,000,000, of which $140,000,000 was outstanding under the Revolving Line of Credit. The Company's borrowings from M&T Bank are secured by the Company's accounts receivable, inventory and equipment.

As of March 31, 2015 and March 31, 2014, the Company has on deposit from its shareholders and others affiliated with the Company a total of approximately $5,162,258 and $5,508,338, respectively. These amounts represent general unsecured obligations of the Company. The Company uses these funds for general working capital. The Company pays interest quarterly based upon a variable rate of .5% below the Company's borrowing rate on its bank debt.

### Competition

The wholesale drug business is very competitive and almost all drug stores, including pharmacies served by the Company, buy regularly from at least two wholesale drug distribution companies. The Company faces strong competition in both price and service from national, regional and local full-line, short-line and specialty wholesalers, service merchandisers, and from manufacturers engaged in direct distribution.

The Company's principal market is independent pharmacies. Throughout the Company's market areas and much of the United States, drug store ownership is increasingly concentrated in large chains, which negotiate volume discounts with manufacturers and large wholesalers. Hospital pharmacies and nursing homes frequently form cooperatives, which negotiate terms for purchases from wholesalers and drug manufacturers. In the Rochester, New York area, for example, three hospital and nursing home buying organizations dominate the sales to hospitals and institutions. The Company's competitive strategy includes focusing on independent pharmacies, frequency of personal contacts with customers, speed and accuracy of service, meeting price competition and providing ancillary services to members and other customers.

### Regulatory Matters

The Company's distribution center is licensed by the U.S. Food and Drug Administration ("FDA"), and the U.S. Department of Justice, Drug Enforcement Administration ("DEA"). Additionally, the Company is licensed by state regulatory authorities and pharmacy boards for the states in which it operates, and each state into which it ships pharmaceutical products. Its operations are subject to the regulatory jurisdiction of various federal and state agencies, including the FDA, DEA, the U.S. Department of Agriculture, the Environmental Protection Agency, the Occupational Safety and Health Administration and state pharmacy boards. Like other wholesale drug distributors, the Company is subject to a variety of requirements, including guidelines on storage, handling and records maintenance and, with respect to controlled substances, specific labeling, packaging and record keeping requirements. The Company maintains a compliance program with strict record keeping to monitor ongoing compliance, and

13

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 27 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 22 of 41

believes it is in compliance with each of these regulations.

*Dividend Policy*

The Company's Preferred Stock bears a non-cumulative preferred dividend of 5% per year. No dividend may be declared or paid for any fiscal year on the Company's Voting or Non-Voting Common Stock until provision is made for payment of the preferred dividend.

The patronage dividend is calculated annually based upon the Company's earnings during the most recently concluded fiscal year. Once the aggregate amount of the patronage dividend pool has been established, it is allocated to the Company's shareholders based upon their purchases. The Company had insufficient earnings from which to pay dividends in a number of years prior to 1986, but has paid a patronage dividend in each year since 1986.

Approximately 76% of the Company's sales during the fiscal year ended March 31, 2015 were to holders of its Voting Common Stock, which own or operate a licensed pharmacy. Shareholders are eligible to receive distributions when, as and if declared by the Board of Directors of the Company, in amounts related to the shareholder's purchases of pharmaceutical and other products from the Company and payments to the Company for other services. These distributions, known as "patronage dividends", totaled $31,068,406. The largest patronage dividend paid to a single shareholder for the fiscal year ended March 31, 2015 was $10,567,921.

The following table sets forth the aggregate patronage dividends paid during the past five years:

| Fiscal Year Ended March 31, | Patronage Dividend | Patronage Dividend As Percentage of Each Shareholder's Purchases From RDC |
|---|---|---|
| 2011 | $8,600,000 | 1.73% |
| 2012 | $12,398,418 | 2.00% |
| 2013 | $14,178,971 | 2.16% |
| 2014 | $19,400,000 | 2.10% |
| 2015 | $31,068,406 | 2.00% |

There can be no assurance that funds will be available to pay patronage dividends in any year. To the extent that such funds are available, a shareholder can increase its patronage dividend by increasing its purchases from the Company. For the fiscal year ended March 31, 2015, the Company's overall profitability increased due to expanding geographic markets, particularly in the Metro Markets, increased purchases by new shareholders, stricter control of selling, general and administrative expenses, and increased generic sales. Certain of these positive factors were offset by the loss of sales of products for which patent protection expired, increased delivery expenses and the continued closure of independent pharmacies and sales of independent pharmacies to national retailers. There can be no assurance that these factors will not continue to exist and impact the Company's profitability and its ability to pay patronage

14

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 28 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 23 of 41

dividends.

In 2015, the Company opened a second distribution in Fairfield, New Jersey to allow it to expand its market share in and better serve the needs of its existing client base within that Metro Markets. The acquisition, retrofitting, and equipping of the Metro Markets distribution center cost approximately $30,000,000. These costs, together with the additional ongoing operating expenses related to payroll, occupancy, utilities, other leasing costs and the funding of working capital needs, are anticipated to negatively affect the Company's net profitability, and thus its ability to pay patronage dividends at rates consistent with the prior five (5) years, during the initial period following commencement of operations at the Metro Markets distribution center. When the Company commenced operations at the Metro Markets distribution center, it anticipated that its net profits would decrease during at least the first three fiscal years following its geographic expansion, and that the aggregate amount available to pay patronage dividends would thus be reduced for its fiscal years ended March 31, 2016, March 31, 2017 and March 31, 2018. There can be no assurances of any particular level of profitability or that any amounts will be available to pay patronage dividends for any period.

If a subscriber in this Offering elects to pay for a portion of his Voting Common Stock by delivering to the Company a promissory note in the form attached hereto as Exhibit C, the subscriber will be deemed to be a shareholder of the Company upon making partial payment and delivery to the Company of the promissory note, the related pledge agreement and stock power (in the form attached hereto as Exhibit D), and the Subscription Agreement, and as such will be entitled to receive patronage dividends based upon its purchases from the time it becomes a shareholder. However, in the event the promissory note is not repaid in full by the subscriber on or prior to the earlier of (i) six months following its date of issuance, or (ii) March 22, 2017, the subscriber will not be deemed eligible to receive any patronage dividend previously paid or payable with respect to periods on or prior to March 31, 2017 and will waive any rights with respect thereto. The Company will have certain rights as a secured creditor pursuant to the pledge agreement.

Pursuant to its Certificate of Incorporation and Bylaws and to the fullest extent permitted by law, the Company is expressly authorized to offset against and reduce the amount of any patronage dividends otherwise payable to a stockholder who, directly or through entities controlled by the stockholder, is indebted to the Company with respect to amounts more than 60 days past due.

*Properties*

**Rochester Distribution Center:**

RDC owns an approximately 67,000 square foot office and warehouse/distribution facility located at 50 Jet View Drive, Rochester, New York. The building contains a separate narcotics vault and cage constructed and maintained in accordance with DEA standards.

The Company moved to its Rochester distribution center location in early 2001.

The Rochester facility is located on approximately 11 acres in the Jet View Business Park in Chili, New York. The facility includes a 55,000 square foot warehouse with 24-foot ceilings,

15

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 29 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 24 of 41

together with approximately 12,000 square feet of office space. The building also includes a 19,000 square foot mezzanine level over a portion of the space, constituting additional warehouse space. There is sufficient additional real property to allow for future expansion of the facility. The warehouse in this facility is state of the art and includes an automated conveyor system, which is currently in the process of being enhanced. The first floor of the warehouse of this facility stores items that represent a substantial percentage of the Company's sales, and the mezzanine is arranged for "open stock picking". In addition, all invoices and labels are printed at the staging area. Moreover, the Company makes use of radio frequency technology throughout its warehouse operations. The Company has installed a state-of-the-art voice directed warehousing and picking system to maximize the productivity, speed, quality control and accuracy of its warehouse operations including stocking inventory and filling customer orders, and has further expanded its warehousing efficiency through the installation of an SSI computer-driven automated conveyor system. The Company has installed a new emergency generator and associated automatic transfer switch, distribution panel, and wiring to address its emergency power and data center backup power needs. The Company believes its facility improvements greatly modernize the Company's processes and efficiencies, will allow the Company to further increase its sales volume and capacity, and will assist the Company in its efforts to achieve continued growth in its existing markets.

### Metro Markets Distribution Center:

During the past several years, the Company has achieved significant growth in its customer base in downstate New York, Long Island, New Jersey, Connecticut and the Philadelphia area (the "Metro Markets"). Between fiscal year 2011 and fiscal year 2015, the percentage of the Company's overall sales volume attributable to customers in the Metro New York Market has grown from approximately 51.5% to approximately 72%, and is expected to continue to increase. The Company's sales to customers located in the Metro Markets for the first nine months of its current fiscal year were approximately $1,426,000,000 compared to approximately $1,183,000,000 for the first nine months of the prior fiscal year, representing an increase of approximately 20.5%.

Because of the distance between its Rochester distribution center and the Metro Markets, the Company faced increasing challenges in delivering products on a timely and cost effective basis to customers in the Metro Markets. In response, the Company purchased a building in Fairfield, New Jersey in July, 2014 and opened its Metro Market distribution center at that location in July, 2015, thus allowing the Company to better serve and expand its customer base in the Metro Markets. The new facility is approximately 106,000 square feet. The acquisition, retrofitting, and equipping of the Metro Markets distribution center cost approximately $30,000,000. The opening and testing phase of the new facility started in late July, 2015. Approximately 40 Metro customers agreed to be part of the beta testing phase, which was completed in January, 2016. There are now approximately 600 customers serviced out of the Metro Markets facility. The Company believes that a Metro Markets distribution center will allow it to better serve the needs of its existing client base within the Metro region, as well as geographical expansion into additional markets. The Company is working to use excess capacity created at the Rochester distribution center as a result of the opening of the Metro Markets distribution center by strongly pursuing new sales opportunities in Ohio and Pennsylvania.

16

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 30 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 25 of 41

## USE OF PROCEEDS

The Company estimates net proceeds of the offering to be approximately $41,500, after deduction of legal fees, accounting fees, and other expenses in the aggregate amount of approximately $958,460, and assuming that all of the shares of Voting Common Stock offered hereby are sold. The Company intends to use the net proceeds of the offering for general working capital needs, as determined in the discretion of the Board of Directors.

## DIRECTORS AND OFFICERS

The Company is managed by a nine-person Board of Directors elected by the shareholders of the Company. Directors serve for three-year terms and three members of the Board are elected annually. Each Director must be a shareholder, and must own or operate a licensed pharmacy.

The Directors elect the President, Vice President, Secretary, Treasurer and any other officers the Directors consider necessary. The President and Vice President must be members of the Board of Directors. Directors are compensated at the rate established from time to time by the Board of Directors, and currently fixed at $1,500 for each Board meeting attended, plus $100 per committee meeting attended, and $100 for anyone traveling more than two hundred miles to attend the meeting. The composition of the Company's committees as of the date of this memorandum is as described below. Committee composition is determined by the Board of Directors annually at its July meeting.

Directors and Executive Officers of the Company are as follows:

| Name | Age | Title | Term Expires |
|------|-----|-------|--------------|
| Donald Arthur Jr. 47 Da Vinci Court Williamsville, NY 14221 | 55 | Director | June 2016 |
| Joseph Brennan 177 Red Cedar Drive Rochester, NY 14616 | 52 | Chief Operating Officer | N/A |
| Christopher K. Casey 6 Quoin Crescent Victor, NY 14564 | 60 | Director | June 2018 |
| Laurence F. Doud, III 18 Melbourne Green Fairport, NY 14450 | 72 | Chief Executive Officer, Secretary and Treasurer | N/A |
| Stephen Giroux | 58 | President | June 2016 |

17

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 31 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 26 of 41

| Name | Age | Title | Term Expires |
|------|-----|-------|--------------|
| 9034 Ridge Road<br>Gasport, NY 14067 | | | |
| Sherwood Klein<br>5 Lincoln Drive<br>PO Box 832<br>Ellicottville, NY 14731 | 60 | Vice President | June 2017 |
| Richard Klenk<br>8770 Haley Court<br>Clarence Center, NY 14032 | 70 | Director | June 2018 |
| Joseph Lech<br>13 Rockledge Lane<br>Tunkhannock, PA 18657 | 57 | Director | June 2017 |
| Boris Mantell<br>118 Urban Street<br>Brooklyn, NY 11235 | 71 | Director | June 2017 |
| J. Scott Miskovsky<br>8 Fourth Street<br>Vandling, PA 18421 | 65 | Director | June 2018 |
| Garry Mrozek<br>8303 Misty Ridge Trail<br>Poland, Ohio 44514 | 56 | Director | June 2016 |
| Paul Pagnotta<br>283 Beaver Dam Road<br>Selkirk, NY 12158 | 46 | Chairman | Ex Officio |
| Kim M. Perry<br>6954 Benedict Beach<br>Hamlin, NY 14464 | 64 | Chief Financial Officer | N/A |

Donald Arthur, Jr. serves as a Director of the Company. Mr. Arthur was elected to the Company's Board of Directors in 1998 and has previously served as the Company's Chairman of the Board of Directors and as its President. He is an owner of Black Rock Pharmacy and the Brighton Eggert Pharmacy in Buffalo, New York. Mr. Arthur serves on the Company's Bank Committee, and serves as Chairman of the Accounts Receivable Committee.

Joseph Brennan has served as the Company's Chief Operating Officer since June, 2013.

18

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 32 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 27 of 41

From August 2003 to June 2013, Mr. Brennan served as General Manager of the Company. Prior to that, Mr. Brennan served as Director of Business Development/Trade Relations from August 1999 to August 2003, as Director of Sales from 1995 to 1999, and as a Sales Representative from 1992 to 1995. Before joining the Company, Mr. Brennan worked for Goldline Laboratories as a territory sales manager.

Christopher K. Casey serves as a Director of the Company. He has served three prior terms as the Company's President and Chairman of the Board of Directors. Mr. Casey has served on the Company's Board of Directors for all but three years since 1989. Mr. Casey is owner, President and pharmacist of Mead Square Pharmacy in Victor, New York. Mr. Casey is also part owner of Alberty Drug in Batavia, New York. Mr. Casey serves on the Company's Insurance, Banking and Nominating Committees.

Laurence F. Doud, III was elected Chief Executive Officer, Secretary and Treasurer of the Company in May 1991. From July 1987 to that time, Mr. Doud served as General Manager of the Company. Prior to that time, Mr. Doud was Vice President of Sales for Cardinal Health, Inc. and a predecessor company for eleven years. Mr. Doud serves on the Company's Executive, Insurance, Audit, Nominations, and Accounts Receivables Committees, and on its Banking and Investments Committee.

Stephen Giroux is currently serves as President and has served on the Company's Board of Directors since June 1995. Mr. Giroux has twice previously served as the Company's Chairman of the Board of Directors and as its President. Mr. Giroux is a partner in Middleport Family Health Center, Transit Hill Pharmacy, Summit Park Pharmacy, Lockport Home Medical, Rosenkrans Pharmacy, Thee Barker Store, Wurlitzer Family Pharmacy, Inc., Oakfield Family Pharmacy, Inc., and Hilton Family Pharmacy, all in western New York State. Mr. Giroux is a past President of the National Community Pharmacists Association. He serves on the Company's Accounts Receivable Committee, Executive and Audit Committees.

Sherwood Klein currently serves as Vice President and is a member of the Board of Directors. He has previously served as the Company's President and as its Chairman of the Board of Directors. Mr. Klein has served on the Company's Board of Directors since 1993. He is a pharmacist and owns, in partnership, Ellicottville Pharmacy in Ellicottville, New York. He is Chairman of the Company's Insurance Committee, and also serves on the Nominating, Executive and Audit Committees.

Richard Klenk currently serves as a Director on the Company's Board of Directors. He has served as a director since June, 1994 and has previously served as the Company's President and Chairman of the Board. He serves on the Company's Accounts Receivables Committee. He is a partner in Summit Park Pharmacy in Niagara Falls, New York.

Joseph Lech has been a Board member since 2007. He has previously served as the Company's President and Chairman of the Board. He is the principal owner of the Lech's Pharmacy Group, a six pharmacy chain located in Wyoming, Sullivan, Bradford and Lackawanna counties in Pennsylvania. He serves on the Company's Insurance Committee.

Boris Mantell has served on the Company's Board of Directors since June, 2014. Mr. Mantell is a partner in and operates Elm Drugs and Elm Health Chelsea, in Manhattan. He is

19

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 33 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 28 of 41

actively involved in PSSNY and has served as that organization's president and chairman. Mr. Mantell has also served as president and chairman of the New York City Pharmacist Society. Mr. Mantell serves on the Company's Tote Committees.

J. Scott Miskovsky was appointed to the Board in 2002. He is the Company's first Director from outside New York State. He is the owner of Red Cross Pharmacy in Forest City, Pennsylvania. He has previously served as the Company's President and Chairman of the Board. Mr. Miskovsky serves on the Company's Accounts Receivables and Nominations Committees.

Garry Mrozek has served on the Company's Board of Directors since June, 2014. Mr. Mrozek is chief executive officer of Hometown Pharmacy Solutions, which has retail and compounding divisions in Northeast Ohio and Western Pennsylvania, and owns and manages long-term care pharmacies. Mr. Mrozek founded Hometown Pharmacies in 1999 after an extensive career in the banking industry. Mr. Mrozek serves on the Company's Banking and Tote Committees.

Paul Pagnotta is currently Chairman, and a member of the Board of Directors, and has served on the Board since 2011. He was the Company's first Board member from the eastern portion of New York State. Mr. Pagnotta owns, in partnership, Four Corners Pharmacy in Delmar, New York. He serves on the Executive, Audit, and Insurance Committees.

Kim M. Perry, CPA, has served as the Company's Chief Financial Officer since 2009, and has over 30 years of experience as a controller and CFO in various industries, as well as broad finance and accounting experience.

Mr. Doud, the Company's Chief Executive Officer, has an employment agreement, dated effective as of April 1, 2014, which extends for a term through March 31, 2019.

Mr. Brennan, the Company's Chief Operating Officer, has an employment agreement, dated effective as of April 1, 2013, which extends for a term of four years through March 31, 2017.

## DESCRIPTION OF SECURITIES

The Company has authorized 570,000 shares of capital stock, of which (i) 60,000 shares are Voting Common Stock with a par value of $5 per share, (ii) 10,000 shares are Non-Voting Common Stock with a par value of $.01 per share, and (iii) 500,000 shares are Preferred Stock with a par value of $5 per share. Only shares of the Company's Voting Common Stock are offered hereby. As of the Record Date for the Stock Dividend described below, the Company had issued and outstanding 262 shares of Voting Common Stock, 138 shares of Non-Voting Common Stock, and 124,208 shares of Preferred Stock. The net book value per common share of the Company's Common Voting Stock as of March 31, 2015 was $34,546. On a pro forma basis, after giving effect to the Stock Dividend described below, the net book value per common share as of March 31, 2015 would have been reduced to $17,273. The Company only calculates book value per common share at the conclusion of each fiscal year. As such, the actual net book value per common share as of the date of this Confidential Summary Offering Statement may be higher or lower than $17,273.

20

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 34 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 29 of 41

## Stock Dividend

On February 16, 2016, the Company declared a stock dividend (the "Stock Dividend"), payable in the form of RDC's non-voting common stock, equal to one share of new non-voting common stock for each issued and outstanding share of voting common stock as of March 15, 2016 (the "Record Date") and one share of new non-voting common stock for each share of non-voting common stock issued and outstanding as of the Record Date. On the Record Date, there were 262 shares of voting common stock and 138 shares of non-voting common stock issued and outstanding. Accordingly, on the Record Date, the Company issued a total of 400 new shares of non-voting common stock, consisting of (i) an additional 262 shares of non-voting common stock, representing the dividend on the then-outstanding shares of voting common stock, and (ii) an additional 138 shares of non-voting common stock, representing the dividend on the then-outstanding shares of non-voting common stock. The additional shares of non-voting common stock were issued to shareholders of record on March 29, 2016. Immediately following the issuance of the new shares of non-voting common stock, there were 262 shares of the Company's voting common stock and 538 shares of non-voting common stock issued and outstanding.

As a result of the Stock Dividend, the total number of shares of the Company's common stock (consisting of voting common stock and non-voting common stock) has been doubled and, accordingly, the Company's net book value per share of common stock has been reduced by half. The Company calculates its net book value per share only once per year, following the completion of its fiscal year. As of March 31, 2015, the completion of the Company's last fiscal year, the Company's net book value per common share was $34,546 per share. On a pro forma basis, had the Stock Dividend been completed as of March 31, 2015, the net book value per common share would have been reduced to $17,273 per share.

## Voting Common Stock; Non-Voting Common Stock.

The Company's Voting Common Stock and Non-Voting Common Stock have the following rights and privileges:

### Voting

Each holder of the Company's Voting Common Stock is entitled to one vote in the election of directors and one vote in all other matters submitted to the shareholders. Holders of Non-Voting Common Stock do not have any voting rights, except as otherwise provided by law.

### Preemptive Rights

The holders of the Company's Common Stock do not have any preemptive right to acquire any additional shares issued by the Company.

### Ownership and Minimum Purchase Requirements

Holders of the Company's Voting Common Stock are required to own a licensed pharmacy and are required pursuant to the Company's Certificate of

21

Case 2-20-20230-PRW,  Doc 480-1,  Filed 07/10/20,  Entered 07/10/20 11:16:30,
Description: Exhibit A - Kinney Declaration, Page 35 of 45

Case 2-20-20230-PRW,  Doc 1793-1,  Filed 02/15/23,  Entered 02/15/23 20:18:02,
Description: Exhibit A-1 - Claim 281, Page 30 of 41

Incorporation and By-laws to make minimum annual purchases from the Company of at least $500,000. A shareholder who fails to meet these ownership and/or minimum purchase requirements is subject to redemption, as described below. The Subscription Agreement required to be delivered by an investor in this offering will provide that an investor in this Offering is required, as a condition to its subscription for Voting Common Stock, to agree to make and pay for purchases from the Company, during each of the five (5) fiscal years of the Company beginning with the fiscal year commencing April 1, 2015 (the "Five Fiscal Year Period"), of generic pharmaceutical products having an aggregate purchase price of not less than $100,000 (the "Minimum Generic Purchase Requirement"). The $100,000 Minimum Generic Purchase Requirement is a component of, and is not intended to increase, the aggregate dollar amount of the minimum purchase requirements set forth in the Company's By-laws and Certificate of Incorporation.

### Dissolution

Upon dissolution of the Company, after payment of the Company's debts and provision has been made for the retirement of the Company's Preferred Stock at its par value and accruals thereon and other fixed obligations, if any, held by holders of Common Stock, then the holders of Voting and Non-Voting Common Stock are entitled to receive the net assets remaining in accordance with applicable law.

### Redemption; Right of First Refusal

The Company's Certificate of Incorporation and By-Laws provide that the Company may redeem any Voting Common Stock or Non-Voting Common Stock owned by (a) a shareholder who does not, as of the date his Voting Common Stock is called for redemption, own a licensed pharmacy or (b) a shareholder who has made from the Company during the previous fiscal year no purchases or purchases amounting to less than $500,000. Such shares may be redeemed at net book value, less amounts owed to the Company directly or indirectly by such shareholder, plus previously declared and unpaid dividends. In addition, the Company has the right to purchase at net book value, less any amounts owed by a shareholder to the Company, plus declared and unpaid dividends, any Voting Common Stock presented for transfer. Shares of Voting Common Stock and Non-Voting Common Stock held by a shareholder who (directly or indirectly) is indebted to the Company with respect to any amounts which are more than 180 days past due may also be called for redemption, with the price determined in the manner set forth above (with any such amounts otherwise payable reduced by the amount of the shareholder's indebtedness to the Company). The Company may also refuse to consent to the transfer of any Voting Common Stock or Non-Voting Common Stock if the proposed transferor is indebted to the Company.

Upon any default by an investor in this Offering of the Minimum Generic Purchase Requirement described above, the Company may elect to redeem and repurchase the shares of Voting Common Stock held by the investor, upon written notice given within one hundred eighty (180) days following the conclusion of any of year during the Five Fiscal Year Period. The purchase price for any repurchase

22

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 36 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 31 of 41

of Voting Common Stock pursuant as a result of a failure to meet the Minimum Generic Purchase Requirement shall be equal to the lesser of (i) the amount originally paid by the investor to purchase the shares of Voting Common Stock from the Company, or (ii) the book value per share of Voting Common Stock as of the last day of the fiscal year for which the Minimum Generic Purchase Requirement was not met, as determined by the Company's independent auditors. The purchase price for any repurchase of Voting Common Stock upon a failure to meet the Minimum Generic Purchase Requirement shall be increased by the amount of any previously declared and unpaid dividends, and reduced by any amounts owed by the shareholder to the Company.

### *Dividends; Patronage Dividends*

In accordance with the Company's Certificate of Incorporation, the Company may pay dividends of up to 8% on its Voting Common Stock. These dividends may only be declared and paid after payment of accrued dividends on Preferred Stock.

In addition, as a co-operative corporation, the Company is also authorized to return earnings to its shareholders based upon their patronage of the Company, in the form of "patronage dividends". After establishment of reserve funds, the Company may distribute its earnings and savings in the form of stock, cash or evidence of indebtedness, or in savings proportionately and equitably among shareholders on the basis of the amount of sales or other services rendered to or by such shareholders as determined from time to time by the Board of Directors. The Board's current policy on such "patronage dividends", and information regarding the right to receive or retain patronage dividends by subscribers who deliver promissory notes in payment of the purchase price for Voting Common Stock, is described under the heading "DIVIDEND POLICY". Pursuant to its Certificate of Incorporation and Bylaws and to the fullest extent permitted by law, the Company is expressly authorized to offset against and reduce the amount of any patronage dividends otherwise payable to a stockholder who, directly or through entities controlled by the stockholder, is indebted to the Company with respect to amounts more than 60 days past due.

## Preferred Stock

### *Voting*

The holders of the Company's Preferred Stock do not have any voting rights, except as otherwise provided by law.

### *Preemptive Rights*

The holders of the Company's Preferred Stock do not have any preemptive right to acquire any additional shares issued by the Company.

---

23

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30,
Description: Exhibit A - Kinney Declaration, Page 37 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02,
Description: Exhibit A-1 - Claim 281, Page 32 of 41

### Dividend Rights

The Preferred Stock bears a non-cumulative preferred dividend of 5% per year. No dividend may be declared or paid for any fiscal year on the Company's Voting or Non-Voting Common Stock until provision is made for payment of the Preferred dividend.

### Dissolution

Upon dissolution of the Company, the holders of Preferred Stock are entitled to receive the $5 par value per share and accrued non-cumulative dividends at the rate of 5% of the par value per annum until the date of retirement of their shares, before the payment of any amounts to the holders of Common Stock.

### Redemption; Right of First Refusal

The Preferred Stock may be called for redemption by the Company's Board of Directors at any time, upon 30 days' prior notice, at its par value, plus unpaid dividends, less amounts owed to the Company by the shareholder. Shares of Preferred Stock held by a shareholder who (directly or indirectly) is indebted to the Company with respect to any amounts which are more than 180 days past due may also be called for redemption, at the par value of such shares, less amounts owed by the Shareholder (directly or indirectly) to the Company, plus any declared and unpaid preferred stock dividends thereon. In addition, the Company has a right of first refusal to purchase at par value, plus declared and unpaid dividends, less amounts owed to the Company, any preferred stock presented for transfer. The Company may also refuse to consent to the transfer of any Preferred Stock if the proposed transferor is indebted to the Company.

## ADDITIONAL INFORMATION

The Company will give prospective investors access to such additional information as they reasonably request in writing. Notwithstanding the foregoing, the Company will not disclose any information concerning its operations, which it believes to be proprietary, or the public disclosure of which would harm its competitive position.

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 38 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 33 of 41

## Index To Exhibits

Exhibit A        Unaudited Financial Statements for the Nine Months Ended December 31, 2015 and Audited Financial Statements for the Fiscal Years ended March 31, 2015 and 2014

Exhibit B        Form of Subscription Agreement

Exhibit C        Form of Promissory Note

Exhibit D        Form of Pledge Agreement and Irrevocable Proxy (with Stock Power)

Exhibit E        Certificate of Incorporation and By-laws, each as amended to date

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 39 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 34 of 41

# EXHIBIT 2

Case 2-20-20230-PRW,   Doc 480-1,   Filed 07/10/20,   Entered 07/10/20 11:16:30,
Description: Exhibit A - Kinney Declaration, Page 40 of 45

Case 2-20-20230-PRW,   Doc 1793-1,   Filed 02/15/23,   Entered 02/15/23 20:18:02,
Description: Exhibit A-1 - Claim 281, Page 35 of 41

 United States Department of Justice

U.S. Attorneys » Southern District of New York » News » Press Releases

**Department of Justice**

U.S. Attorney's Office

Southern District of New York

FOR IMMEDIATE RELEASE

Thursday, April 2, 2020

# Manhattan U.S. Attorney Announces Settlement Of Fraudulent Billing And Kickback Lawsuit Against Compounding Pharmacies And Owners

Geoffrey S. Berman, the United States Attorney for the Southern District of New York, Lt. Gen. Ronald J. Place, Director of the Defense Health Agency of the U.S. Department of Defense ("DoD"), Scott J. Lampert, Special Agent in Charge of the New York Regional Office of the U.S. Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), Michael Mikulka, Special Agent-in-Charge of the Office of Investigations, Labor Racketeering and Fraud, of the U.S. Department of Labor, Office of Inspector General ("DOL-OIG"), and Thomas W. South, Deputy Assistant Inspector General for Investigations of the U.S. Office of Personnel Management, Office of Inspector General ("OPM-OIG"), announced today that the United States has filed a lawsuit and simultaneously settled civil healthcare fraud claims against FPR SPECIALTY PHARMACY LLC and MEAD SQUARE PHARMACY, INC. ("MEAD SQUARE" and together, the "Pharmacies"), and their owners, CHRISTOPHER K. CASEY and WILLIAM RUE (collectively, "Defendants"), for their submission of fraudulent claims for reimbursement to federal healthcare programs for compounded prescription drugs in violation of the False Claims Act and the Anti-Kickback Statute. Specifically, as alleged in the Government's complaint, the Pharmacies sold prescription drugs to federal healthcare program beneficiaries in states in which the Pharmacies were not licensed, improperly induced patients to purchase expensive custom compounded medications by waiving all or part of the substantial co-payments required under the federal healthcare programs, and paid sales representatives per-prescription commissions to illegally induce more prescriptions to be written. In connection with the settlement agreements, which were approved today by U.S. District Judge Paul A. Engelmayer, Defendants agreed to pay a total of $426,000, and admitted to and accepted responsibility for the conduct alleged in the complaint. The amounts paid by Defendants under the settlements are based on the Office's assessment of their ability to pay based on the financial information they provided.

Manhattan U.S. Attorney Geoffrey S. Berman said: "Pharmacies, like other participants in the healthcare industry, must follow the rules. The defendants here brazenly flouted basic rules on licensing and kickbacks to line their pockets with dollars from federal healthcare programs. That is a prescription for intervention by my Office and our partners."

According to the complaint filed in Manhattan federal court:

During the relevant period, from 2011 through 2015, the Pharmacies dispensed a compounded prescription analgesic cream known as Focused Pain Relief from their facility in Victor, New York, to patients around the country. Many of the Pharmacies' patients were beneficiaries of federal healthcare programs such as TRICARE, Medicare, federal employee workers' compensation programs overseen by DOL, and the Federal Employee Health Benefit Program. CASEY and RUE co-owned and managed FPR SPECIALTY PHARMACY, while CASEY owned and managed MEAD SQUARE, for which RUE also worked for a time.

The rules governing federal healthcare programs require pharmacies dispensing prescriptions to their members to be licensed with the appropriate state authorities in order to request reimbursement for the cost of the medications. The Pharmacies violated the False Claims Act by dispensing and requesting reimbursement for hundreds of prescriptions of Focused Pain Relief dispensed to federal healthcare program beneficiaries located in states where the Pharmacies were not licensed to operate by the appropriate state authorities, and by failing to disclose that they were not licensed. The Pharmacies also violated the False Claims Act by billing federal healthcare programs for prescriptions dispensed in states in which they had obtained their state licenses under false pretenses, including by failing to inform state authorities that they had previously dispensed drugs in the states without a license and by failing to disclose CASEY's criminal history on pharmacy license applications.

In addition, the Pharmacies violated the Anti-Kickback Statute by engaging in two separate illegal practices. First, the Pharmacies regularly charged federal healthcare program beneficiaries co-payments substantially below program requirements (which often exceeded $100) in order to induce them to purchase expensive prescriptions of Focused Pain Relief, for which the federal healthcare programs paid hundreds and sometimes thousands of dollars each. And second, the Pharmacies often paid illegal kickbacks to their sales representatives in the form of sales commissions tied to the number of Focused Pain Relief prescriptions written by the physicians to whom each representative marketed.

As part of the settlement agreements, Defendants agreed and accepted responsibility for the following:

- The Pharmacies sold prescriptions to customers covered by federal healthcare programs who were located in several states in which they were not licensed or no longer licensed by the relevant state pharmacy boards to operate as out-of-state mail-order pharmacies or otherwise sell prescription drugs to residents of those states.

- The Pharmacies did not disclose, in connection with their applications to state pharmacy boards, which were usually signed by CASEY, when they had previously sold mail-order prescription drugs to residents of those states where the Pharmacies either were not licensed or had license applications pending but were not yet licensed.

- The Pharmacies often did not charge customers who were covered by federal healthcare programs the required co-pays or coinsurance payments mandated by those programs for prescription drugs, in connection with their sales of Focused Pain Relief to those customers.

- The Pharmacies entered into agreements with independent sales agents and distributors to solicit physicians to prescribe Focused Pain Relief. These agreements, which were often signed by RUE, generally provided that the Pharmacies would pay the sales agents and distributors specific sums as sales commissions for each prescription of Focused Pain Relief prescribed by a physician assigned to the particular agent or distributor. The Pharmacies actually paid their sales agents and distributors sales commissions on a per-prescription basis, in accordance with these agreements.

As part of today's settlement, MEAD SQUARE also entered into a corporate integrity agreement with HHS-OIG, through which it agreed to implement compliance measures and submit to monitoring.  FPR SPECIALTY PHARMACY dissolved in 2016.

In connection with the filing of the lawsuit and settlement, the Government intervened in a private whistleblower lawsuit that had been filed under seal pursuant to the False Claims Act.

Mr. Berman thanked DoD, HHS-OIG, DOL-OIG, and OPM-OIG for their assistance with the case.

The case is being handled by the Office's Civil Frauds Unit.  Assistant United States Attorney Jean-David Barnea is in charge of the case.

---

**Attachment(s):**
Download 16cv5204_fpr-casey_settlement_stipulation_4.2.20.pdf
Download 16cv5204_rue_settlement_stipulation_4.2.20.pdf
Download fpr_complaint_in_intervention_-_signed.pdf

**Topic(s):**
False Claims Act
Health Care Fraud

**Component(s):**
USAO - New York, Southern

**Contact:**
James Margolin, Nicholas Biase
(212) 637-2600

**Press Release Number:**
20-102

Updated April 2, 2020

# EXHIBIT 3

Case 2-20-20230-PRW,   Doc 480-1,   Filed 07/10/20,   Entered 07/10/20 11:16:30,
Description: Exhibit A - Kinney Declaration, Page 44 of 45

Case 2-20-20230-PRW,   Doc 1793-1,   Filed 02/15/23,   Entered 02/15/23 20:18:02,
Description: Exhibit A-1 - Claim 281, Page 39 of 41

**From:** "ckshade3@gmail.com" <ckshade3@gmail.com>
**Date:** June 19, 2020 at 2:58:41 PM EDT
**To:** Garry Mrozek <garry.mrozek@thehometownpharmacies.com>
**Cc:** donald arthur <donaldarthurjr@gmail.com>, stephen giroux <girouxmf@gmail.com>, Richard Klenk <rxklenk@roadrunner.com>, BORIS MANTELL <rxtsar@aol.com>, J Miskovsky <scott@rcrx.com>, joseph lech <jplrph@me.com>, Paul Pagnotta <Paul@4crx.com>, "John T. Kinney" <jkinney@rdcdrug.com>, Chris Masseth <CMasseth@rdcdrug.com>
**Subject:** Thoughts

Dear All,

I just want to take a moment to thank you all for years of friendships, guidance and discussions as we all did our best to lead RDC to the best of our abilities. I appreciate the professionalism that each of you brought to the table and the friendships that came with it. I certainly will miss this as it has been a large portion of my life. Best wishes bringing this to its unfortunate conclusion.
I am sorry that along the way my debt to RDC became a part of the problem. I am actively pursuing the sale of each of my pharmacies, to help with my obligation to RDC. My career is not ending in the fashion I had planned on but I too need to move on from all the stresses that the last 4 years have brought.
Again, I leave with respect for you all, Thanks for allowing me to part of your lives.

"May your troubles be less and your blessings be more, and nothing but happiness come through your door"

Slan Leat

Chris

Case 2-20-20230-PRW, Doc 480-1, Filed 07/10/20, Entered 07/10/20 11:16:30, Description: Exhibit A - Kinney Declaration, Page 45 of 45

Case 2-20-20230-PRW, Doc 1793-1, Filed 02/15/23, Entered 02/15/23 20:18:02, Description: Exhibit A-1 - Claim 281, Page 40 of 41

**C O U R T   D O C K E T**

| 20-20230 | 65-1 | 7/30/2020 | ACH |
|----------|------|-----------|-----|
| CASE NO. | DOCKET NO. | DATE RETRIEVED | RECEIVED BY |